UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
WHITE PLAINS DIVISION

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS,<br><br>                            Plaintiff,<br><br>v.<br><br>THE UNITED STATES MILITARY ACADEMY AT WEST POINT; THE UNITED STATES DEPARTMENT OF DEFENSE; LLOYD AUSTIN, in his official capacity as Secretary of Defense; CHRISTINE WORMUTH, in her official capacity as Secretary of the Army; LIEUTENANT GENERAL STEVEN GILLAND, in his official capacity as Superintendent of the United States Military Academy; and LIEUTENANT COLONEL RANCE LEE, in his official capacity as Director of Admissions for the United States Military Academy at West Point,<br><br>                            Defendants. | No. _____<br><br>**<u>VERIFIED COMPLAINT</u>** |

Plaintiff, Students for Fair Admissions, brings this civil action for declaratory and injunctive relief against Defendants and alleges as follows:

## INTRODUCTION

1.      The United States Military Academy, or West Point, is one of the crown jewels of the American military. It has trained the future leaders of the United States Army since 1802, producing some of our nation's most revered generals.

2.      West Point's mission is "to educate, train, and inspire" future Army officers "for a career of professional excellence and service to the Nation as an officer in the United States Army." *The U.S. Military Academy at West Point*, perma.cc/LM2A-BGH8.

3.      For most of its history, West Point has evaluated cadets based on merit and achievement. For good reasons: America's enemies do not fight differently based on the race of the

commanding officer opposing them, soldiers must follow orders without regard to the skin color of those giving them, and battlefield realities apply equally to all soldiers regardless of race, ethnicity, or national origin. To that end, President Truman desegregated the military well before other institutions followed suit. *See* Executive Order 9981 (July 26, 1948) ("[T]here shall be equality of treatment and opportunity for all persons in the armed forces without regard to race, color, religion, or national origin.").

4.      Over the past few decades, however, West Point has strayed from that approach. Instead of admitting future cadets based on objective metrics and leadership potential, West Point focuses on race. In fact, it openly publishes its racial composition "goals," and its director of admissions brags that race is wholly determinative for hundreds if not thousands of applicants.

5.      West Point has no justification for using race-based admissions. Those admissions are unconstitutional for all other public institutions of higher education. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 143 S. Ct. 2141 (2023) ("*SFFA*"). The Academy is not exempt from the Constitution. *See, e.g.*, *Crawford v. Cushman*, 531 F.2d 1114, 1120 (2d Cir. 1976) ("A succession of cases in this circuit and others ha[s] reiterated the proposition that the military is subject to the Bill of Rights and its constitutional implications."). And its calls for blind judicial deference to the military on questions of racial discrimination are "'gravely wrong,'" both legally and historically. *SFFA*, 143 S. Ct. at 2162 n.3 (discussing the overruling of *Korematsu v. United States*, 323 U.S. 214 (1944)).

6.      Because West Point discriminates on the basis of race, its admission policy should be declared unlawful and enjoined.

## PARTIES

7.      Plaintiff, Students for Fair Admissions, is a voluntary membership organization formed for the purpose of defending human rights and civil liberties, including the right of individuals to equal protection under the law, through litigation and any other lawful means. SFFA is a nonprofit

membership group of tens of thousands of individuals across the country who believe that racial preferences in college admissions, including the academies, are unfair, unnecessary, and unconstitutional. SFFA has members who are ready and able to apply to the United States Military Academy.

8.      Defendant United States Military Academy at West Point is a military service academy created under federal law and operating under the command and supervision of the Department of the Army and Department of Defense. The Academy and its leadership are responsible for creating and executing its admissions policies for prospective cadets, including the policy at issue here.

9.      Defendant United States Department of Defense is an executive agency headquartered in Washington, D.C., and is responsible for all aspects of the military, including the policy at issue here.

10.     Defendant Lloyd Austin is the Secretary of Defense and is responsible for all aspects of the military, including the policy at issue here. Secretary Austin is sued in his official capacity.

11.     Defendant Christine Wormuth is the Secretary of the Army and oversees all Army operations and policies, including the policy at issue here. Secretary Wormuth is sued in her official capacity.

12.     Defendant Lieutenant General Steven Gilland is Superintendent of West Point and responsible for the creation, implementation, and oversight of all West Point policies, including the policy at issue here. General Gilland is sued in his official capacity.

13.     Defendant Lieutenant Colonel Rance Lee is Director of Admissions at West Point and responsible for the creation, implementation, and oversight of all West Point admissions policies, including the policy at issue here. Lieutenant Colonel Lee is sued in his official capacity.

## JURISDICTION & VENUE

14.     This Court has subject-matter jurisdiction over this case because it arises under the Constitution and laws of the United States. *See* 28 U.S.C. §1331.

15.     Venue is proper because a substantial part of the events or omissions giving rise to the claims occurred here. *See* 28 U.S.C. §1391(b).

16.     The Academy cannot invoke sovereign immunity. Federal courts routinely apply the APA's waiver of sovereign immunity to constitutional claims. *See, e.g.*, *Standage v. Braithwaite*, 526 F. Supp. 3d 56, 86 (D. Md. 2021) (explaining, in a Fifth Amendment case against the Naval Academy, that "the §702 waiver encompasses qualifying claims arising under non-APA authority"); *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 775 (7th Cir. 2011) ("[T]he waiver in §702 is not limited to claims brought pursuant to the review provisions contained in the APA itself." (collecting cases)). The military and its service academies meet the APA's definition of "agency." *See, e.g.*, *Doe v. Hagenbeck*, 870 F.3d 36, 45 (2d Cir. 2017).

## BACKGROUND

### I.     West Point's Admissions Process

17.     Appointment (*i.e.*, "admission") to the academies involves two stages: First, applicants must pass medical examinations and a physical-fitness test and secure a "nomination" from a member of Congress, the Vice President, or the President. Applicants who satisfy the requirements for the first step are considered "qualified" for admission. Second, after securing a nomination, applicants must be accepted by the academy's admissions office. West Point's racial preferences kick in at the second stage, once applicants have received a qualifying nomination.

18.     Admission to West Point is highly selective: in the most recent class, fewer than ten percent of applicants were given the honor of joining the Long Gray Line. *See* West Point Public Affairs, *Class of 2027 to Enter West Point*, (June 21, 2023), perma.cc/4QY3-5BK6.

