**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
**WHITE PLAINS DIVISION**

STUDENTS FOR FAIR ADMISSIONS

*Plaintiff*,

v.

UNITED STATES MILITARY ACAD-EMY
AT WEST POINT; THE UNITED STATES
DEPARTMENT OF DEFENSE; LLOYD
AUSTIN, in his official capacity as Secretary of
Defense; CHRISTINE WORMUTH, in her of-
ficial capacity as Secretary of the Army; LIEU-
TENANT GENERAL STEVEN GILLAND,
in his official capacity as Superintendent of the
United States Military Academy; and LIEU-
TENANT COLONEL RANCE LEE, in his
official capacity as Director of Admissions for
the United States Military Academy at West
Point,

*Defendants.*

No. 7:23-cv-08262

**MEMORANDUM OF LAW IN
SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION**

## INTRODUCTION

The United States Military Academy, or West Point, is one of the crown jewels of the Ameri-can military. It has trained the future leaders of the United States Army since 1802, producing some of our nation's most revered generals. West Point's mission is "to educate, train, and inspire" future Army officers "for a career of professional excellence and service to the Nation as an officer in the United States Army." Ex. A.

For most of its history, West Point has evaluated cadets based on merit and achievement. For good reasons: America's enemies do not fight differently based on the race of the commanding officer opposing them, soldiers must follow orders without regard to the skin color of those giving them, and battlefield realities apply equally to all soldiers regardless of race, ethnicity, or national origin. To that end, President Truman desegregated the military well before other institutions followed suit. *See*

Executive Order 9981 (July 26, 1948) ("[T]here shall be equality of treatment and opportunity for all persons in the armed forces without regard to race, color, religion, or national origin.").

For the past few decades, however, West Point has strayed from that approach. Instead of admitting future cadets based on objective metrics and leadership potential, West Point focuses on race. In fact, it openly publishes its racial composition "goals," and its director of admissions brags that race is wholly determinative for hundreds if not thousands of applicants.

West Point has no justification for using race-based admissions. Those admissions are unconstitutional for all other public institutions of higher education. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 143 S. Ct. 2141 (2023) ("*SFFA*"). The Academy is not exempt from the Constitution. *See, e.g., Crawford v. Cushman*, 531 F.2d 1114, 1120 (2d Cir. 1976) ("A succession of cases in this circuit and others ha[s] reiterated the proposition that the military is subject to the Bill of Rights and its constitutional implications."). And any calls for blind judicial deference to the military on questions of racial discrimination are "'gravely wrong,'" both legally and historically. *SFFA*, 143 S. Ct. at 2162 n.3 (discussing the overruling of *Korematsu v. United States*, 323 U.S. 214 (1944)).

Because West Point discriminates on the basis of race, its admission policy should be declared unlawful and enjoined. Because its admissions cycle will begin and end before this case can be fully litigated (plus any appeals), SFFA respectfully requests that this Court preliminarily enjoin West Point from considering race as a factor in admissions **by December 1, 2023**.

## BACKGROUND

### I.    West Point's Race-Based Admissions Process

Admission to West Point is highly selective: In the most recent class, fewer than ten percent of applicants were given the honor of joining the Long Gray Line. *See* Ex. B. The Academy enrolls between 1,200 to 1,300 cadets in each class. *See, e.g.,* Ex. C ("[m]ore than 1,200" cadets).

Appointment (*i.e.,* "admission") to West Point involves two stages: First, applicants must pass medical examinations and a physical-fitness test and secure a "nomination" from a member of

Congress, the Vice President, or the President. *See* 10 U.S.C. §7442(a); 32 C.F.R. §575.3; Exs. D-G. Second, after securing a nomination, applicants must be accepted by the academy's admissions office. West Point employs racial preferences at this second stage.

When making selections, West Point considers—among other factors—race. *See, e.g.*, Amicus Br. of United States at 17, *Students for Fair Admissions v. President and Fellows of Harvard College*, 2023 WL 4239254, No. 20-1199 (U.S. June 29) ("SFFA U.S. Brief") ("The Air Force, Military, and Naval Academies, along with the Coast Guard Academy, all currently employ holistic recruiting and admissions policies that consider race—along with many other factors—in an individualized review of applicants."); *id.* at 12 (similar). West Point "is fully committed to affirmative action." Ex. D at 2. That "commitment" plays out across all areas of the Academy's admissions policy. West Point sets benchmarks for the percentage of each class that should be filled by "African Americans," "Hispanics," and "Asians," and it meticulously tracks its compliance with those figures down to a tenth of a percentage point. These racial benchmarks vary by year, based on the ever-shifting demographics of the enlisted ranks. In other words, the Academy openly attempts "to balance the Corps" of cadets by setting "desired percentages … of blacks, Hispanics, and other minorities" for each incoming class. Ex. E at 13.

"Targets for minorities at the U.S. Military Academy are set by its superintendent." Ex. F at 20. The following chart, entitled "Class Composition Comparison" and briefed to the Academy's Board of Visitors by then-Director of Admissions Colonel Deborah McDonald,[1] provides an inside look at West Point's racial balancing efforts:

---

[1] McDonald retired in early 2023, and was replaced by her longtime Deputy Director of Admissions, Lieutenant Colonel Rance Lee.

