CHAPTER SEVEN

# BRANCHING AND ASSIGNMENTS

The next stage of the personnel life cycle is the selection of the particular career field and related assignments each servicemember fulfills during his or her time in the military. Together, these career field and assignment selections can affect potential promotion opportunities to higher ranks. However, due to both structural and perceptual barriers, there are potential demographic differences in career field preferences and command assignment opportunities that influence the future demographic diversity of senior military leadership. This chapter describes those barriers and how they can be addressed through policy changes.

## Career Fields, Key Assignments, and Demographic Diversity

As a first step in examining the role played by career fields and assignments in senior military leadership diversity, the Commission explored both the extent to which specific career fields and assignments are related to advancing to senior leadership ranks and the extent to which racial/ethnic minorities and women may be underrepresented in those key career fields and assignments. The Commission used common DMDC-provided AC and RC datasets for these analyses. The data presented in this section are from December 2008 for the AC and June 2010 for the RC. Data on the Coast Guard were not included in the analyses because DMDC personnel data for the Coast Guard were not available.

### Enlisted Career Fields

Based on recent data, it appears that functional support and administration occupations are most closely aligned with membership in the senior enlisted ranks in the AC. However, racial/ethnic minorities and women were not underrepresented in functional support and administrative occupations and were not overrepresented in occupations that are currently aligned with junior enlisted pay grades, such as services and supplies. Thus, for the enlisted corps, there is no evidence that career fields have played any significant role in the underrepresentation of racial/ethnic minorities and women in senior leadership ranks within the AC. Given these results, the Commission did not pursue this line of research for the RC.

### Officer Career Fields

For both the AC and RC officer corps, data indicate that flag/general officers were, in the periods under consideration, disproportionately drawn from tactical/operational

(i.e., combat) career fields. As Figure 7.1 shows, AC officers with tactical/operational backgrounds tended to increasingly populate the higher levels of military leadership.

Furthermore, compared with other occupations, tactical/operational occupations tended to have higher concentrations of white men. For example, Figure 7.2 shows the percentage of tactical/operational and nontactical/nonoperational AC officers in pay grade O-3 who were white men. (For reference, it also shows the percentage of white men among all flag/general officers.) Even at the O-3 level, 75 percent of all officers in tactical/operational occupations were white men, compared with 50 percent of the officers in nontactical/nonoperational occupations. A similar pattern was seen in the RC.

Of course, the demographics of recent flag/general officers depend on the demographics of their own cohorts and not on the demographics of officers recently at the O-3 level. Nonetheless, Figure 7.2 demonstrates that the tendency of tactical/operational occupations to contain higher fractions of white men persisted as recently as 2008.[1] Thus, as long as tactical/operational occupations continue to be associated with advancement to higher officer grades, and as long as these tactical/operational occupations continue to consist predominantly of white men, there is likely to be limited improvement in the demographic diversity of flag/general officers.

## Key Assignments

The demographic diversity of the officer corps is greatly affected by which career fields and specialties officers enter. However, the types of assignments that officers choose or are given once they enter their career fields can also affect the demographic diversity of the officer corps. In general, this is not a factor for the enlisted corps, so the Commission chose to focus specifically on key assignments for officers.

The Commission defined key assignments as those assignments that are recognized to be especially demanding, to have high visibility, and to provide competitive advantage for advancement. Although none of the Services has "a checklist of assignments required for promotion from one grade to the next," each Service branch, community, and career field has "a notional career path comprising work and educational assignments that will make a due-course officer effective and credible" (Schirmer et al., 2006). Based on the experiences of the Commissioners and presentations from the Services, these assignments include holding leadership and staff assignments during one's early career, holding command assignments, meeting certain educational milestones (e.g., getting advanced academic degrees, attending in-residence professional military education, particularly at war colleges), and holding executive officer or assistant positions to current flag/general officers. In addition, current law stipulates that AC officers are required to complete a full joint duty assignment and be designated a joint qualified officer prior to appointment to the rank of flag/general officer.

---

[1]   According to information provided to the Commission by the Coast Guard, a majority (about 71 percent) of Coast Guard tactical/operational (i.e., mission-execution) positions are currently filled by white male officers. However, the same can be said of nontactical/nonoperational (i.e., mission-support) positions, which are largely (about 70 percent) held by white male officers.

**Figure 7.1. Percentage of AC Officers in Tactical/Operational Occupations, December 2008, by Pay Grade**



SOURCE: Defense Manpower Data Center, 2009.

**Figure 7.2. Percentage in Nontactical/Nonoperational and Tactical/Operational Occupations Who Were White Men, December 2008, by Service**



SOURCE: Defense Manpower Data Center, 2009.

In general, the Services do not collect systematic data on demographic differences in the key assignments just described. However, for both the AC and RC, several of the Services do capture some data on command assignments. An examination of the AC O-5 and O-6 command selection/screening processes for the command selection boards in the Army, Marine Corps, and Navy[2] revealed that racial/ethnic and gender differences in O-5 and O-6 command selection rates were not the result of a clear bias for or against any particular group but that a vast majority of personnel (i.e., at least 80 percent) selected for O-5 or O-6 command during the period under review were white men. Similarly, RC data showed that, across all the Services, the majority of command billets in the RC were filled by white men.

These findings suggest that racial/ethnic minority and female representation in recent cohorts of command selectees was low because racial/ethnic minorities and women were not highly represented in the candidate pools for command assignments. The lower representation of racial/ethnic minorities and women in candidate pools for command assignments may be due to race/ethnicity and gender differences in accessions, branching, continuation, previous key assignments, and previous promotion rates prior to command.

## Barriers to Entering Tactical/Operational Career Fields and Serving in Key Assignments

For racial/ethnic minorities and women, barriers to entering tactical/operational career fields and serving in key assignments can affect their ability to reach the senior leadership ranks, particularly in the officer corps. This section describes two types of barriers that currently exist—structural barriers and perceptual barriers.

### Structural Barriers

The Commission identified two structural barriers related to tactical/operational career fields and key assignments—one for women and one for racial/ethnic minorities. The barrier for female officers is created by the collection of DoD and Service assignment policies known as the *combat exclusion policies*. These policies work at two levels. First, they explicitly prohibit women from serving in certain tactical/operational career fields, such as infantry in the Army. Second, within the career fields that are open to women, the policies may prevent women from getting key assignments because they prohibit women from being assigned to units that are likely to be involved in direct offensive ground combat (Harrell & Miller, 1997; Segal & Segal, 2004). Specifically, the assignment policy determines to which unit a female servicemember trained in a particular occupation can be assigned to perform her job. Thus, the assignment policy does

---

[2]  Three of the Services provided AC command selection outcomes by race/ethnicity and gender. Specifically, the Commission was able to compare outcomes of the O-5 and O-6 command selection/screening processes for the command selection boards, by FY, in FY 2006–FY 2010 for the Army, FY 2007–FY 2009 for the Marine Corps, and FY 2007–FY 2009 for the Navy aviation community and the Navy surface warfare officer community.

not curtail what women can do, but it does affect the units to which women can be assigned.

These combat policies are most restrictive in the Army and the Marine Corps. Calculations from 2003 data show that women can serve in only 91 percent of Army and 92 percent of Marine Corps occupations, compared with 99 percent of Air Force and 94 percent of Navy occupations (Segal & Segal, 2004). The percentage of Navy occupations has likely increased since these data were reported because, in early 2010, the Secretary of Defense lifted the ban barring female officers from serving on submarines (Peck, 2010). All occupations in the Coast Guard have been open to women since 1978 (U.S. Coast Guard, n.d.).

Although the percentages presented above regarding the occupations open to women do not appear inordinately low, exclusion from these occupations has a considerable influence on advancement to higher positions. For example, in 2006, 92.3 percent of all Army occupations were open to women. However, the remaining 7.7 percent of Army occupations were the combat arms occupations of infantry, armor, artillery, cavalry, and special forces, which are closed to women because of the current DoD policies that exclude women from direct ground combat. This relatively small percentage of combat arms occupations was held by 29.4 percent of all Army personnel and, in this case, was held exclusively by men (Harrell et al., 2007). Additionally, 2006 data show that, in the Army, *80 percent of general officers (ranks O–7 and above) came from combat arms occupations* (Lim et al., 2009).

> We have one 4-star female, there is no doubt in my mind that she . . . [could have commanded a] division, she is that professional. She's done everything that any of us have done. So, the culture said no, simple as that.
>
> —Lieutenant General Julius W. Becton, Jr., remarks to the Commission, 2010

The structural barrier related to tactical/operational career fields and key assignments for racial/ethnic minority officers is created by the interaction of two patterns related to accession source. First, nonwhite officers are less likely than white officers to commission via the Service academies. Second, the Army and the Air Force allocate a larger portion of tactical/operational slots to their Service academies compared with other officer commissioning sources. Therefore, in these Services, commissioning via a Service academy provides an advantage in terms of securing assignment to a tactical/operational career field.

Finally, the structural barriers that keep racial/ethnic minorities and women from entering tactical/operational career fields also function as barriers to obtaining command assignments. That is, the lower representation of racial/ethnic minorities and women in tactical/operational career fields means that those servicemembers have fewer opportunities for command.

## Perceptual Barriers

Although there are likely perceptual barriers for female servicemembers, the majority of prior research has focused on perceptual barriers for racial/ethnic minority male servicemembers. In particular, evidence suggests that more white men than racial/ethnic minority men prefer tactical/operational career fields in the Army (Lim et al.,

FROM REPRESENTATION TO INCLUSION: DIVERSITY LEADERSHIP FOR THE 21ST-CENTURY MILITARY

2009) and the Air Force (Haygood & Morris, 2009) and that more white men than minority men enter special operations forces in the Army, Navy, and Air Force (Kirby et al., 2000). These findings persist even after controlling for such factors as rankings on merit-based lists for initial branching.[3]

There are several potential reasons for the difference in preferences. For example, research has found that racial/ethnic minorities tend to prefer military career fields that they believe will provide skills (e.g., engineering skills) that will readily transfer to the civilian sector (Kirby et al., 2000). Generally, these skills are more likely to be found in nontactical/nonoperational occupations. Additionally, research suggests that, compared with white communities, racial/ethnic minority communities typically know less about certain career fields and are less supportive of decisions to pursue those career fields. For example, Kirby et al. (2000) found that, compared with racial/ethnic minorities, more of the white participants they interviewed knew about special operations forces, such as Navy SEALs, when they were children. The study also found that some racial/ethnic minorities perceive that people in certain military occupational specialties hold racist attitudes. For example, some of the racial/ethnic minority servicemembers interviewed commented that Army Green Berets and Rangers were believed by many to be white organizations with racist attitudes. Finally, anecdotal accounts suggest that identification with certain career fields may be lacking due to the absence of successful racial/ethnic minority role models in those career fields.

There are also potential perceptual barriers that prevent racial/ethnic minorities and women from obtaining key assignments, such as command. In particular, racial/ethnic minorities and women may lack sufficient knowledge about key assignment opportunities, perhaps because racial/ethnic minorities and women do not receive the same career counseling or mentoring about key assignments as their white male counterparts. If this is the case, they would be more likely to miss career-enhancing assignment opportunities.

## The Services Should Optimize the Ability of Servicemembers to Make Informed Career Choices from Accession to Retirement—with Special Emphasis on Mentoring

*Recommendation 8—*

**The Services should ensure that their career development programs and resources enhance servicemembers' knowledge of career choices, including Reserve Component opportunities,**

---

[3]  Most of the Services' officer commissioning sources have rankings of cadets/midshipmen in terms of "merit-based" factors. These rankings are used to make initial branching and assignment decisions. For example, Army ROTC cadets are put on an Order of Merit List based on a weighted composite of academic grade point average, leadership performance and skills, and physical fitness qualifications (Lim et al., 2009). Although the Services use different strategies when employing merit-based rankings, cadets/midshipmen who are higher on the list generally receive earlier consideration terms of career field preferences than do cadets/midshipmen who are lower on the list.

*to optimize the ability of servicemembers to make informed career choices from accession to retirement.*

- *a. Mentoring and career counseling efforts shall start prior to the initial career field decision point and continue throughout the servicemember's career.*

- *b. Mentoring programs shall follow effective practices and employ an active line of communication between protégé and mentor.*

The Services provide a variety of career development resources, including formal mentoring programs, career counseling events held at individual installations, and websites that provide links to career development information (such as career guides, contact information for career counselors or mentors, and information about enlisted-to-officer programs). However, there are few available data on the effectiveness of these programs and resources.

Additionally, research shows that, compared with nonmentored individuals, mentored individuals tend to be more highly compensated, to receive more promotions, to be more satisfied with their career, to have greater expectations for advancement, to be more committed to their career, and to be more satisfied with their job (Allen et al., 2004). For example, the autobiography of Lieutenant General Frank E. Petersen describes the importance of mentoring to his success. Lieutenant General Petersen describes how, in 1950, as a young cadet, he was having a particularly difficult time with an instructor and was seriously contemplating dropping out of the Naval Aviation Cadet Program. However, he then encountered a phenomenon he considered "an absolute miracle": He saw "a tall black Army Air Corps captain."

> When I was at the War College in 1975 to 1976, thanks to General Becton, I was supposed to go to the Army War College, but because he was sitting on the board for the National War College . . . he plucked me off and threw me into National War College, and I thank you for that again, Julius. I thank you many times.
>
> —The Honorable Colin Powell, remarks to the Commission, 2010

> [The captain] was Dan "Chappie" James, . . . holding forth at the Sugar Bowl on one of his trips home. I was feeling pretty down, and we talked for about two hours. I told him about the hard times, the racism, the possibility of never making it because of that. I laid it all out there, including the fact that the black guy just in front of me had been wiped out. I felt that "they" were simply waiting to wipe me out, too. . . . Chappie stayed so long that he had to cancel his civilian flight home. He could've run. He didn't. He stayed there and listened. He didn't say an awful lot at first, except that I could make it if I wanted it badly enough. . . . I looked at him and somehow felt new resolve. I mean, here was a living example that it could be done. I had a role model now. He patted me on the shoulder, then he said it again: "Just don't give up." That audience with Chappie helped get me through. (Petersen & Phelps, 1998)

Young Petersen became the first black Marine Corps aviator and retired from the Marine Corps as a lieutenant general.

Based on this evidence about the potential benefits of mentoring, the Commission assumes that servicemembers who receive high-quality mentoring relationships from their Services will be able to make more-informed career decisions. This ability is particularly important for minority male servicemembers, who may not choose tactical/operational career fields partly because of a lack of knowledge about the potential benefits of entering such career fields.

### Mentoring and Career Counseling Efforts Shall Start Prior to the Initial Career Field Decision Point and Continue Throughout the Servicemember's Career

The Commission found that the Services value mentoring relationships that benefit both ends of the relationship: Protégés gain from the experience and knowledge of their mentors, and mentors gain a sense of satisfaction and pride from helping to develop the careers of junior individuals. Like many organizations, the Services provide mentoring to inform servicemembers of their career options and to help them develop professionally and personally. However, the Services did not indicate to the Commission that there is a particular focus on mentoring prior to initial career path decisions. Furthermore, a Commission survey involving a small sample of AC servicemembers revealed that, although there were not strong opinions about these career development resources and the assignment process, servicemembers reported that they gained only moderate knowledge of the career process early in their careers. Given that officers in tactical/operational career paths are significantly more likely to be promoted into flag/general officer positions, it is important that newly commissioning officers make their initial career field decisions with full knowledge of these issues.

Mentoring can also have particular benefits for the RC. First, when it comes to retaining qualified and successful servicemembers, mentoring can help inform exiting active-duty members about opportunities available in the RC. Additionally, the RC has its own constraints and issues, particularly for servicemembers who have transitioned from active duty. These include knowledge of the force structure, knowledge of the promotion system, and the geographic distribution of billets that could affect career decisions. Therefore, the Commission recommends that the Services ensure that, for both the AC and RC, mentoring efforts start prior to the initial career decision point and continue throughout the career life cycle.

### Mentoring Programs Shall Follow Effective Practices and Employ an Active Line of Communication Between Protégé and Mentor

Mentoring can play an essential part in career development, but mentoring can also backfire if there is no solid understanding of what makes mentoring relationships successful. Descriptions of the Services' current mentoring programs and practices indicate that the Services are making extensive efforts to assist servicemembers in their career development. However, there is very little information about the effectiveness of these efforts, either collectively or for specific demographic groups.

Research on mentoring has shown that effective mentoring relationships and programs are characterized by practices that include establishing clear objectives, allow-

ing mentees and mentors to establish multiple mentoring relationships, providing high-quality training for both mentors and mentees, and (if relevant to the mentoring program) matching mentors and mentees based on multiple criteria that align with the goals of the mentoring program (Allen et al., 2006; Finkelstein & Poteet, 2007). These characteristics represent effective practices that can be adopted by the Services. In addition, mentoring programs should foster the development of continuous, active lines of communication between mentors and mentees. Finally, the Services should evaluate the outcomes of their mentoring programs against predetermined goals and criteria. The Services can do this through surveys, interviews, and focus groups used to gather information about mentoring experiences. The Services should also track over time the careers of individuals who use their mentoring programs and tools to assess the extent to which mentoring has helped individuals at key career points.

## DoD and the Services Should Eliminate Combat Exclusion Policies for Women

*Recommendation 9—*

*DoD and the Services should eliminate the "combat exclusion policies" for women, including the removal of barriers and inconsistencies, to create a level playing field for all qualified servicemembers. The Commission recommends a time-phased approach:*

- *a. Women in career fields/specialties currently open to them should be immediately able to be assigned to any unit that requires that career field/specialty, consistent with the current operational environment.*

- *b. DoD and the Services should take deliberate steps in a phased approach to open additional career fields and units involved in "direct ground combat" to qualified women.*

- *c. DoD and the Services should report to Congress the process and timeline for removing barriers that inhibit women from achieving senior leadership positions.*

The Commission recommends that DoD and the Services eliminate the combat exclusion policies that have barred women from direct ground combat fields and assignments since the early 1990s. As previously described, these policies constitute a structural barrier that prevents women from entering the tactical/operational career fields associated with promotion to flag/general officer grades and from serving in career-enhancing assignments. The Commission is *not* advocating a lowering of standards with the elimination of the combat exclusion policy. Qualification standards for combat arms positions should remain in place.

The Commission considered four strands of argument related to rescinding the policies. First, the Commission addressed arguments related to readiness and mission capability. One frequently cited argument in favor of the current policies is that having women serving in direct combat will hamper mission effectiveness by hurting unit morale and cohesion. Comparable arguments were made with respect to racial integration but were ultimately never borne out. Similarly, to date, there has been little evidence

FROM REPRESENTATION TO INCLUSION: DIVERSITY LEADERSHIP FOR THE 21ST-CENTURY MILITARY

> First of all, with regard to women in Combat Arms, I don't think you will see a change because I don't think our women want it to change, okay? There are certain demands of officers in a Combat Arms environment that our women see, recognize, appreciate, and say, I couldn't do that—in fact, I don't want to do that because I don't think it best prepares me for success if I am trying to do those things against the male population at Lieutenant, Captain, Major, and Lieutenant Colonel.
>
> —General James T. Conway, remarks to the Commission, 2010

that the integration of women into previously closed units or occupations has had a negative effect on important mission-related performance factors, such as unit cohesion (Defense Department Advisory Committee on Women in the Services, 2009; Harrell & Miller, 1997; McSally, 2007). A study by the Defense Department Advisory Committee on Women in the Services (2009) actually found that a majority of focus group participants felt that women serving in combat in Iraq and Afghanistan have had a positive effect on mission accomplishment.

