**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, | |
| Plaintiff, | |
| v. | 23 Civ. 8262 (PMH) |
| THE UNITED STATES MILITARY ACADEMY AT WEST POINT; THE UNITED STATES DEPARTMENT OF DEFENSE; LLOYD AUSTIN, in his official capacity as Secretary of Defense; CHRISTINE WORMUTH, in her official capacity as Secretary of the Army; LIEUTENANT GENERAL STEVEN GILLAND, in his official capacity as Superintendent of the United States Military Academy; and LIEUTENANT COLONEL RANCE LEE, in his official capacity as Director of Admissions for the United States Military Academy at West Point, | |
| Defendants. | |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S
MOTION FOR A PRELIMINARY INJUNCTION**

DAMIAN WILLIAMS
United States Attorney
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone: (212) 637-2822
Facsimile:  (212) 637-2730

ALYSSA B. O'GALLAGHER
ELLEN BLAIN
Assistant United States Attorneys
-- Of Counsel --

**Table of Contents**

PRELIMINARY STATEMENT ................................................................. 1

BACKGROUND ...................................................................................... 2

   I.   Procedural History ......................................................................... 2

   II.  West Point's Admissions Process ................................................. 3

      A.  Steps to Apply ........................................................................ 4

      B.  The Nomination Requirement ................................................ 5

      C.  Selection of Candidates ......................................................... 6

      D.  West Point's Limited Consideration of Race and Ethnicity ........... 8

LEGAL STANDARDS .......................................................................... 11

   I.   Preliminary Injunction Standard ................................................ 11

   II.  Standard Applied to Admissions Policies that Consider Race .......... 12

   III.  Deference to the Executive in Matters of National Security ........... 13

ARGUMENT ......................................................................................... 15

   I.   Plaintiff Has Not Met Its Burden to Establish Standing ................ 15

   II.  Plaintiff Fails to Demonstrate Irreparable Harm ......................... 16

   III.  Plaintiff Cannot Demonstrate a Clear Likelihood of Success on the Merits ................ 20

      A.  The United States Military Has a Compelling National Security Interest in a Diverse Officer Corps .................................................................... 21

         1.  Racial Tension in the Military and Lack of Diversity in the Senior Ranks ............... 22

         2.  The Military's Judgment That a Diverse Officer Corps Is Vital to National Security 26

            a.  Diversity in the Officer Corps is Critical to Army Cohesion and Lethality ........... 29

               i.  History of Battlefield Experience ........................................ 29

   ii. Empirical Evidence Reveals that Diversity Aids Military Success ................... 32

  b. Diversity in the Officer Corps is Critical to Army Recruitment............................ 34

  c. Diversity in the Officer Corps is Critical to Army Retention................................ 36

  d. Diversity in the Officer Corps is Critical to the Military's Legitimacy in the Nation and the World ........................................................................................................ 37

 3. The United States' Compelling National Security Interests are Distinct and Measurable .............................................................................................................. 38

  a. The Army's Interest in Officer Diversity is Entirely Distinct from Harvard and UNC's Interest in Student Diversity ............................................................... 38

  b. These Goals Are Subject to Meaningful Judicial Review ...................................... 40

 B. West Point's Admissions Process Is Narrowly Tailored ................................................. 44

  1. West Point Considers Each Candidate as an Individual in the Admissions Process.. 46

   a. Letters of Assurance ............................................................................................ 46

   b. Superintendent Nominations.................................................................................. 47

   c. Additional Appointees .......................................................................................... 48

  2. West Point's Diversity Goals Are Aspirational and Do Not Constitute Quotas ........ 50

  3. West Point's Limited Consideration of Race and Ethnicity is Directly Related to the Army's Compelling Interest in a Diverse Officer Corps .................................................. 52

  4. Race and Ethnicity are not Used as a Negative or Stereotype.................................... 53

  5. Race-Neutral Alternatives Are Not Sufficient............................................................ 55

  6. West Point Does Not Intend to Use Race and Ethnicity as a Factor in its Admissions Process Indefinitely............................................................................................................ 58

IV. The Balance of Equities and Public Interest Weigh in Favor of the Government ........ 59

CONCLUSION.................................................................................................................................. 60

## Table of Authorities

**Page(s)**

**Cases**

*Able v. United States*,
  155 F.3d 628 (2d Cir. 1998) ........................................................................... 13, 40

*ACLU v. DoD*,
  901 F.3d 125 (2d Cir. 2018) ........................................................................... 14, 40

*Agudath Israel of America v. Cuomo*,
  938 F.3d 620 (2d Cir. 2020) ........................................................................... 17

*American Civil Liberties Union v. Clapper*,
  785 F.3d 787 (2d Cir. 2015) ........................................................................... 26

*Austin v. U. S. Navy Seals 1-26*,
  142 S. Ct. 1301 (2022) ........................................................................... 13, 28, 39

*Berkley v. U.S.*,
  287 F.3d 1076 (Fed. Cir. 2002) ........................................................................... 29

*Boumediene v. Bush*,
  553 U.S. 723 (2008) ........................................................................... 13, 40

*Burns v. Wilson*,
  346 U.S. 137 (1953) ........................................................................... 14

*Cacchillo v. Insmed, Inc.*,
  638 F.3d 401 (2d Cir. 2011) ........................................................................... 15

*Career Colleges & Sch. of Texas v. United States Dep't of Educ.*,
  2023 WL 4291992 (W.D. Tex. June 30, 2023) ........................................................................... 19, 20

*Carter v. Sewell*,
  2023 WL 7164304 (S.D.N.Y. Oct. 31, 2023) ........................................................................... 17

*Chappell v. Wallace*,
  462 U.S. 296 (1983) ........................................................................... 14

*Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*,
  364 F. Supp. 3d 253 (S.D.N.Y. 2019) ........................................................................... 60

*Citibank, N.A. v. Citytrust*,
  756 F.2d 273 (2d Cir. 1985) ........................................................................... 16, 17

*Clapper v. Amnesty Int'l, USA,*
    568 U.S. 398 (2013) ............................................................................................. 17

*Defense Distributed v. U.S. Dep't of State,*
    838 F.3d 451 (5th Cir. 2016) ................................................................................ 60

*Dep't of Navy v. Egan,*
    484 U.S. 518 (1988) ................................................................................. 13, 14, 39

*Do No Harm v. Pfizer Inc.,*
    646 F. Supp. 3d 490 (S.D.N.Y. 2022) .............................................................. 15, 16

*Doolen v. Wormuth,*
    5 F.4th 125 (2d Cir. 2021) ................................................................................... 14

*Fisher v. Univ. of Texas at Austin,*
    570 U.S. 297 (2013) ...................................................................................... passim

*Fisher v. University of Texas at Austin,*
    579 U.S. 365 (2016) ...................................................................................... passim

*Freedom Holdings, Inc. v. Spitzer,*
    408 F.3d 112 (2d Cir. 2005) ................................................................................ 16

*Gilligan v. Morgan,*
    413 U.S. 1 (1973) ......................................................................................... 13, 40

*Goldman v. Weinberger,*
    475 U.S. 503 (1986) ...................................................................................... 14, 40

*Grand River Enter. Six Nations, Ltd. v. Pryor,*
    481 F.3d 60 (2d Cir. 2007) ............................................................................ 11, 17

*Grutter v. Bollinger,*
    539 U.S. 306 (2003) ...................................................................................... passim

*Haig v. Agee,*
    453 U.S. 280 (1981) ............................................................................. 14, 26, 59

*Hester v. French,*
    985 F.3d 165 (2d Cir. 2021) ............................................................................ 11, 12

*Hodnett v. Medalist Partners Opportunity Master Fund II-a, L.P.,*
    2021 WL 535485 (S.D.N.Y. Feb. 12, 2021) ..................................................... 17, 20

*Holder v. Humanitarian Law Project,*
    561 U.S. 1 (2010) ............................................................................... 26, 27, 37

*Howe v. Burwell,*
   2015 WL 4479757 (D. Vt. July 21, 2015) ............................................................................ 19

*Johnson v. California,*
   543 U.S. 499 (2005) ..................................................................................................... passim

*Korematsu v. United States,*
   323 U.S. 214 (1944) ........................................................................................................... 29

*Majorica, S.A. v. R.H. Macy & Co.,*
   762 F.2d 7 (2d Cir. 1985) .................................................................................................. 17

*Nachshen v. E. 14 Realty, LLC,*
   2019 WL 5460787 (S.D.N.Y. Oct. 9, 2019) ..................................................................... 18

*Nat'l Org. for Marriage, Inc. v. Walsh,*
   714 F.3d 682 (2d Cir. 2013) .............................................................................................. 18

*New York v. United States Dep't of Homeland Sec.,*
   969 F.3d 42 (2d Cir. 2020) .......................................................................................... 16, 17

*Nicolson v. Scoppetta,*
   344 F.3d 154 (2d Cir. 2003) .............................................................................................. 20

*Nken v. Holder,*
   556 U.S. 418 (2009) ........................................................................................................... 59

*Omnistone Corp. v. Cuomo,*
   485 F. Supp. 3d 365 (E.D.N.Y. 2020) .............................................................................. 17

*Orloff v. Willoughby,*
   345 U.S. 83 (1953) ............................................................................................................. 14

*Parents Involved in Cmt. Sch. v. Seattle Sch. Dist. No. 1,*
   551 U.S. 701 (2007) ........................................................................................................... 45

*Patrolman's Benevolent Ass'n  v. City of New York,*
   310 F.3d 43 (2d Cir. 2002) ................................................................................................ 39

*Petit v. City of Chicago,*
   352 F.3d 1111 (7th Cir. 2003) ........................................................................................... 39

*Pilchman v. DoD,*
   154 F. Supp. 2d 415 (E.D.N.Y. 2001) .............................................................................. 14

*Postsecondary Sch. v. DeVos,*
   344 F. Supp. 3d 158 (D.D.C. 2018) .................................................................................. 19

*Regents of the Univ. of California v. Bakke*,
  438 U.S. 265 (1978) ........................................................................................ passim

*Richmond v. J.A. Croson Co.*,
  488 U.S. 469 (1989) ................................................................................................ 40

*Rodriguez ex rel. Rodriguez v. DeBuono*,
  175 F.3d 227 (2d Cir. 1999)............................................................................... 17, 20

*Rostker v. Goldberg*,
  453 U.S. 57 (1981) ............................................................................................. 14, 40

*Schlesinger v. Councilman*,
  420 U.S. 738 (1975) ................................................................................................ 14

*SFFA v. UNC*,
  567 F. Supp. 3d 580 ................................................................................................ 56

*Shain v. Ellison*,
  356 F.3d 211 (2d Cir. 2004) ................................................................................... 19

*Singh v. Berger*,
  56 F.4th 88 (D.C. Cir. 2022) ...............................................................................28-29

*Speech First, Inc. v. Shrum*,
  2023 WL 2905577 (W.D. Okla. Apr. 10, 2023) ..................................................... 15

*Students for Fair Admissions, Inc. v. Harvard*,
  600 U.S. 181 (2023) ......................................................................................... passim

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ........................................................................................... 15, 16

*Superb Motors Inc. v. Deo*,
  2023 WL 5952145 (E.D.N.Y. Aug. 25, 2023) ........................................................ 18

*Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*,
  60 F.3d 27 (2d Cir. 1995) ....................................................................................... 17

*U.S. Navy Seals 1-26 v. Biden*,
  27 F.4th 336 (5th Cir. 2022)................................................................................... 28

*United States v. Nixon*,
  418 U.S. 683 (1974) ................................................................................................ 14

*Wallikas v. Harder*,
  78 F. Supp. 2d 36 (N.D.N.Y. 1999) ....................................................................... 17

*Washington v. Lee,*
   263 F. Supp. 327 (M.D. Ala. 1966).................................................................. 41, 42

*Winter v. Nat'l Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ............................................................................................. passim

*Yang v. Kosinski,*
   960 F.3d 119 (2d Cir. 2020) ..................................................................................... 11

*Youngstown Sheet & Tube Co. v. Sawyer,*
   343 U.S. 579 (1952) ................................................................................................ 14

**Statutes**

10 U.S.C. § 7442 ....................................................................................... 3, 4, 5, 8

## PRELIMINARY STATEMENT

An unparalleled fighting force is fundamental to this country's national security.  Based on more than two centuries of military history, decades of battlefield experience, and internal and external analyses, the most senior leaders in the Armed Forces have repeatedly concluded that a more diverse officer corps makes a more effective force:  more lethal, more likely to attract and retain top talent, and more legitimate in the eyes of the nation and the world.  In seeking an injunction prohibiting the United States Military Academy at West Point ("West Point") from using race in a limited fashion to foster diversity in the Army officer corps and promote operational effectiveness in the Army, Plaintiff Students for Fair Admissions, Inc. overreads *Students for Fair Admissions, Inc. v. Harvard*, 600 U.S. 181 (2023) ("*SFFA*"), in which the Supreme Court invalidated two civilian universities' admissions policies but explicitly did not address the military academies' admissions policies "in light of the[ir] potentially distinct interests."  *Id.* at 214 n.4.  Plaintiff ignores critical differences between civilian and military universities and fails to demonstrate that it has standing and is entitled to the extraordinary remedy of a preliminary injunction.

*First*, Plaintiff has failed to show that its members would suffer irreparable harm absent an injunction—a failure underscored by its delay in filing this action and moving for emergency relief.

*Second*, Plaintiff cannot meet its heavy burden of demonstrating a clear likelihood of success on the merits because West Point's admissions policies serve a compelling national security interest.  As the Supreme Court contemplated, West Point presents distinct interests from civilian universities: the operational interests of the United States Army.  West Point trains battlefield leaders who must be equipped to wield lethal force, to establish cohesive rapport with subordinates who wield such force, and to lead an increasingly diverse Army in an increasingly diverse nation.  The military's most senior leaders have made the judgment—reiterated here by a

1

three-star Army Lieutenant General, the Acting Under Secretary of Defense for Personnel and Readiness for the Department of Defense, and the Under Secretary's Senior Advisor—that the Army's interest in building a diverse officer corps is integral to ensuring national security.  A long line of precedent establishes that interest as a compelling interest of the highest order and affords the military's judgment substantial deference.  Also, courts can measure whether the Army is reaching its goal, unlike in *SFFA*.

West Point's carefully calibrated means of achieving that interest are narrowly tailored. West Point's admissions process treats each candidate as an individual and considers race flexibly as a "plus" factor at only limited points in the admissions process in the context of a holistic, individualized consideration.  Most candidates are unaffected by the consideration of race. Moreover, there is a meaningful connection between the compelling interest the Army pursues and the means West Point employs; race is not used as a negative, does not operate as a stereotype, and is not applied as a part of a quota; and West Point has seriously considered race-neutral alternatives in good faith.  As explained below, no available, workable alternative would suffice.

*Finally*, the balance of equities and the public interest weigh heavily in the Government's favor.  Any alleged burden on the constitutional rights of Plaintiff's members is far outweighed by the burden that would be created by an order from this Court requiring West Point to apply a different admissions policy in the middle of its admissions cycle, and countermanding the strategic judgment of the nation's military leaders on what national security requires.  The United States therefore respectfully requests that the Court deny Plaintiff's motion for a preliminary injunction.

**BACKGROUND**

**I.      Procedural History**

Plaintiff filed both a complaint and a motion for a preliminary injunction on September 19, 2023.  *See* Dkt. Nos. 1 ("Compl.") & 7.   Plaintiff argues that West Point "discriminates on the

2

basis of race" in its admissions policy, and requests that the Court declare the policy unlawful and issue an injunction. Dkt. No. 31 ("Pl. Br.") at 2. Plaintiff further contends that because the admissions cycle "will begin and end before this case can be fully litigated (plus any appeals)," this Court should "preliminarily enjoin West Point from considering race as a factor in admissions by December 1, 2023." *Id*. at 2.

## II.   West Point's Admissions Process

The United States Military Academy at West Point was established in 1802 and prepares students to become leaders and officers in the United States Army. Declaration of Colonel Deborah J. McDonald ("McDonald Decl.") ¶ 7. Upon entry at West Point, cadets are subject to the Uniform Code of Military Justice and must participate in rigorous military training. *Id.* ¶¶ 7, 9. Upon graduation, cadets are commissioned as active-duty officers with an obligation to serve a minimum of five years. *Id.* ¶ 9. Congress has set a total cadet corps size of 4,400, *see* 10 U.S.C. § 7442(a); accordingly, each incoming West Point class currently consists of approximately 1,200 cadets prior to attrition, McDonald Decl. ¶ 10.