19.     The Academy enrolls between 1,200 to 1,300 cadets in each class. *See, e.g.*, West Point Public Affairs, *Class of 2026 to Enter West Point*, (June 22, 2022) perma.cc/ZP2Z-XHQ8 ("[m]ore than 1,200 cadets").

20.     ***Congressional Nominations.*** Representatives and senators have statutory authority to nominate their constituents for admission to West Point. *See* 10 U.S.C. §7442(a). Legislators have unfettered discretion in how they allocate those nominations. However, each senator and congressman can have no more than five nominees attending the Academy at any given time. *See* §7442(a)(3)-(4). "Most members of Congress" stagger their vacancies to ensure that they have "one open vacancy" at West Point each year. Senator Mark Warner, *Academy Admissions*, perma.cc/787E-Y22V.

21.     Members can nominate up to ten of their constituents for consideration for each vacancy. §7442(a). According to West Point, "[t]he majority of the Members of Congress use a competitive nomination process, whereby 10 candidates are named to compete for a single vacancy," and the Academy's admissions office chooses which nominee to offer admission. United States Military Academy, *Admissions Frequently Asked Questions (FAQs)*, perma.cc/8ZXS-ECZK.

22.     Congressional nominees "account for approximately three-fourths" of each incoming class. *Congressional Nominations*, United States Military Academy at West Point, perma.cc/U64Q-FFY5.

23.     ***Vice Presidential Nominations.*** Unlike members of Congress, who are authorized to nominate applicants from their home districts, the Vice President can nominate any U.S. citizen for admission to West Point. *See* 32 C.F.R. §575.3. Like members of Congress, the Vice President has unfettered discretion in how she allocates her nominations, but she cannot have more than five nominees enrolled at West Point at any one time. *Id.*

24.     Accordingly, Vice Presidential nominees "normally" fill only "one or two" seats in each incoming class. *Service Academy Nomination Process*, The White House, perma.cc/A7Q6-FTSP.

25.     ***Presidential (Service-Connected) Nominations.*** Presidential nominations occur automatically. They are awarded to active-duty servicemembers, or to the children of servicemembers who have either served at least eight consecutive years on active duty; served in the military reserves for the equivalent of eight active-duty years; or formally retired from military service and meet the

requirements for retirement pay benefits (*e.g.*, servicemembers who are 100% disabled, servicemembers who were killed in action, etc.). *See* 32 C.F.R. §575.3(b)(1).

26.     One hundred seats are reserved for presidential nominees for each incoming class at all three major service academies. *See* 32 C.F.R. §575.3. If qualified applicants secure both a congressional nomination and a presidential nomination, they can still be admitted if the admissions committee selects them from among the applicant pool for the latter category. The Academy does not publicly report the number of applicants who apply under these circumstances each year.

## II.     West Point's Racial Preferences in Admissions Decisions

27.     West Point openly states that "[t]he United States Military Academy is fully committed to affirmative action." *Cadet Consumer Information/Right to Know*, United States Military Academy at West Point, perma.cc/H38P-JY3J.

28.     That "commitment" plays out across all areas of the Academy's admissions policy. West Point sets benchmarks for the percentage of each class that should be filled by "African Americans," "Hispanics," and "Asians," and it meticulously tracks its compliance with those figures down to a tenth of a percentage point. These racial benchmarks vary by year, based on the ever-shifting demographics of the enlisted ranks. In other words, the Academy openly attempts "to balance the Corps" of cadets by setting "desired percentages … of blacks, Hispanics, and other minorities" for each incoming class. U.S. Government Accountability Office, *Military Academy: Gender and Race Disparities* 13 (Mar. 17, 1994) ("USMA GAO Report"). "Targets for minorities at the U.S. Military Academy are set by its superintendent." United States Department of Defense, Office of the Undersecretary of Defense for Personnel and Readiness, *Career Progression of Minority and Women Officers*, (1999), perma.cc/5KM5-KUL9.

29.   The following chart, entitled "Class Composition Comparison" and briefed to the Academy's Board of Visitors by then-Director of Admissions Colonel Deborah McDonald,[1] provides an inside look at West Point's racial balancing efforts:

**UNITED STATES MILITARY ACADEMY WEST POINT — Class Composition Comparison**

| CLASS | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Population % |
|---|---|---|---|---|---|---|---|
| | | Final Class Admitted Numbers (2015-2020) | | | | | |
| African Americans # Admitted (Goal) | 10.7% 135 (12-15%) | 8.6% 104 (12-15%) | 9.5% 112 (12-15%) | 13.9% 169 (11-13%) | 15.1% 190 (>14%) | 13.8% 180 (>14%) | US – 13.1% Officer – 13.2% Enlisted – 22.5% |
| Hispanics #Admitted (Goal) | 9.6% 123 (9-12%) | 8.6% 103 (9-12%) | 11.7% 128 (9-12%) | 10.1% 122 (9-12%) | 9.7% 123 (>11%) | 9.3% 121 (>11%) | US – 16.9% Officer – 7.0% Enlisted – 13.5% |
| Asians #Admitted (Goal) | 6.1% 96 (4-6%) | 7.1% 86 (4-6% | 7.1% 86 (4-6%) | 7.8% 94 (4-6%) | 8% 99 (>5%) | 9.2% 120 (>5%) | US – 5.1% Officer – 4.9% Enlisted – 2.5% |
| Women #Admitted (Goal) | 16.6% 212 (14-20%) | 15.9% 192 (14-20%) | 15.8% 188 14-20%) | 21.8% 264 (>20%) | 22% 278 (>20%) | 21.7% 282 (>20%) | US – 50.8% Officer – 16.5% Enlisted – 13.0% |
| Scholars #Admitted (Goal) | 34.7% 437 (>30%) | 33.9% 404 (>30%) | 35% 418 (>30%) | 38.4% 465 (>30%) | 35.9% 454 (>30%) | 35.9% 468 (>30%) | |
| Leaders #Admitted (Goal) | 22.2% 280 (>25%) | 25.5% 304 (>25%) | 27.3% 326 (>25%) | 22.9% 277 (>25%) | 25.5% 322 (>25%) | 24.2% 315 (>25%) | |
| Athletes #Admitted (Goal) | 15.9% 200 (18-23%) | 18.5% 221 (18-23%) | 17.5% 210 (18-23%) | 21.5% 260 (>23%) | 21.1% 266 (>23%) | 22.0% 287 (>23%) | |
| Soldiers #Admitted (Goal) | 6.2% 74 (>7%) | 8.5% 102 (>7%) | 10.8% 129 (>7%) | 7.6% 92 (>7%) | 6.5% 82 (>5%) | 5.9% 77 (>5%) | |
| Class Size | 1261 | 1192 | 1193 | 1212 | 1262 | 1302 | 33 |

*See 2017 Annual Report*, United States Military Academy Board of Visitors, 56, https://perma.cc/ER6V-5PRY ("Class Composition Chart"). The briefing on admissions occurred as part of a broader presentation from senior Academy officials—including West Point's then-Commandant, Lieutenant General Robert Caslen—to the Board of Visitors on March 9, 2017. *See id.* at 9-16, 42-56.