**UNITED STATES MILITARY ACADEMY**
**WEST POINT.**

## Class Composition Comparison

| Final Class Admitted Numbers (2015-2020) | | | | | | | |
|---|---|---|---|---|---|---|---|
| CLASS | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Population % |
| African Americans<br># Admitted<br>(Goal) | 10.7%<br>135<br>(12-15%) | 8.6%<br>104<br>(12-15%) | 9.5%<br>112<br>(12-15%) | 13.9%<br>169<br>(11-13%) | 15.1%<br>190<br>(>14%) | 13.8%<br>180<br>(>14%) | US – 13.1%<br>Officer – 13.2%<br>Enlisted – 22.5% |
| Hispanics<br>#Admitted<br>(Goal) | 9.6%<br>123<br>(9-12%) | 8.6%<br>103<br>(9-12%) | 11.7%<br>128<br>(9-12%) | 10.1%<br>122<br>(9-12%) | 9.7%<br>123<br>(>11%) | 9.3%<br>121<br>(>11%) | US – 16.9%<br>Officer – 7.0%<br>Enlisted – 13.5% |
| Asians<br>#Admitted<br>(Goal) | 6.1%<br>96<br>(4-6%) | 7.1%<br>86<br>(4-6%) | 7.1%<br>86<br>(4-6%) | 7.8%<br>94<br>(4-6%) | 8%<br>99<br>(>5%) | 9.2%<br>120<br>(>5%) | US – 5.1%<br>Officer – 4.9%<br>Enlisted – 2.5% |
| Women<br>#Admitted<br>(Goal) | 16.6%<br>212<br>(14-20%) | 15.9%<br>192<br>(14-20%) | 15.8%<br>188<br>14-20%) | 21.8%<br>264<br>(>20%) | 22%<br>278<br>(>20%) | 21.7%<br>282<br>(>20%) | US – 50.8%<br>Officer – 16.5%<br>Enlisted – 13.0% |
| Scholars<br>#Admitted<br>(Goal) | 34.7%<br>437<br>(>30%) | 33.9%<br>404<br>(>30%) | 35%<br>418<br>(>30%) | 38.4%<br>465<br>(>30%) | 35.9%<br>454<br>(>30%) | 35.9%<br>468<br>(>30%) | |
| Leaders<br>#Admitted<br>(Goal) | 22.2%<br>280<br>(>25%) | 25.5%<br>304<br>(>25%) | 27.3%<br>326<br>(>25%) | 22.9%<br>277<br>(>25%) | 25.5%<br>322<br>(>25%) | 24.2%<br>315<br>(>25%) | |
| Athletes<br>#Admitted<br>(Goal) | 15.9%<br>200<br>(18-23%) | 18.5%<br>221<br>(18-23%) | 17.5%<br>210<br>(18-23%) | 21.5%<br>260<br>(>23%) | 21.1%<br>266<br>(>23%) | 22.0%<br>287<br>(>23%) | |
| Soldiers<br>#Admitted<br>(Goal) | 6.2%<br>74<br>(>7%) | 8.5%<br>102<br>(>7%) | 10.8%<br>129<br>(>7%) | 7.6%<br>92<br>(>7%) | 6.5%<br>82<br>(>5%) | 5.9%<br>77<br>(>5%) | |
| Class Size | 1261 | 1192 | 1193 | 1212 | 1262 | 1302 | 33 |

Ex. G at 56. The briefing on admissions occurred as part of a broader presentation from senior Academy officials—including West Point's then-Commandant, Lieutenant General Robert Caslen—to the Board of Visitors on March 9, 2017. *See id.* at 9-16, 42-56.

As the Class Composition Chart makes clear, West Point considers any enrollment rate lower than its racial benchmarks to be a failure, even when a group's percentage of the incoming class exceeds its percentage in the population at large. For example, West Point's benchmark for African Americans in the Class of 2020 was "[greater than] 14%," even though only 13.1% of U.S. citizens are African American.[2] West Point believes that, because African Americans are overrepresented in the enlisted ranks (at 22.5%), they need to be overrepresented among cadets too. And because African Americans comprised only 13.8% of the matriculating class, the chart highlights African American

---

[2] West Point tracks the overall population in terms of U.S. citizenship because citizenship is a requirement for eligibility to commission as a military officer (and is thus a requirement for admission to service academies). *See* 10 U.S.C. §532(a)(1).

enrollment in red, indicating that the Academy failed to meet its goal. West Point does not explain what it means by "African American," "Hispanic," or "Asian."

West Point briefed similar charts to the Board of Visitors in 2018 and 2019 (the final years for which the Academy's reports to the Board are publicly available). *See* Ex. H at 34; Ex. I at 44. For the classes of 2018-2021, the number of Hispanics enrolled in the freshman (or "plebe") class were 116, 122, 121, and 119, respectively. West Point has issued press releases describing the demographics of the incoming classes for the 2022-2027 graduation years. Those figures similarly reflect efforts to racially balance the incoming classes with surgical precision. For example, West Point enrolled 99 Asian Americans in the Class of 2022. *See* Ex. J. The number of Asian Americans enrolled in West Point's Class of 2023? Precisely 99. *See* Ex. K.