Additionally, panel members discussing this topic at a September 2010 Commission meeting cited the need to bring to bear all talent: The blanket restriction for women limits the ability of commanders in theater to pick the most capable person for the job. For example, Colonel Martha McSally noted,

> If you want to have the best fighting force, why would you exclude 51 percent of your population from even being considered for any particular job? I've seen recent statistics that say 75 percent of our Nation's youth between the ages of 17 and 25 are not even eligible to be in the military based on whether it's mental, medical, or other—criminal issues or whatever. So we just have a very small pool to pick from. So if we're trying to have the most ready force, why would we just exclude 51 percent of the population from even competing? (McSally, 2010)

Second, and relatedly, the Commission considered whether the policies are still appropriate given the changes in warfare and doctrine that have occurred over the last decade. DoD and Service policies that bar women from certain combat-related career fields, specialties, units, and assignments are based on standards associated with conventional warfare and well-defined, linear battlefields. However, the current conflicts in Iraq and Afghanistan have been anything but conventional. As a result, some of the female servicemembers deployed to Iraq and Afghanistan have already been engaged in activities that would be considered combat related, including being collocated with combat units and engaging in direct combat for self-defense (see Defense Department Advisory Committee on Women in the Services, 2009, and Harrell et al., 2007). Thus, the combat exclusion policies do not reflect the current operational environment.

Third, the Commission addressed arguments related to discrimination and fairness. Many Commissioners consider the policies fundamentally discriminatory because they stipulate that assignment decisions should be based solely on gender, without regard to capability or qualifications.

Finally, the Commission considered whether there might be unanticipated effects from rescinding the combat exclusion policies, especially with regard to opening career fields. In particular, the type of effect such a policy change would have on enlisted recruiting is unknown. If young women perceive the opening of combat career fields to mean that they will be *required* to enter these occupations rather than being *allowed* to volunteer for them, female propensity to enlist may drop, and the Services may find it difficult to achieve their recruiting missions.

> This is about discrimination of the first order. This is 2010, and as we look at outyears for war, it will probably be much more electronic than it is now. We have things from Creech Air Force Base fighting unmanned vehicles in Afghanistan right now. So we cannot look at the war that was fought in Vietnam and compare that to today or future wars. It's going to be totally different. This has to do with every American citizen being able to be considered for anything that they are qualified to do. It's about discrimination at its very basics.
>
> —Rear Admiral Mary O'Donnell, remarks to the Commission, 2010

Based on these considerations, the Commission recommends that DoD and the Services eliminate their combat exclusion policies for women, including the removal of barriers and inconsistencies, to create a level playing field for all qualified servicemembers. This should be done using a phased approach so that all potential issues, including how to best implement new policies, can be thought through. This recommendation was approved by a majority, but not all, of the Commissioners. Due to concerns regarding the potential effect of the policies' removal on unit effectiveness and to potential challenges associated with implementation, a small number of Commissioners did not approve recommending removal of the policies immediately but instead favored further study. On the other hand, a small number of other Commissioners believed that the recommendation is not strong enough. They would have preferred a more forceful recommendation to immediately eliminate the policies.

The Commission proposes three strategies for implementing this recommendation.

## Women in Career Fields/Specialties Currently Open to Them Should Be Immediately Able to Be Assigned to Any Unit That Requires That Career Field/Specialty, Consistent with the Current Operational Environment

As previously discussed, current DoD and Service assignment policies prohibit women from being assigned to units that may be involved in direct ground combat. Again, this means that, for a given occupation, the policies determine to which units a female servicemember may be assigned to do the job for which she has been trained. However, given the nature of the wars in Iraq and Afghanistan, women are currently engaged in direct combat, even when it is not part of their formally assigned role. Two key features of the policies have created the disconnect between the roles women may be formally assigned (policy) and the roles they may fill while deployed (practice).

First, many of the terms used in the policies have either lost or changed meaning: Such concepts as "enemy," "exposed to hostile fire," "forward," and "well forward" are no longer useful when determining which units should be closed to women. The enemy is no longer clearly and consistently identifiable, and all units are essentially exposed to hostile fire. Additionally, the spatial concepts of "forward" and "well for-

ward" are inadequate to convey the complexity of such operations as those in Iraq and Afghanistan.

Second, once a female servicemember has been assigned to a unit, the assignment policy prescribes neither what duties she can do nor with which other units she may interact. As a result, women are performing in combat roles. Indeed, local commanders have the authority to use their personnel as they see fit to fulfill the unit mission. Harrell et al. (2007) found examples of female servicemembers who had been trained as cooks having received the Combat Action Badge in Iraq, likely because contractor cooks obviated the need for U.S. servicemembers to cook. Instead, these women, along with their male colleagues trained as cooks, were performing other duties, such as guard duty, that placed them in greater danger.

The Commissioners were in near-unanimous agreement that this aspect of the combat exclusion policies should be eliminated immediately because, given current practices for employing women in the wars in Iraq and Afghanistan, it seems obsolete. The assignment policies constitute an *unnecessary* barrier to women's advancement.

### DoD and the Services Should Take Deliberate Steps in a Phased Approach to Open Additional Career Fields and Units Involved in "Direct Ground Combat" to Qualified Women

As previously discussed, tactical/operational career fields are associated with advancing to flag/general officer grades. Therefore, as long as the combat exclusion policies bar women from entering tactical/operational career fields and units, women will be at a disadvantage compared with men in terms of career advancement potential. The Commission is not arguing that women cannot reach senior leadership levels without being in tactical/operational career fields, and it is not asserting that a large number of women will necessarily choose to enter tactical/operational career fields, given the opportunity. However, the Commission believes that the existing policies are a structural barrier whose removal could help improve both the career advancement potential of qualified women and, ultimately, the demographic diversity of senior leaders. Therefore, the Commission recommends that DoD and the Services take steps to open all career fields and units to all qualified women.

### DoD and the Services Should Report to Congress the Process and Timeline for Removing Barriers That Inhibit Women from Achieving Senior Leadership Positions

Although there are no laws that specifically restrict women from being assigned to any career field, specialty, assignment, or unit, Title 10, Section 652, does require the Secretary of Defense to report to Congress about changes to the current combat exclusion policies. Therefore, the Commission recommends that DoD and the Services report to Congress the process and timelines for developing and implementing new policies based on recent combat experience. To be clear, this recommendation means that DoD and the Services will have to first determine *how* to develop and implement new policies, not *whether* to do so.

CHAPTER EIGHT
# PROMOTION

The next stage of the personnel life cycle is selecting servicemembers for promotion. In the military's closed personnel system,[1] the demographic diversity of senior leadership depends largely on the relative career progression rates of members of each demographic group: If racial/ethnic minorities and women advance at lower rates than white men, they will be underrepresented in the top leadership positions. Thus, potential barriers to promotion and resulting demographic differences in promotion rates can affect the future demographic diversity of senior military leadership.

Typically, there are more servicemembers eligible for promotion than can be selected, so selection depends critically on identifying the best and most-qualified candidates. To understand how racial/ethnic minorities and women are currently faring in the military promotion process, the Commission asked the Services to provide data regarding average promotion rates.[2] The findings presented in this chapter do not reflect RC data, however. The information requested from the RC either had not been compiled or collected or was not available in a comparable format.

## Demographic Differences in Average Promotion Rates

### Line Officer Promotion Rates

The Services were asked to provide data on line officers in pay grades O-4 through O-6. Line officers are officers who serve in combat-related specialties, and they constitute the majority of officers. Noncombat specialties include chaplains, lawyers, logisticians, and medical officers. Also, comparing line officers controls for potential occupational differences that may influence promotion rates, such as being in a tactical/operational career field.

In several cases, the data showed that promotion rates from O-4 through O-6 for several racial/ethnic minority groups were lower than the average. In particular,

---

[1]  As described in Chapter Four, the military operates as a closed personnel system in that senior leaders cannot be brought in from the outside but are instead brought up through the lower ranks. Therefore, as previously noted, each stage of the military personnel life cycle—from who is recruited to who is promoted—is intricately linked to the composition of the future military leadership.

[2]  Army and Air Force averages are based on data from FY 2007 to FY 2009, Navy and Coast Guard averages are based on data from FY 2007 to FY 2010, and Marine Corps averages are based on data from FY 2008 to FY 2010.

- In all the Services, black (Hispanic and non-Hispanic) officers' promotion rates were substantially lower than the pay grade–specific average promotion rates for their respective Services.
- Except in the Army, Hispanic officers' promotion rates were below the Service- and pay grade–specific averages. Across the Services, Hispanic officers tended to have higher promotion rates than black (Hispanic and non-Hispanic) officers.
- Officers from other race/ethnicity groups (i.e., Asians, Pacific Islanders, American Indians, Alaska natives, and individuals reporting more than one race) in each Service had substantially lower-than-average promotion rates to O-5. In the Air Force and Coast Guard, their promotion rates to O-4 were also below average.
- Female officers in the Navy and Coast Guard had substantially lower-than-average promotion rates to O-4 and O-5.

The Commission also examined demographic differences in flag/general officer promotion rates. However, discussion of flag/general officer promotion rates requires an important caveat: The racial/ethnic minority and female representation in the eligible populations for promotion to O-7, O-8, and O-9 can be very small. In those circumstances, a single promotion can cause a racial/ethnic minority or female promotion rate to change substantially. Therefore, flag/general officer promotion rates are provided for descriptive reference only. Overall, the data show that, in the period under review, the promotion rates of women to O-7 and O-8 roughly equaled the Service averages. This was also true of Asian/Pacific Islanders (except for promotions to O-8 in the Coast Guard). Although Hispanics had well-above-average promotion rates to O-7 in the Marine Corps and Coast Guard, the promotion rates of blacks (Hispanic and non-Hispanic) to this pay grade were below average for these Services. Finally, blacks (Hispanic and non-Hispanic) and Hispanics experienced very low promotion rates to O-8 in the Army and Marine Corps.

## E-7 to E-9 Promotion Rates

The Commission examined potential demographic differences in average promotion rates for AC senior noncommissioned officers (i.e., enlisted ranks E-7 through E-9). Overall, the data indicate that there were a few cases, especially in the Marine Corps, in which advancement differed by race/ethnicity or gender. However, below-average rates for racial/ethnic minority noncommissioned officers were not the widespread problem they were for officers. The key findings were that

- Black (Hispanic and non-Hispanic) marines had substantially lower-than-average promotion rates to E-7, E-8, and E-9.
- Hispanic Marines had promotion rates to E-7 and E-8 that were somewhat lower than average.
- Airmen from other race/ethnicity groups (i.e., Asians, Pacific Islanders, American Indians, Alaska natives, and individuals reporting more than one race) had a substantially lower-than-average promotion rate to E-9. Marines from these

other race/ethnicity groups had a promotion rate to E-7 that was somewhat below average.

- Female marines had a substantially lower-than-average promotion rate to E-9 but a higher-than-average promotion rate to E-7. Female soldiers had slightly below-average promotion rates to E-8 and E-9.

Thus, data on recent AC line officer promotion rates indicate that, overall, racial/ethnic minority officers had lower promotion rates than white officers for pay grades O-4 through O-6. With only a few exceptions—for example, Hispanic Army officers—this pattern appears to have held for all the Services and each race/ethnicity group. However, the gender differences for officers and the racial/ethnic or gender differences for enlisted servicemembers were more varied across both the Services and pay grades and thus do not signal the same widespread, persistent majority-minority gap.

## The Officer Promotion Process

It is hard to identify any single reason for or barrier that explains the lower promotion rates of racial/ethnic minorities and women in the military. The Commission did not have access to the required data to control for the effects of other variables when analyzing the rates presented above; however, the current rates tend to be similar to those found by past analyses that did control for factors other than race/ethnicity or gender (see Hosek et al., 2001). Because below-average officer promotion rates appear to be a widespread issue across several Services (rather than just one Service, as in the case of enlisted promotion rates), the Commission further explored the existence of institutional or individual bias in promotion selection boards, assignment histories, performance evaluations, and knowledge of the promotion process.

### Promotion Selection Boards

Overall, the Commission found that the promotion board process appears to be designed to be institutionally fair and to mitigate the effects of bias on the part of any individual board member. Selections are made not by a single individual but rather by multimember boards that are, to the extent possible, demographically representative of the pool of candidates. Furthermore, the guidance to these boards—delivered in the form of precepts, instructions, and laws—requires that selections be based on the needs of the Services and that they meet the best-and-fully-qualified criterion, without regard to race/ethnicity or gender.

### Assignment Histories and Performance Evaluations

The Commission explored the potential for unfairness in the inputs to the promotion process in terms of assignment histories and performance evaluations. For example, each functional community within each Service has a defined due-course career path describing the successive milestones that servicemembers need to achieve to be competitive for promotion to each rank. Because of the strict timing requirements of the

military promotion system, deviations from the due-course path can negatively affect an officer's competitiveness in the selection process. Similarly, bias in the performance evaluations an officer receives can influence the officer's competitiveness in the selection process.

To examine the potential for unfairness in these inputs to the promotion process, the Commission looked at survey data from several different sources. Overall, the survey data regarding servicemembers' perceptions of the fairness of both assignment opportunities and performance evaluations generated ambiguous results. According to the 2009 Workplace and Equal Opportunity Survey of Active-Duty Members (WEOA),[3] racial/ethnic minority servicemembers were more likely than whites to believe that race/ethnicity was a factor in both their assignments and their performance evaluations. In contrast, both the 2008 Status of Forces Survey (SOFS)[4] and a Commission supplement to the Defense Equal Opportunity Management Institute (DEOMI) Organizational Climate Survey (DEOCS)[5] indicated that white and nonwhite servicemembers had similar perceptions about the fairness of these two "inputs." These two surveys did, however, find significant differences by gender: According to responses on both the SOFS and the DEOCS, women were less likely than men to agree that they received the assignments they needed to be competitive for promotion.

In addition, prior research by Hosek et al. (2001) examining differences in career progression for officers in the 1970s and 1980s found that a potential explanation for the lag in black officer career progression was that black officers were more likely to be given assignments that took them off the due-course career path. Although this research is dated, the findings are consistent with the Commissioners' more recent

---

[3]   The survey targets active-duty members of the Air Force, Army, Coast Guard, Marine Corps, and Navy who had completed at least six months of service at the time the survey was first fielded and were below flag/general officer rank. For the 2009 WEOA, data were collected predominantly via the web in February, March, and April 2009, and completed surveys (defined as those with at least half the survey questions answered) were received from 26,167 eligible respondents. The resulting sample of respondents was 72 percent enlisted and 28 percent officers, and 84 percent DoD and 16 percent Coast Guard.

[4]   The *Status of Forces Survey of Active Duty Members* is administered to DoD servicemembers three times a year; the Coast Guard does not participate in the SOFS. As with the WEOA, the target population is active-duty members who had completed at least six months of service and were below flag/general officer rank six months prior to data collection. Members of the National Guard and Reserve in active-duty programs were not eligible. The SOFS data used here were collected via the web between November 5 and December 19, 2008. A total of 10,435 eligible servicemembers returned usable surveys, again defined as those with at least half the questions answered. The final sample included 3,474 officers (33 percent), 6,303 enlisted servicemembers (61 percent), and 658 warrant officers (6 percent).

[5]   The Commission added several sets of questions to learn about servicemembers' perceptions of various aspects of the promotion system, and its questions were fielded during March 2010. During this period, a total of 2,196 servicemembers completed the survey, with 2,004 respondents providing usable information. The sample includes AC and RC servicemembers, but the RC sample was too small to allow for separate analysis by demographic group. Relevant shares of the final sample were 87 percent enlisted personnel, 12 percent officers, 1 percent warrant officers, and 60 percent white non-Hispanic. It is important to note that the DEOCS sample is much smaller than the WEOA and SOFS samples, and the DEOCS sample was collected without the use of any particular sampling methodology. Therefore, it is less likely to have been representative of the population of servicemembers as a whole.

experience in their Services. Furthermore, although the 2001 study by Hosek et al. and an OSD report based on the study's early findings (Gilroy et al., 1999) recommended that DoD conduct further research to determine whether black officers' promotion rates were indeed hampered by recruiting- and EO-related deviations from the due-course career path, the Commission was unable to find any indication that this recommendation was ever implemented.

## Knowledge of the Promotion Process

Finally, the Commission explored the extent to which servicemembers felt they had adequate knowledge of the promotion process. Overall, the Services reported using multiple approaches to educate servicemembers about how to be successful in general and about the promotion system in particular. These approaches include formal seminars, formal and informal mentoring, and the establishment of websites that provide general and community-specific information about key career milestones and due-course career paths. However, the Commission also found that no Service is systematically evaluating the effectiveness of these tools, either overall or for different demographic groups.

## Improve Transparency So That Servicemembers Understand Performance Expectations, Promotion Criteria, and Processes

*Recommendation 10—*

*DoD, the Services, and Chief, National Guard Bureau, must ensure that there is transparency throughout their promotion systems so that servicemembers may better understand performance expectations and promotion criteria and processes. To do this, they*

- *a. Must specify the knowledge, skills, abilities, and potential necessary to be an effective flag/general officer or senior noncommissioned officer.*

- *b. Shall formalize the process and requirements for 3- and 4-star officer selection in DoD Instruction 1320.4.*

- *c. Shall educate and counsel all servicemembers on the importance of, and their responsibility for, a complete promotion board packet.*

This recommendation calls for making the promotion system as transparent as possible to ensure that all servicemembers have adequate and equal knowledge in their efforts to proactively manage their own careers. Although the Commission did not have data for the RC with which to assess demographic differences in promotion rates or perceptions of the fairness of the RC promotion process, these recommendations should also help improve promotion opportunities for RC servicemembers. To implement this recommendation, the Commission proposes three strategies.

## Specify the Knowledge, Skills, Abilities, and Potential Necessary to Be an Effective Flag/General Officer or Senior Noncommissioned Officer

Many have noted that future leaders in the officer corps will require a greater mix of knowledge, skills, and abilities in order to be effective in changing operational environments. This claim is supported by changes that have already occurred as a result of the wars in Iraq and Afghanistan and against Al-Qaeda and its Violent Extremist Affiliates and by forecasts of needed competencies that have been laid out in such reports as the *Quadrennial Defense Review Report*. For example, many of the forecasts suggest a greater need for foreign-language, regional, and cultural expertise as well as improved expertise in cyber warfare. Although the demand for these skills is growing, in terms of career advancement, it is often risky for servicemembers to deviate from traditional career paths if they seek to reach the highest ranks of the military.

As previously discussed, research shows that the majority of flag/general officers are drawn from tactical/operational occupations. Although there are positions that must be filled by an officer from a tactical/operational occupation, there are other flag/general officer positions that do not require the knowledge, experience, skills, and abilities of an officer in a tactical/operational occupation. The experiences of some Commissioners suggest, for example, that key leadership positions in combat support and combat service support organizations are slated for combat arms officers instead of officers who have spent their entire careers in combat support and combat service support positions. This tendency to slate key flag/general officer positions for those in tactical/operational occupations limits the ability of officers in other occupations to fill key assignments that would increase their likelihood of further promotion.

> [W]hen I became an armor officer, supposed to be qualified with tanks and all of those kinds of things, I have never fired a tank on a tank range. I have never gone down range in any part of a tank, and yet I commanded an armor brigade with two tank battalions and an infantry battalion. When I went into combat in Vietnam, I had never been in a cavalry unit, yet I commanded an airborne cavalry unit. When I took command of a division that was converted to an armored division, I had never been on a tank range in a tank, so someone saw something in what I could do. . . . [W]e ought to keep that in mind . . . . I don't think we want to deny a person an opportunity when they may not be "qualified." It depends on how you define being qualified.
>
> —Lieutenant General Julius W. Becton, Jr., remarks to the Commission, 2011

Therefore, the Commission encourages a change to a more flexible officer career development system that starts with core competencies and progresses to a broader range of skills as the officer becomes more senior. In the short term, based on the knowledge, skills, abilities, and potential required for senior leadership positions, the Services should give consideration, where appropriate, to a wider range of officers. This approach may increase promotion opportunities for racial/ethnic minorities and women who would otherwise not be considered for more-senior levels of advancement.