To become an officer in the Army, an individual must either graduate from West Point, attend a civilian college or university while participating in a Reserve Officers' Training Corps program; attend Officer Candidate School after graduating from college; receive a direct commission after earning a professional degree; or advance through the enlisted ranks and then complete one of these officer training programs. McDonald Decl. ¶ 103 n.9. Of those commissioning sources, West Point is the most prestigious, and West Point graduates comprise 33% of general officers (those above the rank of Colonel) in the Army. Declaration of Lieutenant General Douglass F. Stitt ("Stitt Decl.") ¶ 38. West Point graduates account for an even greater share of senior officers, and almost 50% of the Army's current four-star generals are commissioned

from West Point.  *Id*. ¶ 39.  Accordingly, West Point is a vital pipeline to the officer corps, and especially senior leadership, in the Armed Forces.  *Id*. ¶¶ 38-40.  West Point's admissions process is governed by, *inter alia*, federal statute (10 U.S.C. §§ 7442–46), Army regulations (Regulation 150-1, Chapter 3-4), and internal guidance.  McDonald Decl. ¶ 11.  As discussed below, West Point's process differs substantially from those at civilian universities.

### A.     Steps to Apply

To be admitted to West Point, a candidate must successfully complete (i) a candidate questionnaire, (ii) a second step kit, (iii) a candidate physical fitness assessment, (iv) a medical evaluation, and (v) an interview, and must receive (vi) a nomination.  McDonald Decl. ¶ 19.  First, a candidate must complete a "[c]andidate [q]uestionnaire," reporting their high school GPA, standardized test scores, extra-curricular activities, athletic participation, and basic demographic information, including race and gender.  *Id.* ¶ 19.  Candidates may submit the candidate questionnaire as early as February of the year before they would enter West Point (their junior year for candidates applying directly from high school).  *Id.* ¶ 20.  The Admissions Office reviews this questionnaire to determine if a candidate meets West Point's basic statutory eligibility requirements and is likely to be competitive for admission, and if so, an admissions officer will permit the candidate to proceed to the next step in the process.  *Id.* ¶ 23-24.

The next step, known as the "second step kit," requires official (rather than self-reported) high school transcripts and standardized test scores, as well as essays and teacher evaluations.  *Id.* ¶ 25.  Candidates are also asked to provide background information, including whether they are the first member of their immediate family to attend college, their combined family income, and whether they speak any foreign languages.  *Id.* ¶ 25.  The candidate must also complete a candidate fitness assessment, a medical evaluation, and an interview.  *Id.* ¶¶ 26-28.   These steps must be

completed by January 31 of the year the candidate would enter West Point.  *Id.* ¶ 29.

B.     **The Nomination Requirement**

Unlike applicants to other universities, a candidate seeking admission to West Point must also secure a nomination.  *See* 10 U.S.C. § 7442.  There are two types of nominations:  those from a "statutory nominating authority" and "service-connected" nominations.  *Id.*; McDonald Decl. ¶ 31.  Statutory nominating authorities include Members of the United States House of Representatives and Senate; the Vice President; Delegates to Congress from American Samoa, the District of Columbia, Guam, the Virgin Islands, and the Commonwealth of the Northern Marianas Islands; the Governor and the Resident Commissioner of Puerto Rico; and the Superintendent of West Point.  McDonald Decl. ¶ 31.  Service-connected nominations are reserved for children of certain service members and candidates who are already enlisted in the Army or members of ROTC programs.  *Id.* ¶ 45-48.

Nominations from Members of Congress, the Vice President, Delegates to Congress, and the Governor and Resident Commissioner of Puerto Rico make up 75% of West Point's cadet corps.  *Id.* ¶ 32.  A candidate admitted (or "appointed") to West Point pursuant to nomination by a Member of Congress is "charged" to that member.  *Id.*  Each Member of Congress may have five "charges" at West Point at any one time.  *Id.*  When a Member has fewer than five charges at the end of the academic year, the Member is considered to have a "vacancy" for the following admissions cycle.  *Id.*  In a typical year, each Member of Congress will have one vacancy at West Point.  *Id.*  For each vacancy, Members can nominate up to ten candidates.  *Id.*

Members may nominate their slate of candidates using one of three methods:  (i) "competitive," in which the Member submits nominees to West Point without any order of preference, leaving it to the Admissions Office to choose among them based on merit; (ii)

5

"principal-competing alternate," in which the Member identifies a principal nominee and a list of unranked alternates; or (iii) "principal-numbered alternate," in which the Member identifies a principal nominee and a ranked list of alternates.   Army Regulation 150-1, Chapter 3-4(a); McDonald Decl. ¶¶ 34–36.  Most Members (around 85%) use the competitive method.  McDonald Decl. ¶ 37.  Because of the nomination requirement, statutory nominating authorities, especially Members of Congress, play a large, and often determinative, role in the admissions process.  *Id.* ¶ 43.  Candidates generally compete against other candidates in their nomination pool, rather than against all applicants to West Point.  *Id.*  West Point has no authority or control over which candidates Members of Congress nominate.  *Id.* ¶ 32.

### C.       Selection of Candidates

West Point's process for selecting candidates also differs from the typical process used at civilian universities.  Once an applicant to West Point completes the candidate questionnaire, the Admissions Office assigns the candidate an initial numerical score, known as the "Whole Candidate Score," which fluctuates as the candidate completes their application.  *Id*. ¶¶ 49, 54.  The score is based on academic qualifications (60%), a "community leader score" (30%), and the candidate's fitness assessment (10%).  *Id.* ¶¶ 51-53.  The Admissions Office does not consider a candidate's race or ethnicity when calculating the Whole Candidate Score.  *Id.* ¶¶ 55, 58; *see also id.* Ex. A.

Once the Admissions Office assigns a Whole Candidate Score, it then determines whether a candidate is "qualified" or "not qualified."  *Id.* ¶ 59.  Three different reviewers in the Admissions Office evaluate the candidate's file and each separately determines whether the candidate meets the academic, leadership, and physical standards as reflected in the Whole Candidate Score.  *Id.* ¶¶ 59-60.  The reviewing officials also provide an individualized, holistic evaluation considering

the subjective components of the application, including essays, interviews, writing samples, and teacher evaluations. *Id.* ¶ 60. If any of the three reviewers disagree as to whether the candidate is qualified, the candidate is reviewed by the Admissions Committee, whose decisions are determined by a simple majority. *Id.* The Admissions Office does not consider a candidate's race or ethnicity in determining whether a candidate is qualified. *Id.* ¶ 64.

Among the qualified candidates, West Point selects the vast majority of its incoming cadet class based on "order of merit," as determined by the Whole Candidate Score, within the category of nomination obtained by the candidate. *Id.* ¶ 65. For example, when a slate of candidates is nominated by a Member of Congress under the "competitive" method, West Point will offer an appointment to the fully qualified nominee from that Member's slate with the highest Whole Candidate Score. *Id.* ¶ 66. In that instance, race and ethnicity play no role in West Point's selection under this process. *Id.* ¶ 55.

For candidates who receive congressional nominations under the "principal-competing" or "principal-numbered" alternate methods, West Point must consider the order specified by the Member of Congress. *Id.* ¶¶ 35-38, 68. Under those methods, if the principal nominee is determined to be qualified, West Point must first offer an appointment to that candidate. *Id.* ¶¶ 35-36. If the principal nominee is determined *not* to be qualified or declines admission: (i) under the "principal-competing" method, West Point must offer admission to the fully qualified candidate on the Member's list with the next highest Whole Candidate Score; and (ii) under the "principal-numbered" method, West Point must offer admission to the fully qualified candidate who ranks *next* highest on the Member's list, even if that candidate has a *lower* Whole Candidate Score than others on the Member's list. *Id.* In these instances, race and ethnicity also play no role in West Point's selection process. *Id.* ¶ 55, 68.

If a qualified candidate is not selected for appointment for the vacancy for which they were nominated, they may still be offered an appointment under two other statutory provisions.  First, West Point may appoint up to 150 "qualified alternates": qualified candidates who received nominations from a Member of Congress, Delegate in Congress, the Resident Commissioner from Puerto Rico, or the Governor of Puerto Rico but did not win the vacancy.  10 U.S.C. § 7442(b)(5). West Point also appoints these candidates by Whole Candidate Score and thus does not consider race or ethnicity.  McDonald Decl. ¶¶ 55, 70(a).  Second, if West Point has filled each nomination vacancy, admitted 150 qualified alternates, and yet has not filled its class, it may offer appointment to other remaining qualified nominees, known as "Additional Appointees."  *Id.* ¶ 70(b).  For at least the last 15 years, West Point has provided offers of appointment to Additional Appointees to meet its class size of around 1,200 cadets.  *Id.* ¶¶ 6, 70(b).  For example, for the classes of 2026 and 2027, 284 candidates and 364 candidates respectively were provided offers of appointment as Additional Appointees.  *Id.* ¶ 70(b).  As explained below, the Admissions Office may consider race and ethnicity as one factor in a holistic assessment in extending offers to Additional Appointees.  *Id.*

### D.    West Point's Limited Consideration of Race and Ethnicity

West Point considers race and ethnicity flexibly as a plus factor in an individualized, holistic assessment of African American, Hispanic, and Native American candidates at three limited stages of the admissions process.  First, early in the admissions process—after a candidate submits a candidate questionnaire, official transcripts and standardized test scores, and is interviewed—the Admissions Office may consider race and ethnicity flexibly as a plus factor in deciding whether to send a "letter of assurance" (LOA) to an African American, Hispanic, or Native American candidate.  McDonald Decl. ¶¶ 72, 75, 91.  An LOA is a conditional offer of

admission—the candidate must still complete their application, pass physical fitness standards, become medically qualified, and receive a nomination.[1]  *Id.* ¶ 73.  In considering whether to send an LOA, the Admissions Office conducts an individualized, holistic review of a candidate's candidate questionnaire, high school transcript, standardized test score, and interview.  *Id.* ¶¶ 72, 77.  West Point's Diversity Outreach Office conducts this review for African American, Hispanic, and Native American candidates, while regional teams conduct this review for other candidates.[2]  *Id.* ¶ 78.  Both the Diversity Outreach Office and the regional teams make their LOA recommendations to the Director of Admissions, who decides whether to issue an LOA.  *Id.*

Second, throughout the admissions cycle, admissions officers conduct a holistic review of all candidates to identify qualified candidates who are highly desired for the valuable contributions they are expected to make (based on their demonstrated leadership, athleticism, scholastic aptitude, past experience as a soldier, and diverse background) but who lack a nomination and may warrant a Superintendent nomination.  *Id.* ¶ 94.  If the Diversity Outreach Office determines that an African American, Hispanic, or Native American candidate is otherwise qualified for admission but has not received a nomination, the Office may recommend that the Director of Admissions recommend the candidate for a Superintendent nomination.  *Id.*  Both the Diversity Outreach Office and the regional teams make their Superintendent nomination recommendations to the Director of Admissions, who considers recommendations for all candidates and then makes recommendations to the Superintendent as to which candidates should receive Superintendent nominations.  *Id.*  The Superintendent may nominate up to 50 candidates per year.  *Id.* ¶ 41.  Since 2008, the Superintendent has never exhausted his nominations in any given year.  *Id.* ¶ 42.  Most

---

[1] If a candidate satisfies these conditions but is not selected to fill a congressional vacancy, non-congressional vacancy, or qualified alternate slot, they will receive an admissions offer as an Additional Appointee.  McDonald Decl. ¶ 93(a).
[2] "Regional team" and "regional admissions officer" are used as those terms are used in the Declaration of Colonel Deborah J. McDonald.  *See* McDonald Decl. ¶ 17 n.2.

Superintendent nominations go to athletes.  *Id.* ¶ 41.

Third, at the end of the admissions cycle, if West Point has not reached its class size, the Admissions Office may consider race and ethnicity in extending offers to Additional Appointees. *Id.* ¶ 93.  The Admissions Committee may consider race and ethnicity flexibly as a plus factor for African American, Hispanic, and Native American candidates in its holistic assessment of candidates to identify those who are expected to make valuable contributions to the cadet environment.[3]

West Point considers race and ethnicity narrowly as one factor at these three stages of the admissions process only to further the military's distinct operational interest in developing a diverse officer corps to ultimately ensure that the military can meet its critical national security mission.  *Id.* ¶¶ 80, 95; Declaration of Ashish S. Vazirani ("Vazirani Decl.") ¶¶ 8-30.  As explained below, the Admissions Office sets (and reviews bi-annually) aspirational diversity goals for the number of African American, Hispanic, and Asian cadets in accordance with demographics of the current officer corps, in order to keep pace with the Army in support of its diversity goals. McDonald Decl. ¶¶ 84-85, 96.  It does not consider race and ethnicity solely in the interest of educational diversity or based on a stereotypical belief that minority students express a characteristic minority viewpoint on an issue.  *Id.* ¶ 95.  West Point's aspirational goals do not operate as ceilings or floors.[4]  *Id.* ¶ 85-87.  For example, West Point did not meet its aspirational diversity goals for certain groups in the class of 2027, but did not offer appointments to additional candidates based on their race to achieve its aspirational goals.  *Id.* ¶ 86.

---

[3] The Admissions Office does not consider race as a plus factor at these stages for Asian and Pacific Islander candidates because Asian and Pacific Islander cadets typically make up a greater share of West Point cadets than Asian and Pacific Islander officers do of the Army officer corps.  McDonald Decl. ¶ 16.
[4] The Admissions Office did not include Native American and Pacific Islander cadets in its diversity goals because these candidates make up a very small percentage of the applicant pool and cadet corps.  McDonald Decl. ¶ 85.

**LEGAL STANDARDS**

### I.     Preliminary Injunction Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  It is "one of the most drastic tools in the arsenal of judicial remedies," and "should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (citation omitted).  To demonstrate its entitlement to this "extraordinary and drastic remedy," *id.*, a movant must clearly demonstrate: "(1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, [] (3) public interest weighing in favor of granting the injunction," and (4) "that the balance of equities tips in his or her favor," *A.H. by & through Hester v. French*, 985 F.3d 165, 176 (2d Cir. 2021) (quotation marks and citations omitted).  Where, as here, a movant seeks "to modify the status quo by virtue of a 'mandatory preliminary injunction' (as opposed to seeking a 'prohibitory preliminary injunction' to maintain the status quo)," the "standard for obtaining preliminary injunctive relief is higher."  *A.H.*, 985 F.3d at 176 (quoting *Yang v. Kosinski*, 960 F.3d 119, 127 (2d Cir. 2020)). In that case, "the movant must . . . make a *strong* showing of irreparable harm and demonstrate a *clear or substantial* likelihood of success on the merits." *Id.* (emphasis added; quotation marks and citations omitted).

In an attempt to avoid this higher standard, Plaintiff incorrectly argues that its requested injunction would preserve the status quo.  Pl. Br. at 9-10.  To ascertain the status quo, the Court must identify "the last actual, peaceable uncontested status which preceded the pending controversy." *A.H.*, 985 F.3d at 177 (citation and internal quotation marks omitted).  In *A.H.*, the appellant urged the Second Circuit to "fix the status quo at a time before" the dual enrollment program at issue was enacted eight years earlier.  *Id.*  But the court "decline[d] to do so," noting

11

that the program's challenged eligibility requirements had been in force "for the better part of a decade" and that the requested injunction would alter these longstanding requirements—and thereby alter the status quo.  *Id.*  This Court should similarly decline Plaintiff's invitation to regard the status quo as the admissions regime that long ago existed before West Point began considering race in admissions.  Pl. Br. at 10.  Indeed, as described below, West Point has been considering race in admissions for far longer than the challenged eligibility requirements were in force in *A.H.* McDonald Decl. ¶ 81.  Plaintiff's requested injunction would undoubtedly alter the status quo.