30.   As the Class Composition Chart makes clear, West Point considers any enrollment rate lower than its racial benchmarks to be a failure, even when a racial or ethnic group's percentage

[1] McDonald retired in early 2023, and was replaced by her longtime Deputy Director of Admissions, Lieutenant Colonel Rance Lee.

of the incoming class exceeds its percentage in the population at large. For example, West Point's benchmark for African Americans in the Class of 2020 was "[greater than] 14%," even though only 13.1% of U.S. citizens are African American.[2] West Point believes that, because African Americans are overrepresented in the enlisted ranks (at 22.5%), they needed to be overrepresented among cadets, too. And because African Americans comprised only 13.8% of the matriculating class, the chart highlighted African American enrollment in red, indicating that the Academy had failed to meet its goal. (The Class Composition Chart does not mention white applicants.)

31.     During the briefing, McDonald informed the Board of Visitors that although the admissions period for the Class of 2021 was still ongoing, the admissions office "anticipate[d] that … African Americans will comprise about 15 percent" of the class, "with other demographics remaining largely the same." *Id.* at 7-8.

32.     West Point briefed similar charts to the Board of Visitors in 2018 and 2019 (the final years for which the Academy's reports to the Board are publicly available). *See 2018 Annual Report*, United States Military Academy Board of Visitors, (Jan. 9, 2019), perma.cc/Y8J2-6T3X; *2019 Annual Report*, United States Military Academy Board of Visitors, (Jan. 13, 2020), perma.cc/66LT-QVU7. For the classes of 2018-2021, the number of Hispanics enrolled in the freshman (or "plebe") class were 116, 122, 121, and 119, respectively.

33.     West Point has issued press releases describing the demographics of the incoming classes for the 2022-2027 graduation years. Those figures also reflect efforts to racially balance the incoming classes with surgical precision. For example, West Point enrolled 99 Asian Americans in the Class of 2022. *See* United States Military Academy, News Release, *Class of 2022 to Enter West Point*, June 25, 2018, perma.cc/L36Q-BX59. The number of Asian Americans enrolled in West Point's Class of

---

[2] West Point tracks the overall population in terms of U.S. citizenship because citizenship is a requirement for eligibility to commission as a military officer (and is thus a requirement for admission to service academies). *See* 10 U.S.C. §532(a)(1).

2023? Precisely 99. *See* United States Military Academy, News Release, *Class of 2023 to Enter West Point*, June 24, 2019, perma.cc/6MW6-VBEB.

34.     West Point goes to great lengths to achieve these racial-balancing goals. At a 2010 West Point Diversity Leadership Conference, McDonald told the audience that, "[a] couple of years ago, every qualified African-American applicant were [*sic*] offered admission into West Point, yet the class composition goal was still lacking." Mike Strasser, *West Point Diversity Conference Discusses Progress, Challenges in Way Ahead*, Army.Mil, (April 16, 2010), perma.cc/B344-MTM9. In another interview of the Academy's deputy director for admissions, the deputy director acknowledged that "West Point does use race as a determinant in its appointment process." Sarah Sicard, *How Affirmative Action Works at West Point*, Task and Purpose, (July 19, 2016), perma.cc/MH9E-KE2U.

35.     Race is, indeed, determinative for hundreds of applicants each year. According to the Academy itself, congressional nominees comprise roughly 75% of each incoming class, and in most cases, up to ten qualified applicants compete against one another for the single slot afforded to their Senator or Representative each year. Because skin color can be—and often is—a decisive factor for successful applicants who are chosen from those congressional nominee pools, it is equally dispositive for the other qualified nominees who are turned away. Put differently, because race is a "positive" factor for some West Point applicants, it is necessarily a "negative" factor for others. *SFFA*, 143 S. Ct. at 2169.

## III.   West Point's Flawed Justifications for Its Race-Based Admissions Practices

36.     Over the years, West Point has offered shifting justifications for its use of race in admissions. In 2003, while the Supreme Court was considering Michigan's use of racial preferences in *Grutter v. Bollinger*, 539 U.S. 306 (2003), West Point's dean of admissions told the *New York Times*: "We like to represent the society we come from in terms of the student body's undergraduate experiences. So having a diverse student body allows personal growth in areas where people may not have gotten it otherwise. We want people to understand the society they will defend." Adam Clymer, *Service*

*Academies Defend Their Use of Race in Admissions Policies*, THE NEW YORK TIMES, (Jan. 28, 2003), perma.cc/7HNU-QBGD.

37.    Although the Solicitor General declined to defend Michigan's use of racial preferences in *Grutter*, a collection of retired former military officers submitted an amicus brief arguing that racial preferences in higher education served a national security interest. *See* Brief of Julius W. Becton, Jr., et al. as Amici Curiae Supporting Respondents at 6, *Grutter v. Bollinger* 539 U.S. 306 (2003) (No. 02-241) ("Becton Brief"). Unlike West Point's then-dean of admissions, the *amici* did not argue that the racial makeup of the Army's officer corps needed to reflect society at large. They argued that racial preferences were necessary because the racial composition of the military's officer corps needed to reflect the racial composition of its enlisted corps, and that proportional representation could only be achieved through racial preferences. *Id.*

38.    *Grutter* accepted the Becton brief's assertions, without any evidence or adversarial testing. It repeated the brief's assertion that, "to fulfill its mission, the military 'must be selective in admissions for training and education for the officer corps, *and* it must train and educate a highly qualified, racially diverse officer corps in a racially diverse educational setting.'" 539 U.S. at 331 (cleaned up). And it repeated the Becton brief's conclusory argument that "[a]t present, 'the military cannot achieve an officer corps that is both highly qualified and racially diverse unless the service academies and the ROTC use limited race-conscious … admissions policies.'" *Id.* (cleaned up).