West Point goes to great lengths to achieve these racial-balancing goals. At a 2010 West Point Diversity Leadership Conference, McDonald told the audience that, "[a] couple of years ago, every qualified African-American applicant were [*sic*] offered admission into West Point, yet the class composition goal was still lacking." Ex. L at 2. In another interview of the Academy's deputy director for admissions, the deputy director acknowledged that "West Point does use race as a determinant in its appointment process." Ex. Q at 2.

Race is, indeed, determinative for hundreds of applicants each year. According to the Academy itself, congressional nominees comprise roughly 75% of each incoming class, and in most cases, up to ten qualified applicants compete against one another for the single slot afforded to their Senator or Representative each year. Because skin color can be—and often is—a decisive factor for successful applicants who are chosen from those congressional nominee pools, it is equally dispositive for the other qualified nominees who are turned away. Put differently, because race is a "positive" factor for some West Point applicants, it is necessarily a "negative" factor for others. *SFFA*, 143 S. Ct. at 2169.

II.     **West Point's Shifting Justifications for Its Race-Based Admissions Practices**

Over the years, West Point has offered shifting justifications for its use of race in admissions. In 2003, while the Supreme Court was considering Michigan's use of racial preferences in *Grutter v. Bollinger*, 539 U.S. 306 (2003), West Point's dean of admissions told the *New York Times* that West Point was trying to balance the racial demographics of the admitted class to mirror the race of society at large: "We like to represent the society we come from in terms of the student body's undergraduate experiences. So having a diverse student body allows personal growth in areas where people may not have gotten it otherwise. We want people to understand the society they will defend." Ex. M at 2.

Although the Solicitor General declined to defend Michigan's use of racial preferences in *Grutter*, a collection of retired former military officers submitted an amicus brief arguing that racial preferences in higher education served a national security interest. *See* Amicus Br. of Lt. Gen. Julius W. Becton, et. al., *Grutter v. Bollinger*, 2003 WL 1787554, Nos. 02-241, 02-516 (U.S. Feb. 21) ("Becton Brief"). Unlike West Point's then-dean of admissions, the amici did not argue that the racial makeup of the Army's officer corps needed to reflect society. They argued that racial preferences were necessary because the racial composition of the military's officer corps needed to reflect the racial composition of its enlisted corps. *Id.*

Since *Grutter*, West Point's defense of its racial preferences has continued to vacillate. Echoing the Becton Brief, it most recently argued that the military "has a powerful interest in developing an officer corps that is prepared to lead a diverse force and that shares the diversity of the enlisted ranks *and* the general population." Amicus Br. of United States at 12, *Fisher v. Univ. of Tex. at Austin*, 2012 WL 3418588, No. 11-345 (Aug. 13, 2012) (emphasis added) ("Fisher US Brief"). A report of the Military Diversity Leadership Commission stressed that "[t]he military should mirror the demographic composition of the population it serves" and that "senior leaders should mirror the demographic

composition of the troops they lead." Ex. W at 39. This is necessary, West Point insists, to ensure unit cohesion and internal trust and to maintain societal legitimacy. *See, e.g.*, SFFA U.S. Brief 15-19.

Under this proffered justification, statistical parity with the racial makeup of the general population is not enough. Now, racial preferences are supposedly necessary to achieve racial balance between the enlisted corps—an all-volunteer force—and the officer corps. *See, e.g.*, *id.* at 15 ("The military has not yet achieved its goal of building an officer corps that reflects the 'racial and ethnic composition' of the service members officers lead" because "White service members are 53% of the force but 73% of officers."); *id.* (listing similar statistical comparisons for black and Hispanic officers and enlisted service members).

This new goal is tantamount to a declaration that West Point will *never* stop using race in admissions, since the percentage of soldiers from certain racial categories who voluntarily enlist in the Army will always dictate West Point's racial targets. Indeed, the Defense Department acknowledges that the "demographic makeup" of society and the enlisted force is "continually changing" and states that the military "must change" alongside it "to maintain and sustain its future forces." Ex. N at 3. Even if the racial demographics of the officer corps do eventually mirror those of the enlisted corps, the continued use of race will be necessary to preserve that statistical parity going forward. In short, West Point's use of race "lack[s] a 'logical end point.'" *SFFA*, 143 S. Ct. at 2170. And West Point has never adopted a sunset date for its use of race.

III.    **Students For Fair Admissions and This Litigation**

SFFA is a voluntary membership organization formed for the purpose of defending human rights and civil liberties, including the right of individuals to equal protection under the law, through litigation and any other lawful means. Blum Decl. ¶2. SFFA is a nonprofit membership group of tens of thousands of individuals across the country who believe that racial preferences in college

admissions, including the academies, are unfair, unnecessary, and unconstitutional. ¶3. SFFA has members who are ready and able to apply to the United States Military Academy. ¶4.