## Formalize the Process and Requirements for 3- and 4-Star Selection

DoD Instruction 1320.4 contains some information on O-7 to O-8 and O-9 to O-10 promotions, but it lacks an overview of the entire process. Therefore, the Commission

recommends that the selection process for flag/general officers from ranks O-7 through O-10 be made transparent through description and documentation in DoD Instruction 1320.4, *Military Officer Actions Requiring Approval of the Secretary of Defense or the President, or Confirmation by the Senate*, which outlines the current promotion policy.

### Educate and Counsel All Servicemembers on the Importance of, and Their Responsibility for, a Complete Promotion Board Packet

As part of their educational efforts, the Services already provide officers with some instruction on how to construct a complete promotion packet in preparation for being evaluated by a promotion board. With this recommendation, the Commission calls out this fundamental step as necessary to ensuring that the promotion system works minimally well for all officers. This is a simple procedural step that, if not done properly, could decrease a servicemember's chances of promotion. The Services should ensure that education on constructing complete promotion packets is effective and that it reaches all servicemembers equally.

In addition to recommending improvements to the transparency of the promotion process, the Commission also makes a recommendation, described immediately below, to address potential unfairness in the inputs (i.e., assignment histories and performance evaluations) to the promotion process.

### Ensure That Promotion Board Precepts Provide Guidance on How to Value Service-Directed Special Assignments Outside Normal Career Paths or Fields

*Recommendation 11—*

***The Services shall ensure that promotion board precepts provide guidance regarding Service-directed special assignments outside normal career paths and/or fields. As appropriate, senior raters' evaluations shall acknowledge when a servicemember has deviated from the due-course path at the specific request of his or her leadership.***

Although the Commission was not able to conduct a systematic analysis of officer assignment patterns across the Services, there is some indication that officers who are members of demographically underrepresented groups are disproportionately diverted from their due-course career paths to fill recruiting and EO assignments, thus making them less competitive for promotion. This result is mainly supported by the Commissioners' collective wisdom and a study by Hosek et al. (2001). Acknowledging that this pattern has not been confirmed, the Commission feels strongly that officers should not be penalized for helping their Services execute their diversity efforts: It is not only unfair to the officers but also detrimental to the Services' demographic diversity goals. Therefore, the Commission recommends that the Services ensure that promotion board precepts provide guidance to board members on how to value Service-directed assignments that take officers off the due-course path and recommends that, when possible,

performance evaluations note whether a candidate has taken an unusual assignment at the request of his or her leadership.

Although the main motivation for this recommendation is to eliminate institutional bias that might contribute to the promotion gap between racial/ethnic minority and white officers, the wording is intentionally general, referring to any Service-directed assignment that falls outside the community norm. This wording reflects the Commission's position that diversity encompasses many kinds of human difference and contributes to mission capability. In particular, diversity of experience, potentially reflected in deviations from the due-course path, is expected to be of extra value in the context of changing warfighting environments and in the development of new doctrine. Indeed, the current conflicts in Iraq and Afghanistan may already be changing the Services' ideas about what is considered a "key" assignment. The recent *Quadrennial Defense Review Report*, for example, highlights the need to build expertise in foreign-language, regional, and cultural skills (U.S. Department of Defense, 2010). These changes mean that promotion boards must be open to nontraditional assignment histories until due-course career paths can be reevaluated.

CHAPTER NINE

# RETENTION

Because career progression depends on the ability to retain as well as promote servicemembers, it is important to examine whether there are demographic differences in who chooses to remain in and who chooses to separate from military service. It is also important to identify potential barriers that influence demographic differences in retention.

To calculate the retention behavior of different demographic groups for the AC, the Commission accessed records from FY 2000–FY 2008 from the Proxy Personnel Tempo files provided by DMDC and from information provided separately by the Coast Guard. For the RC, the Commission accessed records from FY 2004–FY 2009 from the Reserve Component Common Personnel Data System files provided by DMDC.[1] For the AC, the Commission calculated reenlistment rates based on those servicemembers who were eligible (i.e., who had completed at least 17 months of service) both to voluntarily leave active-duty service and to reenlist. Officer retention was based on continuation rates of officers, which are calculated as the percentage of officers in the same Service observed at year $t$ and again at year $t$ + 1.[2] For the RC, retention for both enlisted servicemembers and officers was calculated based on continuation rates.

## Retention of Racial/Ethnic Minorities

### Active Component Retention

Among AC enlisted servicemembers, the reenlistment rates of non-Hispanic blacks, Hispanics, and non-Hispanic Asian/Pacific Islanders were higher than those of whites and members of other races or ethnicities (i.e., American Indians, Alaska Natives,

---

[1]  The data focus specifically on the Selected Reserve.

[2]  These continuation rates do not distinguish between voluntary and involuntary separation. Differences in personnel management in the enlisted and officer communities led the Commission to focus on reenlistment rates among active-duty enlisted servicemembers and on continuation rates among active-duty officers. Enlisted servicemembers enlist for a set period of time and, after the completion of that term of service, must decide either to leave or to reenlist for another term. If the servicemember chooses to stay, another stay/leave decision must be made at the end of the second service obligation, and so on. Therefore, retention behavior among enlisted servicemembers can be studied at the time of a decision point using reenlistment rates. In contrast, officers are free to leave active-duty service at any point after an initial obligation period and do not have to make specific recommitment decisions at any particular point. Therefore, retention behavior among officers is usually measured through continuation rates.

and individuals of more than one race). This pattern was consistent across all Services. However, the gap in reenlistment rates shrank as time in service increased.

For AC officers, on average, non-Hispanic black and Hispanic officers had cumulative continuation rates that were greater than or equal to whites' rates at every year-of-service point. Specifically, after the fourth year of service, non-Hispanic blacks and Hispanics had consistently higher rates of continuation than both whites and members of other racial/ethnicity minority groups. Until 20 years of service, when differences in retention begin to taper, the differences between non-Hispanic blacks, Hispanics, and whites became more pronounced as years of service increased. The one exception to this trend is found in the Air Force, where non-Hispanic blacks consistently had lower continuation rates than whites until year 20, at which point the gap began to close. The retention rates for other racial/ethnic minority officer groups are more complicated because the rates varied according to Service. On average, the rates of non-Hispanic Asian/Pacific Islanders and members of other minority races/ethnicities (i.e., American Indians, Alaska Natives, and individuals of more than one race) were less than or equal to the rates of whites. Thus, for both the AC enlisted and AC officer corps, racial/ethnic minorities were, overall, more than or equally as likely as whites to remain in service.

### Reserve Component Retention

Among RC enlisted servicemembers, average continuation rates varied somewhat across Service components and years of service. However, overall, non-Hispanic Asian/Pacific Islanders and Hispanics had higher average continuation rates than whites. On the other hand, non-Hispanic blacks and, in some Services, members of other minority races/ethnicities (i.e., American Indians, Alaska Natives, individuals of more than one race, and those of unknown race) had significantly lower average continuation rates than whites. However, the lower continuation rates of non-Hispanic blacks and members of other minority races/ethnicities (i.e., American Indians, Alaska Natives, individuals of more than one race, and those of unknown race) were small, ranging from only a 1- to 4-percentage–point difference.

Among officers in the RC, average continuation rates also varied somewhat across Service components and years of service. Overall, though, the continuation rates of racial/ethnic minorities were higher than or the same as the rates of whites. The only exceptions to this pattern were non-Hispanic blacks in the Air Force Reserve, the Marine Corps Reserve, and the Navy Reserve and non-Hispanic Asian/Pacific Islanders in the Coast Guard Reserve. Again, these differences in promotion rates were relatively small, ranging from only a 1- to 4-percentage–point difference.

## Retention of Women

### Active Component Retention

Examining retention among AC enlisted servicemembers, the Commission found that, across the Services, women were less likely than men to remain in service. There

are two notable exceptions: In the Air Force, women's reenlistment rates early on in their careers (between 17 months and six years of active service) were higher than men's during the mid-2000s. Similarly, men and women had very comparable reenlistment rates earlier on in their careers in the Marine Corps.

Similarly, female officers across the Services were less likely to be retained than male officers. During the first three years of service as an officer, men and women displayed similar continuation rates. However, by the time officers had completed their fourth year of service, differences between male and female continuation rates began to emerge and to increase with years of service through roughly years 8 to 12. By the tenth year of service, the percentage-point difference between male and female officer cumulative continuation rates was 10 in the Army, 15 in the Navy, and 20 in both the Marine Corps and Air Force. In other words, although both male and female officers separated from the military as years of service increased, female officers separated at higher rates during the period under consideration. This difference in later years is likely the result of retention rather than promotion because it occurs before the first competitive promotion point. However, after 20 years of service, the gender gap begins to narrow again, with a difference of less than 5 percentage points by 30 years of service. Thus, overall for both the AC enlisted and officer corps, women were less likely than men to remain in service.

## Reserve Component Retention

Women enlisted in the RC, no matter what the Service, were less likely than men to remain in service. Furthermore, continuation rates for women generally remained below those of their male counterparts across years of service, with only some increase in retention past 20 years of service.[3]

As in the case of enlisted trends, data on RC officer continuation rates show that, across all the Services, women were less likely than men to remain in service. In general, female continuation rates were lower than male rates until roughly ten years of service. Female continuation rates then rose above those of their male counterparts between ten and 20 years of service and then dropped back down below the rates of men after 20 years of service. Thus, overall, for both the RC enlisted and RC officer corps, women were less likely than men to remain in service.

## Gender Differences in Attitudes Toward Military Life

Although there were small differences in the retention rates of racial/ethnic minorities compared with those of whites, particularly in the RC, the largest gap in retention rates was between men and women. To explore why this gender gap in retention exists, the Commission examined potential differences in servicemembers' attitudes toward military life. Using data from the DMDC's November 2008 SOFS (found at Defense

---

[3]  RC servicemembers may have had prior service time in the AC before joining the RC. Therefore, the Commission uses the Years of Service Pay Entry Base Date as a measure of years of service rather than years of service in the RC. This Years of Service Pay Entry Base Date metric measures years of service from the time a servicemember first joins the Armed Forces.

Manpower Data Center, 2010c), the Commission assessed whether there were gender differences in satisfaction with military life, organizational commitment, and retention intentions.[4]

In the AC, female enlisted servicemembers were as likely as their male counterparts in the Army, Navy, Air Force, and Marine Corps both to be satisfied with the military way of life and to report that they intended to remain in the Armed Forces. Similarly, in the AC Air Force, Marine Corps, and Navy, female officers were as likely as their male counterparts both to be satisfied with the military way of life and to report that they intended to remain in the Armed Forces. There was an exception in the case of female Army officers, who, compared with their male counterparts, reported being less satisfied with the military and less likely to stay. Consistent with the AC, female servicemembers in the RC were as likely as their male counterparts to report that they were satisfied with the military way of life and that they intended to remain in the Armed Forces.

However, the results also showed that AC enlisted female soldiers and sailors were less likely than their male counterparts to report that they saw the military as a career. Similarly, across all four DoD Services, female AC officers were less likely than their male counterparts to report that they saw the military as a career. The Commission did not have data on RC servicemember attitudes toward a military career.

Finally, through the DEOCS, the Commission gathered additional AC data on potential reasons for leaving military service.[5] Overall, the results from the DEOCS suggest that men and women cited similar reasons for leaving active duty. Both genders reported dissatisfaction with their job, low pay, and lack of promotion or advancement opportunities as reasons for leaving. For male officers, the most frequently cited

---

[4]  The AC sample consisted of 37,494 servicemembers of the Air Force, Army, Marine Corps, and Navy who had completed at least six months of service and were below flag/general officer rank six months prior to data collection. A total of 10,435 eligible servicemembers returned usable surveys (3,474 officers, 6,303 enlisted servicemembers, and 658 warrant officers). The RC sample included responses from the Army National Guard, the Army Reserve, the Navy Reserve, the Marine Corps Reserve, the Air National Guard, and the Air Force Reserve. The Coast Guard does not participate in the SOFS.

[5]  Survey data were collected in two periods during February–March and May 2010. Although a total of 3,419 servicemembers completed the survey during this period, the Commission focused its attention on the 1,111 AC officers and enlisted servicemembers who reported that they either were leaving at the end of their current obligation (n = 592) or were not sure whether they were leaving at the end of their current obligation (n = 519) and whose responses were not missing data on race/ethnicity, gender, branch of Service, or rank.

Just over half of the servicemembers in the analytic sample were in the Army (616), and roughly one-third were in the Navy (315). The rest were spread throughout the Marine Corps (87), Coast Guard (70), and Air Force (23). The distribution of respondents across Services reflects differences in how each of the Services uses the DEOCS. The DEOCS is typically not used by the Air Force, which relies on its own internal climate survey. Therefore, it is likely that the Air Force respondents in the sample were in a cross-Service command. In the Navy and Marine Corps, unit participation in the DEOCS is required within 90 days of a new commander taking command and every year thereafter. The Army has its own climate survey that must be administered to units within 90 days of a new commander taking command, but the DEOCS is also available to commanders who choose to use it. The Coast Guard requires administration of the DEOCS to each unit annually, as long as the unit contains at least 16 servicemembers. In general, DEOMI does not generate a DEOCS report unless at least 16 assigned personnel complete the survey.

reason for leaving was failure to be promoted. Although there were fewer female officer responses to analyze, the high frequency of deployments and the desire to settle in one location were both listed as primary motivations for separating. Among male enlisted servicemembers, low pay and low allowances was the most frequently cited reason for leaving; among female enlisted servicemembers, involuntary separation or ineligibility to reenlist was the most frequently cited reason. Overall, however, none of the data points to a single reason or single set of reasons that can explain why women haven chosen to leave military service at higher rates than men.

## DACOWITS Should Expand Its Focus to Include an Explanation of the Gender Gap in Retention

*Recommendation 12—*

***Where appropriate, DACOWITS should expand its current focus on retention to include an explanation of the gender gap in retention. As part of this renewed focus, DACOWITS should examine the effects of retention programs, such as the sabbatical programs currently offered by the Navy and the Coast Guard as well as any other innovative Service-specific approaches to retention. Findings and recommendations from this research should be presented to the Secretary of Defense.***

Because the data do not clearly indicate why more women leave service earlier and at greater rates than men, the Commission recommends that the Defense Advisory Committee on Women in the Services (DACOWITS) expand its current focus on retention to examine the gender gap in retention. This examination should also explore why women are less likely to view the military as a career and should help to identify existing policies and practices that may effectively decrease the retention gap between men and women.

The Commission also suggests that DACOWITS examine the effectiveness of a number of sabbatical programs. All the Services currently offer a number of these programs to enhance retention among their servicemembers. However, because the law prohibits the award of benefits to individuals solely based on gender, designing retention programs specifically aimed at women is challenging. Thus, retention outcomes related to three potentially effective, and legal, sabbatical programs should be more fully explored.

In FY 2009, the Navy began to conduct a pilot program, the Career Intermission Pilot Program, to encourage retention through enhanced career flexibility. The National Defense Authorization Act for Fiscal Year 2009 allows 20 officers and 20 enlisted members in each Service to participate in the program each year. The program, which is open to both men and women, allows officers and enlisted personnel to temporarily (for up to three years) take time off from active duty. Participants in the program transition from the AC to the Individual Ready Reserve during this period. Although those who participate in a career intermission do not receive active-duty pay or allowances, they do retain medical and dental care benefits and continued access to

commissaries, exchanges, and Morale, Welfare, and Recreation programs. Service-members incur an additional active-duty service obligation of two months for every month of participation in this career intermission. Upon their return to active duty, participants return at the same rank they held upon entering the program.

The Coast Guard has two sabbatical programs worthy of exploring. The first, Care for Newborn Children, and the second, Temporary Separation Program, are restricted to individuals who are at the rank of E-4/O-3 or above. To qualify for Care for Newborn Children, at least four years of active-duty service in the Coast Guard are required; six years are required to qualify for the Temporary Separation Program. Both programs allow for up to a 24-month absence, and the servicemember receives no pay or benefits while away. Upon return, individuals are reinstated at the same rank they held upon leaving, assuming that they meet physical fitness requirements and return within two years. Servicemembers may take advantage of one sabbatical, but not both.

The Commission suggests that DACOWITS examine the available data on these leave programs as well as other innovative Service programs and assess the effect of their expansion on female retention. The Commission also recommends that DACOWITS disseminate the findings and recommendations from its review to a wide audience, including the Secretary of Defense. This can help facilitate the use of successful retention practices that close the gender gap across Services.

CHAPTER TEN

# GOING BEYOND RACE/ETHNICITY AND GENDER

Although the majority of Chapters Four through Nine has focused on increasing racial/ethnic and female representation within senior military leadership, the Commission also recommends tracking and improving other aspects of diversity within the military.

## DoD and the Services Must Better Manage Personnel with Mission-Critical Skill Sets

*Recommendation 13—*

***DoD and the Services must track regional and cultural expertise and relevant Reserve Component civilian expertise and continue to track language expertise upon military accession and throughout servicemembers' careers in order to better manage personnel with mission-critical skill sets.***

As noted in the recent *Quadrennial Defense Review Report*, DoD needs to build regional, cultural, and foreign-language expertise in order to prepare for future security needs (U.S. Department of Defense, 2010). Given that no one can predict where the next conflict might be and what future regional expertise would be needed, it is prudent to track all language and cultural expertise, not just that specified by the current *Quadrennial Defense Review Report*, throughout servicemembers' careers.

In addition, certain RC civilian expertise can be a critical aid to missions. RC personnel may, via their civilian careers and other experiences, possess skills that are in high demand in the military. Some of these skills, such as regional, cultural, and language expertise, are linked with demographic diversity. Others, such as those related to science and technology, go beyond demographics. Therefore, the Commission recommends that DoD and the Services codify and track civilian expertise that is deemed mission critical.

A mechanism that could be used to track relevant RC civilian expertise is the Civilian Employment Information program, which requires each member of the Ready Reserve to report employment status, employer's name and address, civilian job title, and years of experience in current civilian occupation. This information is stored in the Reserve Component Common Personnel Data System. This program could be expanded to collect information on servicemember skills, including regional, cultural,

language, technical, and scientific expertise. This information would then be available to commanders looking for servicemembers with specific skill sets.

## DoD Must Promote Structural Diversity, Total Force Integration, and Overall Retention

*Recommendation 14—*

*To promote structural diversity, total force integration, and overall retention,*

- *a. DoD must improve the personnel and finance systems affecting transition between Active and Reserve Components and internal Reserve Component transition protocols.*
- *b. The Assistant Secretary of Defense for Reserve Affairs and the Service Chiefs must assess how Reserve Component members can more effectively both gain operational experience and fulfill joint requirements within the constraints of their dual military/civilian lives and take action as appropriate.*

### Improve the Personnel and Finance Systems Affecting Transition Between Active and Reserve Components and Internal Reserve Component Transition Protocols

Personnel leaving the AC are valuable resources for the RC, but the current process for transitioning from the Active Duty List to the Reserve Active Status List is lengthy and inefficient. On average, it takes one to six months to transition from the AC to the RC. To encourage servicemembers to join the RC rather than leave the military, DoD needs to improve personnel and pay systems to facilitate the transition. For example, many steps in this process could be made more efficient through automation and better interfaces between personnel and financial (i.e., pay) systems across the Services. These improvements could include automatic checks and balances wherever possible, real-time updated billet availability for assignment approvals, and close-to-real-time transitions between personnel and pay systems across the Services. Overall, streamlining this process would give the RC access to a broader talent pool by making it easier for a servicemember leaving the AC to join the RC.