## II.      Standard Applied to Admissions Policies that Consider Race

Governmental classifications based on race must satisfy "strict scrutiny."  *SFFA*, 600 U.S. at 206-07.  To determine whether an action satisfies strict scrutiny, the Court must first consider whether consideration of race would "further compelling governmental interests."  *Grutter v. Bollinger*, 539 U.S. 306, 326 (2003).  It must then determine whether "the government's use of race is 'narrowly tailored'—meaning 'necessary'—to achieve that interest."  *SFFA*, 600 U.S. at 207 (citing *Fisher v. Univ. of Texas at Austin*, 570 U.S. 297, 311-312 (2013) ("*Fisher I*")).  The Supreme Court has recognized that civilian universities may have a compelling interest in "obtaining the educational benefits that flow from an ethnically diverse student body."  *Regents of the Univ. of California v. Bakke*, 438 U.S. 265, 306 (1978) (Powell, J.); *see also Fisher v. University of Texas at Austin*, 579 U.S. 365 (2016) ("*Fisher II*"); *Fisher I*, 570 U.S. at 310; *Grutter*, 539 U.S. at 325.  Recently, in *SFFA*, the Supreme Court concluded on a full trial record that the admissions programs of Harvard College and the University of North Carolina failed to satisfy strict scrutiny.  600 U.S. at 230.  But it left open the possibility that other admissions programs *could* satisfy strict scrutiny if they are designed to achieve one or more compelling interests that can be "subjected to meaningful judicial review" and are narrowly tailored to achieve those

interests, *id.* at 213, and it explicitly declined to "address[] the propriety of race-based admissions systems" in the context of the military academies given the "distinct interests that [they] may present," *id.* at 214 n.4.

### III.   Deference to the Executive in Matters of National Security

"[U]nless Congress specifically has provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs." *Dep't of Navy v. Egan*, 484 U.S. 518, 530 (1988). "The President, after all, is the 'Commander in Chief of the Army and Navy of the United States.'" *Id.* at 527 (citation omitted); *see also Austin v. U. S. Navy Seals 1-26*, 142 S. Ct. 1301, 1302 (2022) (Kavanaugh, J., concurring). The "complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments," and it is "difficult to conceive of an area of governmental activity in which the courts have less competence." *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973); *see also Boumediene v. Bush*, 553 U.S. 723, 797 (2008) ("neither the Members of this Court nor most federal judges begin the day with briefings that may describe new and serious threats to our Nation and its people").

While courts "are not free to disregard the Constitution in the military context," courts still must defer to the "government's justification for its action" because they "are ill-suited to second-guess military judgments that bear upon military capability or readiness." *Able v. United States*, 155 F.3d 628, 634 (2d Cir. 1998). Thus, the Supreme Court and the Second Circuit have repeatedly deferred to the professional judgment of military authorities on particular military interests. *See, e.g.*, *Austin*, 142 S. Ct. at 1302 (staying order precluding the Navy from considering vaccination status in making "deployment, assignment, and other operational decisions"); *id*. (Kavanaugh, J., concurring) (denying "judicial intrusion into military affairs . . . . because the Navy has an

13

extraordinarily compelling interest in maintaining strategic and operational control over the assignment and deployment [of] personnel"); *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 24 (2008) (reversing preliminary injunction prohibiting the Navy from conducting sonar exercises, and deferring to "declarations from some of the Navy's most senior officers, all of whom underscored the threat posed by enemy submarines and the need for extensive sonar training to counter this threat"); *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986) (deferring to the "considered professional judgment of the Air Force" that standardized uniforms promote "discipline and unity"); *Rostker v. Goldberg*, 453 U.S. 57, 64-68 (1981) (judgments concerning registration and the draft "are based on judgments concerning military operations and needs" and "unquestionably due" deference); *ACLU v. DoD*, 901 F.3d 125, 136 (2d Cir. 2018) ("Courts are not well-suited to evaluate the constantly evolving military conditions and national security challenges faced by U.S. forces and personnel.").  Indeed, the Supreme Court has "give[n] great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest," even when challenged on constitutional grounds.  *Goldman*, 475 U.S. at 507 ("Our review of [constitutional challenge to] military regulations is far more deferential than constitutional review of similar laws or regulations designed for civilian society.").[5]

---

[5] *See also Gilligan*, 413 U.S.at 4, 10; *Egan*, 484 U.S. at 530; *Chappell v. Wallace*, 462 U.S. 296, 301-302 (1983); *Haig v. Agee*, 453 U.S. 280, 291-294 (1981); *Schlesinger v. Councilman*, 420 U.S. 738, 757-758 (1975); *United States v. Nixon*, 418 U.S. 683, 710 (1974); *Orloff v. Willoughby*, 345 U.S. 83, 93-94 (1953); *Burns v. Wilson*, 346 U.S. 137, 142, 144 (1953); *see also Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 645 (1952) (Jackson, J., concurring) (the Court "should indulge the widest latitude" to sustain the President's "function to command the instruments of national force"); *Doolen v. Wormuth*, 5 F.4th 125, 133 (2d Cir. 2021) (upholding West Point's cadet removal process and recognizing that "[c]ourts grant 'greater deference' in the context of national defense and military affairs than perhaps any other area"); *Pilchman v. DoD*, 154 F. Supp. 2d 415, 422 (E.D.N.Y. 2001) (holding that standards of admission to military officer programs are "entitled to a high degree of deference"), *aff'd*, 40 F. App'x 614 (2d Cir. 2002).

**ARGUMENT**

**I.      Plaintiff Has Not Met Its Burden to Establish Standing**

Where, as here, Plaintiff is seeking a preliminary injunction, "a plaintiff's burden to demonstrate standing will normally be no less than required on a motion for summary judgment." *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011) (citation omitted).  Plaintiff seeks to establish associational standing on behalf of its members, which requires, among other things, that it identify *by name* at least one member with standing." *Do No Harm v. Pfizer Inc.*, 646 F. Supp. 3d 490, 501 (S.D.N.Y. 2022) (emphasis added), *appeal docketed*, No. 23-15 (2d Cir.).  "The weight of authority in federal courts [holds] that at least one member must be named for associational standing." *Do No Harm*, 646 F. Supp. 3d at 502-503 (collecting cases).  Two district courts have recently dismissed complaints where the plaintiff, represented by the same counsel as Plaintiff in this case, submitted anonymous member declarations. *Id.* at 504; *Speech First, Inc. v. Shrum*, 2023 WL 2905577, at *3 (W.D. Okla. Apr. 10, 2023), *appeal docketed*, No. 23-6054 (10th Cir.).

The requirement that a Plaintiff "identify members by name" serves several "important purposes." *Do No Harm*, 646 F. Supp. 3d at 503.  It "assure[s] that 'there is a real need to exercise the power of judicial review in order to protect the interests of the complaining party,'" and that the plaintiff "has 'such a personal stake in the outcome of the controversy as to warrant . . . invocation of federal-court jurisdiction.'" *Id.* (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)).  And "absent identified members, courts would face 'the difficulty of verifying the facts' upon which standing depends." *Id.* (quoting *Summers*, 555 U.S. at 499).

Plaintiff has submitted only "anonymous declarations" from Member A and Member C.

15

*Id.* at 497; Dkt. Nos. 8, 25.[6]  Faced with anonymous declarations, the Court has no way to know whether, and if so, how, race and ethnicity would play a role in West Point's consideration of Plaintiff's members' applications.  As explained above, West Point's limited consideration of race and ethnicity does not affect most West Point appointments.  Race plays no role, for example, in West Point's selection of candidates to fill congressional vacancies or qualified alternate slots. There is substantial likelihood, therefore, that SFFA's members could fall into those categories in which the consideration of race places no role.  Because Plaintiff has submitted only anonymous member declarations, the Court cannot determine whether "there is a real need to exercise the power of judicial review in order to protect" Plaintiff's members' interests or whether Plaintiff's members have a "personal stake in the outcome of th[is] controversy."  *Summers*, 555 U.S. at 499 (citation omitted).

## II.      Plaintiff Fails to Demonstrate Irreparable Harm

Plaintiff has not made any showing—let alone a "strong showing"—that either Member A or Member C would suffer irreparable harm absent a preliminary injunction.  As the Second Circuit has recognized, "perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered."  *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 275 (2d Cir. 1985) (citations omitted).  "Irreparable harm is injury that is neither remote nor speculative[.]" *New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42, 86 (2d Cir. 2020). It is also injury that "cannot be remedied if a court waits until the end of trial to resolve the harm." *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005).  "Only when the threatened

---

[6] Plaintiff does not reference Member C in its brief in support of its motion, nor did it file his declaration until after the brief was filed.  Dkt. Nos. 7, 25, 31.  Plaintiff appears not to rely on Member B, *see generally* Pl. Br., and with good reason.  Member B will not be "ready and able to apply to West Point" until the fall of 2025—two years from now, *see* Compl. ¶ 88, and Plaintiff only seeks a preliminary injunction for this year's admissions cycle, Pl. Br. at 9.

harm would impair the court's ability to grant an effective remedy is there really a need for preliminary relief." *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 235 (2d Cir. 1999) (citation omitted).  Given the primacy of irreparable harm in the preliminary injunction analysis, "the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered." *Grand River Enter. Six Nations*, 481 F.3d at 66 (citation and internal quotation marks omitted).

"A district court should generally consider [a litigant's] delay in assessing irreparable harm," *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 39 (2d Cir. 1995), as delay typically has an "undercutting effect . . . on [a] claim of irreparable harm," *Majorica, S.A. v. R.H. Macy & Co.*, 762 F.2d 7, 8 (2d Cir. 1985); *accord Citibank, N.A.*, 756 F.2d at 276.  Although there is no bright-line rule, "courts in this Circuit 'typically decline to grant preliminary injunctions in the face of unexplained delays of more than two months.'"  *Hodnett v. Medalist Partners Opportunity Master Fund II-a, L.P.*, 2021 WL 535485, *6 (S.D.N.Y. Feb. 12, 2021) (citation omitted).  "[A] plaintiff's delay in commencing a lawsuit seeking protection of his constitutional rights tends to negate a finding of immediate and irreparable harm necessary for the issuance of a preliminary injunction." *Wallikas v. Harder*, 78 F. Supp. 2d 36, 42 (N.D.N.Y. 1999); *Carter v. Sewell*, 2023 WL 7164304, *1 (S.D.N.Y. Oct. 31, 2023); *Omnistone Corp. v. Cuomo*, 485 F. Supp. 3d 365, 367, 369 (E.D.N.Y. 2020).  Plaintiff cannot meet its burden of showing that irreparable harm is likely here, in three main respects.[7]

First, the irreparable harm Plaintiff claims would result to Members A and C is "remote"

---

[7] Plaintiff argues that a presumption of irreparable injury flows from a violation of constitutional rights, but any such *presumption* is easily overcome for the reasons that follow.  Plaintiff's reliance on *Agudath Israel of America v. Cuomo*, 938 F.3d 620 (2d Cir. 2020), for the proposition that "[a]n Equal Protection Clause violation . . . is . . . an irreparable injury," Pl. Br. at 19, is misplaced, as that quote does not come from *Agudath*, which does not involve equal protection violations.  Plaintiff's reliance on out-of-circuit cases, *see* Pl. Br. at 20, is similarly misplaced, as such cases provide little guidance in determining whether this Circuit's irreparable harm standard has been met.

and "speculative," not "actual" and "imminent." *New York*, 969 F.3d at 86.  Indeed, Members A and C would lose "a year of [their] li[v]es and thus could never catch up to [their] peers in terms of military seniority," Pl. Br. at 20, only if these Members complete their West Point applications before January 31, 2024, but Member A's and Member C's declarations do not state that they will actually apply by that deadline.  Moreover, this argument requires accepting that Members A and C (1) will be qualified; (2) will not be selected to fill a vacancy or qualified alternate slot; (3) will be considered for selection as Additional Appointees or Superintendent nominations; and (4) ultimately will not be selected for appointment because of West Point's limited consideration of race.  Plaintiff makes no attempt to support this "highly attenuated chain of possibilities," *Superb Motors Inc. v. Deo*, 2023 WL 5952145, at *4 (E.D.N.Y. Aug. 25, 2023) (citation omitted), with the evidence that is necessary at this juncture to demonstrate that irreparable harm is likely.  The sparse declarations provided by Members A and C provide little information regarding their academic, leadership, and fitness qualifications; fail to identify the districts and/or states in which they could compete for congressional nominations; and do not indicate whether they intend to compete for service-connected nominations, nominations from statutory nominating authorities, or both.  Without this information, it is not possible to make *any* assessment regarding the likelihood of the course of events identified above coming to pass and these Members suffering the harm claimed as a result.[8]  Because this theory of irreparable harm is premised on nothing more than "an accumulation of inferences," it "is simply too speculative and conjectural to supply a predicate for prospective injunctive relief."  *See Nachshen v. E. 14 Realty, LLC*, 2019 WL

---

[8] For the same reasons, Plaintiff's claims are also arguably not ripe.  *See Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 687 (2d Cir. 2013) ("Ripeness is peculiarly a question of timing.  A claim is not ripe if it depends upon contingent future events that may not occur as anticipated, or indeed may not occur at all." (citation and internal quotation marks omitted)).

5460787, at *2 (S.D.N.Y. Oct. 9, 2019) (citing *Shain v. Ellison*, 356 F.3d 211, 216 (2d Cir. 2004)).[9]

Plaintiff may argue that it is enough that Members A and C are "ready and able" to apply to West Point but allegedly cannot compete on equal footing due to their race.  *See* Dkt. No. 8 ¶ 6–7; Dkt. No. 25 ¶ 3, 5.  Not so.  Even assuming such unsupported statements are sufficient to establish standing to challenge West Point's admissions policies, "[a] prospective injury that is sufficient to establish standing . . . does not necessarily satisfy the more demanding burden of demonstrating irreparable injury."  *California Ass'n of Priv. Postsecondary Sch. v. DeVos*, 344 F. Supp. 3d 158, 170 (D.D.C. 2018); *see also Career Colleges & Sch. of Texas v. United States Dep't of Educ.*, 2023 WL 4291992, at *5 (W.D. Tex. June 30, 2023).  To meet that more demanding burden, Plaintiff must provide evidence—beyond the fact that they simply will forgo applying to West Point—that Members A and C will "lose a year" of their lives and never catch up to their peers "in terms of military seniority."  That they have failed to do.

Second, Plaintiff's delay in filing this action and seeking emergency relief for the 2023-24 admissions cycle undercuts its claim of irreparable harm to Members A and C.  West Point has considered race and ethnicity, in a limited fashion, since at least the 1990s and has been transparent and public in doing so.  McDonald Decl. ¶¶ 81-85.  Moreover, there can be no doubt that Plaintiff itself has specifically been aware of West Point's consideration of race and ethnicity for over a year.  Indeed, in August 2022, the United States submitted an amicus brief in support of respondents in *SFFA* explaining "the United States['] . . . vital interest in ensuring that the Nation's service academies . . . retain the ability to achieve [certain] benefits by considering race in the

---

[9] Plaintiff may argue instead that this chain of possibilities is certain to come to pass because Members A and C will not apply to West Point in the absence of a preliminary injunction.  *See* Dkt. No. 25 ¶ 5.  But in that case, the harm claimed would be self-inflicted, and a "party may not satisfy the irreparable harm requirement if the harm complained of is self-inflicted."  *Howe v. Burwell*, 2015 WL 4479757, at *6 (D. Vt. July 21, 2015) (quoting 11A Charles A. Wright, Federal Practice and Procedure § 2948.1 (3d ed. 1998)); *cf. Clapper v. Amnesty Int'l, USA*, 568 U.S. 398, 418 (2013) (reaffirming that "self-inflicted injuries" cannot support standing).

limited manner authorized by *Bakke*, *Grutter*, and *Fisher*." *SFFA v. Harvard*, No. 20-1199 (U.S.), Brief for the United States as Amicus Curiae Supporting Respondent, at 12. That same month, Plaintiff filed its reply brief in *SFFA*, expressly challenging the importance of the service academies' consideration of race. *Id.*, Reply Brief for Petitioner, at 12. But Plaintiff fails to provide any justification for why it waited for more than a year—until September 2023—to seek "emergency" relief against West Point for the current admissions cycle.[10]

Finally, "[t]he threatened harm would [not] impair the [C]ourt's ability to grant an effective remedy" to Members A and C were Plaintiff to succeed on its claim at the end of trial, and thus there is no "need for preliminary relief." *Rodriguez*, 175 F.3d at 235. Given that (1) Members A and C are, respectively, not yet 18 years old, *see* Dkt. No. 8 ¶ 1, and 18 years old, *see* Dkt. No. 25 ¶ 1; and (2) cadets may enter West Point between their 17th and 23rd birthdays, *see* McDonald Decl. ¶ 22, it is all but guaranteed that, under either an expedited or typical litigation schedule, a trial could be completed, and all appeals concluded, with ample time for Members A and C to apply and compete for appointment to West Point in several future admissions cycles.