39.    After *Grutter*, West Point added the justification put forth in the Becton brief. Specifically, its new position was that the military "has a powerful interest in developing an officer corps that is prepared to lead a diverse force and that shares the diversity of the enlisted ranks *and* the general population." Br. of United States as *Amicus Curiae* in Support of Resp'ts 12, *Fisher v. Univ. of Tex. at Austin*, 136 S. Ct. 2198 (No. 14-981) (2016) (emphasis added) ("Fisher US Brief"). A report of the Military Diversity Leadership Commission stressed that "[t]he military should mirror the demographic

composition of the population it serves and that senior leaders should mirror the demographic composition of the troops they lead." Military Diversity Leadership Commission, *From Representation to Inclusion* 42, (Mar. 15, 2011), perma.cc/VR65-UFNE ("MLDC Report").

40. Under this revised formulation, statistical parity with the racial makeup of the general population is not enough. Now, racial preferences are supposedly necessary to achieve racial balance between the enlisted corps—an all-volunteer force—and the officer corps. *See, e.g.*, Br. of United States as *Amicus Curiae* in Support of Resp'ts 15, *Students for Fair Admissions v. President and Fellows of Harvard College*, -- S. Ct. --, 2023 WL 4239254, No. 20-1199 (U.S. June 29, 2023) ("SFFA US Brief") ("The military has not yet achieved its goal of building an officer corps that reflects the 'racial and ethnic composition' of the service members officers lead," because "White service members are 53% of the force but 73% of officers."); *see also id.* (listing similar statistical comparisons for black and Hispanic officers and enlisted service members).

41. This new goal is tantamount to a declaration that West Point will *never* stop using race in admissions, since the percentage of soldiers from certain racial categories who voluntarily enlist in the Army will dictate West Point's racial targets. Indeed, the Defense Department acknowledges that the "demographic makeup" of society and the enlisted force is "continually changing" and states that the military "must change" alongside it "to maintain and sustain its future forces." Department of Defense, *DoD Diversity Strategic Plan 2012-2017* 3, perma.cc/TSN2-T62L.

42. Even if the racial demographics of the officer corps do eventually mirror those of the enlisted corps, the continued use of race will be necessary to preserve that statistical parity going forward. In short, West Point's use of race "lack[s] a 'logical end point.'" *SFFA*, 143 S. Ct. at 2170.

43. As to *how* "fostering diversity at [West Point]" through racial preferences "is essential to fulfilling [the Army's] mission to defend the nation," West Point offers a scattershot of reasons devoid of evidentiary support and naked appeals to deference. They can be broadly summarized as

two propositions: (1) that racial preferences enhance the military's internal functioning; and (2) that racial preferences enhance the military's functional capacity by fostering internal confidence within the ranks and by bolstering its external legitimacy which, in turn, increases societal trust and recruitment efforts.

44.    Before the Supreme Court's decision in *SFFA*, the Academy also invoked the "educational benefits of diversity," like Harvard and UNC did in *SFFA*, as a third justification. Specifically, the Academy submitted that the racial "diversity" achieved through race-based admissions "reduc[ed] a sense of isolation and alienation" among ethnic minorities in the Corps of Cadets and "encourage[d] greater participation by minority students in the classroom." *Students for Fair Admissions v. President and Fellows of Harvard College*, No. 21-707, Tr. 145:1-146:11, (Oct. 31, 2022). Now that the Supreme Court has refused to allow colleges to justify their actions by reference to those undefined—and undefinable—"educational benefits," West Point is left with its first two justifications.

### A.    Internal Functioning and Military Readiness

45.    West Point posits several ways that racial preferences are critical to having a well-functioning Army in a pluralistic society. All of them view soldiers primarily as members of racial groups, rather than as individuals, and are grounded in the assumption that minority service members all think and feel the same way.

46.    First, West Point argues that statistical parity between the racial demographics of officers and enlisted soldiers is necessary to preserve unit cohesion and ward off racial strife within units. In support of that assertion, it highlights anecdotal incidents of racial tension among enlisted servicemembers during the Vietnam War, most of which occurred in a brief period from 1969 to 1972. That talking point, raised for the first time by the Becton brief in *Grutter* and repeated in virtually every government defense of racial preferences since, cherry-picks a few unfortunate incidents and

extrapolates them to the American military in general. At best, it is a textbook example of conflating correlation with causation.

47.    In fact, "racial animosity had been negligible within the U.S. armed forces" prior to 1967, and it has been virtually nonexistent post-Vietnam. James Maycock, *War Within War*, The Guardian (Sept. 14, 2001), perma.cc/PX5M-ELMJ. During the Korean War—just a few years after President Truman ordered desegregation in the military—"practical measures outweighed racial beliefs," and integration "failed to produce the violence or poor morale the military brass expected." Walt Napier, *A Short History of Integration in the U.S. Armed Forces*, United States Air Force (July 1, 2021), perma.cc/PYT6-SDXA. The "military brass" of that era were pro-segregation, and their predictions of "violence" and "poor morale" did not bear out. *Id.*

48.    The brief period of racial unrest that West Point retells over and over was not produced by colorblind policies. It was a tragic byproduct of broader factors: "a changing social environment, a controversial war, and new conscription strategies" that allowed wealthier Americans to escape the draft through college deferments while sending disproportionate numbers of low-income draftees to frontline combat units based on their educational backgrounds. Br. of Veterans for Fairness and Merit as *Amicus Curiae* in Support of Pet'r at 7, *Students for Fair Admissions v. President and Fellows of Harvard College*, -- S. Ct. --, 2023 WL 4239254, No. 20-1199 (U.S. June 29, 2023) ("VFM Brief"). In short, the incidents that West Point cites to justify open-ended racial preferences were the product of a "perfect storm for racial conflict" that has not existed for the past half century. *Id.*

49.    Moreover, the underlying assumption of West Point's argument is that soldiers view their peers and superiors foremost in terms of race, rather than in terms of their ability or character traits like loyalty, devotion, and selflessness. Put differently, it assumes that soldiers apply the same racial stereotypes to one another that West Point applies to them. There is no evidence to suggest that's the case, and plenty of evidence suggests that it isn't. *See generally id.*

50.     West Point makes a related argument that officers will "often fai[l] to perceive racial tensions among enlisted personnel" if the officer corps does not have the same levels of racial and ethnic diversity as the enlisted ranks. Fisher US Brief 11. That argument relies on the same misguided assumptions.