Member A, for example, is a U.S. citizen and a senior in high school who lives in the upper Midwest. Member A Decl. ¶2. He has a grade point average of 3.77, near the very top of his class. ¶3. He is active in youth sports and is in excellent physical condition. ¶4. Member A receives annual physicals and has no medical condition that would prevent him from being medically qualified to attend a military academy. *Id.* Military service runs in his family, and he has long wanted to join the military and attend an academy. ¶5. Member A believes that it would be an honor to serve his country, like his family did. *Id.* He is ready and able to apply to West Point in the fall of 2023 and is taking all necessary steps to apply, qualify, and get nominated. ¶6. But Member A is white. ¶7. Unless West Point is quickly ordered to stop using race as a factor in admissions, his race will prevent him from competing for admission on an equal footing. *Id.*

## ARGUMENT

SFFA is entitled to a preliminary injunction if it can satisfy four factors: it is "likely to succeed on the merits," it is "likely to suffer irreparable harm in the absence of preliminary relief," the "balance of equities tips in [its] favor," and "an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008); *A.H. ex rel. Hester v. French*, 985 F.3d 165, 176 (2d Cir. 2021). SFFA satisfies all four.

## I.      SFFA is likely to succeed on the merits.

*Brown v. Board of Education* proclaimed that the right to public education—a right intimately connected with "service in the armed forces"—"must be made available to all on equal terms." *Brown v. Board of Education*, 347 U.S. 483, 493 (1954) ("*Brown I*"). *SFFA* built on *Brown*'s legacy, holding that "the Constitution is color blind," 143 S. Ct. at 2160, and that all "racial discrimination in public education"—including the race-based admissions programs practiced at "[m]any universities"—is unconstitutional. *Id.* at 2160, 2176.

West Point's admissions system is one such program. When it was before the Supreme Court, the government bragged that the Academy uses race in the same way that Harvard and UNC did. *See, e.g.*, SFFA U.S. Brief 5 (comparing the academies' use of race to "colleges and universities across the country"); *id.* at 24 (similar); *id.* at 7-8 (explaining that the academies use "admissions policies like the one this Court approved in *Grutter*"). That concession is fatal. The strict-scrutiny test that the Fifth Amendment applies to West Point is "'the same'" as the strict-scrutiny test that the universities flunked in *SFFA. Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 224 (1995). So while *SFFA* "does not address" the military academies, 143 S. Ct. at 2166 n.4, its logic leads to a straightforward conclusion: West Point cannot use race either. Under strict scrutiny's "daunting two-step examination," *id.* at 2162-63, West Point's interests are not sufficiently compelling, and its race-based admissions program is not narrowly tailored.

### A. West Point has no compelling interest in race-based admissions.

To begin, none of the Academy's interests survive *SFFA*. Although West Point asserts that "fostering diversity" is "essential to fulfilling [the Army's] mission to defend the nation," that assertion is devoid of evidentiary support and rests on naked appeals to deference. West Point's supposed interests in using explicit racial classifications can be broadly summarized as two propositions: (1) racial preferences improve the military's internal functioning; and (2) racial preferences enhance the military's functional capacity by fostering internal confidence within the ranks and by bolstering its external legitimacy which, in turn, increases societal trust and recruitment efforts.[3] Neither interest is compelling.

---

[3] Before the Supreme Court's decision in *SFFA*, the Academy also invoked the "educational benefits of diversity," like Harvard and UNC did in *SFFA*. Specifically, it said that racial "diversity" "reduc[ed]" "a sense of isolation and alienation" among ethnic minorities in the Corps of Cadets and "encourage[d] greater participation by minority students in the classroom." *Students for Fair Admissions v. President and Fellows of Harvard College*, No. 21-707, Tr. 145:1-146:11, (Oct. 31, 2022). Now that the Supreme Court has refused to allow colleges to justify their actions by reference to those undefined—

### 1.    Internal Functioning

West Point posits several ways that racial preferences are critical to having a well-functioning Army in a pluralistic society. All of them view soldiers as members of racial groups, rather than as individuals—and all are grounded in the assumption that minority service members all think and feel the same way.

First, West Point argues that statistical parity between the racial demographics of officers and enlisted soldiers is necessary to preserve unit cohesion and ward off racial strife within units. In support of that assertion, it highlights anecdotal incidents of racial tension among enlisted servicemembers during the Vietnam War, most of which occurred in a brief period from 1969 to 1972. Further undermining this justification is it was raised for the first time by the Becton brief in *Grutter*—not by the government itself. The government later adopted the talking point and has repeated it in virtually every defense of racial preferences since. Post-hoc cherry picking a few unfortunate incidents and extrapolating them to the entire American military is not enough for strict scrutiny.

History paints a different picture. "[R]acial animosity had been negligible within the U.S. armed forces" prior to 1967, and it has been virtually nonexistent post-Vietnam. Ex. O at 2. During the Korean War—just a few years after President Truman ordered desegregation in the military—integration "failed to produce the violence or poor morale the military brass had expected." Ex. P at 3.[4]

---

and undefinable—"educational benefits," West Point is left with its other justifications. *See SFFA*, 143 S. Ct. at 2166 n.4 (stressing that the academies must, at a minimum, identify "distinct" interests).