Additionally, flexible service opportunities, such as seamless transition within the RC, have the potential to improve structural integration within the RC. The force structure constraints of one RC Service may limit promotion opportunities for some qualified servicemembers; however, another RC Service may not have the same constraints. By moving from one RC Service to another, servicemembers can take advantage of a wider variety of promotion opportunities.

### Assess How RC Members Can More Effectively Gain Operational Experience and Fulfill Joint Requirements

Joint requirements are currently not aligned with the career path of traditional drilling reservists in the National Guard and Reserve. Unlike their AC counterparts, RC ser-

vicemembers must meet their military educational and operational requirements without detriment to or neglect of their civilian occupations. In addition, their window of opportunity to gain operational experience and credibility in their primary area of concentration and to complete a joint assignment is particularly narrow; thus, these two career milestones are often mutually exclusive. As a result, because they may lack joint qualifications or because they missed out on key operational assignments, many traditional RC servicemembers become uncompetitive for flag/general officer consideration.

To address this issue, the Commission recommends that DoD and the Services implement policy that provides flexible opportunities for officers to become joint-qualified to accommodate the constraints and requirements of the RC career path. In particular, the Services should provide mechanisms for officers to acquire both joint and operational experience, at the appropriate rank, and they should provide enough education slots so that all qualified National Guard and Reserve servicemembers can complete their joint professional military education and other education requirements in a timely fashion.

The purpose of this recommendation is to promote a highly qualified RC officer corps that can effectively compete for the highest ranks in the military. The Commission believes that this can add to the structural diversity of the upper ranks by ensuring that traditional reservists are qualified to be promoted to the highest ranks.

## Conclusion

The chapters in this section outlined how specific stages of the military personnel life cycle and related structural and perceptual barriers influence the diversity of future military leaders. In an effort to improve the career progression of racial/ethnic minorities and women at each stage, the Commission made detailed recommendations to address key barriers.

Through partnerships and outreach programs, DoD and the Services can attempt to address current eligibility issues. Improved recruiting efforts focused on members of underrepresented demographic groups can then help improve the demographic diversity of initial accessions. The removal of combat exclusion policies for women and further development of effective mentoring efforts can create opportunities for, and educate servicemembers regarding the importance of, career field selection and key assignments to career advancement. Ensuring that the promotion process is transparent and fair can then help ensure that members of all demographic groups receive opportunities for advancement. Further research into the current gender gap in retention can lead to changes that ensure that there is a demographically diverse pool of candidates for promotion. Finally, going beyond demographics, other important diversity dimensions, such as language skills, cultural expertise, and the structural diversity brought by the RC, should be promoted within the Services. Taken together, these recommendations can help develop and sustain a talented military leadership that truly represents the face of America.

# SECTION IV:
# ENSURING CONTINUED PROGRESS

CHAPTER ELEVEN

# MANAGING AND SUSTAINING DIVERSITY

So far, this report has suggested a new definition of diversity, proposed that diversity leadership be a core competency in the Services, and recommended ways that barriers to career advancement can be reduced at all stages of a military career both for under-represented demographic groups and for people with desirable backgrounds and skill sets. These changes, however, cannot be managed and sustained without developing a stronger organizational structure and a system of accountability, monitoring, and enforcement to ensure continued progress toward greater diversity at all ranks of the military.

This chapter highlights the priorities in these areas and makes recommendations to address them. It begins with the need for a management system with oversight from a Chief Diversity Officer who reports directly to the Secretary of Defense. It then identifies the need for strategic diversity planning, new policies, and metrics for measuring progress across the Services and within DoD. Finally, it describes the importance of holding leaders accountable for progress toward achieving a military workforce that is not only diverse demographically but also inclusive of all the characteristics required for high performance in the future.

## Priority: Aligning the Organizational Structure to Support an Effective Diversity Management System

Currently, responsibility for diversity management in OSD is assigned to the Office of Diversity Management and Equal Opportunity (ODMEO). This office is charged with promoting EO throughout DoD and overseeing diversity policy for DoD, including coordinating the diversity efforts of the Services. The diversity mission was an added function initiated by ODMEO leadership to help DoD incorporate diversity management practices and processes into its workforce management culture.

> In addition to the CEO's leadership, responsibility for diversity in "best-practice" companies is seen as a line-management responsibility, not as a Human Resources . . . staff program or initiative.
>
> —Defense Business Board Task Group on Increasing Diversity in DoD's Flag and Senior Executive Ranks, 2004

ODMEO grew out of the Office of the Deputy Under Secretary (EO) (DUSD(EO)), which was established under the Principal Deputy Under Secretary of Defense (Personnel and Readiness). DUSD(EO) was established in 2003, when the Deputy Assistant Secretary of Defense for EO was elevated to the position of DUSD(EO) and the position was filled by a

political appointee. When that political appointee departed in 2006, the Office of the DUSD(EO) was renamed ODMEO and placed under the Deputy Under Secretary (Plans). On one hand, this realignment mainstreamed diversity and EO by integrating responsibility for these functions into the established organization responsible for "developing and implementing change in high priority areas within Personnel and Readiness" (Under Secretary of Defense (Personnel and Readiness), 2006). On the other hand, this change dealt two blows: demotion in status and loss of a political appointee position to set and carry out the agenda (Haughton, 2010). In 2010, the position of Deputy Under Secretary (Plans) was eliminated, and ODMEO was placed under the Deputy Under Secretary (Readiness).

> I think . . . this office has been diluted, has been moved down in a food chain to a point where there is no punch. Taking away the Deputy Assistant Secretary position, burying them five dead letters down in an organization is not the answer.
>
> —The Honorable D. Michael Collins, remarks to the Commission, 2010

For some time, then, ODMEO has been isolated from top leadership and unable to set the agenda or drive progress. Although several key diversity initiatives have been undertaken, the diversity management function of ODMEO's portfolio has been slow to develop (Johnson, 2011).[1] Today, ODMEO remains an understaffed office several levels below the Secretary of Defense. In the military departments and the Services, the placement of—and funding and staffing for—the diversity offices varies considerably.

The Commission looked to industry to see how companies with exemplary diversity programs approach and organize for effective diversity management. The Commission found that the personal engagement of top leadership is the single most important factor in achieving diversity leadership and inclusion across any organization. In corporations, personal engagement from the CEO has been shown to be vital. In the U.S. military, the Secretary of Defense is analogous to the corporate CEO and, as such, should be responsible for pushing DoD forward on the path to inclusion. He and his successors will, however, need help and continuity to enforce new policies and ensure that progress continues to be made. *The Commission believes that a systems approach is needed to ensure the sustained emphasis on diversity that has been lacking in the past. Within that system, the establishment of a Chief Diversity Officer (CDO)—a practice common to all the diversity exemplars studied—is the key driver toward embedding diversity within the "DNA" of DoD.*

---

[1]   ODMEO's accomplishments include sponsoring a diversity summit, establishing the Defense Diversity Working Group, and promulgating DoDD 1020.02, *Diversity Management, Equal Employment Opportunity, and Military Equal Opportunity in the Department of Defense* (Issue Paper #7; Issue Paper #20; Lim et al., 2009).

## Establish the Position of Chief Diversity Officer

*Recommendation 15—*

**The Office of the Secretary of Defense organizational structure must be aligned to ensure a sustained focus on diversity and diversity initiatives and should include establishment of the position of a Chief Diversity Officer who reports directly to the Secretary of Defense.**

- **The existing Research & Analysis office should be directed and resourced to support the Chief Diversity Officer.**

- **Chief, National Guard Bureau, must establish and resource organizational structures that support DoD diversity initiatives and reinforce ongoing National Guard diversity leadership efforts.**

In the corporate world, the CDO does not have operational authority per se but depends on others for execution of diversity initiatives. Thus, he or she is a strategic business partner of others in the executive team, "helping them develop strategy for their business units and making sure that they understand what the organization is doing and why, how results are measured, who is accountable" (Dexter, 2010).

The Commission recommends that the DoD CDO report directly to the Secretary of Defense and receive support from the Under Secretary of Defense (Personnel and Readiness), who is analogous to a vice president of human resources. This practice is one way of ensuring that diversity management is embraced as a "line" rather than "staff" responsibility. In addition, this reporting relationship supports the goal of establishing diversity leadership as the CEO's responsibility. It is also consistent with military staff organizations, which typically have a small number of individuals with responsibilities of such importance (e.g., safety) that the commander keeps them close.

The CDO cannot work in isolation, however. *An integrated, holistic system for implementation and accountability is needed if progress is to be sustained.* Figure 11.1 illustrates such an approach and reveals the centrality of the CDO to all facets of the system.

This proposed diversity management system is a set of mutually reinforcing elements that work together to provide effective, consistent implementation and persistent accountability for achieving the goals of diversity and inclusion. Note that all of these components have counterparts in best practices in the Services, the corporate world, or both. The components are

- *Accountability reviews.* The Secretary of Defense meets annually with the leadership of each Service to go over progress toward diversity goals (see Recommendation 17). This prepares him or her for the diversity annual report to Congress.
- *The diversity annual report to Congress.* Called for in Recommendation 5, this report from the Secretary of Defense draws on the Services' accountability reviews to review DoD's progress toward its overarching diversity goals.
- *The early warning/inspector general function.* The set of activities undertaken by the CDO together provides the information needed to alert the Secretary of Defense to potential problems with diversity management progress, programs, or practices.

**Figure 11.1. The Centrality of the CDO Within the Proposed Diversity Management System**



- *The Diversity Policy Integration Group.* The CDO, acting as a strategic business partner, chairs a diversity policy integration group, through which OSD's policy offices take responsibility for implementation of diversity initiatives within their domains.[2]
- *Deputy's Advisory Working Group (DAWG) "Diversity Days."* The DAWG, the existing senior DoD leadership forum, follows up in a regular meeting on over-arching diversity issues (see Recommendation 19).
- *Expanded DACOWITS special studies.* DACOWITS expands the scope of its work to provide external oversight and special studies focused on the diversity issues of the day (see Recommendation 19).
- *CDO supervision of the Research & Analysis office.* The Research & Analysis office provides support for accountability reviews, the diversity annual report to Congress, barrier analyses, and early warning of systemic diversity issues.

## Provide the CDO with Research and Analysis Support

For the CDO to be effective, he or she needs timely, accurate, insightful research and analysis based on objective, standardized data. In its effort to provide recommendations that are executable, the Commission recommends that the CDO turn to the existing Research & Analysis office within the Office of the Under Secretary of Defense (Per-

---

[2]   This group would provide the CDO with access to policy offices that have not traditionally been involved with diversity, and it would ensure the implementation of diversity initiatives, using a "mainstreaming" approach to infuse a diversity perspective across the organization. Implementation of diversity initiatives would be carried out by the Under Secretary of Defense (Personnel and Readiness)'s "line" organizations (Reserve Affairs, Civilian Personnel Policy, Military Personnel Policy, and Readiness) and, ultimately, by the Services.

sonnel and Readiness).[3] This office must be properly resourced to support the many data and analysis requirements needed throughout the system, including accountability reviews, barrier analyses (see Recommendation 18), the diversity annual report to Congress, early warning of systemic diversity issues, the DAWG "Diversity Days," and the expanded DACOWITS special studies.

## Chief, National Guard Bureau, Must Reinforce Ongoing Efforts to Promote Diversity

The unique features of the National Guard require specific attention in terms of implementation and accountability.[4] As codified in Title 10, the President is the Commander in Chief of the Armed Forces of the United States, including the National Guard and Reserve when called to active duty. Most of the time, however, the National Guard is not on active duty and, therefore, not under federal control.

As explained in Chapter Three, Title 32 assigns command of State National Guard units to the Governors of the States when the units are not under federal control. As commander in chief, the Governors select the Adjutant General for their States. Title 10 and Title 32 effectively indicate that Chief, National Guard Bureau, has no command authority over each State's National Guard.

Given these governing laws, the National Guard has a very different command and control structure from that of the AC. The fact that National Guard members report to their State's Governor as commander in chief means that policies are often State-specific and lack national oversight. In September 2009, the National Guard Bureau established the position of Special Assistant to the Chief for Diversity. This "diversity office" has a single position, has no annual budget, and reports to the Comptroller and Director of Administration and Management for the National Guard Bureau. Thus, the current diversity office is not staffed, resourced, or placed appropriately in the organizational chart to influence policy or promote accountability, and top leaders are not involved.[5]

---

[3]   To ensure broad knowledge of workforce issues, the Research & Analysis office should become a truly joint organization by including expert researchers from the major personnel centers of the Services. These Services' analysts could serve at Research & Analysis on a rotational basis. Such a program would institutionalize knowledge sharing among the Services and OSD. Additional expertise could be provided by diversity experts at the federally funded research and development centers. This talent base should serve as an advisory team to support the CDO and the Research & Analysis office.

[4]   Because the major recommendations include the RC through each parent Service, the focus here is on the National Guard.

[5]   The role of the Special Assistant for Diversity is to provide diversity policy for the entire National Guard. The Army and Air National Guard offices are responsible for supporting these policies in each of the states. The Army National Guard has a national diversity office and a diversity coordinator in each State. As of this writing, the Air National Guard planned to stand up a diversity office in January 2011, and it has a Human Resource Advisor in each State. However, these offices do not report directly to the National Guard Bureau's diversity office and are not obligated to advocate national diversity policy. Thus, much of the intended impact of this office is curtailed because it lacks direct implementation power. Given these limitations, good com-

Chief, National Guard Bureau, could take several steps to make the diversity office more effective. As with the Commission's recommendation to establish a CDO who reports directly to the Secretary of Defense, the Special Assistant to the Chief for Diversity should report directly to the Chief, National Guard Bureau, to maximize leadership visibility and involvement. In addition, this office should be properly staffed and resourced to support the policy objectives of the leadership.

A properly resourced diversity office within the Chief, National Guard Bureau, Personal Staff organization can act as the center of communication between the National Guard Bureau and OSD. It can also distribute policy and information to the Air and Army National Guard from the Chief, National Guard Bureau, Personal Staff position. These changes to reporting and resources will increase the ability of the Special Assistant for Diversity to influence National Guard Bureau diversity policy and its implementation.

## Priority: Developing Strategic Plans, Policies, and Metrics for a Diversity Management System

The CDO will need a solid foundation on which to build. First, to be effective and practical, the diversity management system must function within the framework of an overall DoD strategic plan that publicly states a diversity definition, vision, and goals for DoD. But individual Services need their own strategic plans for achieving diversity. Currently, only two Services have such plans: the Air Force and the Coast Guard. The release of the Air Force plan was announced during the writing of this report and was therefore not evaluated. The Coast Guard's plan has objectives, milestones, and metrics. Its focus, however, is primarily racial/ethnic and gender diversity, which is not consistent with the Coast Guard's broad definition of diversity. The other Services have pieces of plans, but they have not been synthesized and promulgated and do not provide detailed, coordinated strategies for achieving the diversity visions. Similarly, roles, responsibilities, authorities, and accountability have not been addressed in any coordinated fashion. Finally, DoD has a diversity policy (DoDD 1020.02), but no strategic plan.

Second, to support the strategic plan, DoD, the military departments, and the Services need a strong set of policies that spells out roles, assigns and aligns responsibilities and authorities, and specifies who is accountable. In addition, to compel progress toward the goals identified in the strategic plan, the Secretary of Defense needs to define a set of strategic metrics that are (1) directly linked to key organizational priorities and goals, (2) actionable, and (3) actively used to drive improvement.

In the area of EO, DoD had in place a number of directives and other policy statements, last revised in the 1990s. Together, these provided a rigorous accountability system designed to ensure the continuation of DoD's pioneering past. These documents included the following mandates:

---

munication about the importance of the message and support for implementing the policy are key elements for successful implementation of national policy in the States, territories, and District of Columbia.

- the DoD Human Goals Charter, part of DoD's EEO policy for civilian employees, to be reissued by each new Secretary of Defense
- the Military Equal Opportunity Assessment, to be compiled annually from reports and data submitted by the Services
- the Defense Equal Opportunity Council, consisting of DoD's top leadership, to promulgate policy and track progress.

However, these mandates were allowed to lapse during the George W. Bush administration and have not been revived under President Barack Obama. The Commission believes that DoD needs newly crafted policies and plans that not only restore its leadership in the area of EO but also address the realm of diversity, broadly defined. Ultimately, the goal of this effort is to embed the values of diversity and inclusion into the culture and practices of the military, as called for in Chapter Three.

Finally, the new system requires a set of metrics that enable leaders to monitor progress toward achieving the goals expressed in the strategic plan. Regular, rigorous evaluations and assessments can help military leaders understand how well the new diversity paradigm defined in the strategic plans is "sticking" and how effective each program is at furthering its goals.

## Implement Clear, Consistent, Robust Diversity Management Policies

*Recommendation 16—*

*DoD and the Services must resource and institute clear, consistent, and robust diversity management policies with emphasis on roles, responsibilities, authorities, and accountability.*

- *a. DoD and the Services shall implement diversity strategic plans that address all stages of a servicemember's life cycle. Each strategic plan shall include*
  - *a diversity mission statement that prioritizes equity and inclusion and provides a purpose that is actionable and measurable*
  - *a concept of operations to advance implementation.*

- *b. DoD must revise (if appropriate), reissue, and enforce compliance with its existing diversity management and equal opportunity policies to*
  - *Define a standard set of strategic metrics and benchmarks that enables the Secretary of Defense to measure progress toward the goals identified in the strategic plan, including the creation of an inclusive environment.*
  - *Establish standards that allow for the collection of data needed to generate these metrics and the analysis needed to inform policy action.*
  - *Provide oversight of, and support for, the Services' respective diversity initiatives and metrics to ensure that, at a minimum, they align with the end state established by DoD.*

FROM REPRESENTATION TO INCLUSION: DIVERSITY LEADERSHIP FOR THE 21ST-CENTURY MILITARY

## Create Diversity Strategic Plans

Under the umbrella of a DoD strategic diversity management plan, each of the Services needs its own strategic plan, crafted to articulate goals related to the amount and type of diversity in its forces and to explain how all types of diversity should be leveraged to improve mission capability. In particular, the strategic plans should highlight the creation of cultures that value equity and inclusion as a fundamental aspect of successful diversity management and should lay the groundwork for embedding diversity leadership as a core competency of the Armed Forces. The diversity plans must also address the whole personnel life cycle of military members to ensure that the Services both recruit effectively from an ever more demographically diverse eligible population and facilitate career progression for a force that will be increasingly diverse along many dimensions, including not just race/ethnicity and gender but also religion, functional expertise, and military component, among others. Within this diversity management construct, facilitating career progression means equipping servicemembers to proactively map out and follow their own career paths.

Finally, to ensure that strategic plans are translated into practical action, each plan should include a concept of operations (CONOPS) to clearly and concisely express what leadership intends to accomplish and how it will be done with available resources.[6] Specifically, the CONOPS should tell leaders how to plan for and monitor the way diversity is managed from recruiting through training, branching, assignment, education, retention, promotion, and command and should identify who will be held responsible for making progress at each stage.

## Revise, Reissue, and Enforce Compliance with Existing Diversity Management and EO Policies

Good policies outlast individual leaders and are required for institutionalization. Currently, the Services' diversity policy statements say nice things about diversity but contain no specifics about what diversity programs should cover, how they should be executed, or who is responsible for achieving the desired results. The DoD policy on diversity management and EO, DoDD 1020.02, provides a general framework by distinguishing between diversity management and EO, but it is vague about implementation and contains no real accountability mechanism.