### III. Plaintiff Cannot Demonstrate a Clear Likelihood of Success on the Merits

The extensive evidentiary record fatally undermines Plaintiff's assertions that West Point has no compelling interest in considering race and ethnicity in admissions or that West Point's

---

[10] If Plaintiff claims that it was waiting for the present admissions cycle to begin before filing suit against West Point and seeking a preliminary injunction based on harm to Members A and C, such an argument lacks merit. Plaintiff initially sought to establish irreparable harm through only Member A. Dkt. No. 8 ¶ 2. But West Point's candidate questionnaire opened to him in January 2023—over ten months ago, *see* McDonald Decl. ¶ 20—and Plaintiff fails to provide any explanation for why it did not seek injunctive relief at that time. Any claim that Plaintiff was waiting for the Supreme Court to decide *SFFA* before initiating this challenge similarly lacks merit. Any strategic reasons Plaintiff may have had for waiting for the *SFFA* decision cannot excuse the delay in seeking emergency preliminary relief. *Hodnett*, 2021 WL 535485, at *7 (the "Second Circuit has expressed skepticism as to whether 'a court can or should properly reach any conclusions about the likelihood of irreparable harm from the strategic decisions of plaintiff's counsel to delay seeking relief until such time as the plaintiffs can actually demonstrate that relief is warranted'") (citing *Nicolson v. Scoppetta*, 344 F.3d 154, 167 n.6 (2d Cir. 2003)). And in any event, Plaintiff waited nearly three months after the Supreme Court's decision in *SFFA* to act here. This period of unexplained delay alone weighs in favor of denying Plaintiff's preliminary injunction motion. *Id.* at *6.

alleged justifications are "devoid of evidentiary support[.]"  Pl. Br. at 11.  As discussed in detail below, the military's interest in a diverse officer corps is amply supported by research, the history of race relations in the military, and actual experience on the battlefield.  Fundamentally, the military has concluded that a diverse officer corps is critical to the military's ability to defend our nation—a judgment to which courts defer—and West Point's admissions policies are narrowly tailored to achieve that goal.

### A. The United States Military Has a Compelling National Security Interest in a Diverse Officer Corps

Our nation's security relies on its exceptional fighting force.  *See* Vazirani Decl. ¶ 8; Stitt Decl. ¶ 12.  The United States cannot afford to lose its posture as the preeminent fighting force in the world with the continued increase and evolution of international threats.  Vazirani Decl. ¶ 8.  For decades, senior military leaders have concluded that the fighting force is stronger when it is racially and otherwise diverse at all levels.  *See* Haynie Decl. ¶¶ 17-28; Vazirani Decl. ¶ 9; Stitt Decl. ¶¶ 14, 15, 21; Declaration of Beth Bailey, PhD ("Bailey Decl.") ¶ 87; see generally MLDC Report.  As Secretary of Defense Lloyd Austin recently testified before Congress, "[b]uilding a talented workforce that reflects our nation . . . is a national security imperative" that "improves our ability to compete, deter, and win in today's increasingly complex global security environment." Fiscal Year 2023 Defense Budget Request: Hearing Before the House Armed Services Comm., 117th Cong., 2d Sess. (2022).

In particular, the United States Armed Forces have long recognized that the nation's military strength and readiness depend on a pipeline of officers who are both highly qualified and racially and ethnically diverse, and who have been educated in environments that prepare them to lead increasingly diverse forces.  *See* Haynie Decl. ¶¶ 9-33; Vazirani Decl. ¶¶ 11-16; Stitt Decl. ¶

14; Bailey Decl. ¶ 9.[11]   The Army has concluded that diversity in the officer corps is vital to national security because it (1) fosters cohesion and lethality; (2) aids in recruitment of top talent; (3) increases retention; and (4) bolsters the Army's legitimacy in the eyes of the nation and the world.

### 1.   Racial Tension in the Military and Lack of Diversity in the Senior Ranks

The Armed Forces learned this lesson the hard way.  The history of racial tension, and resulting violence, disciplinary issues, and distrust described below, directly informed the military's judgment about the critical need for diversity in the armed forces generally and in the officer corps more specifically.  Plaintiff's remarkable assertion that racial animosities were "negligible," "brief," and "anecdotal," Compl. ¶¶ 46-47, is belied by history.  Rather, the Army has faced internal racial strife that has risked mission readiness since its inception.  Bailey Decl. ¶ 10; Declaration of Jason Lyall, PhD ("Lyall Decl.") ¶ 53.

While racial minorities have served in the Armed Forces since the Revolutionary War, the military was racially segregated until the mid-20th century.  Bailey Decl. ¶ 15.  From the Civil War through World War II, Black servicemembers served in segregated units, were subject to different drafts, and were often assigned less prestigious positions than white servicemembers— including heavy labor at training camps, supply services, and other miscellaneous detachments. *Id.* ¶¶ 18-19 (highlighting conditions faced by minority servicemembers); Congressional Research Service, *Diversity, Inclusion, and Equal Opportunity in the Armed Services: Background and Issues for Congress* (June 5, 2019) ("CRS Report"), at 13.   In 1917, racial violence erupted at

---

[11] Plaintiff is wrong that *SFFA* "overruled the government's national-security objections about the effect [of invalidating civilian university admissions programs] on ROTC," Pl. Br. at 8-9, such that SFFA also "broadly" "overruled" the government's national security interests in connection with the service academies.  The Supreme Court expressly declined to address the issue, recognizing that the interests might be "distinct."  600 U.S. at 213 n.4. Try as it might, Plaintiff cannot ignore the distinction.

Camp Logan, Texas, and Camp Merrit, New Jersey.  Bailey Decl. ¶ 21 (detailing incidents).  Race riots erupted again in 1943 at, among other places, Camp Van Dorn, Mississippi; Camp Stewart, Georgia; Lake Charles, Louisiana; March Field and Camp San Luis Obispo, California; Fort Bliss, Texas; Camp Phillips, Kansas; Camp Breckinridge, Kentucky; and Camp Shenango, Pennsylvania. *Id.* ¶ 24.  At peak World War II manpower strength in 1945, Black servicemembers accounted for 7.2% of the total military but only 0.6% of the officer corps.  *See* CRS Report at 13.

In 1948, President Truman issued Executive Order 9981, directing the desegregation of the Armed Forces and establishing the Fahy Committee to evaluate the impact of integration on military efficiency.  *See* Executive Order 9981.  The Fahy Committee concluded that it was "convinced that a policy of equality of treatment and opportunity will make for a better Army, Navy, and Air Force" and "will strengthen the nation."  President's Committee on Equality of Treatment and Opportunity in the Armed Service, *Freedom to Serve: Equality of Treatment and Opportunity in the Armed Services*, United States GPO, Washington, D.C., 1950, at 68. Nevertheless, the Secretary of the Army refused to integrate army personnel.  Bailey Decl. ¶ 28.

The Korean War accelerated integration efforts due to the need to rapidly build and deploy armed forces, but the military still deeply resisted integration.  CRS Report at 14.  The Army continued to establish segregated units, which undermined military efficiency.  Bailey Decl. ¶ 29. For example, as the Army's Center for Military History later concluded, the 24th Infantry, an all-Black unit led by white officers, struggled in the Korean peninsula because the "corrosive effects of segregation and the racial prejudices that accompanied it" created a system that "crippled the trust and mutual confidence so necessary among the [Black] soldiers and [white] leaders of combat units and weakened the bonds that held the 24th together, producing profound effects on the battlefield." *Id*. ¶ 30.

As discussed in a later report issued by the Military Leadership Diversity Commission ("MLDC"), a commission of senior military leaders, President Kennedy convened the Gessell Committee in 1962 to examine the military's continued racial disparities.  The Gessell Committee recommended that the Secretary of Defense pursue "greater institutionalization of the military's commitment to equality of treatment and opportunity."  MLDC, *From Representation to Inclusion: Diversity Leadership for the 21st-Century Military,* March 2011 ("MLDC Report"), at 5.  But Secretary of Defense Robert McNamara instead issued only a general policy directive ordering DoD to "conduct all of its activities in a manner which is free from racial discrimination[.]"  DoD, Equal Opportunity in the Armed Forces, DODD 5120.36, July 1963.  As MLDC concluded, "DoD's failure to implement the Gessell Committee's recommendation had high costs," as inequities persisted, "particularly in the leadership ranks."  MLDC Report at 6.

By 1968, the Army had 520 white Generals and only one Black General.  Bailey Decl. ¶ 67.  Racial tension within the armed forces erupted into violence.  It was "extraordinarily disruptive and widespread," extending "from fire bases in Vietnam to army posts within the United States to installations in West Germany, Korea, Thailand, and Okinawa."  *Id.* ¶¶ 38-41.  The violence occurred in 1968, at the Army jail in Long Binh, Vietnam; in 1970, at Fort Carson, Colorado; in 1971, at the "GI Alley" in South Korea and at the 1st Cavalry Division's camp in Central Highlands, Vietnam; and in 1971 and 1972, in West Germany.  *Id.* ¶¶ 46-51.  It spilled from "the United States to the Republic of Vietnam [] to the Cold War 7th Army in West Germany [] to bases and surrounding communities in Okinawa, Thailand, and Korea."  *Id.* ¶ 38.  Large scale incidents occurred at Fort Lejeune (involving more than 50 marines); at Travis Air Force Base (involving dozens of civilian police officers and airmen); and on the USS Kitty Hawk (involving almost 50 sailors).  *Id.* ¶¶ 43-44.  One member of General Westmoreland's staff called this racial

violence within the U.S. armed forces, quite simply, "a war." *Id.* ¶ 41.

The racial violence also caused foreign relations problems. *Id*. ¶¶ 53-55 (reciting reports of concerns expressed by the governments of West Germany, South Korea, Greece, Iceland, and Turkey). The press reflected and amplified the racial tension: stories of disproportionate casualties among African Americans and terms such as "cannon fodder" and genocide circulated in African American media, undermining the military's legitimacy at home. *Id.* ¶¶ 20, 33, 71, 78, 84 (citing press reports from as early as World War I arguing that the shortage of Black officers undermined the Army's claimed commitment to equality).

The clashes were so widespread that the Army directed units around the world to gather data about each incident. *Id.* ¶ 40.[12] In 1969, the House Armed Services Committee began investigating the incident at Camp Lejeune; the Army Chief of Staff directed the Army to assess the level of racial tension and identify problems that could "impair the army's ability to accomplish its mission." *Id.* ¶ 56. And Secretary of the Army Stanley Resor insisted that the Army must address the problem of racial conflict within the ranks, stating, "Do not misunderstand me. The Army does not view itself as an institution of social reform. That is not our charge. But we cannot ignore the realities of the society in which we live. If ignored, those realities can lessen our ability to defend the Nation." *Id.*

West Point's cadet corps mirrored this problem. For the first two hundred years of its history, the West Point cadet corps was overwhelmingly white. The first Black cadet graduated in 1877, and no Black cadet graduated from 1889 to 1936. *Id.* ¶¶ 77-78 (synthesizing history of

---

[12] The Army and DoD thoroughly documented these incidents through regular required reports quantifying instances of cross-racial conflict, quarterly "Chronology of Racial Incidents," and yearly "Race Relations Surveys," as well as in Army SIRS (Serious Incident Reports), Blue Bells (reports of incidents that may publicly embarrass the U.S. Army), and Inspector General Investigations. Incidents of racial violence prompted a range of investigations, studies, policy proposals, white papers, and reports. Bailey Decl. ¶ 39.

mistreatment of Black cadets at West Point).  As of 1968, in its entire history, West Point had graduated almost 30,000 cadets, but only 68 Black cadets.  *Id.* ¶ 76; McDonald Decl. ¶ 81.

### 2.  The Military's Judgment That a Diverse Officer Corps Is Vital to National Security

This decades-long crisis left senior Army leaders convinced that the level and extent of racial violence fundamentally threatened the Army's ability to fulfill its mission of national defense.  Bailey ¶¶ 56-74; Vazirani Decl. ¶ 14; Stitt Decl. ¶ 32.  "It is obvious and unarguable that no government interest is more compelling than the security of the Nation."  *Haig*, 453 U.S. at 307 (citation omitted).  Courts have repeatedly recognized that the government's interest in preserving national security is "an urgent objective of the highest order."  *Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010); *American Civil Liberties Union v. Clapper*, 785 F.3d 787, 826 (2d Cir. 2015) ("maintaining national security . . . is a public interest of the highest order").  The threat to the military's fundamental mission by racially segregated forces was so grave that, even in the middle of an all-consuming war in Vietnam, the Army ordered extensive reforms, including by replacing critical combat training with race relations training.  Bailey Decl. ¶ 61.  Indeed, the Army began relieving officers of their command if they could not manage race relations within their units.  *Id*. ¶ 64.

In particular, senior military leaders recognized that the scarcity of minority officers created distrust within the force and the nation and helped fuel the racial tensions that so critically undermined mission readiness.  As a Congressional commission comprised of military leaders later stated, "During the Vietnam War, the lack of diversity in military leadership led to problems that threated the integrity and performance of the Nation's military."  MLDC Report at xvi.  The Commission concluded that this was because "the performance of the Nation's military is tied to the individual's belief that he or she will be treated fairly regardless of his or her background," and

because "the popular perceptions of racial/ethnic minorities serving as 'cannon fodder' for white military leaders" "estrange[d] the military from the people it represents and from which it ultimately draws its strength." *Id.* at xvi, 15.

Thus, starting in at least 1963, the military's senior leadership determined that a diverse officer corps is vital to mission success and national security. Bailey Decl. ¶¶ 56-74 (discussing the Gessell Committee's 1963 recommendation that the services recruit Black officers to address the "shocking" lack of Black officers; the Army Chief of Staff's 1969 direction to "take a hard look" at data on the racial composition of the officer ranks; the Secretary of Defense's 1971 proclamation that the Army must make recruiting and training Black officers a matter of "top priority"; and DoD's efforts to increase minorities at the senior officer level). And although early efforts led to "modest increases in minority demographic representation among junior to mid-grade officers," they failed to close the demographic gap and yielded even "less progress" in "diversifying the military's senior leadership." DoD Board on Diversity and Inclusion Report: Recommendations to Improve Racial and Ethnic Diversity and Inclusion in the Military (2020) ("DoD D&I Report"), at 2.

The military has continued to evaluate the issue and reaffirmed its judgment that a diverse officer corps prepared to lead an increasingly diverse military is critical for success in war. In 2009, the MLDC, made up of thirty active and retired military leaders from all branches of services, concluded that the Armed Forces must "develop a demographically diverse leadership that reflects the public it serves and the forces it leads." MLDC Report at xiii. The Commission underscored the importance of "[d]evelop[ing] future leaders who represent the face of America and are able to effectively lead a diverse workforce," because it would "inspire future servicemembers," "engender trust among the population," and foster trust and confidence

"between the enlisted corps and its leaders." *Id*. at 8, 44.[13]   In 2020, a 15-member Board, led by the Secretary of the Air Force with officers from each service branch, once again concluded that "appropriate representation of minorities in military leadership positions is increasingly important in the context of the nation's demographic trends." DoD D&I Report at 9.[14]   And still today. "The Army, using its best military judgment, has concluded that a diverse officer corps is critical to combat effectiveness and unit cohesion; the recruitment and retention of officers and enlisted personnel alike; and the domestic and international legitimacy of the U.S. Army as an institution." Stitt Decl. ¶ 12; *see also id*. ¶ 14 ("Developing and maintaining a highly qualified and demographically diverse military leadership is critical for mission effectiveness and is essential to national security."); Vazirani Decl. ¶¶ 9-30 (explaining why DoD has determined that diversity within the officer corps "is critical to mission readiness and efficacy"); Haynie Decl. ¶¶ 7-31.

The Armed Forces have made a strategic judgment that diversity, including racial and ethnic diversity, at all levels is imperative.   In particular, as detailed below, the military has concluded that a diverse officer corps is necessary to ensure mission success, aid in recruitment and retention, and bolster the military's legitimacy.   That judgment is entitled to deference. *See supra* Legal Standards Pt. III (collecting cases).[15]

---

[13] *See also* MLDC Report at 12 (quoting Professor Jerome Karabel: "It is easy to forget just how segregated the officer corps once was.   In 1968, African-American enrollment at West Point and Annapolis was less than 1 percent, just 2.8 percent of all military officers were African-American.   By contrast, during that period, African-Americans constituted as much as 17 percent of the rank and file.   In Vietnam, the consequences of this de facto segregation were devastating.").

[14] *See also* DoD, Office of People Analytics ("OPA"), *An Exploration of the Return on Investment for Diversity & Inclusion in the Military Using Cluster Analysis to Identify Force-Wide Climates, Correlates, and Implications: Executive Report*, OPA (October 2022) ("OPA Report").