51.     Second, West Point claims that statistical parity between the racial demographics of the officer corps and those of the enlisted corps is necessary to "foster trust between the enlisted corps and its leaders." SFFA US Brief 15; *see also* Fisher US Brief 12 ("military leaders have concluded that an officer corps that shares the diversity of the enlisted ranks improves performance by 'facilitating greater confidence' in leadership"); U.S. Military Academy, *West Point, USMA Strategic Plan 2015-2021* 25, (Mar. 2015) (when class composition "reflects the population of the Army and the Nation," cadets learn "sociocultural competencies essential to multicultural leadership in the 21st century"); *Students for Fair Admissions*, No. 21-707, Tr. 145:1-146:11 (discussing military academies, Solicitor General asserts that benefits of increased racial diversity include "cross-racial understanding," which can "lead[] to positive developments with cognitive development.").

52.     The Academy has never provided evidence to support that assertion, and indeed, all available evidence says otherwise. This argument relies on crude and infantilizing stereotypes about the men and women who volunteer to serve in our armed forces, and it defies common sense. It assumes that black soldiers will be more likely to trust a black officer or a chain of command that includes black officers, that Hispanic soldiers are more likely to trust Hispanic officers, and so forth— because of their skin color, not their trustworthiness. And it completely ignores reams of evidence showing that trust between soldiers is formed through battlefield performance, and that servicemembers in war zones are more concerned with their leaders' competency than with their skin color. *See, e.g.*, VFM Brief 18 ("[T]he immutable human element of warfare requires a colorblind warrior ethos for trust, unit cohesion, and combat effectiveness.").

53.     Third, West Point broadly claims that the diversity produced by racial preferences makes Army units "more effective at accomplishing their missions." SFFA US Brief 15. It does not define what it means to be racially "diverse," nor does it provide concrete evidence that military units that choose their members based on race are more successful on the battlefield than units who select their members based on objective measures of tactical competency, regardless of skin color.

54.     In *Fisher*, the Solicitor General extrapolated on this theme and claimed that units with greater racial diversity are more capable of interacting with and understanding partner forces from international allies. *See* Fisher US Brief 12 ("Maintaining a diverse leadership corps also ensures that the military contains the cultural and racial identities necessary to better understand our partner forces."). The government did not elaborate on why it thinks that's true. Apparently, it thought it self-evident that individuals who share the same skin color also share a common "understand[ing]."

**B.      External Legitimacy and Societal Trust**

55.     West Point maintains that having an officer corps that does not reflect the racial makeup of the general population and the enlisted ranks will "undermine the military's legitimacy by fueling 'popular perceptions of racial/ethnic minorities serving as 'cannon fodder' for white military leaders." Fisher US Brief 12 (quoting MLDC Report at 15); *see also* SFFA US Brief 19 ("[G]overnment agencies that lack diversity risk losing legitimacy in the eyes of a diverse nation").

56.     Again, this conclusory statement assumes that the American people assess the "legitimacy" and trustworthiness of an institution based on its racial makeup. That notion is both un-American and devoid of any evidentiary support. To the contrary, a significantly higher percentage of Americans expressed confidence in the U.S. military three decades ago than they do today. *See* Gallup, *Confidence in Institutions,* perma.cc/DEH2-M92Y. And half of Americans now think that military leaders' over-emphasis on social justice issues and political correctness is "undermining military effectiveness." Ronald Reagan Institute, *Reagan National Defense Survey*, (Nov. 2022), perma.cc/32B9-RZTZ.

57.     Finally, West Point argues that the Army will lose "societal trust" if racial metrics be-
tween the officer and enlisted corps (and between the officer corps and society at large) are not equiv-
alent. West Point further argues that this speculative loss of societal trust could, in turn, harm recruit-
ing efforts. But today, at the apex of West Point's use of racial preferences, the Army is facing a
recruiting crisis that is unprecedented in the modern, all-volunteer era. The Army is spending hundreds
of millions of dollars to help would-be recruits satisfy basic eligibility requirements and is accepting
enlistees who were previously rejected eight different times, but it still cannot meet recruiting goals.
*See* Tom Vander Brook, *The Army Is Desperate For Smart, Fit Soldiers. How These $200M Fit Camps Get*
*Soldiers Into Shape*, USAToday (July 5, 2023), perma.cc/LXB2-2L7N.

58.     If anything, West Point's assertions about recruiting and retention are backwards. In-
depth surveys and statistical studies of the Army's personnel crisis—*i.e.,* the rigorous analyses that
West Point has failed to offer—show that the military's emphasis on non-merit factors in admissions
and promotions decisions is a leading cause of junior officer attrition. "According to 9 out of 10
respondents, more officers would stay if the military was more of a meritocracy." Tim Kaine, *Why Our*
*Best Officers Are Leaving*, The Atlantic, (February 2011), perma.cc/Y6AV-XZUC. And 71% of active
duty officers believe the military would retain more talent if opportunities were based solely on merit.
Sayce Falk & Sasha Rogers, *Junior Military Officer Retention: Challenges and Opportunities*, Kennedy Sch. of
Gov't, Harvard Univ. (2011), perma.cc/JW2V-Y24Y. To the extent that West Point's mission is to
solidify the public's trust, its race-based admissions policy shoots itself in the foot—especially since
70% of Americans agree that universities should not "be allowed" to "consider race in admissions."
Anthony Salvanto, *CBS News Poll Finds Most Americans Say Colleges Shouldn't Factor Race Into Admissions*,
CBSNews.Com, (June 21, 2023), perma.cc/PW5D-ZUAT.

59.     Flawed as they are, none of West Point's justifications for racial preferences are new.
In fact, nearly all its nebulous arguments for race-based admissions were made sixty-five years ago by

opponents of desegregation. The military segregationists' arguments—like the arguments offered by West Point—were long on racial stereotypes but short on actual evidence. Like West Point, segregation proponents argued that a colorblind military would "create difficulties 'which would be reflected in morale and military efficiency.'" President's Committee on Equality of Treatment and Opportunity in the Armed Services, *Freedom to Serve* 12, (May 22, 1950), perma.cc/C2F5-6SCD. Like West Point, they claimed that colorblind policies would degrade the military's ability to accomplish its national-defense mission. *Id.* at 49-50. And, like West Point, they warned that a colorblind approach would be inconsistent with "civilian sentiment" and pose external risks to the institution. *Id.*

60.     Truman's commission rejected all those arguments as unsupported and ideologically driven conjecture. In the process, the commission unequivocally affirmed that servicemembers should be treated as individuals in all circumstances, and that drawing inferences from a person's membership in a particular racial or ethnic group was immoral and illogical. "To put racial restrictions on job opportunities seemed to the Committee to ignore completely the essential factor of individual differences." *Id.* at 13.