[4] What's more, the brief period of racial unrest that West Point retells over and over was not produced by colorblind policies. It was a tragic byproduct of broader factors: "a changing social environment, a controversial war, and new conscription strategies" that allowed wealthier Americans to escape the draft through college deferments while sending disproportionate numbers of low-income draftees to frontline combat units based on their educational backgrounds. Amicus Br. of Veterans for Fairness and Merit at 7, *Students for Fair Admissions v. President and Fellows of Harvard College*, 2023 WL 4239254, No. 20-1199 (U.S. June 29) ("VFM Brief"). In short, the incidents that West Point cites to justify open-ended racial preferences were the product of a "perfect storm for racial conflict" that has not existed for the past half century. *Id.*; *cf. Shelby Cnty., Ala. v. Holder*, 570 U.S. 529, 545-57 (2013).

Moreover, the underlying assumption of West Point's argument is that soldiers view their peers and superiors foremost in terms of race, rather than in terms of their ability or character traits like loyalty, devotion, and selflessness. It assumes that soldiers apply the same racial stereotypes to one another that West Point applies to them. There is no evidence to suggest that's the case.

Second, West Point claims that statistical parity between the racial demographics of the officer corps and those of the enlisted corps is necessary to "foster trust between the enlisted corps and its leaders." SFFA US Brief 15; *see also* Fisher US Brief 12 ("military leaders have concluded that an officer corps that shares the diversity of the enlisted ranks improves performance by 'facilitating greater confidence' in leadership"); *Students for Fair Admissions*, No. 21-707, Tr. 145:1-146:11 (discussing military academies, Solicitor General asserts that benefits of increased racial diversity include "cross-racial understanding," which can "lead[] to positive developments with cognitive development").

The Academy has never provided evidence to support that assertion; and indeed, all available evidence says otherwise. Boiled down to its core, this argument simply relies on crude and infantilizing stereotypes about the men and women who volunteer to serve in our armed forces: It assumes that black soldiers will be more likely to trust a black officer and that Hispanic soldiers are more likely to trust Hispanic officers—not because of their trustworthiness, but merely because of their self-reported ethnicity. That's precisely the type of racial stereotyping that *SFFA* condemns. 143 S. Ct. at 2170. And such sad stereotypes completely ignore that trust between soldiers is formed through battlefield performance, and that servicemembers in war zones are more concerned with their leaders' competency than with their race.

Third, West Point broadly claims that the diversity produced by racial preferences makes Army units "more effective at accomplishing their missions." SFFA U.S. Brief 15. It does not define what it means to be racially "diverse," nor does it provide concrete evidence that military units that choose their members based on race are more successful on the battlefield than units who select their

members based on objective measures such as tactical competency. In *Fisher*, the Solicitor General extended this idea further, claiming that units with greater racial diversity are more capable of interacting with and understanding partner forces from international allies. *See* Fisher U.S. Brief 12 ("Maintaining a diverse leadership corps also ensures that the military contains the cultural and racial identities necessary to better understand our partner forces."). The government, however, did not elaborate on why it thinks that's true. Apparently, the government thought it self-evident that individuals who share the same skin color also share a common "understand[ing]." But that sort of assumption is precisely the racial stereotyping that *SFFA* prohibits. 143 S. Ct. at 2170.

### 2.    External Legitimacy and Societal Trust

West Point also maintains that having an officer corps that does not reflect the racial makeup of the general population and the enlisted ranks will "undermine the military's legitimacy by fueling 'popular perceptions of racial/ethnic minorities serving as 'cannon fodder' for white military leaders." Fisher U.S. Brief 12 (quoting Ex. W at 15); *see also* SFFA U.S. Brief 19 ("[G]overnment agencies that lack diversity risk losing legitimacy in the eyes of a diverse nation"). Again, this conclusory statement assumes that the American people assess the "legitimacy" and trustworthiness of an institution based on its racial makeup. And that just isn't true. Less than a third of Americans think "selective colleges and universities" should take "race and ethnicity into account." Ex. V at 3. Even fewer think "diversity" is "very important." *Id.* at 5. And three-fourths of Americans—decisive majorities in every race— think employers should "[o]nly take a person's qualifications into account" when considering whether to hire them. *Id.* at 4. In-depth surveys of military personnel (the type of rigorous analyses that West Point has failed to offer) paint the same picture. According to one study, 71% of active-duty officers believe the military would retain more talent if opportunities depended solely on merit. Ex. T at 13. So, if anything, West Point's claims about "diversity," "legitimacy," and "public trust" have it backwards: If its mission is to solidify the public's trust, the Academy should do away with race-based

admissions, not double down on them. *See Johnson v. California*, 543 U.S. 499, 510-11 (2005) ("compliance with the [Constitution's] ban on racial discrimination … bolsters the legitimacy of the [government]").

West Point also argues that the Army will lose "societal trust" if racial metrics between the officer and enlisted corps—and between the officer corps and society at large—are not equivalent. This speculative loss of societal trust, West Point claims, could, in turn, harm recruiting efforts. Not so. Today, at the apex of West Point's use of racial preferences, the Army is facing a recruiting crisis that is unprecedented in the modern era—a crisis fueled by a lack of public confidence in the military, that itself appears to be a direct result of the military's overemphasis on "social justice" issues. *See* Gallup, *Confidence in Institutions,* perma.cc/DEH2-M92Y; *see also* Ex. R at 2 (observing that over half of Americans think the military's overemphasis on social justice is "undermining military effectiveness").