Following the development of their diversity strategic plans, both DoD and the Services need to strengthen and finalize their diversity management policies, some of which have been in draft form for many years. Service policies will vary according to Service culture and practices, but, as with the DoD and Service-specific strategic plans, DoD needs to provide a fleshed-out policy umbrella under which those policies can operate. In addition, OSD should remedy some of the omissions of the past decade. The military already has several well-established and well-understood EEO and mili-

---

[6]  The U.S. Joint Chiefs of Staff (2010) define a CONOPS as "[a] verbal or graphic statement that clearly and concisely expresses what the joint force commander intends to accomplish and how it will be done using available resources. The concept is designed to give an overall picture of the operation."

tary equal opportunity policies, but some important pieces of DoD EO policies have been allowed to lapse.[7]

These policies will need to be revised in accordance with the vision defined in the DoD strategic diversity management plan and put into effect in ways that not only improve the representation of minorities and women in military leadership but also increase military readiness and support mission accomplishment.

### Define a Standard Set of Strategic Metrics and Benchmarks that Enables the Secretary of Defense to Measure Progress

The Commission's review of management literature and testimony by diversity managers of major companies suggested that metrics empower an organization by enabling managers and workers to evaluate and control the performance of the resources for which they are responsible and by helping them identify gaps between performance and expectation that, ideally, point to intervention and improvement. To do this effectively, however, metrics need to be designed carefully and to result in clearly communicated messages. The final results should provide the user of the metrics with a sense of knowing what needs to be done without requiring him or her to understand the intricacies of every related process. Poorly developed or poorly implemented metrics can lead to frustration and confusion and can send mixed messages.

DoD already has well-established metrics for measuring progress in demographic diversity. According to DoDD 1350.2, *Department of Defense Military Equal Opportunity (MEO) Program*, the Services are required to submit an annual Military Equal Opportunity Assessment that reports the demographic composition of promotions, retention, and assignments for that year and contains data on additional aspects of demographic diversity (U.S. Department of Defense, 1995). This assessment was the sole reporting mechanism required from the Services on their affirmative action and EO policies, and although the report is still a requirement according to policy, it was last produced in September 2004, using FY 2002 data. The Commission recommends that DoD enforce this reporting requirement and compliance with the goals of the Services' strategic plans.[8]

Although the Services do internally track the demographic profile of their personnel, they generally do not systematically track other aspects of diversity, such as cultural expertise and ability, and they do not explicitly evaluate the inclusiveness of the environment. To properly assess the broad diversity climate, DoD and each of the Services must begin tracking, reporting on, and reviewing programs and personnel accordingly.

This requires developing a new set of metrics to capture the inclusion and capability aspects of DoD's broader diversity goals. Assessment results will allow leaders to enforce accountability, identify which strategies are most effective, and acquire

---

[7]  DoDD 1020.02 refers to four major EO directives: DoDD 5500.11 and DoDD 1020.1 on nondiscrimination, DoDD 1440.1 on DoD civilian EEO policies, and DoDD 1350.2 on military equal opportunity policies.

[8]  The Commission recommends that the data continue to be reported but that the accountability review process be used (see Recommendation 17).

a big-picture view of how the new vision of diversity is being received and implemented across the Armed Forces. These metrics must go beyond the traditional "head-counting" metrics (e.g., how many women are in the Navy?) used to assess the success of diversity policies in the past. Relying entirely on the traditional metrics can send the wrong signal about diversity, suggesting that Armed Forces, to meet diversity "standards," need to reach a "quota" of certain people, regardless of their qualifications. Establishing an environment of inclusion is not about adhering to a set of regulations but about working with different people toward a common goal, and it is important to create metrics that are consistent with this new vision.

**The Characteristics of Good Metrics.** The Commission believes that the following are the characteristics of good metrics:

- *Developed with an end state in mind and systematically linked to strategic goals.* Metrics should link intended goals, strategies, and actual execution. Metrics not linked to a strategic end state do not create value for organizations.
- *Clearly stated*. Metrics should be easily understood and communicated.
- *Value-added*. Metrics should deliver value to the organization by providing information on key aspects of performance.
- *Actionable to drive improvements*. Good metrics must provide information that has implications for a clear plan of action.
- *Tracked over time.* Metrics must be tracked over time to provide information on the trend in the metric, not simply its status at one particular moment.
- *Verifiable.* Metrics should be based on an agreed upon set of data and a documented process for converting data into the measure.

The primary property of good diversity metrics is that they go beyond simply calculating representation of particular groups in the workforce and actually measure how those groups are integrated in the workforce. Some of the best measures of this kind can come from administrative data sources. The advantages of these sources are both that they release servicemembers from the burden of filling out surveys and that they are the result of standardized, rigorous administrative processes. The example of disciplinary data is used below to illustrate this point.

**Going Beyond Head-Counting.** Survey data are one means of assessing command climate and the extent to which it is inclusive. Data on EO and sexual harassment complaints provide another source of information.

A third metric for an inclusive environment is provided by discipline data: court martial cases and nonjudicial punishment. Discipline data are more reliable than survey data as an indicator of command climate. Each data point represents the results of an investigation that provided sufficient evidence to bring charges, whereas survey data are based on anonymous responses from self-selected samples of servicemembers.

The Services provided the Commission with recent data on courts martial. The Commission analyzed the available data for 2007 and 2008. Table 11.1 shows the 2008 data across court martial type for the four DoD Services combined. Because the data

**Table 11.1. Court Martial Cases, by Race/Ethnicity Group, 2008**

| Race/Ethnicity Group | No. of Court Martial Cases | Total No. of Military Personnel | Rate of Cases per Thousand |
|---|---|---|---|
| White | 2,937 | 895,965 | 3.28 |
| Black, non-Hispanic | 1,240 | 231,645 | 5.35 |
| Other | 715 | 259,641 | 2.75 |
| Total | 4,892 | 1,387,251 | 3.53 |

NOTE: "Other" encompasses American Indians/Alaska Natives, Asians/Pacific Islanders, Hispanics, and those whose race/ethnicity was unknown.

the Commission received did not use consistent race/ethnicity categories, we show the information for three categories: white, non-Hispanic black, and other.

The discipline data are normalized into rates of cases brought per thousand servicemembers, and they include all active-duty personnel (enlisted servicemembers, officers, and warrant officers). The patterns were consistent across Services and for both 2007 (not shown) and 2008 (shown): Blacks had a much higher rate of being court martialed. The differences were statistically significant: The probability that the differences are due to random chance is very low (less than 0.01). That level of statistical significance was also present in the analysis of each individual Service.

These discipline data can be interpreted in multiple ways. Note that the data presented here do not indicate the outcome of the court martial; information on outcome would add another level of meaning to the data. Differences in discipline rates might reflect difficulties in some servicemembers' feeling fully included in their unit, their Service, and, most importantly, the U.S. military. Differential rates by race/ethnicity might indicate that current acculturation processes have been less successful in getting racial/ethnic minorities to fully incorporate and internalize Service norms, or they might reflect a failure in diversity leadership. Without further investigation, one cannot pinpoint the locations of this potential failure in the existing acculturation process. But the data clearly indicate that the process has failed differentially for black servicemembers.

These data do not take into account an array of relevant factors that influence the numbers, and, due to lack of standardization, the Commission could not look in more depth at patterns for different race/ethnicity categories. It is worth noting, however, that in-depth analyses of such data could be undertaken by the CDO. Such information is a good candidate for a diversity metric at the strategic level.

### *Establish Standards That Allow for the Collection of Data Needed to Generate These Metrics and the Analysis Needed to Inform Policy Action*

Currently, consistency is lacking across the Services in terms of the data they collect and the metrics they employ. For meaningful metrics, a standard set of data definitions and collection procedures that are uniform across the Services must be employed and enforced. Currently, even basic demographic data are not uniform across DoD,

and such metrics as promotion and retention rates are not calculated in a consistent manner. The CDO should promulgate standards for these basic data elements and for the new types of information required to produce more-meaningful measures of diversity and inclusion. The CDO should also produce standards for analytical methodology to ensure that analysis of the data is rigorous, meaningful, and consistent over time and from one Service to the next.

***Provide Oversight of, and Support for, the Services' Respective Diversity Initiatives and Metrics to Ensure That, at a Minimum, They Align with the End State Established by DoD***

The Secretary of Defense, through the accountability review process described in Recommendation 17, will meet annually with Service leadership to discuss the state of diversity within the Services and the Services' progress toward the two goals of demographic representation and mission capability. Annual meetings at this strategic level are necessary to ensure that top leadership across DoD is fully engaged in meeting the diversity goals established by the Secretary of Defense. The CDO will play a key role in this effort by ensuring the production of consistent, meaningful diversity metrics. He or she should also work with the Services' diversity offices to guide and monitor their Service-specific diversity work.

## Priority: Holding Leaders Accountable

Meaningful change is most likely to be sustained if leaders are held accountable for performance at all stages of implementation. Ongoing communication, ongoing assessment, and the establishment of a rewards system are effective approaches to take when trying to change the norms of an organization, but, ultimately, leaders should be responsible for developing an organizational culture that values and benefits from diversity.

The best accountability measures reviewed by the Commission did much more than have managers check a box on a form. Rather, organizations use both internal and external measures to assure top leadership that managers at all levels are committed and engaged. Internally, midlevel leaders are held accountable for their performance in carrying out plans and, if successful, are rewarded accordingly. Externally, all leaders, including those at the top, are reviewed by outside consultants that have the ability to ask the most-difficult questions and give tough feedback—activities that can be challenging for insiders due to lack of critical distance or fear of repercussion.

Once DoD develops a plan, policies, and metrics, it cannot just put them on the shelf. The most-senior leaders must make use of these tools to drive progress by holding themselves and leaders below them accountable for following the plan, implementing the policies, and measuring the results. The diversity annual report to Congress discussed earlier is the bedrock of accountability. It requires the Secretary of Defense to document, from a strategic level, the extent to which the Services are reaching their goals of achieving better racial/ethnic and gender representation across the ranks and creating a more inclusive environment. Later in this chapter, the Commission recommends that the Secretary of Defense add another subject to that annual report.

## Institute a System of Accountability Reviews

*Recommendation 17—*

*DoD must and DHS (Coast Guard) should institute a system of "accountability reviews" that is driven by the Secretaries of Defense and Homeland Security (Coast Guard).*

- *a. The Secretary of Defense shall meet at least annually with Service Secretaries, Service Chiefs, senior enlisted leaders, and Chief, National Guard Bureau, to drive progress toward the diversity management goals identified in the strategic plans. The Coast Guard should be subject to a similar review.*

- *b. The Secretary of Defense and Secretary of Homeland Security should send an annual report to Congress and the President on the progress made toward diversity management goals in the Services, including the Reserve Component; the report should include the barrier analyses described in Recommendation 18.*

- *c. The National Guard Bureau should report annually to Congress and DoD on the status of diversity in each State, territory, and the District of Columbia for all ranks of the Army and Air National Guard. This report shall show how reflective the Army and Air National Guard are of the eligible pool in their particular State or territory or in the District of Columbia.*

    - *Based on the report to Congress, the National Guard Bureau shall produce a "dashboard" of diversity metrics to be used by the Army and Air National Guard. This dashboard shall show comparisons across States, territories, and the District of Columbia and highlight best practices.*

The practice of annual accountability reviews was initiated for the Navy by then-CNO Admiral Mike Mullen and was expanded by his successor, Admiral Roughead. Admiral Roughead sits down annually, one on one, with each of his 16 enterprise heads (all flag officers) on the topic of racial/ethnic and gender diversity within that enterprise or community. In these reviews, each enterprise head discusses with the CNO the demographic diversity health of his or her community.

These meetings do not consist of a 100-slide briefing deck; rather, they are conversations that focus on both progress and problem areas. Enterprise heads are expected to speak knowledgably and comfortably about the current composition of their force, the factors that led to that composition, and any initiatives undertaken to affect that profile in the future.

The Commission considers Admiral Roughead's accountability review process a best practice that each Service can follow either on its own or in support of OSD-level reviews. This recommendation uses the Navy's accountability review construct

> [The accountability reviews] are extraordinarily valuable. . . . [They have] focused leadership in a way that is more than shouting louder. It's about substance, mentoring, development, understanding who you have, moving them along.
>
> —Admiral Gary Roughead, remarks to the Commission, 2010

as the model for a series of similar sessions across DoD that culminate in a meeting between the Secretary of Defense and each Service, represented by its Service Chief,

Service Secretary, and senior enlisted leader. At that meeting, Service leadership discusses with the Secretary of Defense progress in meeting the goals in the Service's diversity strategic plan.

One way for the Service Chief to prepare for the meeting is to sit down, one on one, with his or her enterprise heads or their equivalents. Another option is using the senior leadership forum in each Service to share community diversity status and lessons learned.[9]

Regardless of the specific process, a system of accountability reviews would force diversity accountability down as leaders prepared to brief up the chain. It would also serve as a powerful indicator of leader commitment to achieving and leading a diverse force. Finally, it would enable military leaders not only to see evidence on demographics but also to take stock of the diversity awareness and leadership of those in line to succeed them. In particular, it would provide a forum for senior leaders to assess whether and how leaders at lower levels are leveraging all types of diversity in their units to improve capability.

The roles of the CDO in the accountability review process are preparation and facilitation. The CDO's responsibilities might include analyzing data, assembling evidence, preparing the Secretary of Defense, coordinating with the Services, attending each Service's review, and monitoring compliance with directives.

The command and control structure of the National Guard makes holding leaders accountable at the State level a complex issue. To increase accountability at the State level, the National Guard Bureau should both prepare the diversity annual report to Congress (called for in Recommendation 5b) and set up and maintain a detailed diversity "dashboard" to help National Guard units, and their State leadership, assess their diversity efforts related to demographic representation.[10] The dashboard will include statistics on career progression and on racial/ethnic and gender representation compared with State-specific civilian population benchmarks. Easy access to such data should increase stakeholder and public awareness about diversity issues in the National Guard and, consequently, increase accountability.

The Air National Guard developed a web-based dashboard that enables continuous updating and interactivity. An expanded dashboard covering both the Air and Army National Guard could help each State identify diversity problem areas and solutions. This expanded dashboard should incorporate some of the same statistics included in the diversity annual report to Congress, augmented with diversity indicators at the unit level. Moreover, the dashboard website should include a compendium of diversity best practices and programs. Such a compilation will be a resource for States just beginning (or currently struggling) to implement diversity initiatives.

All of the information contained in the dashboard should be available to the States. Taken together, the statistics and best practices will help leaders assess the

---

[9]   This recommendation envisions focused annual meetings between the Secretary of Defense and the different Service Secretaries, Service Chiefs, and senior enlisted leaders. In contrast, the DAWG would focus on policy and take on specific issues as they arose.

[10]   A dashboard is a detailed display of key metrics.

diversity situation of their units or commands and facilitate improvement in State National Guard diversity programs.

## The Services Should Conduct Annual Barrier Analyses

*Recommendation 18—*

*As part of the accountability reviews, the Services, in conjunction with the Chief Diversity Officer (established in Recommendation 15), should conduct annual "barrier analyses" to review demographic diversity patterns across the military life cycle, starting with accessions.*

- *a. To ensure comparability across Services, DoD shall establish a universal data collection system, and the analyses of the data should be based on common definitions of demographic groups, a common methodology, and a common reporting structure.*

- *b. The annual analyses should include*
  - *accession demographics*
  - *retention, command selection, and promotion rates by race/ethnicity and gender*
  - *analysis of assignment patterns by race/ethnicity and gender*
  - *analysis of attitudinal survey data by race/ethnicity and gender*
  - *identification of persistent, group-specific deviations from overall averages and plans to investigate underlying causes*
  - *summaries of progress made on previous actions.*

The diversity annual reports and the accountability review process will provide military leaders of all components with the information they need to move toward the goals of representation and inclusion. However, the Commission believes that further steps are required to ensure that both the annual reports and the accountability reviews are based on accurate data and that appropriate analysis has converted the data into actionable information.

To prepare for the accountability reviews, each Navy enterprise conducts barrier analyses based on what the data show about how racial/ethnic minorities and women are progressing along the community's notional career path. This practice should be adopted by all the Services and should take place at the Service level. All steps along the career life cycle—recruiting, career field selection, assignment to command and other key billets, education milestones, retention, and promotion—should be assessed. The process should include not only assessments of statistical variances by race/ethnicity and gender and analyses of root causes for any differences (i.e., barriers) but also identification of corrective actions and creation of representation goals and metrics.

Each Service has its own career structures, career progression patterns, and other idiosyncrasies, which it understands best. For this reason, and to ensure that the Services take ownership of diversity initiatives, the Services should take the lead in preparing the barrier analyses. The CDO should serve as a consultant to each Service, ensuring analytical consistency across DoD and seeking to understand any inherent and valid differences. The CDO must ensure that all the Services are adhering to the

data and reporting standards described above. Once the standards are promulgated, accountability reviews within each Service can take advantage of the standards to produce consistent analysis both across communities and over time.

If the barrier analyses, accountability reviews, and annual reports are to be meaningful over time and across reporting groups (i.e., Services and components), consistent, comparable data must be collected from all the Services. OSD should define and DMDC should promulgate these standards and data structures to the Services, and the Services must be directed to follow them. In addition, analysis of the data must also adhere to common standards and methodology.

The Commission's research was hampered by the lack of such standards. All of the Commission subcommittees that analyzed personnel data faced the same problem: lack of consistency across the Services. For example, the Services do not use the same procedures for estimating retention rates or even consistent race/ethnicity categories for their calculations; they also do not regularly report retention results. This made it very hard to make comparisons across Services, but, more importantly, it also makes it difficult to formulate any DoD-wide assessments of retention patterns. This Commission recommendation asks all the Services to collect and analyze equivalent data in order to compare retention rates and other important aspects of career progression, but it still allows them to individually calculate whatever statistics may be meaningful within each Service.[11]

Regardless of the type of data collected, it must be consistent not only across Services but also over time. This can be achieved through the use of common methodologies, data definitions, and reporting conventions. By keeping track of consistent data year after year, DoD and each individual Service can assess when and where interventions may be necessary to address differential rates of career progression. They can also use the data to help assess whether policy or program changes have made a difference.

---

[11] The Commission recommends that three different types of data be collected for the purpose of tracking career progression across diverse groups:

- Personnel data can be used to show actual behavior and outcomes. Personnel data should go beyond race/ethnicity and gender to include other aspects of diversity (e.g., religion; language ability; other low-density, high-demand skills) as need dictates.
- Survey data that show attitudes and opinions can be used to assess why group-level differences in career progression may be occurring. For example, exit surveys could be used to collect information about reasons for leaving active-duty service. Currently, some Services do not conduct exit surveys, and there is no centralized system for collection or analysis of this type of data. In the National Defense Authorization Act for Fiscal Year 2000, Congress required that every member separating from active-duty service during a six-month period be surveyed regarding his or her reasons for leaving. The survey was conducted once by DMDC and never repeated (see Deak et al., 2002).
- Focused qualitative data can more specifically address the issues identified by personnel or survey data. Although exit surveys can be helpful in terms of quantitative analysis, they sometimes do not supply the nuanced reasons for separation from active-duty service. Thus, the Commission also recommends the use of focused qualitative data, such as that obtained in focus groups, to study personnel and manpower issues.