[15] Cases Plaintiff cites where courts have "refused to defer" to government officials' "judgments on race," Pl. Br. at 19 (quoting *Johnson*, 543 U.S. at 512), are inapposite.   *U.S. Navy Seals 1-26 v. Biden*, 27 F.4th 336 (5th Cir. 2022), is unavailing, as the Supreme Court reached the opposing conclusion of the Fifth Circuit, staying that court's decision and deferring to the Navy's judgment with respect to making deployment, assignment, and operational decisions during the pendency of litigation.   *See Austin*, 142 S. Ct. at 1302.   And while the D.C. Circuit invalidated the Marine Corps' grooming policy as applied to Sikh recruits based on those recruits' religious objections, *Singh v. Berger*, 56 F.4th 88, 99 (D.C. Cir. 2022), the court noted that the Corps had already granted "'a system of exceptions' to boot

### a.   Diversity in the Officer Corps is Critical to Army Cohesion and Lethality

### i.      History of Battlefield Experience

As demonstrated most starkly in the Vietnam era, the military has determined that lack of internal unit cohesion jeopardizes mission success.  General James Mattis, then-Commander of United States Joint Forces Command and later Secretary of Defense, noted in 2010:

> I don't care how tactically or operationally brilliant you are, if you cannot create harmony—even vicious harmony—on the battlefield based on trust across service lines, across coalition and national lines, and across civilian/military lines, … your leadership in today's age is obsolete.

MLDC Report at xiv.  As three-star Army Lieutenant General Stitt explains, "[m]ilitary units are unlike other organizations in that their degree of cohesion influences their ability to accomplish their missions and is, therefore, essential to their survivability."  Stitt Decl. ¶ 14.  "[S]uccess or failure is an existential condition on the battlefield.  Soldiers fight for the man or woman on their right or left.  How hard they fight and whether they can persevere through the hardships that those in the Army are asked to endure depends to a considerable extent on the cohesion of their team." *Id.* ¶ 14.  The "Army officer corps must continue to be diverse or the cohesiveness essential to the Army mission will be critically undermined." *Id.* ¶ 17; *see also id.* ¶ 16 (soldiers who report higher levels of cohesion are also less likely to report post-traumatic stress and more likely to continue to

---

camp grooming rules," which "seriously 'undermine[d]' the Corps' contention" that it had a compelling interest in "brook[ing] no departures" from those rules.  Here, there are no exceptions to West Point's admissions policy: it applies the same policy to all candidates.  In *Berkley v. U.S.*, 287 F.3d 1076 (Fed. Cir. 2002), while the Federal Circuit concluded that the Air Force's instruction governing which officers should be selected for involuntary termination required differential treatment based on race and gender, the court did not evaluate whether the policy complied with equal protection.  Finally, *Johnson v. California*, 543 U.S. 499 (2005), did not involve the military; rather, the Court evaluated a corrections department's policy segregating inmates based on race after arrival at a facility, and similarly did not determine whether the policy complied with equal protection.  Plaintiff appears to challenge military deference more generally by pointing to the Supreme Court's deference to the military's judgment to segregate Japanese Americans during World War II, *Korematsu v. United States,* 323 U.S. 214 (1944), but this case bears no resemblance to *Korematsu*, which singled out members of a particular race for dramatically disfavored treatment, and the Supreme Court, the Second Circuit, and this Court repeatedly have recognized and applied this deference even while repudiating the Court's decision in *Korematsu*.  The policy at issue here is a far cry from the military's decision to separate an entire group of Americans into internment camps.

serve).  As Under Secretary Vazirani states, "enhanc[ing] racial and ethnic diversity in the officer corps allow[s] Service members to see themselves as part of an inclusive, representative force and, importantly, as potential future leaders of that force.  This engenders a shared commitment, greater cohesion, trust, and confidence that enhances military effectiveness through increased job satisfaction and performance."  Vazirani Decl. ¶ 15; *see also id*. ¶ 16 ("racial and ethnic diversity within the officer corps of the DoD is considered a force multiplier—it enables us to bring together people with different experiences, identities and perspectives, which increases the effectiveness, adaptiveness and capabilities of the entire group").  Today, DoD recognizes that "[o]ur efforts will ultimately fail if we allow problems in our own ranks to undermine our cohesion, performance, and ability to advance our mission."  2022 National Defense Strategy at 21 (committing to increase diversity, address sexual assault and harassment, and eradicate extremism).  Thus, the Army has concluded that, to be combat ready, Army units must act as one, and that racial diversity helps to ensure such teamwork.

But cohesion cannot exist when there is internal strife, which has sometimes resulted from perceived racial imbalances between enlisted members and officers.  The Army learned these lessons most acutely during the Vietnam War, when the lack of diversity in military leadership led to racial conflict that "threatened the integrity and performance of the Nation's military."  Haynie Decl. ¶ 26: *see also id.* ¶ 7 (because "officers set the tone and culture for their units and are responsible for key people- and mission-oriented decisions, [] diversity of the officer corps and the inclusive nature of the teams and units they belong to and lead is critical for overall mission success"); *id*. ¶¶ 10, 17 (exclusionary practices may lead to "less accuracy in information analysis, errors in decision-making, less innovation capacity, and may enable stagnation and risk aversion or worse"; and more diverse teams "make fewer mistakes" and have better "group thinking"); Stitt

Decl. ¶ 32; Vazirani Decl. ¶ 14 (non-diverse leadership "undermines the integrity and performance of the military, fostering an environment that threatens unit cohesion and limits the vision soldiers have for their future"); MLDC Report at 15 ("perceptions of racial/ethnic minorities serving as 'cannon fodder' for white military leaders" during the Vietnam war era reveal "how important ethnic, racial, and gender representation is to the psychological well-being and reputation of the U.S. military"); *id.* at 44 (concluding that "military leadership should [] represent the servicemembers it is entrusted to lead," and "[d]emographic similarities between the enlisted corps and its leaders can [] inspire and facilitate greater confidence"); *Army People Strategy* at 2 (The Army's "readiness relies upon people.  After all, equipment does not learn, understand, innovate, build cohesive teams, or exercise judgment—people do.").  Racial tension in the Army remains a concern today, as "[s]urveys indicate that isolated instances of white nationalism, racism, and extremism have unfortunately been growing in the military."  Stitt Decl. ¶ 18.  Lieutenant General Sttit notes that "these and similar challenges have the potential to undermine unit cohesion and the Army's ability to achieve its mission, [and] diversity mitigates such threats and preserves the cohesion upon which our readiness depends."  *Id.* (citing internal surveys and reports).[16]

This is not just a theoretical exercise; Lieutenant General Stitt has personally experienced, across three decades as an Army officer, the difference between units that lack cohesion and units that maintain cohesion on the battlefield:

Units that lack cohesion are unable to effectively accomplish the Army's mission.

---

[16] As discussed in more detail below, Plaintiff crudely mischaracterizes this interest.  Pl. Br. at 11 (asserting that West Point views "soldiers as members of racial groups, rather than as individuals—[] grounded in the assumption that minority servicemembers all think and feel the same way"); Pl. Br. at 12 (asserting that West Point argues that "soldiers view their peers and superiors foremost in terms of race, rather than in terms of their ability or character traits like loyalty, devotion, and selflessness").  The Army seeks to foster a wide range of diversity of all kinds, including racial and ethnic diversity, not because a servicemember of one race or ethnicity views members of her race or ethnicity the same way, as Plaintiff insinuates, but because the Army has experienced the repercussions of an all-white officer corps.  *See* Haynie Decl. ¶ 26.  Learning from that experience, the Army has concluded that fostering a diverse and inclusive Army at all levels enhances cohesion, increases lethality, and improves decision-making.  *See generally* Vazirani Decl. & Stitt Decl.

> Conversely, cohesive teams with strong bonds among members perform better, achieve unmatched levels of synchronization, demonstrate tenacity and a will to win that surpasses all others. Cohesive teams can absorb more task demands, perform with fewer errors, and exceed performance.

Stitt Decl. ¶ 15.  Thus, as Lieutenant General Stitt explains, "The Army must maintain a diverse officer corps, or it risks renewed challenges to its legitimacy, performance, and combat readiness." Stitt Decl. ¶ 31.

### ii.    Empirical Evidence Reveals that Diversity Aids Military Success

Plaintiff's arguments notwithstanding, *see* Pl. Br. at 11, numerous internal and external empirical studies demonstrate the importance of diversity, including racial and ethnic diversity, and the related concept of inclusion, to military effectiveness.  *See* Haynie Decl. ¶ 8 (explaining the connection between diversity and inclusion).  Because service members are "the military's most valuable asset," in 2022, OPA evaluated the relationship between diversity and inclusion climates in the military and key military readiness outcomes.  Haynie Decl. ¶ 32; OPA Report at ii, 6-9 (explaining study methodology). Using statistical analysis, cluster analysis, and regression models, OPA analyzed active-duty survey response patterns and three years of associated personnel records and concluded that servicemembers who characterized their diversity climates as "healthy"—such as supervisors' attention to and efforts to stop "racial/ethnic harassment"— ranked their units' readiness far higher than those who characterized their diversity climates as "unhealthy."  OPA Report at 6, 16; *see also* Lyall Decl. ¶ 21 (explaining that officers "provide the leadership and command culture that either allows diversity to flourish or, conversely, proves toxic to it").  In particular, those who characterized their diversity climates as unhealthy "were more likely to identify as underrepresented groups, such as racial or ethnic minorities."  Haynie Decl. ¶¶ 31-32; OPA Report at 14.

Professor Jason Lyall, the James Wright Chair in Transnational Studies at Dartmouth

College and author of *Divided Armies: Inequality and Battlefield Performance in Modern War* (Princeton University Press, 2020), which informs DoD's work, *see* Haynie Decl. ¶ 11, has also conducted extensive research regarding how diversity and equality affect battlefield performance. Creating a data set from information on nearly 300 armies in 250 wars since 1800, stress-tested by 134 coders over seven years, and using a Military Inequality Coefficient, Professor Lyall has concluded that "evidence from quantitative and historical case studies demonstrates that a diverse and inclusive military is critical for battlefield success." Lyall Decl. ¶¶ 9-12; *see also id.* ¶¶ 24-25 (explaining study methodology and statistical analyses). Professor Lyall determined that a diverse army is better at "problem-solving," "innovate[s] faster," is "more resilient and adaptive," and enhances "legitimacy at home." *Id.* ¶ 19. But the more armies treat their diverse ranks unequally, (1) the greater losses these armies suffer as compared to those they inflict on enemy forces, (2) the more desertion and defection from the ranks they experience, (3) the more commanders "coerce their soldiers to fight though fear of lethal punishment," and (4) the greater their "tactical inflexibility." *Id.* ¶¶ 22-38; *see also id.* at Table 1 & Figure 1. Professor Lyall concluded, therefore, that "high rates of military inequality are associated with a belligerent losing the war itself," such that whether an army is inclusive is often more decisive in battle than whether an army has superior firepower. *See id.* ¶ 44. Thus "battlefield performance is dictated by how armies manage the diversity with their ranks." *Id.* ¶ 17.[17]

---

[17] Plaintiff's other assertions about the realities of combat are likewise undermined by data. First, Plaintiff claims that "battlefield realities apply equally to all soldiers regardless of race, ethnicity, or national origin," Pl. Br. at 1, but Professor Lyall has concluded that the risks that soldiers face are "often determined by their identity," including "exposure to battlefield risk [] and treatment if captured." Lyall Decl. ¶ 54 (surveying examples); *see also* Bailey Decl. ¶ 78. Second, "America's enemies" can indeed "fight differently based on the race of the commanding officers," Pl. Br. at 1, as "units suffering from ethnic and racial inequalities have often been singled out by opposing commanders," Lyall Decl. ¶ 55 (providing examples). Finally, contrary to Plaintiff's claims that there is no evidence that parity in demographics of the officer and enlisted corps fosters trust, Pl. Br. 11, there is "mountains of evidence gathered over decades." Lyall Decl. ¶ 56 ("Plaintiff's conjectures about the drivers of military effectiveness are based on an outmoded notion of how combat power is created and the dubious assumption that combat automatically creates a band of brothers mentality that overcomes any ethnic or racial differences.") (citing evidence).

Extensive qualitative research has provided similar findings. Especially in the areas of conflict and security, research demonstrates that including "diverse perspectives of [underrepresented] groups at every level of leadership is key" to "develop[ing] the fullest understanding of the operational environment" and "bring[ing] forth the most effective responses and strategies," and further that "diverse groups make fewer mistakes and improve group thinking."   Haynie Decl. ¶ 16; *see id.* ¶¶ 9-20 (discussing numerous studies).   In short, "organizations that possess diversity of identities prove more adept at complex problem solving because they are able to harness different life experiences and mental models." Lyall Decl. ¶ 31.

### b.  Diversity in the Officer Corps is Critical to Army Recruitment

Because the Army promotes exclusively from within, the demographic diversity of future military leaders is first shaped by who enters the officer corps. Stitt Decl. ¶ 23; Vazirani Decl. ¶ 23.   Currently, the Army faces significant recruitment challenges.   The Army was 25% below its recruiting goal for fiscal year 2022 and expects to be short 10,000 recruits this fiscal year.   Stitt Decl. ¶ 27.   In part, that is because the pool of candidates eligible to enter the military has dramatically declined, as fewer and fewer individuals can meet the weight, physical fitness, and medical qualifications necessary to serve.  *Id.*   But it is also a result of declining propensity to serve.  *See id.* ¶ 28.[18]   To recruit the top talent in the country, the Army must make a career in military service attractive. But "[i]f those who are considering joining the DoD . . . do not see

---

[18] The trend is not because—as Plaintiff seemingly posits—eligible recruits are dissuaded due to the Army's commitment to diversity.  *See* Pl. Br. at 14.  Indeed, exhibit T to Plaintiff's motion does not even mention the consideration of diversity as a reason for increased attrition rates.   Rather, that exhibit suggests that the military's personnel system fails to identify and reward top performers because rather than pay for performance—like corporate America—the military officer's rank and paycheck are determined by number of years in service, rather than talent or military occupation.  *See* Pl's Ex. T at 12-13.  This concern has nothing to do with the consideration of diversity. Actual data also dooms Plaintiff's hypothesis.  In a 2022 study completed by OPA, eligible youth identified the top ten reasons for not considering the military—and did not identify diversity and equity initiatives as one of the top concerns.  *See* Stitt Decl. ¶ 28 (top ten reasons included possibility of death or other injuries, leaving family and friends, and possibility of sexual harassment).

themselves represented amongst the leaders of the DoD's armed forces, it increases the likelihood

that they will be discouraged from serving." Vazirani Decl. ¶ 22; *see also* Haynie Decl. ¶ 30 (noting

that current recruiting challenges make it "all the more important for the DoD to ensure a diverse

military and officer corps"); MLDC Report at 44 (diverse leaders can "inspire future

servicemembers"); *id.* at 15 (quoting Representative James E. Clyburn: "Just as our military looks

like America, so too must our general officers"); *id.* (quoting Representative Kendrick B. Meek:

"The truest melting pot in our society exists aboard aircraft carriers, in barracks, and on bases.

Mess halls and exchange services stores, shooting ranges and training facilities are portraits of

diversity.   But in the officers' clubs, a much different picture emerges").   As West Point

recognizes:

> We must create an environment that appeals to the aspirations of America's
> younger generation.  Only then will we be successful in competing with the civilian
> sector for the highest quality recruits.  Increasing diversity in the Officer Corps and
> developing officers who engage and understand American society will foster a
> better civil-military relationship and assist in shrinking the gap between the military
> and civilian leaderships.  A diverse and inclusive organization that is representative
> of the society it serves will allow us to attract men and women, which inherently
> strengthens the force.

https://www.westpoint.edu/about/west-point-staff/office-of-diversity.    A diverse officer corps

"encourage[s] future generations of warfighters to serve in the armed forces" by "demonstrating

to them that they have a chance to reach the highest levels of military leadership." Vazirani Decl.

¶ 17 (recounting his and his son's personal experiences of inspiring minority servicemembers).

Indeed, Admiral Gary Roughead, former Chief of Naval Operations, told the MLDC: "Leadership

is what we need, because I believe that when someone who is attracted to the Navy [] looks up that

chain of command, they have to see themselves.  If they can't see themselves, they won't believe."

MLDC Report at 15.   Because the military promotes from within, "each stage of the military

personnel life cycle—from who is recruited to who is promoted—is intricately linked to the

composition of future military leaders." Stitt Decl. ¶ 23.  Thus, the needs of the military as a fighting force depend in unusually direct fashion on the admissions policies of West Point and other service academies.