**IV.    *SFFA v. Harvard***

61.     The Supreme Court held in *SFFA* that racial preferences in college admissions violate the Equal Protection Clause of the Fourteenth Amendment.

62.     Harvard and UNC both admitted to using race in admissions, but both institutions strenuously insisted that they did so in a "holistic" manner that treated race only as an optional "tip." Both institutions defended their consideration of race as necessary to further a compelling interest in "the educational benefits of diversity."

63.     The Court held both policies unconstitutional for several reasons.

64.     The Court deemed the universities' reasons for using race impermissibly vague and unmeasurable. Harvard claimed that its consideration of race was crucial for "(1) training future leaders

in the public and private sectors; (2) preparing graduates to 'adapt to an increasingly pluralistic society'; (3) 'better educating its students through diversity'; and (4) 'producing new knowledge stemming from diverse outlooks.'" *SFFA*, 143 S. Ct. at 2166. UNC made similar arguments but added a fifth justification to the list: "enhancing appreciation, respect, and empathy, cross-racial understanding, and breaking down stereotypes." *Id.*

65.     The Court held that those goals could not justify race-based admissions because they could not "be subject to meaningful review" and were thus "[in]sufficiently coherent for purposes of strict scrutiny." *Id.* Federal courts had no way of measuring the Universities' self-assessed progress toward achieving those goals. *Id.* Moreover, "[e]ven if [those] goals could somehow be measured," there was no way for courts "to know when they have been reached, and when the perilous remedy of racial preferences may cease." *Id.*

66.     The universities also "measure[d] the racial composition of their classes using the following categories," which come from the federal government: "(1) Asian; (2) Native Hawaiian or Pacific Islander; (3) Hispanic; (4) White; (5) African-American; and (6) Native American." *Id.* at 2167. But those categories are "imprecise," "arbitrary," "undefined," "opaque," and both over- and "under-inclusive." *Id.*

67.     "The Universities' main response to these criticisms [was], essentially, 'trust us.'" *Id.* at 2168. Accepting that proposition, however, would have meant forgoing any meaningful judicial review. And although the Court recognized that some "degree of deference" applies to universities' educational decisions, "deference does not imply abandonment or abdication of judicial review." *Id.*

68.     Both universities strenuously protested that, although they used race as a "positive" for certain applicants, "an individual's race is never a negative factor in admissions." *Id.* The Court found that argument "hard to take seriously." *Id.* Because "[c]ollege admissions are zero-sum," a "benefit provided to some applicants but not to others necessarily advantages the former group at the

expense of the latter." *Id.* Thus, by using race as a "positive" for some applicants, Harvard and UNC necessarily used it as a negative attribute for others.

69.     Both universities assumed that increasing the percentage of racial minorities on campus would necessarily increase other students' exposure to different ideas and perspectives. In blunter terms, their policies assumed that all racial minorities had certain views and life experiences solely because of the color of their skin. But "[o]ne of the principal reasons race is treated as a forbidden classification is that it demeans the dignity and worth of a person to be judged by ancestry instead of by his or her own merits and essential qualities." *Id.* at 2170.

70.     Neither Harvard's nor UNC's use of race had a logical end point. *See id.* at 2170-71. Neither institution could identify when they would stop using race or under what circumstances.

71.     For example, UNC defined its racial "diversity" goals in relation to the racial demographics of the general population. *See id.* at 2171-72 ("The University frames the challenge it faces as 'the admission and enrollment of underrepresented minorities,' a metric that turns solely on whether a group's 'percentage enrollment within the undergraduate student body is lower than their percentage within the general population in North Carolina.'" (cleaned up)). As the Academy does, UNC claimed that it "ha[d] not yet fully achieved its diversity-related educational goals" because it still needed to "obtain closer to proportional representation." *Id.* at 2172.

72.     The Court rejected that metric out of hand. It reiterated that "'outright racial balancing' is 'patently unconstitutional,'" because "at the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat citizens as individuals, not as simply components of a racial, religious, sexual or national class." *Id.* (cleaned up). UNC's use of race to obtain "proportional representation" in incoming classes was further unconstitutional, the Court held, because it "'effectively assur[ed] that race will always be relevant and that the ultimate goal of eliminating' race as a criterion 'will never be achieved.'" *Id.* (cleaned up).

73.     In sum, the Court held that both Universities failed strict scrutiny and their use of race was therefore unconstitutional because their "programs lack sufficiently focused and measurable objectives warranting the use of race, unavoidably employ race in a negative manner, involve racial stereotyping, and lack meaningful end points." *Id.* at 2175.

74.     In a footnote to the opinion, the Court declined to analyze the use of race by the military academies because "none of the courts below addressed the propriety of race-based admissions systems in that context." *Id.* at 2166 n.4. But *SFFA*'s reasoning makes it perfectly clear that West Point's use of race in the admissions process is unconstitutional. *Compare United States v. Windsor*, 570 U.S. 744, 778 (2013) (Roberts, C.J., dissenting) (noting that the majority opinion, which declared unconstitutional a federal definition of marriage, left open the constitutionality of "state marriage definitions")*, with Obergefell v. Hodges*, 576 U.S. 644, 662-63 (2015) (explaining that virtually every court of appeals concluded that the logic of *Windsor* also deemed the state definitions unconstitutional).

75.     The Academy has not changed its race-based admissions in light of *SFFA*. Officials at the academies told the press that "they would continue to use race as a factor while awaiting guidance from the Department of Defense"—guidance that has not been issued. Moreover, Superintendent Gilland informed the House Armed Service Committee in July that the Academy used racial "composition goals" when selecting the incoming Class of 2027.

## V.     Plaintiff and This Litigation

76.     SFFA has members who are ready and able to apply to the United States Military Academy at West Point, including Members A and B.

77.     Member A is a U.S. citizen and a senior in high school who lives in the upper midwest.

78.     He has a Grade Point Average of 3.77, near the very top of his class.

79. Member A is active in youth sports and in excellent physical condition. He receives annual physicals and has no medical condition that would prevent him from being medically qualified to attend a military academy.

80. Member A has long wanted to join the military and attend an academy. One of his grandfathers served in the military, and the other served in various law-enforcement capacities. Member A believes that it would be an honor to serve his country, like they did.