So, if anything, West Point's assertions about recruiting and retention are backwards. In-depth surveys and statistical studies of the Army's personnel crisis confirm this. "According to 9 out of 10 respondents, many of the best officers would stay if the military was more of a meritocracy." Ex. S at 3. And 71% of active-duty officers believe the military would retain more talent if opportunities were based solely on merit. *See, e.g.*, Ex. T at 13. To the extent that West Point's mission is to solidify the public's trust, its race-based admissions policy shoots itself in the foot—especially since 70% of Americans agree that universities should not "be allowed to consider race in admissions." Ex. U.

Flawed as they are, none of West Point's justifications for racial preferences are new. In fact, nearly all its nebulous arguments for race-based admissions were made sixty-five years ago by opponents of desegregating the military. The military segregationists' arguments—like the arguments offered by West Point—were long on racial stereotypes but short on actual evidence. Like West Point, segregation proponents argued that a colorblind military would "create difficulties 'which would be reflected in morale and military efficiency.'" President's Committee on Equality of Treatment and

Opportunity in the Armed Services, *Freedom to Serve* 12, (May 22, 1950), perma.cc/C2F5-6SCD. Like West Point, they claimed that colorblind policies would degrade the military's ability to accomplish its national-defense mission. *Id.* at 49-50. And, like West Point, they warned that a colorblind approach would be inconsistent with "civilian sentiment" and pose external risks to the institution. *Id.*

Truman's commission rejected all those arguments. In the process, the commission unequivocally affirmed that servicemembers should be treated as individuals in all circumstances, and that drawing inferences from a person's membership in a particular racial or ethnic group was immoral and illogical. "To put racial restrictions on job opportunities seemed to the Committee to ignore completely the essential factor of individual differences." *Id.* at 13. So too today.

### B.    West Point's use of race is not narrowly tailored.

West Point's race-based admissions program also fails narrow tailoring. *See SFFA*, 143 S. Ct. at 2167 (requiring the Academy to prove that its "use of race" is "necessary" to achieve its interests). When *SFFA* reaffirmed that the Constitution is colorblind, it also reiterated many of the prohibitions that equal protection has long entailed. *Id.* at 2162. "[R]ace," the Court instructed, "may not operate as a stereotype." *Id.* at 2168. And it "may never be used as a negative." *Id.* Race-based admissions programs must always have a "logical end point." *Id.* at 2170. And they may never engage in "outright racial balancing." *Id.* at 2172. West Point's admissions program transgresses each of these lines.

Taking them in reverse order, the Academy's carefully calibrated scheme of racial balancing is "patently unconstitutional." *Id.* Every year, West Point sets rigid benchmarks for the percentage of "African Americans," "Hispanics," and "Asians" that should fill each class, painstakingly tracking those benchmarks down to a faction of a percent. These rigid quotas "are set by [the Academy's] superintendent," Ex. F at 20, and they change every year, trailing the ever-shifting demographics of the enlisted ranks and "the population it serves," Ex. W at 39. The Class Composition Chart makes that clear. *See* Ex. G at 56. The Academy openly attempts "to balance the Corps" of cadets by setting

"desired percentages … of blacks, Hispanics, and other minorities" for each incoming class. Ex. E at 13. And it does so with surgical precision. *See, e.g.*, Ex. H at 34.

Because of this scheme—one that relies on racial balancing to preserve parity between officers, the enlisted, and the citizens they serve—West Point's use of race "lack[s] a logical end point." *SFFA*, 143 S. Ct. at 2170. Indeed, under West Point's theory, the only way it can "mirror the demographic composition of the population," Ex. W at 39, is by setting rigid racial targets for each incoming class and adjusting them year over year to ensure the Academy always "shares the diversity of the enlisted ranks and the general population." Fisher U.S. Brief 12. By tying its racial composition to the whims of demography, West Point's promises to use race in perpetuity—something that *SFFA* forbids. 143 S. Ct. at 2172-74.

West Point's use of race also thwarts the fundamental command "that an individual's race may never be used against him." *Id.* at 2168. For starters, the Academy's admissions program, like all "[c]ollege admissions" programs, is "zero-sum," meaning that "[a] benefit provided to some applicants but not to others necessarily advantages the former group at the expense of the latter." *Id.* at 2169. And because race can (and often is) a decisive "plus" factor for many Black, Hispanic, and Asian applicants, it is an equally dispositive "minus" for everyone else. *Id.* That's illegal. *Id.* at 2166.

If that weren't enough, the Academy's entire admissions program rests on racial stereotypes. The Supreme Court has "long held that universities may not operate their admissions programs on the 'belief that minority students always (or even consistently) express some characteristic minority viewpoint on any issue.'" *Id.* at 2170. But that's precisely what West Point does. By relying on the "educational benefits of diversity," the Academy's program assumes "that there is an inherent benefit in race *qua* race"—an assumption which "rests on the pernicious stereotype that a black student" (or a white student, or a Hispanic student, or an Asian student) "can usually bring something that a [student of another race] cannot offer." *Id.* And by balancing its class to avoid "racial tensions among

enlisted personnel" or to "foster trust between the enlisted corps and its leaders," Fisher Br. 11, West Point is forced to assume that, among other stereotypes, some races won't respect or follow people who have a different skin color. Such sordid stereotyping is "contrary … to the 'core purpose' of the Equal Protection Clause." *SFFA*, 143 S. Ct. at 2170.