## Institute Mechanisms for Accountability and Internal and External Monitoring for Both the Active and Reserve Components

*Recommendation 19—*

*DoD must and DHS (Coast Guard) should institute mechanisms for accountability and internal and external monitoring for both the Active and Reserve Components.*

- *a. The Services must embed diversity leadership in performance assessments throughout careers.*

- *b. DoD must and DHS (Coast Guard) should establish diversity leadership as a criterion for nomination and appointment to senior enlisted leadership positions and flag/general officers, including 3- and 4-star positions and Service Chief.*
    - *The Senate Armed Services Committee should include this criterion in its confirmation questionnaire.*

- *c. The Secretary of Defense must transfer the functions of the former Defense Equal Opportunity Council to a minimum of biannual meetings of DoD's leadership, the existing Deputy's Advisory Working Group.*

- *d. The Secretary of Defense must expand the DACOWITS charter, where appropriate, to encompass diversity as a whole.*

Over the years, there have been many reports, studies, and bodies established to look at EO and racial/ethnic and gender diversity in the military. The Commission has heard that, in the past, when progress was made in increasing demographic diversity among senior officers, there was no deliberate, coordinated effort to monitor that progress and ensure that it continued. As a result, the same themes and recommendations can be found in studies conducted during the past 20 years.

Early in this chapter, the Commission laid out a system for diversity management, centered on the CDO. The CDO does not have the authority, however, to establish policies or ensure adherence to them. In particular, the CDO cannot, on his or her own, drive the cultural change needed to create an inclusive environment or embed the use of effective diversity leadership practices. Thus, the final piece of the Commission's recommended implementation and accountability system is aimed at institutionalizing diversity leadership throughout the Armed Forces, forcing continuing engagement on the part of senior leadership, and providing the means for sustained effort.

### Embed Diversity Leadership in Performance Assessments Throughout Careers

Accountability for internalizing and modeling diversity leadership is needed throughout the Armed Forces, not only at senior levels. Discussions about evaluating an individual's diversity leadership often center on the difficulty of measuring such a thing. But, a simple checkbox on an assessment form will accomplish nothing. In its research, the Commission discovered several practices that could be used by the Services to evaluate diversity leadership throughout a servicemember's career. Based on its understanding of private sector practices and military culture, the Commission believes that

FROM REPRESENTATION TO INCLUSION: DIVERSITY LEADERSHIP FOR THE 21ST-CENTURY MILITARY

the Services must incorporate such assessment mechanisms into their performance evaluation systems. Possible mechanisms for embedding diversity leadership into the core competencies expected of a servicemember include the following:

- documentation of one's diversity leadership in a self-statement
- incorporation of diversity perspective into leadership assessment
- 360-degree evaluations
- utilization of the following relevant indicators:
  - climate survey trends
  - discipline and EO data
  - retention rates.

One place to start could be following the Coast Guard practice of producing a self-statement that documents what one has done to foster an environment of inclusion. Another approach could be drawing from the Navy's incorporation of EO practices into its assessments of enlisted personnel. This approach could be expanded through incorporating diversity leadership and inclusion into the existing assessment of leadership in general.

And, even though it runs counter to the hierarchical military culture, the Services could experiment with 360-degree evaluations. These incorporate assessments from peers and subordinates, as well as supervisors. Sodexo uses these 360-degree evaluations to gauge its executive team's performance in diversity management, diversity leadership, and inclusion.

At higher levels of the hierarchy, other options are available, including a careful utilization of numerical indicators. For officers who have held command, possible metrics involve indicators of the climate within their units. These include trends in climate surveys, unit disciplinary and EO data, and retention rates. Although it is expected that such data will form part of the accountability reviews described in Recommendation 17, it may be worth examining their usage in individual assessment at a lower level.

Both quantitative and qualitative metrics are important and should be utilized. Whereas quantitative metrics are generally easier to collect, making the extra effort to integrate both types of metrics provides a more complete picture of an individual's diversity leadership. At Sodexo, for example,

the quantitative metrics look at recruiting, retention, promotion of women and minorities. The qualitative metrics . . . are about behavior change. We look at things like mentoring, like engagement in the community. . . . So, the qualitative aspect of the scorecard [has] been very, very critical in changing the behaviors because otherwise it becomes just a numbers game, "the quota has to be filled" is how it's perceived. But here what we are saying is, their behavior systemically need[s] to be changed. If you get the right behaviors, you'll get to the numbers. So, we look at really both of those. (Anand, 2010)

### Diversity Leadership as a Criterion for Top Leadership

The assessment of diversity leadership performance must be extended to the highest levels of the Services. Demonstrated diversity leadership should be a topic of conversation in both the nomination and confirmation of flag/general officers to 3- and 4-star positions, both within DoD and during the congressional confirmation process. Although this is important for all senior leadership positions, it is especially relevant for Service Chiefs and senior enlisted leaders. As discussed elsewhere in this report, personal commitment at the top is a crucial ingredient in establishing and sustaining successful diversity leadership throughout an organization.

The Commission heard about effective diversity practices from CDOs at companies that have been acclaimed for their excellence in creating demographically diverse workforces and inclusive environments. One of the topics these CDOs spoke about was the need for an executive team committed to diversity.

In response to a question about how Sodexo ensures that executives hired from outside are as committed to diversity and inclusion as the rest of the senior team, Dr. Rohini Anand indicated the importance of including diversity leadership in the interview process:

> [T]he candidates who've come from the outside to Sodexo have actually said that they are very surprised [by] the emphasis that the organization places on diversity in the interview process, so they really are asked about their commitment, what they have done, their understanding. And if they are not articulate on this particular topic, we don't seriously consider them. (Anand, 2010)

Along these lines, the Commission believes that those individuals considered for top leadership positions, both senior enlisted appointments and 3- and 4-star nominations, should be expected to be "articulate on this particular topic." They should be able to address their experience in providing diversity leadership not only for race/ethnicity and gender but across all dimensions.

Congress can assist in establishing diversity leadership as a criterion for 3- and 4-star positions through the questionnaire each nominee must submit to the Senate Armed Services Committee. Requiring a self-statement that explains how the nomi-

Regardless of how staff support is provided or where it is placed, all "best practice" companies regard diversity as a line management leadership issue. This leadership imperative in several "best-practice" companies is active and visible through:

– Diversity Councils—heads of major business units that meet periodically with the CEO and . . . [Human Resources]/diversity head to review diversity progress and plan initiatives.

– Advisory Boards—distinguished outside advisors and experts who meet periodically with the business leaders and Affinity Group leaders . . . to bring external perspectives and developments to the company.

– Performance Appraisals and Leadership Assessments—that reinforce the importance of diversity by including assessments of creating a diverse culture and recruiting, developing and promoting a diverse talent pool in measuring executives' performance.

—Defense Business Board Task Group
on Increasing Diversity in DoD's Flag
and Senior Executive Ranks, 2004

nee has demonstrated diversity leadership will further emphasize diversity leadership's importance and will lead to sustained progress.

### Reestablish a Leadership Forum for Diversity

As part of an integrated, strategic approach to accountability, the Commission recommends that DoD revisit the goals and duties ascribed to the now-defunct Defense Equal Opportunity Council (DEOC) with an eye toward transferring applicable goals and duties to the DAWG. The membership of the DAWG is close to that of the former DEOC, and specifying diversity, broadly defined, as part of the DAWG's mission and purview will both reinstate the high-level attention to EO that had been allowed to lapse and expand it to encompass other aspects of diversity.[12]

DEOC, first established in 1987, was given the responsibility to advise the Secretary of Defense on EO policies, coordinate policy and review programs, and monitor progress of program elements. DEOC members presented regular progress reports on how well DoD was doing in meeting EO goals, and they appointed members to attend to specific issues by forming working committees, such as the DEOC Task Force on Discrimination and Sexual Harassment. This body was one of the mechanisms set forth in DoD's EO policies that, like the Human Goals Charter and the Military Equal Opportunity Assessment, fell into disuse in the past ten years.

The DAWG, established in conjunction with the Quadrennial Defense Review process, consists of the most-senior military and civilian leaders, including its co-chairs, the Vice Chairman of the Joint Chiefs of Staff and the Deputy Secretary of Defense. Meetings are held twice weekly and consist of presentations on and candid discussion of matters concerning military leadership. The Commission recommends that this body also hold regular meetings, at least annually, on diversity issues. Such meetings will form part of the strategic accountability system proposed by the Commission. They will also help anchor the concepts of diversity and inclusion among the most-senior leadership of the Armed Forces.

### Expand the DACOWITS Charter

In 1951, Secretary of Defense George C. Marshall established DACOWITS to provide advice and recommendations on issues related to women serving in the military. DACOWITS is now a Federal Advisory Committee, authorized by Congress. Currently, it comprises up to 35 civilian members distributed across demographic groups,

---

[12] The chair and membership of the DEOC differ in the two directives that establish it, DoDD 1440.1 and DoDD 1350.2. According to DoDD 1440.1, first published in 1987, the chair was to be the Assistant Secretary of Defense (Force Management & Personnel); members were to include the Assistant Secretary of Defense (Reserve Affairs) and the military departments' assistant secretaries for personnel policy and Reserve affairs. DoDD 1440.1, first published in 1995, raised the bar, with the Deputy Secretary of Defense as chair, the Under Secretary of Defense (Personnel and Readiness) as vice chair, and a membership including the under secretaries of defense, the secretaries of the military departments, and the Chairman of the Joint Chiefs of Staff. The more-senior membership of the latter directive is close to that of the DAWG, and, at the time, it ensured that the panel was sufficiently senior to assume leadership and take decisive action.

career fields, and geography. DACOWITS members come from the following groups: former servicemembers, military family members, and experts in women's workforce issues. DACOWITS's list of accomplishments over the past 60 years is long.[13]

The Commission suggests that DACOWITS expand its charter beyond gender to include diversity of all types. The group would continue to hold regular meetings, sponsor research, and undertake installation visits and other means of eliciting servicemembers' views. In addition,

> The Committee is composed of civilian women and men who are appointed by the Secretary of Defense to provide advice and recommendations on matters and policies relating to the recruitment and retention, treatment, employment, integration, and well-being of highly qualified professional women in the Armed Forces. Historically, DACOWITS' recommendations have been very instrumental in effecting changes to laws and policies pertaining to military women.
>
> —Defense Department Advisory Committee on Women in the Services, n.d.-b

the expanded committee would receive briefings from DoD leadership on metrics and progress made toward implementing diversity management plans and policies. The Commission notes that DACOWITS dates to 1951 and has provided a clear, unapologetic forum on issues for women in the military. This focus must not disappear when other elements of diversity are addressed. Besides the example provided by DACOWITS, this concept—creating an external body to monitor progress toward achieving diversity goals—was recently adopted by Sodexo. Its CEO views this establishment as a "next phase in [Sodexo's] commitment to diversity and inclusion" (Sodexo, 2010).

Providing an external body to focus on diversity in the Services would help "keep things honest" and add an additional dimension to DoD's monitoring mechanisms. Expanding DACOWITS's charter would provide continuity and place gender issues within the broader context of diversity.

## Include an Assessment of Qualified Minority and Female Candidates for Top Leadership Positions in the Diversity Annual Report to Congress

*Recommendation 20—*

*In congruence with Recommendation 5, Congress should revise Title 10, Section 113, to require the Secretary of Defense to report annually an assessment of the available pool of qualified racial/ethnic minority and female candidates for the 3- and 4-star flag/general officer positions.*

- *The Secretary of Defense must ensure that all qualified candidates (including racial/ethnic minorities and women) have been considered for the nomination of every 3- and 4-star position. If there were no qualified racial/ethnic minority and/or female candidates, then a statement of explanation should be made in the package submitted to the Senate for the confirmation hearings.*

---

[13] See the Defense Department Advisory Committee on Women in the Services, n.d.-a, for more information on DACOWITS's processes, research, and reports.

As part of the effort to improve accountability, the Commission suggests that Congress include an additional requirement to the revisions in Title 10 called for in Recommendation 5: The Secretary of Defense, in his or her diversity annual report to Congress, should provide an assessment of the pool of qualified minority and female candidates for 3- and 4-star positions. Developing a pool of strong nominees from traditionally underrepresented demographic groups must also become a DoD-wide goal. How well leaders are doing at promoting members of underrepresented groups should be made transparent through documentation.

This recommendation complements Recommendation 10b, which involves formalizing and documenting the process and requirements for promotion to 3- and 4-star rank. One of the reforms the Commission would like to see made permanent is the requirement for the Services to provide to the Secretary of Defense biannual "laydowns" of their flag/general officer corps.[14] These would focus on the up-and-coming 2-star officers and on the paths laid out for their advancement. With Recommendation 20, the Commission suggests that the racial/ethnic and gender aspects of the laydown be provided annually to Congress.

The second part of this recommendation carries this concern over to a case-by-case certification that, as each nomination is sent to the Senate, qualified racial/ethnic minority and female candidates were considered. If no qualified racial/ethnic minority or female candidates were identified, the Secretary of Defense should accompany each nomination with an explanation.

## Summary

This chapter has presented a combined approach to the challenges of designing and implementing diversity policies throughout DoD: It has taken the best from military diversity practices and from corporate diversity practices that are especially congruent with DoD concerns and culture.

Successful implementation of diversity initiatives requires a deliberate strategy. Piecemeal efforts will not effect the change in culture that is needed, and they will not address all of the stages of a servicemember's career. Among the issues that the Commission addressed are the need for a systems approach and for the designation of an individual to facilitate and sustain change. Clear, robust policies that specify roles, responsibilities, authorities, and accountability are required to institutionalize change. Appropriate Service-wide metrics and reporting tools must be put in place, and leaders must be held accountable for progress toward explicit diversity goals. Finally, the Commission believes that a continuing external monitoring mechanism will serve as an insurance policy, so that another military leadership diversity commission will never be needed.

---

[14] Former Secretary of Defense Donald Rumsfeld instituted the practice of requiring the Services to provide a comprehensive picture of their flag/general officers and the positions they held. Information in these "laydowns" included when positions were projected to become vacant and which candidates were likely to fill them.

CHAPTER TWELVE

# CONCLUSION

The Armed Forces have long been national leaders in securing advancement opportunities for men and women of different racial/ethnic backgrounds. This report describes how they can sustain that role in the future by institutionalizing a broad definition of diversity that includes both demographic representation and dimensions of diversity to develop military leaders who reflect the troops they lead and embody the qualifications the Services need to maintain readiness and perform their missions.

The Commission first recommends that all members of the Armed Forces embrace an understanding of diversity that goes beyond the traditional focus on eliminating discrimination against members of certain demographic groups and moves toward valuing all kinds of human differences for their contributions to military capability and readiness. Such a concept needs to become a core value that informs the way servicemembers interact with one another and helps motivate the way the organization works. Effectively leading diverse groups—i.e., diversity leadership—requires recognizing the differences among members of a group as assets that have the potential to improve performance, neutralizing the tensions that can arise within a diverse working group, and leveraging diversity in support of the mission. Top leaders need to make a personal and visible commitment to diversity for these needed changes to take hold; to sustain change, the Commission recommends that Congress revise Title 10 to require the Secretary of Defense to report annually on the progress of DoD's diversity efforts.

In its second set of recommendations, the Commission urges the Services to recognize the barriers that may have prevented racial/ethnic minorities and women from advancing through the stages of their careers to positions of leadership. Beginning with the pool of eligible recruits, racial/ethnic minorities are at an increasing disadvantage in terms of meeting military eligibility requirements. The Commission recommends that all stakeholders work together to improve the educational and physical readiness of American youth. It provides recommendations for improving current recruiting practices toward underrepresented demographic groups. The Commission also recommends the removal of existing institutional barriers relating to assignments—both the initial career field assignment and subsequent assignments to key positions. An important step in this direction is to remove the restrictions that prevent women from engaging in direct ground combat. Other recommendations address the need to educate and mentor all servicemembers about the promotion process, especially early in their careers.

Finally, the Commission offers recommendations to ensure continual progress toward inclusion by the Chief Diversity Officer, who works with the Services and OSD to achieve effective diversity management by developing policy goals for the Services to

achieve, metrics for measuring their achievements, and annual reporting requirements that hold military leaders accountable for progress toward stated goals.

This report began by comparing two previous committees dedicated to expanding diversity in the Armed Forces. Both committees identified gross inequities of opportunity in the Services and made detailed recommendations for reform, some of which are echoed in this report. In one case—that of the Fahy Committee—the committee not only received clear commitment from the President for its tasks but was also directly involved in the implementation of desegregation policies that helped shift the entire culture of the military. In the other case—that of the Gesell Committee—the committee played only an advisory role, and the Secretary of Defense ignored the most important recommendations in a setback that stalled progress toward equal opportunity and led to protracted conflicts among servicemembers in posts around the world.

The lesson in this contrast between the two earlier committees is that the ultimate impact of the recommendations in this Commission's final report will depend on the unwavering commitment of the President of the United States, the resolute conviction of the Secretary of Defense, and the concerted effort of military leaders at all levels to bring about enduring change. The U.S. military is a learning institution that can continue to evolve, but only if the highest leaders of the Nation provide a clear vision and sustained oversight. The Armed Forces have led the Nation in the struggle to achieve equality. To maintain that leadership, they must push forward once more, renewing their commitment to equal opportunity for all. The time has come to embrace the broader concept of diversity needed to achieve the Armed Forces' goals and to move the Nation closer to embodying its ideals.

APPENDIX A
# THE MILITARY LEADERSHIP DIVERSITY COMMISSION CHARTER

 **Military Leadership Diversity Commission Charter**

## Scope:

The commission shall conduct a comprehensive evaluation and assessment of policies that provide opportunities for the promotion and advancement of minority members of the Armed Forces, including minority members who are senior officers.

## Deliverables:

Not later than 12 months after the date on which the commission first meets, the commission shall submit to the President and Congress a report on the study. The report shall include the following:
   – The findings and conclusions of the commission.
   – The recommendations of the commission for improving diversity within the Armed Forces.
   – Such other information and recommendations as the commission considers appropriate

## Tasks:

• **Develop** a uniform definition of diversity to be used throughout DoD congruent with the core values and vision of DoD for the future workforce.
• **Incorporate** private sector practices successful in cultivating diverse leadership to DoD policy.
• **Assess** the ability of the current organizational structure to ensure effective and accountable diversity management across DoD, including ODMEO and other similar offices within the Military Departments.
• **Explore** options available to improve the substance and implementation of current plans and policies of DoD and the Military Departments.
• **Examine** existing metrics and milestones for evaluating DoD diversity plans (including the plans of the individual Services) and how to facilitate future evaluation and oversight.
• **Evaluate** efforts to develop and maintain diverse leadership at all levels of the Armed Forces.
• **Analyze** successes and failures of efforts to develop and maintain diverse leadership, particularly of flag officers.
• **Determine** the status of prior recommendations made to DoD and Congress concerning diversity initiatives within the Armed Forces.
• **Consider** the benefits of conducting an annual conference focused on diversity attended by DoD civilians, active duty and retired military personnel, and corporate leaders, to include a review of current policy and the annual demographic data from the DEOMI and DMDC.
• **Examine** the possible effect of expanding DoD secondary educational programs to diverse civilians populations, including military academy preparatory schools.
• **Evaluate** the ability of current recruitment and retention practices to attract and maintain a diverse pool of qualified individuals in sufficient numbers in pre-commissioning officer development programs.
• **Assess** the pre-command billet assignments of ethnic-specific officers.
• **Examine** command selection for officers of particular ethnicities.
• **Evaluate** the establishment and maintenance of fair promotion and command opportunities and their effect by gender and ethnicity for officers at O-5 and above.
• **Evaluate** the existence and maintenance of fair promotion, assignment, and command opportunities for ethnic- and gender-specific members of the Armed Forces at the levels of warrant officer, chief warrant officer, company and junior grade, field and mid-grade, and general and flag officer.
• **Measure** the ability of current activities to increase continuation rates for ethnic- and gender-specific members of the Armed Forces.