### c.  Diversity in the Officer Corps is Critical to Army Retention

Retaining top talent is also essential to sustaining a mission-ready force that is adaptable, responsive, and effective.  Stitt Decl. ¶ 24; Vazirani ¶ 25.  In light of the fact that the Army cannot replace officers from outside Army ranks, high rates of attrition present an organizational risk— and could unwind any gains from recruiting diverse junior officers.  *See* Stitt Decl. ¶¶ 24-25. Research "demonstrates that diversity directly impact . . . retention" within the military.  Haynie Decl. ¶ 33.  OPA's quantitative analysis found that active-duty members who identified their diversity climates as unhealthy—experienced most often by minority service members— were nearly twice as likely to separate at the end of the survey period than those who identified their diversity climates as healthy, even when controlling for other variables.  OPA Report at iv. Diversity in leadership also impacts mentorship and advocacy for diverse service members and junior officers.  Stitt Decl. ¶¶ 25-26 (mentorship "provide[s] diverse talent the tools to compete for leadership opportunities," whereas "underrepresentation of minority officers can decrease confidence" and "perpetuat[e] the lack of diversity among senior military leaders"); *see also* MLDC Report at 44 (concluding that diverse military leadership can inspire future leaders).  After all, "[y]oung people only aspire to be what they can see."  Stitt Decl. ¶ 26.[19]

---

[19] *See also* Losey, S.. *Recruiting Women and People of Color Has Gotten Harder. The Air Force Thinks Diverse Leadership Will Help*. (Sept. 22, 2021); Chivvis, C., *Diversity in the High Brass*, Carnegie Endowment for International Peace (Sept. 6, 2022) ("for largely structural and historical reasons, there are fewer opportunities for Black officers to benefit from the mentorship of more successful Black officers"); Butler, R. *Why Black Officers Still Fail*, U.S. Army War College Quarterly, Volume 40, Number 3 (August 2010) (finding a dearth of senior black officers available to serve as mentors); Carter, F., *Applying a Cultural Diversity Metric to the Selection of Armor Brigade Command Selectees*, Strategy Research Project (Carlisle Barracks, PA: US Army War College, March 15, 2008), p. 12 (Army War College study concluding that "[t]here is not a conscious effort on the part of leaders to exclude

### d.  Diversity in the Officer Corps is Critical to the Military's Legitimacy in the Nation and the World

Since the public perception crisis of the Vietnam era, when some of the country believed that the almost entirely white military leadership was treating Black servicemembers as expendable "cannon fodder," DoD has made the military judgment that the all-volunteer force, and its leadership, "must represent the country it defends."  MLDC Report at 15; Vazirani Decl. ¶ 26; Stitt Decl. ¶ 32; Haynie Decl. ¶ 30 (explaining that "African American troops, who rarely saw members of their own race in command positions, lost confidence in the military as an institution"). A diverse officer corps "that is reflective of the increasingly diverse population of the United States instills trust in the American public that the armed forces will faithfully execute their duty to protect all Americans."  Vazirani Decl. ¶ 26 "If our military does not reflect those who it exists to protect, it calls that commitment into question." *Id.*; *see also, e.g.*, DoD D&I Report at vii (DoD must "ensure that the military across all grades reflects and is inclusive of the American people it has sworn to protect"); MLDC Report at 44 (diverse military leadership "engender[s] trust among the population"); Haynie Decl. ¶ 31. West Point likewise has concluded that "[a]n Army not representative of the nation risks becoming illegitimate in the eyes of the people." West Point Diversity and Inclusion Plan (2020-2025) at 5.  And diversity is crucial to equip "graduates with the skills and competencies needed to lead a diverse and inclusive 21st century Army." *Id.* at 3. *See also* Lyall Decl. ¶ 19 (discussing research showing that a representative disconnect between the military and the public generates civil-military friction that undermines military effectiveness).

Moreover, a diverse officer corps that reflects our increasingly diverse nation "protects the U.S. militaries' legitimacy among its international partners" and strengthens and builds

---

minorities but rather a recognition that certain innate human tendencies affect how leaders are more apt to mentor member[s] of his [or] her own phenotype").

international alliances, particularly as new threats and competitors emerge on the global stage. Vazirani Decl. ¶ 28; Stitt Decl. ¶ 34.  "The Army currently has 137,000 soldiers in over 140 countries and continues to deploy Soldiers across the globe."  Stitt Decl. ¶ 20.  Being able to "understand[] and effectively navigat[e] diverse people and experiences is therefore a crucial skill set."  *Id*.  This is particularly so as overseas deployments become increasingly lengthy and demand significant interactions with diverse local populations and military partners.  The military has learned that "the more that military members are exposed to a wide range of demographic, cognitive, experiential, and cultural perspectives and backgrounds, the more they become attuned to the necessity of considering human-based elements across all operating environments."  Haynie Decl. ¶ 19; Stitt Decl. ¶ 20; Vazirani Decl. ¶ 29.

### 3. The United States' Compelling National Security Interests are Distinct and Measurable

#### a. The Army's Interest in Officer Diversity is Entirely Distinct from Harvard and UNC's Interest in Student Diversity

Fundamentally, the military's interest in diversity at military academies is of an entirely different nature than a civilian university's interest in educational diversity.  Unlike civilian universities, West Point prepares students for war.  Graduates are immediately commissioned as active-duty officers and required to serve a minimum of five years in the Army.  West Point cadets train in combat, learn to lead tactical operations, and endure physically demanding training.  *See, e.g.*,       https://www.westpoint.edu/military/department-of-military-instruction/cadet-summer-training.  Also unlike civilian universities, West Point provides a vital pipeline for the future leaders of the Army: "cadets leave West Point as military officers" who must "wield lethal force I legal and ethical manner," "care for the Soldiers in their units," "exercise stewardship over the Army Profession," and "accomplish missions in a complex, decentralized operating environment." Stitt Decl. ¶ 35.  The Army has determined that for its future officers to perform these weighty and

unique roles, its officers-in-training must comprise, and be exposed to, individuals of different backgrounds.   "West Point's diverse . . . training environment, where students of different backgrounds throughout the country come together, is essential to preparing the Army's future leaders to operate in complex human environments and lead a diverse population of soldiers."  Stitt Decl. ¶ 35.   Also unlike civilian universities, the Army's closed personnel system requires reliance on a diverse pipeline of future leaders, which it cannot achieve without the approximately 1,000 West Point graduates who commission every year.  Stitt Decl. ¶ 23, 37.   Critically, West Point's graduating class serves as a pipeline for a diverse senior military leadership: West Point graduates have a distinct advantage over other officers when it comes to future promotion, "disproportionately ascend[ing] to the upper echelons of Army leadership."  Stitt Decl. ¶ 38.  In short, these unique requirements for military preparation reflect fundamentally distinct interests from those in the civilian educational context. *See supra* Legal Standards Pt. III (collecting Supreme Court cases articulating the altogether different context in which the military operates).[20]

Further unlike civilian universities, the Army has concluded that building a diverse officer corps is critical to mission success and national security.  That is exactly the type of "complex, subtle, and professional" military decision concerning national security affairs, *Gilligan*, 413 U.S. at 10, into which "courts traditionally have been reluctant to intrude," *Egan*, 484 U.S. at 530.  *See*

---

[20] Moreover, courts have recognized that a government entity's operational need for diversity can constitute a compelling interest even absent past discrimination.  *See, e.g., Patrolman's Benevolent Ass'n  v. City of New York*, 310 F.3d 43, 52 (2d Cir. 2002) ("We have recognized that 'a law enforcement body's need to carry out its mission effectively, with a workforce that appears unbiased, is able to communicate with the public and is respected by the community it serves,' may constitute a compelling state interest . . .and several courts have relied on the 'operational need' of law enforcement and correctional agencies to uphold hiring or assignment practices that favored minorities, even in the absence of past discrimination.") (citing cases); *Petit v. City of Chicago*, 352 F.3d 1111, 1114 (7th Cir. 2003) (finding a "compelling need for diversity in a large metropolitan police force charged with protecting a racially and ethnically divided major American city like Chicago," and holding that Chicago "has set out a compelling operational need for a diverse police department").  A government actor must "demonstrate that it is 'motivated by a truly powerful and worthy concern and that the racial measure ... adopted is a plainly apt response to that concern,'" and substantiated by "objective evidence."  *PBA*, 310 F.3d at 52-53.  Here, the Army has presented objective evidence of its operational need for diverse leadership—a need made even more compelling by the national security interests at stake in the military context.

*also Austin*, 142 S. Ct. at 1302; *Boumediene*, 553 U.S. at 797; *Winter*, 555 U.S. at 24; *Goldman*, 475 U.S. at 507; *Rostker*, 453 U.S. at 64-68; *ACLU v. DoD*, 901 F.3d at 136; *Able*, 155 F.3d at 634; *see also supra* Legal Standards Pt. III.[21]

### b.  These Goals Are Subject to Meaningful Judicial Review

Unlike the "elusive" goals identified by Harvard and UNC, whether the Army has achieved the benefits that from flow a diverse cadet—and eventually officer—corps is clear and measurable. In *SFFA*, the Court held that Harvard's and UNC's interest in educational diversity was not sufficiently measurable because a court could not know whether leaders have been adequately "train[ed]," whether the exchange of ideas is "robust," or whether "new knowledge" is being developed. 600 U.S. at 214.  The Court contrasted those "elusive" goals with goals it previously found measurable:  whether "temporary racial segregation of inmates will prevent harm to those in prison," such as a "prison race riot," *id.* at 207, 215 (citing *Johnson v. California*, 543 U.S. 499, 512-13 (2005)); *Richmond v. J.A. Croson Co*., 488 U.S. 469, 521 (1989) (Scalia, J., concurring in judgment); and whether "race-based remedial [school desegregation] action produces a distribution of students 'compar[able] to what it would have been in the absence of such constitutional violations,'" *SFFA*, 600 U.S. at 215 (citation omitted).

Here, while the Army certainly derives educational benefits from a diverse West Point cadet corps, its diversity goals are designed to address a concrete problem never faced by civilian universities:  creating and maintaining a lethal fighting force that is not undermined by racial

---

[21] While the Supreme Court has "refused to defer to state officials' judgments" on explicit racial segregation in the prison context, an "area[] where those officials traditionally exercise substantial discretion," *Johnson*, 543 U.S. at 512, the Court even in that context recognized that the "operation of penal institutions [] is a highly specialized endeavor, and the sober judgment of experienced correctional personnel [] deserves the most careful consideration of this Court." *Lee*, 263 F. Supp. at 332.  As in penal institutions, where "the association between men [] is closer and more fraught with physical danger and psychological pressures than is almost any other kind of association between human beings," *id.* (citation and quotation marks omitted), so too do the demands of military service involve unique and heightened pressures, and the views of experienced, senior leadership are likewise entitled to "careful consideration."

tension.  *See* Vazirani Decl. ¶ 35; Stitt Decl. ¶ 35; Haynie Decl. ¶¶ 6-8.

To determine whether the Army is meeting that goal, the court can examine a number of metrics.  First, a court can examine whether internal race riots have occurred since the Army made an effort to diversify its officer corps.  None have.  *See* Bailey Decl. ¶ 81.  That alone demonstrates success.  But West Point must continue to foster diversity in the officer corps to maintain this achievement and create a culture of inclusion, particularly to counter recent trends of "[i]nstances of white nationalism, racism, and extremism," which, as Lieutenant General Stitt explains, have been growing in the military.[22]  Stitt Decl. ¶ 18 (citing, *inter alia*, studies conducted by the Military Times and the Inspector General of the Air Force); *see also* Policy Proposal: An Anti-Racist West Point (2022) (recent West Point graduates recounting experiences of racial harassment and discrimination they experienced while cadets, including being "spit on," enduring racially charged derogatory comments, and being subjected to racist caricatures).  The military's consideration of race and ethnicity is therefore no less measurable than in the prison context, where success is measured by the "prevent[ion] [of] harm."  *SFFA*, 600 U.S. 215; *Johnson*, 543 U.S. at 512-13; *Richmond*, 488 U.S. at 521.[23]

Second, as in the prison context, the court can "careful[ly] consider" the views of senior military leadership.  *Washington v. Lee*, 263 F. Supp. 327, 332 (M.D. Ala. 1966), *aff'd*, 390 U.S. 333 (1968).  Senior military leadership has consistently concluded that officer diversity is a national security imperative.  *See* Stitt Decl. ¶ 42; *see also* Vazirani Decl. ¶ 19; Haynie Decl. ¶¶

---

[22] While West Point expects to stop using race-based admissions policies in the future, as discussed below, these internal tensions left unaddressed can erupt into violence.  While the Army has successfully prevented that for decades, the Army has a compelling interest in continuing to prevent it.

[23] Plaintiff's assertion—relying on an article in the British publication *The Guardian*—that "[r]acial animosity" "has been virtually non-existent [in the American army] post-Vietnam," Pl. Br. at 12, cuts against Plaintiff, because it demonstrates that increasing diversity has worked.   But the article is also misleading; as Lieutenant General Stitt describes, while racial tension has not erupted into violence since the Vietnam era, servicemembers and officers continue to unfortunately experience discrimination and harassment within the military.  *See* Stitt Decl. ¶ 18; *see also* OPA Report.

17-28.  That conclusion is a strategic military judgment, and as described above, amply supported by military history, battlefield experience, and qualitative and quantitative studies.

Plaintiff's attempt to label this military judgment as "shifting," by drawing a distinction between the military's interest in having the officer corps reflect the nation, and the military's interest in having the officer corps reflect the enlisted corps, falls flat.  Plaintiff misses the obvious. Those goals are one and the same: as the enlisted corps continues to reflect an increasingly diverse country, *see* Haynie Decl. ¶ 25, so too must the officer corps.  Accordingly, the more the officer corps diversifies, the more it will reflect both the fighting force and the country.  Indeed, the Armed Forces gave this same rationale in 2015, in the first brief it filed on this issue, stating this as it does today: "As both the enlisted ranks of the military and the Nation's population have become increasingly diverse, our military leaders have concluded that an officer corps that is markedly less diverse than the enlisted ranks, and that is unattuned to the perspectives and experiences of those they must lead, can undermine combat readiness. Maintaining a pipeline of well-prepared and diverse officer candidates is therefore an urgent military priority."  *Fisher II*, Amicus Brief, 2015 WL 6735838, at *11.  Thus, as the most senior military leaders have consistently recognized, in this increasingly diverse nation, the military leaders must be prepared to lead an increasingly diverse military.[24]

Third, the court can also examine the same data that the Army does: feedback from current servicemembers.  Lieutenant General Stitt explains that "the Army measures unit cohesion through Army-wide surveys and annual command climate surveys," including though the congressionally-mandated Defense Organizational Climate Survey.  Stitt Decl. ¶ 15 (describing survey data); *see*

---

[24] In support of the (incorrect) argument that the military sought to (only) "mirror the race of society at large," Pl. Br. at 6, Plaintiff cites to a *New York Times* article quoting one statement by the West Point Director of Admissions, Dkt. No. 10 Ex. M.  But a press article does not represent Army policy, nor can a three-sentence statement by a West Point official in a news article reflect the entirety of the Army's approach to diversity.

*also* OPA Report at iv (multi-year study evaluating the impact of diversity on servicemembers' views of mission readiness, demonstrating that the more a servicemember felt his or her unit to be inclusive and free from racial tension, the more mission "prepared" a servicemember believed his or her unit to be).

Finally, because the Army has concluded that it is mission critical that the officer corps reflects the diversity of the enlisted corps and the nation as a whole, the court can examine demographic data to determine whether the Army is meeting those goals.[25]  Per the most recent U.S. Census data, individuals of Hispanic origin make up approximately 18% of the population and, per Army records, 18% of the Army active duty enlisted corps but only approximately 9% of the officer corps (and only 2% of the Flag Officers).  Stitt Decl. ¶¶ 9-10; U.S. Census Data (2020).  The same sources indicate that Black individuals comprise approximately 14% of the population and 20.2% of the Army active duty enlisted corps, but only 11% of the officer corps.  Stitt Decl. ¶¶ 9-10; 2022 U.S. Census Data (202).  Those of Asian and Pacific Islander origin make up approximately 6% of the population and (as of October 2022) 6.3% of the Army active duty enlisted corps, and 8% of the officer corps.  Stitt Decl. ¶¶ 9-10; 2022 U.S. Census Data (2020).  Finally, white individuals make up approximately 62% of the population and 51.7% of the Army active duty enlisted corps, and 68% of the officer corps.  Stitt Decl. ¶¶ 9-10; 2022 U.S. Census Data (2020).  Accordingly, while the Army has made progress in the representation of Asian and Pacific Islander officers, the Army has not achieved the same progress for Hispanic or Black officers.  And while West Point does not have class composition requirements, its goals are

---

[25] As discussed below, this examination of demographic data is wholly different from UNC's and Harvard's use of demographic data to meet "numerical commitment[s]" and enroll minorities in proportion to the general population. 600 U.S. at 222-25.  West Point does not have any such numerical commitments or otherwise "balance" its classes based on race.  Indeed, the fact that the percentages between the country, enlisted corps, and officer corps do not precisely mirror each other and, instead, fluctuate, *cf. SFFA*, 600 U.S. at 22, further demonstrates that demographic goals do not act as quotas for West Point.  The data is relevant for one purpose: the court can use it to measure whether the Army is meeting its goal to achieve diversity.

informed by these benchmarks.