81. Member A is ready and able to apply to West Point in the fall of 2023, and he is taking all necessary steps to apply, qualify, and get nominated.

82. But Member A is white. Unless West Point is ordered to stop using race as a factor in admissions, Member A's race will prevent him from competing for admission on an equal footing.

83. Member A joined Students for Fair Admissions because he supports its mission and this lawsuit. He wishes to remain pseudonymous, however, because he is a high-school student, and he fears reprisal from West Point and others if his participation in this litigation becomes public.

84. Member B is a U.S. citizen who currently attends high school in the southeastern United States.

85. Member B is an honors student, taking an accelerated course of study. His GPA is 4.2.

86. Member B is active in youth sports and in excellent physical condition. He receives annual physicals and has no medical condition that would prevent him from being medically qualified to attend a military academy.

87. Member B has long wanted to join the military and attend an academy. He is actively involved in a club for high schoolers who want to join the military. Both his grandfathers served; and three of his family members currently serve. One of his grandfathers fought in the Army on D-Day. Member B believes that it would be an honor to serve his country, like they did.

88.     Member B is ready and able to apply to West Point in the fall of 2025. He will take all necessary steps to apply, qualify, and get nominated.

89.     But Member B is white. Unless West Point is ordered to stop using race as a factor in admissions, his race will prevent him from competing for admission on an equal footing.

90.     Member B joined Students for Fair Admissions because he supports its mission and this lawsuit. He wishes to remain pseudonymous, however, because he is a high-school student, and he fears reprisal from West Point and others if his participation in this litigation becomes public.

91.     If West Point is allowed to continue making admissions decisions based on applicants' race, SFFA's members—including Members A and B and other similarly-situated applicants—will suffer harm because they will be denied the opportunity to compete for a West Point appointment on equal grounds, solely because of their race.

## CLAIM FOR RELIEF
### COUNT
### Violation of the Fifth Amendment

92.     Plaintiff incorporates and restates all its prior allegations here.

93.     "It is undisputed that 'service academies are subject to the Fifth Amendment.'" *Lebrun v. England*, 212 F. Supp. 2d 5, 16 (D.D.C. 2002); *see also Crawford v. Cushman*, 531 F.2d 1114, 1120 (2d Cir. 1976) ("A succession of cases in this circuit and others ha[s] reiterated the proposition that the military is subject to the Bill of Rights and its constitutional implications."); *Frontiero v. Richardson*, 411 U.S. 677, 688 (1973) (similar).

94.     The Fifth Amendment contains an equal-protection principle that binds the federal government and is no less strict than the Equal Protection Clause that binds the States. *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 224 (1995). "[A]ny person, of whatever race, has the right to demand that any governmental actor subject to the Constitution justify any racial classification subjecting that person to unequal treatment under the strictest judicial scrutiny." *Id.* That principle stems not only

from the Fifth Amendment, but also from the Fourteenth Amendment's guarantee of equal citizen-ship, the Constitution's limits on the scope of federal power, and bedrock principles of equality laid out in the Declaration of Independence.

95.     Because West Point's admissions policy relies on racial classifications, it must satisfy strict scrutiny. *Id.* In other words, it must employ measures that are "narrowly tailored" to "further compelling governmental interests." *SFFA*, 143 S. Ct. at 2162. West Point's overt racial preferences cannot clear this bar.

96.     The Supreme Court has recognized compelling interests in the use of race in only the narrowest of circumstances, where those preferences are explicitly designed to remedy recent acts of discrimination and to make the *individual subjects* of that discrimination whole. *See id.* West Point's ad-missions policy does not meet this standard, and the Academy makes no pretenses that it does.

97.     West Point asserts compelling interests in facilitating organizational cohesion, forming culturally aware leaders, ensuring societal "legitimacy" (circularly defined by the Academy), and safe-guarding the public trust. If those themes sound familiar, it's because the Supreme Court rejected all of them in *SFFA. See* 143 S. Ct. at 2166-67 (rejecting Defendants' claim to have compelling interests in "training future leaders"; "preparing graduates to 'adapt to an increasingly pluralistic society'"; "bet-ter educating [their] students through diversity"; and "producing new knowledge stemming from di-verse outlooks").

98.     *None* of West Point's purportedly compelling interests can "be subjected to meaningful judicial review." *Id.* at 2166. There is no way for "courts … to measure these goals," and even if they could be measured, courts have no basis for assessing "when they have been reached." *Id.*; *see also id.* ("How is a court to know whether leaders have been adequately 'trained'; whether the exchange of ideas is 'robust'; or whether 'new knowledge' is being developed?" (cleaned up)).

99.     West Point's appeal to the military benefits of diversity is no different from Harvard and UNC's appeal to the "educational benefits of diversity." In both instances, the purported benefits are vague and "elusive." *Id.* In fact, the only quantifiable aspects of West Point's race-based admissions program are the racial and ethnic enrollment percentages set by the superintendent each year.

100.    Moreover, "the question in this context is not one of *no* diversity or of *some*: it is a question of degree. How many fewer leaders [West Point] would create without racial preferences, or how much poorer the education at [West Point] would be, are inquiries no court could resolve." *Id.* at 2167.

101.    The Academy's admissions program also fails narrow tailoring because it "fail[s] to articulate a meaningful connection between the means [it] employ[s] and the goals [it] pursue[s]." *Id.* West Point claims that racial preferences are necessary to ensure "an officer corps that reflects the demographics of the nation it serves." To that end, it carefully tracks the class composition of "African Americans," "Hispanics," and "Asians." That interest is not compelling; it is pure racial balancing.

102.    Besides, these categories are "imprecise in many ways." *Id.* "Some of them are plainly overbroad: by grouping together all Asian students, for instance, [West Point is] apparently uninterested in whether *South* Asian or *East* Asian students are adequately represented, so long as there is enough of one to compensate for a lack of the other." *Id.* (emphasis original). "Meanwhile, other racial categories, such as 'Hispanic,' are arbitrary or undefined." *Id.*

103.    Furthermore, West Point produces only seventeen percent of newly commissioned Army officers each year. Even if it had a compelling interest in ensuring perfectly proportional racial representation between the officer corps and the general population, the Academy's use of the "invidious" practice of racial preferences barely moves the needle in terms of the demographics of the officer corps as a whole. *Id.* at 2166.