The racial box-checking that West Point uses also fails narrow tailoring. Such a system is borne of "incoherent and irrational" categories, which are "imprecise," "arbitrary," "undefined," "opaque," and "underinclusive." *Id.* at 2167. "[B]y grouping together all Asian students, for instance, [the Academy is] apparently uninterested in whether *South* Asian or *East* Asian students"—students who come from countries as diverse as Japan and Pakistan—"are adequately represented." *Id.* (emphasis original). And West Point apparently thinks that a Mexican-American soldier is more likely to follow a white officer of Spanish descent, just because he checked the box for "Hispanic." This racial pseudoscience is not the stuff of strict scrutiny.

And, what's more, the Academy has never shown that comparable race-neutral programs won't work. Narrow tailoring demands "serious, good faith consideration of workable race-neutral alternatives." *Grutter*, 539 U.S. at 339; *accord Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 280 n.6 (1986) (narrow tailoring "require[s] consideration of whether lawful alternative[s] and less restrictive means could have been used"). West Point has no studies, reports, or experiments "carefully considering" race-neutral alternatives. Yet the Coast Guard Academy provides a real-world example that these alternatives can work. Until 2010, that academy was prohibited from using racial preferences in its admissions process. *See* Pub. L. No. 111-281, 124 Stat. 2905. In the two years before the Academy began considering race, it launched an aggressive advertising and recruiting campaign targeting minorities. Verified Compl. ¶ 105. At the end of those two years, the academy had increased minority enrollment by 60%, from 15% to 24%. *Id.* Those numbers were within a few percentage points of the other academies (which had been using explicit racial preferences for years), *id.*, and nowhere does West

Point try to prove that the difference stopped it from achieving its asserted interests. Nor could it: In *SFFA*, West Point conceded that its Merchant Marine Academy doesn't use race for most of admissions, and that admissions system (like the Coast Guard's admissions system) furthers the Academy's interests. *SFFA* U.S. Br. at 17 n. 3. West Point has long had a duty to prove that a race-based policy—rather than a race-neutral policy—is essential to its functioning. *Grutter*, 539 U.S. at 339. It cannot. And it's never tried, despite decades of opportunities.

For its final argument, West Point tries the same path that Harvard and UNC tried in *SFFA*: "trust us." 143 S. Ct. at 2168. To be sure, courts must be mindful of the military's unique role. *See, e.g., Dep't of Navy v. Egan*, 484 U.S. 518, 530 (1988). But the Supreme Court "ha[s] been unmistakably clear that any deference must exist within constitutionally prescribed limits"—limits that categorically prohibit invidious racial discrimination. *SFFA*, 143 S. Ct. at 2168; *accord U.S. Navy Seals 1-26 v. Biden*, 27 F.4th 336, 349 (5th Cir. 2022); *Singh v. Berger*, 56 F.4th 88, 99 (D.C. Cir. 2022); *Berkley v. United States*, 287 F.3d 1076, 1091 (Fed. Cir. 2002). It has "refused to defer" to government officials' "judgments on race," even in "areas where those officials traditionally exercise substantial discretion." *Johnson*, 543 U.S. at 512 (prisons).

*Korematsu* provides a warning and a lesson. Deferring to the military's expert "judgment," the Supreme Court rubberstamped the systemic internment of Japanese Americans because "military authorities decided that the military urgency of the situation demanded that all citizens of [that race] be segregated." *Korematsu*, 323 U.S. at 223. The Supreme Court abrogated that case, *see Trump v. Hawaii*, 138 S. Ct. 2392, 2423 (2018), cautioning courts to never "retreat from the most searching judicial inquiry" when considering "illegitimate racial classification[s]," *SFFA*, 143 S. Ct. at 2162 n.3. This Court should heed that instruction and find the Academy's race-based admissions program unconstitutional.

## II.     SFFA satisfies the remaining criteria for a preliminary injunction.

Because SFFA is likely to prevail on its constitutional claim, it readily meets the other require-

ments for a preliminary injunction.

*Irreparable Harm:* A "presumption of irreparable injury flows from a violation of constitu-

tional rights." *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 636 (2d Cir. 2020) (cleaned up); *see also*

*Barrett v. Maciol*, 2022 WL 130878, at *5 (N.D.N.Y. Jan. 14) ("'In the Second Circuit, it is well settled

that an alleged constitutional violation constitutes irreparable harm.'"). "An Equal Protection Clause

violation . . . is therefore an irreparable injury." *Agudath Israel of Am.*, 983 F.3d at 636. Because West

Point's admissions policy subjects SFFA's members to racial discrimination that violates the Fifth

Amendment's equal-protection principle, they face irreparable harm without a preliminary injunction.