APPENDIX B
# COMMISSION MEMBERS

## Current Commissioners

General Lester L. Lyles (U.S. Air Force, Retired), *Chairman*
Lieutenant General Julius W. Becton, Jr. (U.S. Army, Retired), *Vice Chairman*

Major General LaRita A. Aragon (Air National Guard, Retired)
Major General Arthur M. Bartell (U.S. Army)
The Honorable Gilbert F. Casellas
Chief Master Sergeant Gary G. Coleman (U.S. Air Force, Retired)
The Honorable D. Michael Collins (Lieutenant Colonel, U.S. Air Force, Retired)
Marieli E. Colon-Padilla
Rear Admiral Jay DeLoach (U.S. Navy, Retired)
Mary M. Dixon
Brigadier General Rebecca Halstead (U.S. Army, Retired)
Vice Admiral Cecil D. Haney (U.S. Navy)
Lieutenant Colonel Alfred Harris (U.S. Army, Retired)
Colonel Mary Higley Hittmeier (U.S. Air Force)
Lieutenant General John Hopper, Jr. (U.S. Air Force, Retired)
Colonel Ronald M. Joe, Sr. (U.S. Army, Retired)
Sergeant Major Hallie Johnson (U.S. Army Reserve, Retired)
Colonel Jorge J. Martinez (U.S. Army National Guard, Retired)
Rear Admiral Edward Masso (U.S. Navy, Retired)
Senior Chief Petty Officer Thomas McGhee (U.S. Navy, Retired)
Lieutenant General Robert B. Neller (U.S. Marine Corps)
The Honorable Richard J. Noriega (Colonel, Army National Guard)
Rear Admiral Mary P. O'Donnell (U.S. Coast Guard, Retired)
Lieutenant General Frank Petersen (U.S. Marine Corps, Retired)
Master Chief Petty Officer Angela R. Rodriguez (U.S. Coast Guard)
Shamina Singh
Sergeant Major Jack L. Tilley (U.S. Army, Retired)
Sergeant Major William I. Whaley (U.S. Marine Corps, Retired)
Major General Leo V. Williams III (U.S. Marine Corps, Retired)
Frank H. Wu

## Former Commissioners

Captain Kathleen Contres (U.S. Navy, Retired)
Colonel Mohammed A. Khan, Jr. (U.S. Air Force, Retired)
Brigadier General Belinda Pinckney (U.S. Army, Retired)
Lieutenant General Willie J. Williams (U.S. Marine Corps)

## Commission Staff

### Executive Directors and Designated Federal Officers

Colonel James J. Campbell (U.S. Air Force, Retired)
Master Chief Petty Officer Steven Hady (U.S. Navy)

### Research Staff

Nelson Lim, RAND Corporation, *Research Director*
Amanda Kraus, CNA, *Associate Research Director*

Carolyn Chu, RAND Corporation
Kate Giglio, RAND Corporation
Jeremiah Goulka, RAND Corporation
Kimberly Curry Hall, RAND Corporation
Erin-Elizabeth Johnson, RAND Corporation
Kirsten Keller, RAND Corporation
Maria Lytell, RAND Corporation
Jennifer S. McCombs, RAND Corporation
Sarah Meadows, RAND Corporation
Ann Parcell, CNA
Martha Farnsworth Riche, CNA
Seema Sayala, CNA
First Lieutenant David Schulker (U.S. Air Force), RAND Corporation
Lynn Scott, RAND Corporation
Karen Domabyl Smith, CNA
Leopoldo E. Soto Arriagada, CNA
Madeleine Wells, RAND Corporation

*Staff from CNA and the RAND Corporation provided research and analysis to inform the Commissioners' deliberations; however, the findings and recommendations presented in this report are those of the Commissioners alone.*

### Office Staff

D'Oshemeka Amadi, Visionary Integration Professionals, LLC
Vergie Anderson, Visionary Integration Professionals, LLC
Ryan Callanan, Visionary Integration Professionals, LLC

Jennifer Conger, Visionary Integration Professionals, LLC
Ernest Duncan, Visionary Integration Professionals, LLC
Cassandra Gray, Visionary Integration Professionals, LLC
Patricia Grier, Visionary Integration Professionals, LLC
Beaulah Hall, Visionary Integration Professionals, LLC
Myrtle Johnson, Washington Headquarters Services (in memoriam)
Erica Dorosin, Visionary Integration Professionals, LLC
Patricia McClaine, Visionary Integration Professionals, LLC
Jessica Schroeder, Visionary Integration Professionals, LLC

APPENDIX C

# RECOMMENDATIONS

**Recommendation 1—**
DoD shall adopt the following definition: Diversity is all the different characteristics and attributes of individuals that are consistent with Department of Defense core values, integral to overall readiness and mission accomplishment, and reflective of the Nation we serve.

**Recommendation 2—**
To enhance readiness and mission accomplishment, effectively leading diverse groups must become a core competency across DoD and the Services. To implement this recommendation,

- a. Leadership training at all levels shall include education in diversity dynamics and training in practices for leading diverse groups effectively.
- b. DoD and the Services should determine the framework (e.g., curriculum, content, methods) for how to inculcate such education and training into leader development, including how to measure and evaluate its effectiveness.

**Recommendation 3—**
The leadership of DoD and the Services must personally commit to making diversity an institutional priority.

**Recommendation 4—**
DoD and the Services should inculcate into their organizational cultures a broader understanding of the various types of diversity by

- a. Making respect for diversity a core value.
- b. Identifying and rewarding the skills needed to meet the operational challenges of the 21st century.
- c. Using strategic communications plans to communicate their diversity vision and values.

**Recommendation 5—**
Congress should revise Title 10, Section 113, to

- a. Require the Office of the Secretary of Defense to develop a standard set of strategic metrics and benchmarks to track progress toward the goal of having a

dynamic and sustainable 20–30-year pipeline that yields (1) an officer and enlisted corps that reflects the eligible U.S. population across all Service communities and ranks and (2) a military force that is able to prevail in its wars, prevent and deter conflict, defeat adversaries and succeed in a wide range of contingencies, and preserve and enhance the all-volunteer force.

- b. Add diversity annual reports to the list of topics on which the Secretary of Defense reports to Congress and the President. Similar provisions should be added to Title 14 for Coast Guard reporting and to Title 32 for National Guard reporting.
- c. Require the Secretary of Defense to meet at least annually with Service Secretaries, Service Chiefs, and senior enlisted leaders to drive progress toward diversity management goals.

## Recommendation 6—

The shrinking pool of qualified candidates for service in the Armed Forces is a threat to national security. The stakeholders listed below should develop and engage in activities that will expand the pool of qualified candidates.

- a. The President, Congress, and State and local officials should develop, resource, and implement strategies to address current eligibility issues.
- b. DoD and DHS (Coast Guard) should
  – Create and leverage formal partnerships with other stakeholders.
  – Institutionalize and promote citizenship programs for the Services.
  – Require the Services to review and validate their eligibility criteria for military service.
- c. DoD and the Services should focus on early engagement. They should conduct strategic evaluations of the effectiveness of their current K–12 outreach programs and practices and increase resources and support for those that are found to be effective.

## Recommendation 7—

DoD and the Services should engage in activities to improve recruiting from the currently available pool of qualified candidates by

- a. Creating, implementing, and evaluating a strategic plan for outreach to, and recruiting from, untapped locations and underrepresented demographic groups.
- b. Creating more accountability for recruiting from underrepresented demographic groups.
- c. Developing a common application for Service ROTC and academy programs.
- d. Closely examining the preparatory school admissions processes and making required changes to ensure that accessions align with the needs of the military.

## Recommendation 8—

The Services should ensure that their career development programs and resources enhance servicemembers' knowledge of career choices, including Reserve Compo-

nent opportunities, to optimize the ability of servicemembers to make informed career choices from accession to retirement.

- a. Mentoring and career counseling efforts shall start prior to the initial career field decision point and continue throughout the servicemember's career.
- b. Mentoring programs shall follow effective practices and employ an active line of communication between protégé and mentor.

**Recommendation 9—**
DoD and the Services should eliminate the "combat exclusion policies" for women, including the removal of barriers and inconsistencies, to create a level playing field for all qualified servicemembers. The Commission recommends a time-phased approach:

- a. Women in career fields/specialties currently open to them should be immediately able to be assigned to any unit that requires that career field/specialty, consistent with the current operational environment.
- b. DoD and the Services should take deliberate steps in a phased approach to open additional career fields and units involved in "direct ground combat" to qualified women.
- c. DoD and the Services should report to Congress the process and timeline for removing barriers that inhibit women from achieving senior leadership positions.

**Recommendation 10—**
DoD, the Services, and Chief, National Guard Bureau, must ensure that there is transparency throughout their promotion systems so that servicemembers may better understand performance expectations and promotion criteria and processes. To do this, they

- a. Must specify the knowledge, skills, abilities, and potential necessary to be an effective flag/general officer or senior noncommissioned officer.
- b. Shall formalize the process and requirements for 3- and 4-star officer selection in DoD Instruction 1320.4.
- c. Shall educate and counsel all servicemembers on the importance of, and their responsibility for, a complete promotion board packet.

**Recommendation 11—**
The Services shall ensure that promotion board precepts provide guidance regarding Service-directed special assignments outside normal career paths and/or fields. As appropriate, senior raters' evaluations shall acknowledge when a servicemember has deviated from the due-course path at the specific request of his or her leadership.

**Recommendation 12—**
Where appropriate, DACOWITS should expand its current focus on retention to include an explanation of the gender gap in retention. As part of this renewed focus, DACOWITS should examine the effects of retention programs, such as the sabbatical programs currently offered by the Navy and the Coast Guard as well as any other

innovative Service-specific approaches to retention. Findings and recommendations from this research should be presented to the Secretary of Defense.

**Recommendation 13—**
DoD and the Services must track regional and cultural expertise and relevant Reserve Component civilian expertise and continue to track language expertise upon military accession and throughout servicemembers' careers in order to better manage personnel with mission-critical skill sets.

**Recommendation 14—**
To promote structural diversity, total force integration, and overall retention,

- a. DoD must improve the personnel and finance systems affecting transition between Active and Reserve Components and internal Reserve Component transition protocols.
- b. The Assistant Secretary of Defense for Reserve Affairs and the Service Chiefs must assess how Reserve Component members can more effectively both gain operational experience and fulfill joint requirements within the constraints of their dual military/civilian lives and take action as appropriate.

**Recommendation 15—**
The Office of the Secretary of Defense organizational structure must be aligned to ensure a sustained focus on diversity and diversity initiatives and should include establishment of the position of a Chief Diversity Officer who reports directly to the Secretary of Defense.

- The existing Research & Analysis office should be directed and resourced to support the Chief Diversity Officer.
- Chief, National Guard Bureau, must establish and resource organizational structures that support DoD diversity initiatives and reinforce ongoing National Guard diversity leadership efforts.

**Recommendation 16—**
DoD and the Services must resource and institute clear, consistent, and robust diversity management policies with emphasis on roles, responsibilities, authorities, and accountability.

- a. DoD and the Services shall implement diversity strategic plans that address all stages of a servicemember's life cycle. Each strategic plan shall include
  - a diversity mission statement that prioritizes equity and inclusion and provides a purpose that is actionable and measurable
  - a concept of operations to advance implementation.
- b. DoD must revise (if appropriate), reissue, and enforce compliance with its existing diversity management and equal opportunity policies to

- Define a standard set of strategic metrics and benchmarks that enables the Secretary of Defense to measure progress toward the goals identified in the strategic plan, including the creation of an inclusive environment.
- Establish standards that allow for the collection of data needed to generate these metrics and the analysis needed to inform policy action.
- Provide oversight of, and support for, the Services' respective diversity initiatives and metrics to ensure that, at a minimum, they align with the end state established by DoD.

**Recommendation 17—**
DoD must and DHS (Coast Guard) should institute a system of "accountability reviews" that is driven by the Secretaries of Defense and Homeland Security (Coast Guard).

- a. The Secretary of Defense shall meet at least annually with Service Secretaries, Service Chiefs, senior enlisted leaders, and Chief, National Guard Bureau, to drive progress toward the diversity management goals identified in the strategic plans. The Coast Guard should be subject to a similar review.
- b. The Secretary of Defense and Secretary of Homeland Security should send an annual report to Congress and the President on the progress made toward diversity management goals in the Services, including the Reserve Component; the report should include the barrier analyses described in Recommendation 18.
- c. The National Guard Bureau should report annually to Congress and DoD on the status of diversity in each State, territory, and the District of Columbia for all ranks of the Army and Air National Guard. This report shall show how reflective the Army and Air National Guard are of the eligible pool in their particular State or territory or in the District of Columbia.
  - Based on the report to Congress, the National Guard Bureau shall produce a "dashboard" of diversity metrics to be used by the Army and Air National Guard. This dashboard shall show comparisons across States, territories, and the District of Columbia and highlight best practices.

**Recommendation 18—**
As part of the accountability reviews, the Services, in conjunction with the Chief Diversity Officer (established in Recommendation 15), should conduct annual "barrier analyses" to review demographic diversity patterns across the military life cycle, starting with accessions.

- a. To ensure comparability across Services, DoD shall establish a universal data collection system, and the analyses of the data should be based on common definitions of demographic groups, a common methodology, and a common reporting structure.

- b. The annual analyses should include
  - accession demographics
  - retention, command selection, and promotion rates by race/ethnicity and gender
  - analysis of assignment patterns by race/ethnicity and gender
  - analysis of attitudinal survey data by race/ethnicity and gender
  - identification of persistent, group-specific deviations from overall averages and plans to investigate underlying causes
  - summaries of progress made on previous actions.

**Recommendation 19—**
DoD must and DHS (Coast Guard) should institute mechanisms for accountability and internal and external monitoring for both the Active and Reserve Components.

- a. The Services must embed diversity leadership in performance assessments throughout careers.
- b. DoD must and DHS (Coast Guard) should establish diversity leadership as a criterion for nomination and appointment to senior enlisted leadership positions and flag/general officers, including 3- and 4-star positions and Service Chief.
  - The Senate Armed Services Committee should include this criterion in its confirmation questionnaire.
- c. The Secretary of Defense must transfer the functions of the former Defense Equal Opportunity Council to a minimum of biannual meetings of DoD's leadership, the existing Deputy's Advisory Working Group.
- d. The Secretary of Defense must expand the DACOWITS charter, where appropriate, to encompass diversity as a whole.

**Recommendation 20—**
In congruence with Recommendation 5, Congress should revise Title 10, Section 113, to require the Secretary of Defense to report annually an assessment of the available pool of qualified racial/ethnic minority and female candidates for the 3- and 4-star flag/general officer positions.

- The Secretary of Defense must ensure that all qualified candidates (including racial/ethnic minorities and women) have been considered for the nomination of every 3- and 4-star position. If there were no qualified racial/ethnic minority and/or female candidates, then a statement of explanation should be made in the package submitted to the Senate for the confirmation hearings.

APPENDIX D

# GLOSSARY

*Accession:* in general, refers to the act of entering upon or attaining an office. For military purposes, accession refers to entering military service, and the term is applied to new recruits.

*Active Guard and Reserve:* National Guard and Reserve members who are on voluntary active duty providing full-time support to National Guard, Reserve, and Active Component organizations for the purpose of organizing, administering, recruiting, instructing, or training the Reserve Components (U.S. Joint Chiefs of Staff, 2010).

*Amicus curiae:* a phrase that literally means "friend of the court"; a person or group who is not a party to specific litigation but who believes that the court's decision may affect his, her, or its interest.

*Armed Forces of the United States:* a term used to denote collectively all components of the Army, Navy, Air Force, Marine Corps, and Coast Guard (when mobilized under Title 10 to augment the Navy) (U.S. Joint Chiefs of Staff, 2010).

*Barrier analysis:* the process by which an organization uncovers, examines, and removes barriers to equal participation at all levels of its workforce. A barrier is an organizational policy, principle, or practice that limits or tends to limit employment opportunities for members of particular groups (e.g., on the basis of race/ethnicity or gender).

*Benchmark:* any standard or reference by which something can be judged or evaluated. The benchmarks referenced in this report are used to evaluate racial/ethnic minority and female representation in the Armed Forces. For example, there are three commonly suggested external benchmarks for the military: racial/ethnic minority and female shares of the current national population, the future national population, and the military-eligible population.

*Billet:* a personnel position or assignment that may be filled by one person (U.S. Joint Chiefs of Staff, 2010).

*Capability:* the ability to execute a specified course of action (U.S. Joint Chiefs of Staff, 2010).

*Competency/core competency:* DoD- or Service-set requirements that holders of particular positions or ranks must meet and be accountable for meeting.

*Concept of operations:* a verbal or graphic statement that clearly and concisely expresses what the commander intends to accomplish and how it will be done using available resources (U.S. Joint Chiefs of Staff, 2010).

*Core values:* the foundational principles that guide how people in an organization will conduct their everyday business. The DoD core values are leadership, professionalism, and technical know-how. DoD also places particular emphasis on the special core values that everyone in uniform must live by: duty, integrity, ethics, honor, courage, and loyalty.

*Dashboard:* a visual interface that illustrates key measures that an organization has determined are tightly linked to its success or failure in executing strategy.

*Diversity:* differences among individuals involving any attributes (e.g., personal, work related, or other) that determine how they perceive one another. For strategic purposes, organizations define diversity based on the attributes that are relevant to their operations and cultures. Types of diversity and diversity related concepts are summarized below:

- Types of diversity:
  - *Demographic diversity:* diversity in terms of immutable differences among individuals, such as race/ethnicity, gender, or age, as well as personal background differences, such as religion, education level, and marital status
  - *Functional diversity:* diversity in terms of occupation, task, or training background
  - *Structural diversity:* diversity in terms of organizational units, including military rank, Service, and component
  - *Cognitive diversity:* differences pertaining to thinking styles, including the mental processes of perception, memory, judgment, and reasoning, as well as differences in personality types
  - *Global diversity:* diversity related to national affiliations resulting from working with coalition partners, host-country employees, etc.
- Diversity related concepts
  - *Diversity management:* how organizations drive or affect the impact of diversity on key organizational outcomes through plans, policies, and practices
  - *Diversity leadership:* how leaders at all ranks and organizational levels manage people in order to shape the impact of diversity dynamics in the forces under their command through the practices they employ day to day
  - *Diversity dynamics:* how human differences affect interactions between people
  - *Diversity climate:* the prevailing culture, leadership style, and personnel policies and practices of a organization.

*Flag/general officer:* a term applied to an officer holding the rank of general, lieutenant general, major general, or brigadier general in the Army, Air Force, or Marine Corps or admiral, vice admiral, or rear admiral in the Navy or Coast Guard (U.S. Joint Chiefs of Staff, 2010).

*Inclusion/inclusive environment:* An inclusive culture is one where individuals of all backgrounds experience a sense of belonging and experience their uniqueness as being valued. With effective diversity leadership, in a culture of inclusion, the diversity of knowledge and perspectives that members of different groups bring to the organization shapes how the work is done.

*Military personnel life cycle:* the phases of a servicemember's career, from recruitment and accession to assignment, training, advancement, and separation or retirement.

*Mission:* the task, together with the purpose, that clearly indicates the action to be taken and the reason therefore (U.S. Joint Chiefs of Staff, 2010).

*National Guard:* a joint reserve component of the Army and the Air Force that maintains two subcomponents: the Army National Guard of the United States for the Army and the Air Force's Air National Guard of the United States.

*Promotion board:* Promotion boards, also known as selection boards, recommend for promotion to the next higher permanent grade promotion-eligible officers in grades O-3 through O-6. Promotion boards are statutory selection boards because the rules governing them are found in Title 10.

*Racial/ethnic minorities:* members of historically excluded or underrepresented race/ethnicity groups (i.e., groups other than non-Hispanic whites).