To determine whether diversity in the officer corps successfully increased recruitment and retention, the court can examine the numbers.  The number of minority officers is increasing; for example, over the last 14 years, the numbers of Hispanic and Asian officers increased from 5% to 9% and 8%, respectively.  Stitt Decl. ¶ 10.  Non-Hispanic Black representation has recently decreased slightly, dropping from 12% in 2007 to 11% in 2021.  Stitt Decl. ¶ 10.  The number of minority cadets at West Point is also increasing.  McDonald Decl. ¶¶ 81-88.  Finally, retention within the Army is at an all-time high.  Vazirani Decl. ¶ 24.

To determine whether diversity in the officer corps bolsters the Army's legitimacy in the eyes of the nation, the court can evaluate national surveys.  While "confidence in the military has fluctuated since the 1960s," it is currently higher than it was during the height of the "racial crisis [in the Vietnam era] with extreme racial and ethnic disparity between the enlisted and officer corps" and before DoD began a sustained effort to increase diversity.  *See* Stitt Decl. ¶ 32.  And to determine how the Army is viewed by our allies, the court can evaluate whether there have been international incidents as occurred previously.  *See, e.g.*, Bailey Decl. ¶ 81.

## B.  West Point's Admissions Process Is Narrowly Tailored

West Point's use of race and ethnicity is also narrowly tailored to further the military's compelling national security interest.  "The purpose of the narrow tailoring requirement is to ensure that the means chosen fit the compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype." *Grutter*, 539 U.S. at 333 (citation omitted).  To be narrowly tailored, an admissions program that considers race must treat "each applicant" "as an individual in the admissions process." *Bakke*, 438 U.S. at 318; *see also Grutter*, 539 U.S. at 337. "[T]ruly individualized consideration demands that race be used

44

in a flexible, nonmechanical way," and thus universities *may* "consider race or ethnicity . . . flexibly as a 'plus' factor in the context of individualized consideration of each and every applicant." *Grutter*, 539 U.S. at 334; *see also Fisher I*, 570 U.S. at 312.  But universities *may not* "establish quotas for members of certain racial or ethnic groups," "put members of those groups on separate admissions tracks," or "insulate applicants who belong to certain racial or ethnic groups from the competition for admission." *Grutter*, 539 U.S. at 333–34; *see also Bakke*, 438 U.S. at 315–320.[26]

Courts also consider whether there is a meaningful connection between the means employed by universities and the goals pursued, *SFFA*, 600 U.S. at 215; whether race is used as a "negative" or stereotype, *id.* at 218; whether "workable race-neutral alternatives" were considered in "good faith," *Grutter*, 539 U.S. at 339, whether any such alternatives would produce the benefits of diversity sought, *Fisher I*, 570 U.S. at 312; and whether the use of race is "limited in time," *Grutter*, 539 U.S. at 342; *see also SFFA*, 600 U.S. at 221.

At the same time, the narrow tailoring inquiry "must be calibrated to fit the distinct issues raised" by the specific compelling interests asserted.  *Grutter*, 539 U.S. at 334; *see also id.* at 327 ("[c]ontext matters when reviewing race-based governmental action"); *Parents Involved in Cmt. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 725 (2007) (explaining that *Grutter* arose in the "unique context of [civilian] higher education").  In other words, the narrow tailoring inquiry applicable to civilian universities' use of race to achieve "educational diversity," *Grutter*, 539 U.S. at 334, cannot be mechanistically applied to West Point's use of race to achieve the Army's compelling national security interest that is altogether different.  The Supreme Court has had "no

---

[26] To be clear, *SFFA* did not overrule *Grutter*, *Fisher*, or *Bakke* insofar as those cases define the contours of the narrow-tailoring inquiry.   Indeed, the Court *relied* on those cases in striking down Harvard's and UNC's admissions programs that considered race, making clear that the guidance in those cases survives *SFFA* and should continue to guide lower courts as they consider such programs.

occasion to define the contours of the narrow-tailoring inquiry" in this distinct military context. *Grutter*, 538 U.S. at 333; *see SFFA*, 600 U.S. at 213 n.4.

Applying this framework in this distinct context, West Point's admissions process bears all the hallmarks of processes that the Supreme Court has concluded satisfy narrow tailoring and none of the hallmarks of those that do not.

### 1. West Point Considers Each Candidate as an Individual in the Admissions Process

As discussed above, West Point may consider race and ethnicity as a plus factor in its holistic assessment of candidates at only three stages: when considering candidates for LOAs, Superintendent nominations, or Additional Appointees.   *See supra* Background, Pt. 2.D; McDonald Decl. ¶¶ 90-94.   Throughout its admissions process, and especially at these limited points in which race and ethnicity may come into play for a subset of its class, West Point "engages in a highly individualized, holistic review of each applicant's file, giving serious consideration to all the ways an applicant might contribute" to the cadet environment at West Point and ultimately to the Army as a commissioned officer.  *See Grutter*, 539 U.S. at 337.

#### a.  Letters of Assurance

When candidates are considered for LOAs, admissions officers engage in an individualized, holistic review of a candidate's candidate questionnaire, high school transcript, verifiable standardized test scores, and interview, seeking specifically to identify candidates who might make valuable contributions as future Army officers, based on their demonstrated athleticism, scholastic aptitude, prior experience as a solider, and diverse background.  McDonald Decl. ¶¶ 75, 77, 91.  Though race and ethnicity may be considered flexibly as a plus factor, it is not a "defining feature" of the LOA review process.  *Grutter*, 539 U.S. at 337.  Indeed, the LOA review process does not "limit . . . the broad range of qualities and experiences that may be

46

considered valuable contributions" to West Point to considerations of only race and ethnicity. *Id.* at 335–38. Rather, "serious consideration" is given to the many ways a candidate might contribute as future Army officers—of which race and ethnicity is only one of several. *Id.*

West Point thus affords this holistic review equally to candidates of all races and ethnicities. *See Grutter*, 539 U.S. at 337 (noting the importance of "afford[ing] this individualized consideration to applicants of all races"). All candidates who complete the Candidate Questionnaire, submit their 6th semester high school transcript and verifiable standardized test scores, and complete an interview before LOAs stop being issued (typically in September of a candidate's senior year of high school) are evaluated to determine whether they should be issued an LOA based on expected contributions in the several areas identified above. McDonald Decl. ¶¶ 72, 75, 77-78. For African American, Hispanic, and Native American candidates, this review is conducted in the first instance by the Diversity Outreach Office, but all admissions officers evaluate all candidates in the same way, as described above. *Id.* ¶¶ 77-78, 91. In addition, all admissions officers make recommendations to the Director of Admissions, who makes the final decision for all candidates and considers recommendations for LOAs for all candidates using the same criteria. *Id.* That this individualized consideration is afforded to candidates of all races and ethnicities, including white candidates, is borne out by the breakdown of LOAs offered in recent years, as white candidates received 71% and 65.1% of all LOAs for the classes of 2027 and 2026, respectively. *Id.* ¶ 92.

### b. Superintendent Nominations

The same holistic review applies when candidates are considered for Superintendent nominations. Throughout the admissions cycle, admissions officers conduct a holistic review of all candidates to identify qualified candidates who are highly desired for the valuable contributions they are expected to make (based on their demonstrated leadership, athleticism, scholastic aptitude,

past experience as a soldier, and diverse background) but who lack a nomination and may warrant a Superintendent nomination.   McDonald Decl. ¶¶ 41, 94.   This holistic review process is conducted by the Diversity Outreach Office for African American, Hispanic, or Native American candidates and by regional teams for other candidates, and both make their Superintendent nomination recommendations to the Director of Admissions, who considers recommendations for all candidates and then makes recommendations to the Superintendent as to which candidates should receive Superintendent nominations.   *Id.* ¶ 94.   While race and ethnicity may factor into the decision to provide a Superintendent nomination, they rarely do in practice, as most of those nominations go to athletes.   *Id.* ¶¶ 41, 94.   For the class of 2027, the Superintendent provided only 16 nominations, of which all 16 were provided because the candidates were athletes.   *Id.* ¶ 94.   For the class of 2026, the Superintendent provided 19 nominations, of which 15 were provided because the candidates were athletes.   *Id.*   Of the four non-athlete Superintendent nominations provided for that class, all were to white candidates.   *Id.*

### c.  Additional Appointees

And the same holistic review applies when nominees who West Point determined are fully qualified, but who were not selected to fill a vacancy or qualified alternate slot, are considered for "Additional Appointee" slots.   In extending such appointments, the Admissions Committee may consider race and ethnicity flexibly as a plus factor for African American, Hispanic, and Native American candidates in its holistic assessment of candidates to identify those who are expected to make valuable contributions based on their demonstrated leadership, athleticism, scholastic aptitude, past experience as a solider, and diverse background.   McDonald Decl. ¶¶ 70(b), 93. Thus, race is similarly not a defining feature of the Additional Appointee consideration process, and candidates of all races and ethnicities are afforded this holistic review equally.   This is once again borne out by the breakdown of Additional Appointees offered appointment in recent years;

for example, not including Additional Appointees appointed to West Point from USMAPS, 61% of Additional Appointees in the class of 2026 and 72% in the class of 2027 respectively were white.[27]  Thus, race and ethnicity could only have acted (but did not necessarily act) as a plus with respect to a small number of Additional Appointees (which themselves comprise only a small fraction of the entering cadet class) in those years.  And many candidates for whom race and ethnicity *could not* have acted as a plus (a) were selected for other valuable contributions— including their leadership, athleticism, scholastic aptitude, or soldier experience, *see id.* ¶ 93; and (b) had grades and test scores that were *lower than* qualified African American, Hispanic, and Native American candidates who were *not* selected, *id.*, which underscores that West Point "seriously weighs many other diversity factors besides race that can make a real and dispositive difference for nonminority applicants as well," *Grutter*, 539 U.S. at 338.

Thus, at each of these three limited stages of the admissions process, race and ethnicity may be used on occasion, and when it is, it is done permissibly, in a "flexible, nonmechanical way," as one "plus" factor among many considered "in the context of [the] individualized consideration" of each candidate.  *Grutter*, 539 U.S. at 334.  And at each stage, the consideration of race and ethnicity is cabined by the fact that only qualified candidates may ultimately be appointed to West Point, and race is not a factor in determining whether a candidate is qualified. McDonald Declaration ¶¶ 55, 58, 64, 86; *cf. Grutter*, 539 U.S. at 337–38 ("With respect to the use of race itself, all underrepresented minority students admitted by the Law School have been deemed qualified.").

---

[27] The over 10% difference in the number of non-white Additional Appointees between years itself undermines any suggestion that race and ethnicity are being used impermissibly.  *Cf. SFFA*, 600 U.S. at 222 (noting that minority groups consistently represented a tight band of the admitted pool).

### 2.   West Point's Diversity Goals Are Aspirational and Do Not Constitute Quotas

West Point sets aspirational talent and diversity goals for incoming classes of cadets. McDonald Decl. ¶ 85.  These goals include racial and ethnic diversity, by setting aspirational goals for the percentages of African American, Hispanic, and Asian cadets in a given class of cadets that are tied to the demographics of the current officer corps in the active-duty component.  *Id.*  In building an incoming class, West Point also has aspirational goals for Athletes, Leaders, Scholars, Soldiers, and Women.  *Id.*  These goals act as neither floors nor ceilings, and whether they are met or exceeded has no effect on West Point's admissions process.  For example, for the class of 2027, West Point did not meet its aspirational goals for African Americans or Hispanic cadets.  *Id.* ¶ 86. But West Point did not offer appointments to additional candidates based on their race or ethnicity to meet its aspirational goals.  *Id.*; *cf. SFFA*, 600 U.S. at 221–22 (explaining that Harvard would track whether "a group [wa]s notably underrepresented or . . . suffered a dramatic drop off relative to the prior year," and, if so, would "give additional attention to applications from students within that group," resulting in minority students consistently being admitted in "tight band[s]" (internal quotation marks omitted)).

Thus, these aspirational diversity goals are not quotas.  A "quota," "properly understood," reserves "a certain fixed number or proportion of opportunities . . . exclusively for certain minority groups," thereby "impos[ing] a fixed number or percentage which must be attained, or which cannot be exceeded."  *Grutter*, 539 U.S. at 335 (citations omitted).  West Point's aspirational diversity goals do nothing of the sort.  Instead, they constitute just the kinds of permissible goals that evince "only a good-faith effort to come within a range demarcated by the goal itself."  *Id.* at 335 (alteration in the original; citation omitted); *see also id.* at 336 ("Some attention to numbers, without more, does not transform a flexible admissions system into a rigid quota.") (citation omitted).  Plaintiff's characterization of West Point's class composition goals as impermissible

"quotas," therefore, reflects a fundamental distortion of both West Point's admissions process and Supreme Court jurisprudence.  *See* Pl. Br. at 14.

West Point also does not put members of certain racial groups on separate admissions tracks or insulate members of certain racial groups from competition for admission.  *See Bakke*, 438 U.S. at 315–17; *see also Grutter*, 539 U.S. at 334.  While the Diversity Outreach Office plays a role in qualifying and recommending African American, Hispanic, and Native American candidates, *see* McDonald Decl. ¶¶ 16, 59, 78, 94, those candidates are never insulated from comparison with all other candidates, as in *Bakke*.  Rather, they are compared with all other candidates in competition for all available opportunities at each juncture.  With respect to qualification, the same qualification standards and three-step review process apply to all candidates; the only difference is that, for African American, Hispanic, and Native American candidates, the Diversity Outreach Office, rather than a regional admissions officer, conducts the first review of the three-step process.  *Id.* ¶ 59.  And every recommendation for an LOA or Superintendent nomination—regardless of whether it is made by the Diversity Outreach Office or the regional admissions officers—is ultimately forwarded to the Director of Admissions, who considers all such recommendations together.  *Id.* ¶¶ 78, 94.

Finally, West Point does not "desire 'some specified percentage of a particular group *merely because of* its race or ethnic origin,'" which would constitute impermissible "outright racial balancing."  *SFFA*, 600 U.S. at 211 (emphasis added); *Grutter*, 539 U.S. at 330.  The Army's interest here is not simply in diversity for its own sake but rather in the cohesion and lethality, recruiting and retention, and legitimacy benefits that flow from a diverse Army officer corps.  *See supra* Argument, Pt. III.A.  Because West Point treats racial diversity not as an end to be pursued in its own right but rather as a means by which it pursues the Army's national security interest—

including its interest in unit cohesion—it cannot be said to "desire 'some specified percentage of a particular group *merely because of* its race or ethnic origin.'"  *SFFA*, 600 U.S. at 211 (emphasis added).

### 3. West Point's Limited Consideration of Race and Ethnicity is Directly Related to the Army's Compelling Interest in a Diverse Officer Corps

West Point's admissions policies are directly connected to the Army's goal of building an officer corps that reflects the diversity of the enlisted corps and the country it serves despite the fact that it does not tie its diversity goals to the demographics of the enlisted corps or the general population.  Instead, West Point ties its diversity goals to the demographics of the *current* officer corps in the active-duty component of the Army, McDonald Decl. ¶ 85, and with good reason. Historically, the Army has made greater strides in diversifying its officer corps than West Point has in diversifying its cadet corps (which ultimately comprises about 20% of new Army officers each year).  *See id.* ¶¶ 84, 103 (noting, for example, that in 2013, African Americans constituted 14% of the officer corps but only 8% of West Point cadets).  By tying its goals to the demographics of the Army officer corps, West Point thus ensures that it will keep pace with the Army as the Army continues to make progress towards *its* goal of diversifying the Army officer corps to reflect the diversity of both the enlisted corps and the general population of the country it serves.  In this way, West Point's means are meaningfully connected to the Army's goal.