104.     Nor has the government offered facts or evidence-based reasoning to support its excuses for using race at the academies. The government flatly asserts that the "service academies have carefully considered potential race-neutral alternatives" and "have concluded that, at present, those alternatives would not achieve the military's compelling interest in fostering a diverse officer corps." But it has never identified any studies, reports, or experiments "carefully considering" race-neutral alternatives.

105.     Contra West Point, military academies can achieve racially diverse student bodies through race-neutral means. The Coast Guard Academy provides a real-world example. Until 2010, that academy was prohibited by federal statute from using racial preferences in its admissions process. In the two years before the Academy began considering race, it launched an aggressive advertising and recruiting campaign targeting minorities. At the end of those two years, the academy had increased minority enrollment by 60%—from 15% to 24%. Those numbers were within a few percentage points of the other academies, which had been using explicit racial preferences for years.

106.     West Point's race-based admissions violate the Fifth Amendment because "race may never be used as a 'negative'" or "operate as a stereotype." *Id.* at 2168 (cleaned up). As discussed above, West Point openly acknowledges that race is determinative for some applicants. Because West Point provides a racial "benefit" to "some applicants but not to others," it "necessarily advantages the former group at the expense of the latter." *Id.* Because race is a "positive" for minority applicants who receive preferences, it is necessarily a "negative" for all others. *Id.*

107.     The Academy's admissions program also relies on impermissible stereotypes. The Supreme Court has "long held that universities may not operate their admissions programs on the 'belief that minority students always (or even consistently) express some characteristic minority viewpoint on any issue,'" and that they may not "assum[e] that 'members of the same racial group—regardless of their age, education, economic status, or the community in which they live—think alike.'" *Id.* at 2169

(cleaned up). West Point does exactly that when it uses racial preferences to "foster trust between the enlisted corps and its leaders," create "sociocultural competencies essential to multicultural leadership in the 21st century," and "ensur[e] that the military contains the cultural and racial identities necessary to better understand our partner forces."

108.     West Point is violating equal protection by engaging in the "patently unconstitutional" practice of "[o]utright racial balancing." *Id.* 2172. The Academy sets specific racial goals for each incoming class and adjusts them year over year to balance the racial demographics of each class with the racial demographics of the general population and enlisted corps. It is not "'treat[ing] citizens as individuals,'" but as "'simpl[e] components of a racial … class.'" *Id.* (cleaned up).

109.     West Point's use of race in admissions is also unconstitutional because it "lack[s] a 'logical end point.'" *Id.* at 2170 (cleaned up). Indeed, under its theory of "racial diversity," it would be impossible for the Academy to stop considering race. By tying its racial enrollment needs to the ever-shifting demographics of the country and the enlisted ranks, West Point is essentially promising to use race in perpetuity. *Cf. id.* at 2172-74.

110.     West Point's status as a military academy does not mean that courts must defer to its conclusory assertions that it needs to employ racial preferences, let alone diminish any of the constitutional violations described above. *See Owens v. Brown*, 455 F. Supp. 291, 300 (D.D.C. 1978) (courts are not compelled "to abdicate their responsibility to decide cases and controversies merely because they arise in the military context"). Although courts have been mindful of the military's unique role in society and the unique considerations that come with it, no level of deference justifies systematic racial discrimination. *See SFFA*, 143 S. Ct. at 2168 ("any deference must exist 'within constitutionally prescribed limits'").

111.     In fact, as the Court recognized in *SFFA*, blind deference to assertions of national security or military necessity can lead to "gravely wrong" outcomes and gross violations of civil rights.

*Id.* at 2162 n.3. "[I]n the infamous case *Korematsu*," the "Court upheld the internment of 'all persons of Japanese ancestry in prescribed West Coast ... areas' during World War II because 'the military urgency of the situation demanded' it." *Id.* (cleaned up). The Supreme Court has "since overruled *Korematsu*, recognizing that it was 'gravely wrong the day it was decided.'" *Id.* (cleaned up).

112.    "The Court's decision in *Korematsu* nevertheless 'demonstrates vividly that even the most rigid scrutiny can sometimes fail to detect an illegitimate racial classification' and that '[a]ny retreat from the most searching judicial inquiry can only increase the risk of another such error occurring in the future.'" *Id.* (cleaned up).

113.    Because West Point's use of racial classifications in admissions violates the Fifth Amendment, it should be declared unlawful and enjoined.

**WHEREFORE**, Plaintiff asks this Court to enter judgment in its favor and to provide the following relief:

a.  A declaratory judgment that the Academy's use of race in admissions is unconstitutional under the Fifth Amendment;

b.  A preliminary injunction prohibiting the Academy from considering or knowing applicants' race when making admissions decisions;

c.  A permanent injunction prohibiting the Academy from considering or knowing applicants' race when making admissions decisions; and

d.  All other relief that Plaintiff is entitled to, including but not limited to attorneys' fees and costs.

Respectfully submitted,

*s/Thomas R. McCarthy*

|  |  |
|---|---|
| Adam K. Mortara (*pro hac vice* forthcoming) | Thomas R. McCarthy (*pro hac vice* forthcoming) |
| LAWFAIR LLC | Patrick Strawbridge (*pro hac vice* forthcoming) |
| 40 Burton Hills Blvd., Ste. 200 | J. Michael Connolly (*pro hac vice* forthcoming) |
| Nashville, TN 37215 | Cameron T. Norris (*pro hac vice* forthcoming) |
| (773) 750-7154 | Bryan Weir (*pro hac vice* forthcoming) |
| mortara@lawfairllc.com | James F. Hasson (*pro hac vice* forthcoming) |
|  | R. Gabriel Anderson (*pro hac vice* forthcoming) |
| Dated: September 19, 2023 | CONSOVOY MCCARTHY PLLC |

1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
patrick@consovoymccarthy.com
mike@consovoymccarthy.com
cam@consovoymccarthy.com
bryan@consovoymccarthy.com
james@consovoymccarthy.com
gabe@consovoymccarthy.com

*Counsel for Students for Fair Admissions*

## VERIFICATION

I, Edward Blum, declare as follows:

    1.      I am the President of Students for Fair Admissions, the plaintiff in this case.

    2.      I have reviewed this complaint.

    3.      For the allegations within my personal knowledge, I believe them all to be true.

    4.      For the allegations not within my personal knowledge, I believe them all to be true based on my review of the cited policies and documents and based on my conversations with members of Students for Fair Admissions, including Members A and B.

    5.      I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 19, 2023

Edward Blum
President of Students for Fair Admissions