*See id.*; *see also Greer's Ranch Café v. Guzman*, No. 4:21-cv-651, 2021 WL 2092995, at *8 (N.D. Tex.) (May

18, 2021) (finding irreparable harm and granting preliminary injunction because plaintiffs were "expe-

riencing race and sex discrimination at the hands of government officials"); *Ass'n for Fairness in Bus.,*

*Inc. v. New Jersey*, 82 F. Supp. 2d 353, 363 (D.N.J. 2000) (finding irreparable harm and entering a pre-

liminary injunction because plaintiffs were forced to "compete on an unfair playing field" as a result

of a racial set-aside program).

This irreparable harm is particularly acute because, without a preliminary injunction, an entire

admissions cycle will begin and end. SFFA's cases against *Harvard* and *UNC* took nearly a decade to

litigate, including at least five years in district court alone. *See SFFA*, 143 S. Ct. at 2156. Yet Member

A is a high-school senior who is applying to colleges now. Member A Decl. ¶ 2, 6. Unless he gets a

preliminary injunction, he will entirely miss the chance to apply on an equal footing to West Point in

the normal course. ¶ 7. The military academies do not accept transfers; though rejected applicants can

apply again, they must start from square one if they're admitted. Ex. D. So even if this case moved

quickly enough for SFFA to get a final judgment before the *next* admissions cycle, Member A will

have lost a year of his life and thus could never catch up to his peers in terms of military seniority—irreparable harm that money damages could not redress. *See Brewer v. W. Irondequoit Cent. Sch. Dist.*, 212 F.3d 738, 745 (2d Cir. 2000); *Coal. to Defend Affirmative Action v. Granholm*, 473 F.3d 237, 252 (6th Cir. 2006) (Sutton, J.).

**Balance of Harms and Public Interest:** The balance of the equities and the public interest factors "merge when the Government is the party opposing the preliminary injunction." *Nken v. Holder*, 556 U.S. 418, 435 (2009); *see also Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 512 (D.C. Cir. 2016) ("[T]he government's interest is the public interest."). West Point will not be harmed by an injunction requiring it to stop illegally denying equal treatment to applicants. *See, e.g., Doster v. Kendall*, 54 F.4th 398, 428 (6th Cir. 2022) ("The government usually cannot rely on the harm from stopping its likely unconstitutional conduct."). And "[n]o public interest is served by maintaining an unconstitutional policy when constitutional alternatives are available to achieve the same goal." *Agudath Israel of Am.*, 983 F.3d at 636. Again, the Coast Guard Academy operated for years without considering race as a factor in admissions, with no discernible consequences. West Point—like every other university this cycle—can too.[5]

## CONCLUSION

For these reasons, this Court should grant SFFA's motion. By December 1, 2023, West Point should be preliminarily enjoined from considering race as a factor in admissions.

---

[5] The court should not require a bond. "[T]he District Court is vested with wide discretion in the matter of security." *Doc's Assocs. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996). Waiving the bond requirement is particularly appropriate here because SFFA is likely to succeed on the merits, and "there has been no proof of likelihood of harm" to West Point by an injunction that stops them from violating the Constitution. *Id.*

Dated: September 19, 2023

Respectfully submitted,

*s/ Thomas R. McCarthy*

Adam K. Mortara (*pro hac vice* forthcoming)
(TN Bar No. 40089)
LAWFAIR LLC
40 Burton Hills Blvd., Ste. 200
Nashville, TN 37215
(773) 750-7154
mortara@lawfairllc.com

Thomas R. McCarthy (*pro hac vice* forthcoming)
Patrick Strawbridge (*pro hac vice* forthcoming)
J. Michael Connolly (*pro hac vice* forthcoming)
Bryan K. Weir (*pro hac vice* forthcoming)
Cameron T. Norris (*pro hac vice* forthcoming)
James F. Hasson (*pro hac vice* forthcoming)
R. Gabriel Anderson (*pro hac vice* forthcoming)
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
patrick@consovoymccarthy.com
mike@consovoymccarthy.com
bryan@consovoymccarthy.com
cam@consovoymccarthy.com
james@consovoymccarthy.com
gabe@consovoymccarthy.com

*Counsel for Students for Fair Admissions*

**CERTIFICATE OF SERVICE**

I certify that on September 19, 2023, I electronically filed the foregoing with the Clerk of the

Court using the Court's ECF system, which will automatically send email notification to all counsel of

record. I am also serving the foregoing by certified mail, return receipt requested, to the addresses

below:

United States Military Academy at West Point
606 Thayer Rd, West Point, NY 10996

United States Department of Defense
1400 Defense Pentagon Washington, DC 20301-1400

Hon. Lloyd J. Austin III
Secretary of Defense
United States Department of Defense
1400 Defense Pentagon Washington, DC 20301-1400

Hon. Christine Wormuth
Secretary of the Army
Department of the Army
101 Army Pentagon, Washington, DC 20310-0101

LTG Steven Gilland
Superintendent, United States Military Academy at West Point
United States Military Academy at West Point
606 Thayer Rd, West Point, NY 10996

LTC Rance Lee
Director of Admissions, United States Military Academy at West Point
United States Military Academy at West Point
606 Thayer Rd, West Point, NY 10996

*s/ Thomas R. McCarthy*