*Readiness:* the ability of U.S. military forces to fight and meet the demands of the national military strategy. Readiness is the synthesis of two distinct but interrelated levels: (1) Unit readiness, which is the ability to provide capabilities required by the combatant commanders to execute their assigned missions. This is derived from the ability of each unit to deliver the outputs for which it was designed. (2) Joint readiness, which is the combatant commander's ability to integrate and synchronize ready combat and support forces to execute his or her assigned missions (U.S. Joint Chiefs of Staff, 2010).

*Ready Reserve:* the Selected Reserve, Individual Ready Reserve, and Inactive National Guard liable for active duty as prescribed by law (Title 10, Sections 10142, 12301, and 12302) (U.S. Joint Chiefs of Staff, 2010).

*Reserve Component:* The Armed Forces of the United States Reserve Component consists of (1) the Army National Guard of the United States, (2) the Army Reserve, (3) the Navy Reserve, (4) the Marine Corps Reserve, (5) the Air National Guard of the United States, (6) the Air Force Reserve, and (7) the Coast Guard Reserve (U.S. Joint Chiefs of Staff, 2010).

*Retention:* the proportion of individuals who remain in service, regardless of whether they have reached a decision point.

*Services:* the Army, Navy, Air Force, Marine Corps, and Coast Guard (U.S. Joint Chiefs of Staff, 2010).

*Title 10:* the part of U.S. law that provides the legal basis for the roles, missions, and organization of DoD and each of the Services.

*Title 14:* the part of U.S. law that establishes the Coast Guard as a military service and a branch of the Armed Forces and outlines its role.

*Title 32:* the part of U.S. law that outlines the role and organizational structure of the National Guard.

*Total force integration:* DoD's strategy to create a more capable, but also smaller and more affordable, force by purposefully balancing the expertise and experience of personnel from all its components (U.S. Joint Chiefs of Staff, 2010).

# REFERENCES

Allen, T. D., Eby, L. T., & Lentz, E. (2006). Mentorship behaviors and mentorship quality associated with formal mentoring programs: Closing the gap between research and practice. *Journal of Applied Psychology*, *91*, 567–578.

Allen, T. D., Eby, L. T., Poteet, M. L., Lentz, E., & Lima, L. (2004). Career benefits associated with mentoring for protégés: A meta-analysis. *Journal of Applied Psychology*, *89*, 127–136.

Anand, R. (2010, April). Remarks to the Military Leadership Diversity Commission, Fishkill, NY.

Armor, D. J. (1996). Race and gender in the U.S. military. *Armed Forces and Society*, *23*, 7–28.

Armor, D. J., & Roll, C. R., Jr. (1994). Military manpower quality: Past, present, and future. In B. F. Green & A. S. Mavor (Eds.), *Modeling cost and performance for military enlistment: Report of a workshop* (pp. 13–34). Washington, DC: National Academies Press.

Asch, B. J., Buck, C., Klerman, J. A., Kleykamp, M., & Loughran, D. S. (2009). *Military enlistment of Hispanic youth: Obstacles and opportunities* [MG-773-OSD]. Santa Monica, CA: RAND Corporation.

Becton, J. W., Jr. (2010, March). Remarks to the Military Leadership Diversity Commission, Annapolis, MD.

Becton, J. W., Jr. (2011, January). Remarks to the Military Leadership Diversity Commission, Charlottesville, VA.

Becton, J. W., Jr., et al. (2003, February 19). Amicus curiae brief in support of respondent, *Gratz v Bollinger*, 123 S. Ct. 2411, 539 U.S. 244, June 23, 2003, and *Grutter v Bollinger*, 123 S. Ct. 2325, 539 U.S. 306, June 23, 2003.

Boyer, J. (2010, May 13). *Mattis speaks to close out 2010 JWC*. Retrieved on January 31, 2011, from http://www.jfcom.mil/newslink/storyarchive/2010/pa051310.html

Casey, G. W., Jr. (2010, June). Remarks to the Military Leadership Diversity Commission, McLean, VA.

Center for Human Resource Research. (2005). *NLSY97 user's guide*. Columbus, OH: Center for Human Resource Research, 2005.

Centers for Disease Control and Prevention. (2006). *Behavioral risk factor surveillance system survey data*. Atlanta, GA: U.S. Department of Health and Human Services, Centers for Disease Control and Prevention.

Chief of Naval Operations. (2008). *Diversity policy*.

Collins, D. M. (2010, March). Remarks to the Military Leadership Diversity Commission, Annapolis, MD.

Conway, J. T. (2010, March). Remarks to the Military Leadership Diversity Commission, Annapolis, MD.

Cox, T. (1994). *Cultural diversity in organizations: Theory, research, and practice.* San Francisco, CA: Berrett-Koehler.

Deak, M., Helba, C., Rockwell, D., Helmick, J., & Hoover, E. C. (2002). *Tabulations of responses from the 2000 Military Exit Survey.* Rockville, MD: Westat Inc.

Defense Business Board Task Group on Increasing Diversity in DoD's Flag and Senior Executive Ranks. (2004, March 1). *Increasing diversity in the Defense Department's flag ranks and senior executive service.*

Defense Department Advisory Committee on Women in the Services. (n.d.-a). Homepage. Retrieved November 30, 2010, from http://dacowits.defense.gov/

Defense Department Advisory Committee on Women in the Services. (n.d.-b). *About DACOWITS.* Retrieved November 30, 2010, from http://dacowits.defense.gov/tableabout_subpage.html

Defense Department Advisory Committee on Women in the Services. (2009). *2009 report.* Washington, DC: Defense Advisory Committee on Women in the Services.

Defense Equal Opportunity Management Institute, Directorate of Research. (2008, October 14). *DEOMI Organizational Climate Survey (DEOCS).* Patrick Air Force Base, FL: Defense Equal Opportunity Management Institute.

Defense Manpower Data Center. (2009). *November 2008 Status of Forces Survey of Active Duty Members: Administration, datasets, and codebook* [Report No. 2008-033]. Arlington, VA: Defense Manpower Data Center.

Defense Manpower Data Center. (2010a). *2009 Workplace and Equal Opportunity Survey of Active Duty Members* [WEOA2009].

Defense Manpower Data Center. (2010b). Active duty transition files [Dataset].

Defense Manpower Data Center. (2010c). *Status of Forces Survey of Active Duty Members: Attitudes toward promotions.*

Dexter, B. (2010). *The chief diversity officer today: Inclusion gets down to business.* Heidrick & Struggles International.

Dobbin, F. (2010, June). Remarks to the Military Leadership Diversity Commission, McLean, VA.

ExpectMore.gov. (2006). *Detailed information on the Junior Reserve Officer Training Corps Assessment.* Retrieved October 10, 2010, from http://www.whitehouse.gov/omb/expectmore/detail/10003233.2006.html

Finkelstein, L. M., & Poteet, M. L. (2007). Best practices in workplace formal mentoring programs. In T. D. Allen & L. T. Eby (Eds.), *The Blackwell handbook of mentoring: A multiple perspectives approach* (pp. 345–367). Malden, MA: Blackwell Publishing.

Gilroy, C. (2009, March 3). *Recruiting, retention, and end strength overview: Prepared statement of Dr. Curtis Gilroy, Director for Accessions Policy, Office of the Under Secretary of Defense for Personnel and Readiness, before the House Armed Services Subcommittee.*

Gilroy, C., Eitelberg, M., Enns, J., Hosek, S., Kilburn, R., Laurence, J., Mehay, S., Tiemeyer, P., & Verdugo, N. (1999, August). *Career progression of minority and women officers.* Washington, DC: Office of the Under Secretary of Defense (Personnel and Readiness).

Harrell, M. C., Castaneda, L. W., Schirmer, P., Hallmark, B. W., Kavanagh, J., Gershwin, D., & Steinberg, P. (2007). *Assessing the assignment policy for Army women* [MG-590-1-OSD]. Santa Monica, CA: RAND Corporation.

Harrell, M. C., & Miller, L. L. (1997). *New opportunities for military women: Effects upon readiness, cohesion, and morale* [MR-896-OSD]. Santa Monica, CA: RAND Corporation.

Haughton, C., Jr. (2010, March). Remarks to the Military Leadership Diversity Commission, Annapolis, MD.

Haygood, A., & Morris, M. (2009, November). *Air Force accessions*. Briefing presented to the Military Leadership Diversity Commission, Melbourne, FL. Retrieved January 18, 2010, from http://mldc.whs.mil/download%5Cdocuments%5Cmeetings%5C200911% 5CAF1.pdf

Holvino, E., Ferdman, B. M., & Merrill-Sands, D. (2004). Creating and sustaining diversity and inclusion in organizations: Strategies and approaches. In M. S. Stockdale & F. J. Crosby (Eds.), *The psychology and management of workplace diversity* (pp. 245–276). Malden, MA: Blackwell.

Hosek, S. D., Tiemeyer, P., Kilburn, M. R., Strong, D. A., Ducksworth, S., & Ray, R. (2001). *Minority and gender differences in officer career progression* [MR-1184-OSD]. Santa Monica, CA: RAND Corporation.

*House Armed Services Committee approves senior military officer diversity commission; increases Junior Reserve Officer Training Corps units* [Press Release]. (2008, May 15).

Jackson, S. E., Joshi, A., & Erhardt, N. (2003). Recent research on team and organizational diversity: SWOT analysis and implications. *Journal of Management*, *29*, 801–830.

Johnson, C. (2011, January 14). *Memo to the Military Leadership Diversity Commission research director.*

Johnson, J., Ham, C., et al. (2010, November 30). *Report of the comprehensive review of the issues associated with a repeal of "Don't Ask, Don't Tell."* Retrieved December 20, 2010, from http://www.defense.gov/home/features/2010/0610_gatesdadt/DADTReport_FINAL_20101130(secure-hires).pdf

Kalev, A., Dobbin, F., & Kelly, E. (2006). Best practices or best guesses? Assessing the efficacy of corporate affirmative action and diversity policies. *American Sociological Review*, *71*, 589–617.

Karabel, J. (2003, March 28). Race and national security. *Christian Science Monitor.*

Kirby, S. N., Harrell, M. C., & Sloan, J. (2000). Why don't minorities join special operations forces? *Armed Forces and Society*, *26*, 523–545.

Kraus, A., Hodari, A. K., Riche, M. F., & Wenger, J. W. (2007, November). *The impact of diversity on Air Force mission performance: Analysis of deployed servicemembers' perceptions of diversity/capability relationship* [Research Memorandum D0015452.A2]. Alexandria, VA: CNA.

Kraus, A., Wenger, J., Houck, L., & Gregory, D. (2004). *College recruits in the enlisted Navy: Navy outcomes and civilian opportunities*. Alexandria, VA: CNA.

Lim, N., Cho, M., & Curry, K. (2008). *Planning for diversity: Options and recommendations for DoD leaders* [MG-743-OSD]. Santa Monica, CA: RAND Corporation.

Lim, N., Marquis, J., Hall, C., Schulker, D., & Zhuo, X. (2009). *Officer classification and the future of diversity among senior military leaders: A case study of the Army ROTC* [TR-731-OSD]. Santa Monica, CA: RAND Corporation.

Malstrom, F. (2009, June). Before there was a USAFA prep school. *Checkpoints*, 30–33.

McHenry, J. J., Hough, L. M., Toquam, J. L., Hanson, M. A., & Ashworth, S. (1990). Project A validity results: The relationship between predictor and criterion domains. *Personnel Psychology*, *43*, 335–354.

McSally, M. (2007). Women in combat: Is the current policy obsolete? *Duke Journal of Gender Law & Policy*, *14*, 1011–1059.

McSally, M. (2010, September). Remarks to the Military Leadership Diversity Commission, Baltimore, MD.

Mershon, S., & Schlossman, S. (1998). *Foxholes and color lines: Desegregating the U.S. Armed Forces.* Baltimore and London: The Johns Hopkins University Press.

Military Leadership Diversity Commission. (2009). *What is the relationship between demographic diversity and cognitive diversity?* [Issue Paper #4]. Arlington, VA: Military Leadership Diversity Commission.

Military Leadership Diversity Commission. (2009). *The Defense Diversity Working Group* [Issue Paper #7]. Arlington, VA: Military Leadership Diversity Commission.

Military Leadership Diversity Commission. (2010). *Business-case arguments for diversity and diversity programs and their impact in the workplace* [Issue Paper #14]. Arlington, VA: Military Leadership Diversity Commission.

Military Leadership Diversity Commission. (2010). *Demographic profile of the active-duty enlisted force: September 2008 snapshot* [Issue Paper #19]. Arlington, VA: Military Leadership Diversity Commission.

Military Leadership Diversity Commission. (2010). *Services' processes for developing definitions of diversity and diversity policy statements* [Issue Paper #20]. Arlington, VA: Military Leadership Diversity Commission.

Military Leadership Diversity Commission. (2010). *Change as a process: What business management can tell us about instituting new diversity initiatives* [Issue Paper #21]. Arlington, VA: Military Leadership Diversity Commission.

Military Leadership Diversity Commission. (2010). *Effective diversity leadership: Definition and practices* [Issue Paper #29]. Arlington, VA: Military Leadership Diversity Commission.

Montelongo, M. (2010, April). Remarks to the Military Leadership Diversity Commission, Fishkill, NY.

Mor Barak, M., Cherin, D. A., & Berkman, S. (1998). Organizational and personal dimensions in diversity climate: Ethnic and gender differences in employee perceptions. *The Journal of Applied Behavioral Science*, *34*(1), 82–104.

Mullen, M. (2009, September). Remarks to the Military Leadership Diversity Commission, Arlington, VA.

National Center for Education Statistics. (2008). Integrated Postsecondary Education Data System [Dataset].

National Defense Authorization Act for Fiscal Year 2006, Pub. L. 109-163, 119 Stat. 3136, January 6, 2006.

National Defense Authorization Act for Fiscal Year 2009, Pub. L. 110-417, 122 Stat. 4356, October 14, 2008.

National Defense Authorization Act for Fiscal Year 2010, Pub. L. 111-84, 123 Stat. 2190, October 28, 2009.

National Defense Research Institute. (2010). *Sexual orientation and U.S. military personnel policy: An update of RAND's 1993 study.* Santa Monica, CA: RAND Corporation.

O'Donnell, M. (2010, September). Remarks to the Military Leadership Diversity Commission, Baltimore, MD.

Office of the Under Secretary of Defense (Personnel and Readiness). (FY 2002–FY 2008). *Population representation in the military services.*

Oken, C. & Asch, B. J. (1997). *Encouraging recruiter achievement: A recent history of military recruiter incentive programs* [MR-845-OSD]. Santa Monica, CA: RAND Corporation.

Peck, T. R. (2010, March 6). *Women serving in Navy continue reaching milestones* [NNS100306-17]. Retrieved October 11, 2010 from http://www.navy.mil/search/display.asp?story_id=51758

Petersen, F. E., & Phelps, J. A. (1998). *Into the tiger's jaw: America's first black marine aviator.* Novato, CA: Presidio Press.

Powell, C. (2010, March). Remarks to the Military Leadership Diversity Commission, Annapolis, MD.

Ree, M. J., & Earles, J. A. (1992). Intelligence is the best predictor of job performance. *Current Directions in Psychological Science*, *1*, 86–89.

Riche, M. F., Kraus, A., & Hodari, A. K. (2007). *The Air Force diversity climate: Implications for successful total force integration*. Alexandria, VA: CNA.

Roughead, G. (2010, June). Remarks to the Military Leadership Diversity Commission, McLean, VA.

Schirmer, P., Thie, H. J., Harrell, M., & Tseng, M. S. (2006). *Challenging time in DOPMA: Flexible and contemporary military officer management* [MG-451-OSD]. Santa Monica, CA: RAND Corporation.

Segal, D. R., & Segal, M. W. (2004). America's military population. *Population Bulletin*, *59*(4).

Shinseki, E. (2010, September). Remarks to the Military Leadership Diversity Commission, Baltimore, MD.

Sodexo. (2010, September 24). *Sodexo launches diversity and inclusion advisory board to continue progress for minorities, women*. Retrieved November 30, 2010, from http://www.sodexousa.com/usen/newsroom/press/diversityandinclusionadvisoryboard.asp

Stanley, C. (2010, September). Remarks to the Military Leadership Diversity Commission, Baltimore, MD.

Thirtle, M. R. (2001). *Educational benefits and officer-commissioning opportunities available to U.S. military servicemembers* [MR-981-OSD]. Santa Monica, CA: RAND Corporation.

Thomas, D. A., & Ely, R. J. (1996, September–October). Making differences matter: A new paradigm for managing diversity. *Harvard Business Review*, 79–90.

Thompson, D. E., & Gooler, L. E. (1996). Capitalizing on the benefits of diversity through workteams. In E. E. Kossek & S. A. Lobel (Eds.), *Managing diversity: Human resource strategies for transforming the workplace* (pp. 392–437). Malden, MA: Blackwell.

Tsui, A. S., Egan, T. D., & O'Reilly, C. A. (1992). Being different: Relational demography and organizational attachment. *Administrative Science Quarterly*, *37*, 549–579.

Tsui, A. S., & Gutek, B. A. (1999). Demographic differences in organizations. Lanham, MD: Lexington.

Under Secretary of Defense (Personnel and Readiness). (2006, June 23). *Improving diversity through realignment of the Equal Opportunity Office* [Memorandum].

U.S. Air Force. (2009). *Officer opportunities: Commissioned programs*. Retrieved March 17, 2010, from http://www.airforce.com/opportunities/officer/education/

U.S. Army. (2007). *Three ways to become an officer*. Retrieved March 17, 2010, from http://www.usarmy.com/845/3-ways-to-become-us-army-officer/

U.S. Census Bureau. (n.d.). *2009 national population projections (supplemental)*. Retrieved December 20, 2010, from http://www.census.gov/population/www/projections/2009projections.html

U.S. Census Bureau. (1973–2008, March). Current population survey [Dataset].

U.S. Census Bureau. (2007). American community survey [Dataset].

U.S. Coast Guard. (n.d.). *Women & the U.S. Coast Guard: Moments in history*. Retrieved January 21, 2010, from http://www.uscg.mil/History/uscghist/WomenChronology.asp

U.S. Department of Defense. (n.d.). *DoD 101: An introductory overview of the Department of Defense*. Retrieved October 4, 2010, from http://www.defense.gov/pubs/dod101/dod101.html

U.S. Department of Defense. (1987, May 21). *The DoD Civilian Equal Employment Opportunity (EEO) Program* [DoDD 1440.1]. Certified current as of November 21, 2003.

U.S. Department of Defense. (1995, August 18). *Department of Defense Military Equal Opportunity (MEO) Program* [DoDD 1350.2].

U.S. Department of Defense. (2010, February). *Quadrennial Defense Review report*. Washington, DC: U.S. Department of Defense.

U.S. Equal Opportunity Employment Commission. (n.d.). *Overview*. Retrieved October 5, 2010, from http://www.eeoc.gov/eeoc/index.cfm

U.S. General Accounting Office. (1995, November). *Military equal opportunity: Certain trends in racial and gender data may warrant further analysis* [GAO/NSIAD-96-17]. Washington, DC: U.S. General Accounting Office.

U.S. Joint Chiefs of Staff. (2010, November 8). *Department of Defense dictionary of military and associated terms* [JP 1-02]. As amended though December 31, 2010.

U.S. Marine Corps. (2010). *U.S. Naval Academy*. Retrieved March 17, 2010, from http://officer.marines.com/marine/making_marine_officers/commissioning_programs/us_naval_academy

Visconti, L. (2010, April). Remarks to the Military Leadership Diversity Commission, Fishkill, NY.

The White House. (1948, July 26). *Establishing the President's Committee on Equality of Treatment and Opportunity in the Armed Services* [Executive Order 9981]. Washington, DC.

Witte, B. (2009, November 20). *Lawmakers send few minorities to academies*. Retrieved April 23, 2010, from http://www.msnbc.msn.com/id/34066952/