That West Point chose narrower goals to keep pace with the Army's incremental change underscores the narrowness of its consideration of race and ethnicity and the appropriateness of its admissions process.  Indeed, that race and ethnicity plays a *smaller* role here than it would under broader aspirational goals (tied to the enlisted corps or the general population of the country) is "a hallmark of narrow tailoring, not evidence of unconstitutionality."  *Fischer II*, 579 U.S. at 384–85.

The specific race and ethnicity categories that West Point employs to measure its aspirational goals are also meaningfully connected to the Army's goal that its officer corps reflect the diversity of *the enlisted corps* and the *country it serves*.  Indeed, West Point employs the same race and ethnicity categories that are used by law to measure the demographics of the entire Army, including *the enlisted corps*.  *See* McDonald Decl. ¶¶ 112-113 (noting that DoD entities are required to identify the race code and ethnicity code of an individual "in accordance with the 1997 Office of Management and Budget ("OMB") standards on race and ethnicity in the Federal Register).  And West Point employs the same race and ethnicity categories that the United States uses to measure the demographics of the general population of the *country the Army serves*.  *See* United States Census Bureau, *2020 Census Frequently Asked Questions About Race and Ethnicity*, https://www.census.gov/programs-surveys/decennial-census/decade/2020/planning-management/release/faqs-race-ethnicity.html (Aug. 12, 2021).

West Point's use of the same OMB race and ethnicity categories used across the federal government thus undermines any suggestion that the "motive for the[se] classifications was illegitimate racial prejudice or stereotype." *Grutter*, 539 U.S. at 333.  And it distinguishes West Point from the civilian universities at issue in *SFFA*.  *See* 600 U.S. at 215–17.  Moreover, West Point uses these categories to pursue an *entirely different* interest than was at issue in *SFFA*: national security.  "Context matters" in the narrow tailoring inquiry, *Grutter*, 539 U.S. at 308, and, here, there is no "mismatch" between the means West Point employs and the goals the Army pursues, *SFFA*, 600 U.S. at 217.

### 4.  Race and Ethnicity are not Used as a Negative or Stereotype

West Point's admissions process also does not use race and ethnicity as a "negative."  Race is used as a negative where it "unduly harms nonminority applicants."  *SFFA*, 600 U.S. at 212, 218.  In *SFFA*, the Supreme Court cited evidence of such undue harm, *see id.* at 218, but Plaintiff

offers no evidence in support of its motion for a preliminary injunction suggesting that West Point's far more limited use of race and ethnicity has consequences like those in *SFFA*.  Nor is there reason to expect such evidence to emerge in discovery.  As discussed above, West Point's consideration of race affects *appointment decisions* only with respect to Superintendent nominations and Additional Appointees;[28] all other appointments are made by order of merit by Whole Candidate Score (which does not factor in race and ethnicity), or by order specified by Member of Congress where applicable.  *See* McDonald Decl. ¶¶ 65, 89.  Each West Point class consists of approximately 1,200 cadets, and the classes of 2026 and 2027 had only 284 and 364 Additional Appointees and 21 and 17 Superintendent nominations respectively. *Id.* ¶¶ 10, 42, 70(b).  Thus, for the vast majority of cadets in each class, race and ethnicity played *no* role in their evaluation by and appointment to West Point. *Id.* ¶ 89.  As a result, it is unlikely that Plaintiff will be able to demonstrate undue harm to any racial or ethnic group here.[29]

SFFA erroneously suggests that harm to certain racial groups may be presumed in this context because use of race in college admissions is "zero-sum."  Pl. Br. at 15 (quoting *SFFA*, 600 U.S. at 218).  While admissions at civilian universities may be "zero-sum," most appointments to West Point are made through a process—whereby West Point extends offers of appointment by order of merit (or order specified by Member of Congress, where applicable)—wholly unlike the

---

[28] While race and ethnicity is also considered as one factor in the issuance of LOAs, an LOA is not appointment; if all conditions of the LOA are met, candidates with LOAs will be admitted either (1) by winning a congressional vacancy, non-congressional vacancy, or qualified alternate slot (selections for which do not involve the consideration of race), or, (2) barring that, by being offered appointment as an Additional Appointee.  McDonald Decl. ¶ 93(a).

[29] The fact that race and ethnicity "plays a role in only a small portion of admissions decisions" is also itself a "hallmark of narrow tailoring."  *Fisher II*, 579 U.S. at 384–85.  *SFFA*'s suggestion that this fact instead belies the necessity of considering race in admissions is inapposite here, *see SFFA*, 600 U.S. at 219, where West Point—like the University of Texas in *Fisher II*—is constrained by statute and regulation from considering race with respect to the vast majority of appointments.  *Compare* McDonald Decl. ¶ 89 (explaining that consideration of race played no role in over 70% of West Point's appointment of candidates to fill congressional vacancies, non-congressional vacancies, and qualified alternate slots), *with Fisher II*, 579 U.S. at 371–73 (explaining that 75% of the incoming freshman class at the University of Texas was admitted without consideration of race pursuant to the Top Ten Percent Law).

admissions processes at civilian universities.  For these appointments, race is not used as either a "negative" or a "positive" in a zero-sum game—it simply is not used at all.[30]

West Point's admissions process also does not rely on impermissible racial stereotypes, the "offensive and demeaning assumption that [students] of a particular race, because of their race, think alike."  *SFFA*, 600 U.S. at 220-21 (citation omitted, alteration in original).  West Point does not seek to admit diverse candidates on the assumption that they express a particular viewpoint shared by others of the same background.  McDonald Decl. ¶ 95.  Rather, West Point seeks to admit diverse candidates so that cadets can learn how to be effective battlefield commanders and so that the Army can achieve its interest in cohesion and lethality, recruiting and retention, and legitimacy through a diverse officer corps.  Contrary to Plaintiff's contention, *see* Pl. Br. at 15–16, these are completely different considerations than those made by the civilian universities in *SFFA*. And West Point's admissions process is grounded not in stereotyped *assumptions* about how cadets—and ultimately officers—of particular races and ethnicities will or will not contribute to those military interests; it is grounded in professional Army judgments—supported by extensive experience and research—that those interests *cannot* be realized without a diverse officer corps. *See supra* Argument, Pt. III.A.  In so grounding its admissions process, West Point rejects the assumption that there is some inherent benefit in diversity for diversity's sake and embraces the military judgment that there is a measured benefit in the diversity of the Army officer corps.

### 5.  Race-Neutral Alternatives Are Not Sufficient

West Point has seriously considered race-neutral alternatives, but there are no available,

---

[30] And even if the holistic review process West Point uses for Additional Appointees and Superintendent nominations could be characterized as "zero-sum" simply by virtue of the fact that it considers race and ethnicity as a plus among many other factors, this alone would not be fatal to West Point's admissions process.  If it were, the Supreme Court would have had no reason to carve out the military academies from its decision in *SFFA*.  *See SFFA*, 600 U.S. at 213 n.4.  The fact that it *did* suggests that this concern could be overcome if the military academies presented distinct compelling interests held by them and not shared by civilian colleges and universities.  *See id.* The Army has done so here.

workable alternatives that would suffice to produce the benefits of a diverse Army officer corps. Narrow tailoring requires a "good faith consideration of workable race-neutral alternatives that will achieve the diversity the university seeks." *Grutter*, 539 U.S. at 339; *see also Fisher I*, 570 U.S. at 312; *Fisher II*, 579 U.S. at 377. It does not require "exhaustion of every conceivable race-neutral alternative," nor does it require "a university to choose between maintaining a reputation for excellence or fulfilling a commitment to provide educational opportunities to members of all racial groups." *Grutter*, 539 U.S. at 339.[31]

As Colonel McDonald's declaration explains, West Point *has* considered and implemented several race-neutral alternatives, but none has proved a "workable means for [it] to attain the benefits of diversity" it seeks. *Fisher II*, 579 U.S. at 385. West Point has increased marketing to specific underrepresented demographics to increase the pool of diverse candidates, but this effort has not ultimately resulted in increases in the acceptance rates for candidates from these demographic groups. McDonald Decl. ¶ 105; *see Fisher II*, 579 U.S. at 385 (noting that intensifying outreach efforts to African-American and Hispanic applicants did not "succeed[]"). It has similarly increased outreach efforts to soldiers to attempt to tap into the diversity present in the enlisted corps. McDonald Decl. ¶ 106. However, an increase in the number of soldier candidates would have to be dramatic to have more than a marginal impact on diversifying the cadet corps given that soldiers currently make up a small fraction of West Point candidates and cadets. *Id.*

West Point has also considered prioritizing certain race-neutral criteria in its admissions process but determined that doing so would not further its goal of diversifying the cadet corps—

---

[31] Unlike in *SFFA*, Plaintiff has come forward with no evidence that West Point could achieve its goals through race-neutral alternatives. *See, e.g.*, *SFFA v. UNC*, 567 F. Supp. 3d 580, 640–48 (M.D.N.C.) (discussing expert testimony on race-neutral alternatives).

and, in at least one instance, would actually work to the detriment of this goal.  Specifically, in 2016, West Point considered using socio-economic status to increase diversity in the cadet corps. *Id.* ¶ 107.  However, "based on a review of several years' worth" of data, West Point determined that this consideration would, instead, primarily lead to an increase in the number of white male cadets.  *Id.*  West Point also considered using first-generation college status to increase diversity in the cadet corps, but, after reviewing admissions data, determined that "the number of first-generation college candidates applying to West Point was so small that this alternative would not significantly impact diversity" of the cadet corps.  *Id.* ¶ 108; *see Fisher II*, 579 U.S. at 385 (noting that the "University tried, and failed, to increase diversity through enhanced consideration of socioeconomic and other factors").

West Point has further considered changing or eliminating the consideration of standardized test scores from its admissions process, which might increase diversity in the cadet corps, but it values a standardized measure of academic potential, especially considering the variance in academic rigor between high schools, to ensure that admitted cadets can succeed while at West Point.  McDonald Decl. ¶ 109.  And the "Equal Protection Clause does not force universities to choose between a diverse student body and a reputation for academic excellence." *Fisher II*, 579 U.S. at 385; *see also Grutter*, 539 U.S. at 340 (the Constitution does not "forc[e] the Law School to abandon the academic selectivity that is the cornerstone of its educational mission").[32]

Finally, given the outsized role the nomination process plays in shaping the pool of qualified candidates available to West Point for appointment as cadets, West Point has also

---

[32] And in any event, the current version of the Fiscal Year 2024 National Defense Authorization Act, as proposed by the United States Senate, would mandate that service academies require the submission and consideration of standardized test scores as part of the application process.  McDonald Decl. ¶ 109.

conducted outreach to encourage nomination sources—in particular, Members of Congress—"to consider providing nominations that include a diverse slate of candidates that are representative of their districts."    McDonald Decl. ¶ 110.    As it stands, Congressional nominations are disproportionately provided to more white students than students of other demographics; white students receive approximately 74% of Congressional nominations despite comprising 54% of the U.S. population aged 18 to 24.  *Id.*  However, in spite of this outreach, West Point has not observed any demographic shifts in nominations.[33]   *Id.*

### 6. West Point Does Not Intend to Use Race and Ethnicity as a Factor in its Admissions Process Indefinitely

West Point does not intend to use race as a factor in its admissions process indefinitely. Rather, West Point typically reviews its aspirational diversity goals biannually, based on Army officer corps demographic data, and it alters its admissions process in response to trends in this data.  McDonald Decl. ¶ 96.  For example, in around 2014, the Admissions Office stopped its practice of forwarding Hispanic candidates to the Diversity Outreach Office because the qualified candidate pool of Hispanic candidates had grown considerably, such that the Admissions Office could manage their admissions files within the regional teams.  *Id.*  Recently, the Admissions Office started forwarding Hispanic candidates to the Diversity Outreach Office again due to a drop in the acceptance rate of such candidates.  *Id.*  Thus, through its periodic review and adjustment of its admissions policies that consider race and ethnicity, West Point "ensure[s] that race plays no

---

[33] Any suggestion that West Point should adopt a lottery or percentage plan is untenable. For one, such a system would deprive West Point of the opportunity to holistically and individually consider the many and varied ways that candidates might contribute to the cadet environment and the future Army officer corps. *See Fisher II*, 579 U.S. at 385–87 (declining the invitation to compel the University of Texas to admit all students by class rank because "[c]lass rank is a single metric, and like any single metric, it will capture certain types of people and miss others"). Such a system also would not be administrable given the statutory and regulatory mandates under which West Point's admissions process operates. *Cf. Grutter*, 539 U.S. at 340 (faulting a failure to "explain how such plans could work" in the "graduate and professional school" setting).

greater role than is necessary to meet its compelling interest." *Fisher II*, 579 U.S. at 380; *see also Grutter*, 539 U.S. at 342.

Plaintiff's insistence that West Point must have a defined "end point," relying on *SFFA*, Pl. Br. at 16–17, ignores the wholly distinct military interests at issue here, which are far more analogous to the interests in cases like *Johnson*, 543 U.S. 499 (2005), in which the Supreme Court addressed the use of race considerations to avoid serious risks to human safety in the prison context. *See SFFA*, 600 U.S. at 207 (discussing *Johnson*).  Neither *SFFA* nor *Johnson* suggested that prison officials would have to cease such considerations at some defined end point, and for good reason; racial violence in prison is not a problem that simply evaporates after a set number of years.  Likewise here, in the military context, the strength and effectiveness of the armed forces is an enduring requirement with national security implications of the highest order. Countermanding senior military judgments that a diverse officer corps is necessary to achieve that requirement by imposing an inapt "end point" on West Point would pose risks of a kind that the Supreme Court had no occasion to consider in *SFFA*.  These "relevant differences" must be taken into account." *Johnson*, 543 U.S. at 515; *Grutte*r, 539 U.S. at 308 ("Context matters").

## IV.     The Balance of Equities and Public Interest Weigh in Favor of the Government

The final two factors, balance of equities and the public interest, also weigh heavily in the Government's favor.  *See Nken v. Holder*, 556 U.S. 418, 434-435 (2009).  In contrast to Members A and C's individualized interest in changing West Point's policy mid-admissions cycle, the public interest is of paramount import in matters of national security.  *See, e.g.*, *Haig*, 453 U.S. at 307. Thus, the Supreme Court has reversed a preliminary injunction on "[a] proper consideration of these factors alone," when the military provided evidence that it would result in an "adverse impact on the public interest in national defense."  *Winter*, 555 U.S. at 24; *id.* at 28 (criticizing lower

courts' failure to "give sufficient weight to the views of several top Navy officers"); *see also Defense Distributed v. U.S. Dep't of State*, 838 F.3d 451, 459 (5th Cir. 2016) (plaintiffs' First Amendment interest outweighed by government's stronger interest in national security).  For the reasons extensively discussed *supra*, the military has done just that here.

Further, in the context of admissions, the "balance of hardships" can weigh in favor of a defendant when it would be forced to make a late change to its policies.  In *Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*, 364 F. Supp. 3d 253, 276 (S.D.N.Y. 2019), *aff'd*, 788 F. App'x 85 (2d Cir. 2019), for example, the court found that an injunction changing New York City's admissions policies would impose "an undue burden" because "administrators, teachers, students, and parents have all been proceeding for the last eight months under the assumption that the [challenged policies] will be in effect for the upcoming admissions cycle."  *See also id.* (noting that the burden "ha[d] been exacerbated" by plaintiffs' late filing date, which left "only two months to accommodate the possibility that Plaintiffs' motion will be granted").  So too here, where a mid-cycle change to West Point's policies would not only burden the administrators and students who "have all been proceeding" under the existing policies, but would also significantly impact the applicants who have already received LOAs or offers of appointment—and all applicants more generally—by subjecting them to different policies based on the date of their application. McDonald Decl. ¶¶ 114-119.

## CONCLUSION

Accordingly, the Government respectfully submits that the Court should deny Plaintiff's motion for a preliminary injunction.

Dated: November 22, 2023
        New York, New York

        Respectfully submitted,

        DAMIAN WILLIAMS
        United States Attorney
        Southern District of New York

        */s/ Alyssa B. O'Gallagher*
By: ALYSSA B. O'GALLAGHER
      ELLEN BLAIN
      Assistant United States Attorneys
      86 Chambers Street, 3rd Floor
      New York, New York 10007
      Tel.: (212) 637-2822/43
      Fax:  (212) 637-2730
      Email:     alyssa.o'gallagher@usdoj.gov
                ellen.blain@usdoj.gov