UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES MILITARY ACADEMY AT WEST POINT; THE UNITED STATES DEPARTMENT OF DEFENSE; LLOYD AUSTIN, in his official capacity as Secretary of Defense; CHRISTINE WORMUTH, in her official capacity as Secretary of the Army; LIEUTENANT GENERAL STEVEN GILLAND, in his official capacity as Superintendent of the United States Military Academy; and LIEUTENANT COLONEL RANCE LEE, in his official capacity as Director of Admissions for the United States Military Academy at West Point,<br><br>Defendants. | 23 Civ. 8262 (PMH)<br><br>DECLARATION OF COLONEL DEBORAH J. MCDONALD |

I, Deborah J. McDonald, pursuant to the provisions of 28 U.S.C. § 1746, declare, under penalty of perjury, as follows:

1.      I am the former Director of Admissions at the United States Military Academy at West Point and an instructor in the Department of Behavioral Sciences and Leadership.

2.      I am aware of the allegations made by the Plaintiff in this lawsuit. I submit this declaration in support of the Defendants' opposition to the Plaintiff's motion for a preliminary injunction. All statements in this declaration are based on my personal knowledge or knowledge obtained in the course of my official duties.

3.      This declaration consists of eleven parts:

1

- Part I describes my professional background, including my experience as Director of Admissions from 2008 to 2023.
- Part II provides general background on the U.S. Military Academy at West Point, its admissions policies, and its admissions committees.
- Part III explains the steps an applicant (or "candidate") must take to apply to West Point.
- Part IV describes the Admissions Office's process for "quantifying" and "qualifying" a candidate's application.
- Part V explains how West Point selects candidates for appointment.
- Part VI addresses how the Admissions Office uses "letters of assurance," i.e., conditional offers of admission, as part of its recruitment efforts.
- Part VII explains the limited ways in which West Point considers a candidate's race and ethnicity as part of the admissions process.
- Part VIII addresses how West Point's consideration of a candidate's race and ethnicity has been necessary to advance the military's interests.
- Part IX describes other race-neutral alternatives West Point has considered.
- Part X explains the reasons that West Point uses demographic data.
- Part XI explains how a preliminary injunction would impose significant harms on West Point, current applicants to West Point, and the national security interests of the United States.

## I.    Professional Background

4.      I attended West Point as a cadet from 1980 until 1985, when I commissioned into the Army on active duty as a transportation officer. I returned to West Point as an information management officer between 1995 and 1998. Since 2001, I have been stationed at West Point.

5.      In 2001, I began working in the Admissions Office as an Associate Director of Admissions. My responsibilities included overseeing the Admissions Office's budget, information technology, and marketing. From 2004 to 2008, I served as the Deputy Director of Admissions. In that role, my responsibilities included coordinating with Members of Congress, the Department of Defense, the Department of the Army, Army Cadet Command, the Department of Defense Medical Examination Review Board (DoDMERB), and other service academies in relation to West Point's accession and retention initiatives. I also led West Point's

recruitment efforts in areas with high numbers of potential applicants from historically underrepresented groups.

6.    In 2008, I was nominated and presidentially confirmed as West Point's Director of Admissions. In this role, I was responsible for enrolling high-quality classes at West Point, the United States Military Academy Preparatory School (USMAPS), and the West Point Preparatory Scholarship program (WPPSP). I also oversaw West Point's Admissions Directorate, which provides support throughout the admissions process to candidates, parents, Members of Congress, Field Force members (West Point's volunteer admissions representatives), and educators. Finally, in my role as the Director of Admissions, I synchronized efforts with the Army Reserve Officers' Training Corps (ROTC) to enhance the overall recruitment effort of commissioning sources and publicize Army officer opportunities to the youth and communities of America. I was Director of Admissions until July 1, 2023, when I stepped down in preparation for retirement. As the Director of Admissions, I worked under the direct supervision of the Superintendent of West Point. Currently, I serve as an Advisor to the Director of Admissions.

## II.    West Point's Admissions Policies and Committees

7.    The United States Military Academy at West Point was established in 1802. West Point is a four-year, federally established[1] undergraduate institution that prepares cadets to become leaders and officers in the United States Army. Upon entry at West Point, cadets are members of the Army. Each cadet receives an annual salary, room, board, medical, and dental care, and is subject to the Uniform Code of Military Justice.

---

[1] *See* 10 U.S.C. § 7431(a) (establishing "a United States Military Academy, at West Point, New York").

8.      West Point's academic program is designed to develop cadets' critical thinking and creative problem-solving skills. Upon graduation, all cadets receive a Bachelor of Science degree and are fully prepared to meet the intellectual requirements of a leader in today's Army. In addition to course offerings in science, engineering, mathematics, the humanities, and social sciences, West Point offers courses in military instruction that are not offered outside of the military service academies. (This year's course offerings include, for example, "Special Ops: Theory & Practice," "Introduction to Warfighting," and "Platoon Operations.").

9.      In addition to completing academic course work, cadets must participate in rigorous military training and mandatory athletic activities. Upon graduation, cadets are commissioned as active-duty officers with an obligation to serve a minimum of five years. West Point is a significant source of officer commissions for the Army; it historically provides approximately 20% of those commissions, and West Point graduates comprise 33% of general officers in the Army. Accordingly, West Point is a vital pipeline to senior leadership in the Armed Forces.

10.     The Academy is under the immediate supervision and control of the Department of the Army. West Point's Superintendent is the commander of the Academy and the military installation on which it is located. In a typical year, more than 13,000 men and women apply for admission (or "appointment") to West Point. West Point offers approximately 1,800 candidates per year to fill approximately 1,200 first-year seats, though the particular numbers may vary by year. Under 10 U.S.C. § 7442, the authorized strength of the total Corps of Cadets of the Academy is capped at 4,400 cadets on the day before graduation.

11.     West Point maintains a rigorous, holistic merit-based admissions process. West Point's Admissions policies are governed by federal statute (10 U.S.C. §§ 7442–46), Department

of the Army Regulations, West Point Regulations, relevant National Collegiate Athletic

Association (NCAA) Regulations, and internal guidance, including directives from West Point's

Academic Board to its Admissions Committee. The most recent directive was issued on

November 5, 2020 (the "Academic Board Directive," attached as Exhibit A). It remains in effect

this admissions cycle.

12.     As set forth in the Academic Board Directive, West Point seeks to select

candidates who (1) express interest in a career of service to the country as active-duty Army

officers; (2) demonstrate high moral and ethical behavior; (3) demonstrate strong performance in

high school, college, or the Army and are predicted to graduate from West Point; (4) manifest

high levels of physical and emotional stamina; (5) are medically qualified for a commission upon

graduation; (6) meet the needs of the future Army in talent and diversity; and (7) are committed

to all-around excellence. *See* Academic Board Directive § 2(a). West Point also seeks to admit

cadets with a range of talents, such as Leaders, Scholars, Athletes, and Soldiers, as well as a

range of backgrounds. *See id.* § 2(b).

13.     West Point's admissions process is overseen by its Admissions Committee, which

is a standing committee of 16 members of the Academic Board. The Committee is comprised of

the Director of Admissions; Heads of the Departments of Mathematical Sciences, English and

Philosophy, and Behavioral Sciences and Leadership; the Master of the Sword (Head of the

Department of Physical Education); the Director of the Department of Military Instruction; the

West Point Surgeon; a senior representative from the Athletic Department; representatives from

five additional Academic Departments identified annually by the Dean of the Academic Board; a

Regimental Tactical Officer; a Company Tactical Officer; and the Commandant of USMAPS.

14.    The Admissions Committee evaluates and selects candidates for West Point, USMAPS, and WPPSP. The Admissions Committee also assists the Director of Admissions in creating recruitment strategies; recommends to the Academic Board criteria for admission and readmission of former cadets, international cadets, and cadet candidates to West Point, USMAPS, and WPPSP; and informs the Academic Board of candidates offered admission, including the profile of the new class as it develops.

15.    The Admissions Committee has a subcommittee, known as the Executive Committee, that is composed of the Director of Admissions; Department Heads of English and Philosophy, Mathematical Sciences, and Behavioral Sciences and Leadership; the Master of the Sword; the Admissions Committee representative from the athletic department; and a Regimental Tactical Officer. The Executive Committee's primary responsibilities are to make preliminary recommendations for candidates who have certain identified risk factors.

16.    The Admissions Office also houses the Diversity Outreach Office. The Diversity Outreach Office primarily conducts outreach to candidates from populations that are underrepresented at West Point. As further discussed below, the Diversity Outreach Office reviews African American, Hispanic, and Native American candidates' files to make preliminary recommendations for qualification or disqualification for admission and may also recommend these candidates for letters of assurance and Superintendent nominations (both discussed further below) after conducting a holistic review of the candidate's file. The Admissions Office does not forward applications from Asian and Pacific Islander candidates to the Diversity Outreach Office because Asian and Pacific Islander cadets typically make up a greater share of West Point cadets than Asian and Pacific Islander officers do of the Army officer corps, and, as discussed further

below, West Point has tied its talent and diversity goals to the demographics of the current officer corps in the active-duty component.

17.     West Point also has admissions teams for different geographic regions of the United States. Each regional team is led by an Admissions Regional Commander. As further discussed below, an admissions officer from the candidate's region reviews a candidate's file to make preliminary recommendations for qualification or disqualification for admission. Each Admissions Regional Commander may also recommend candidates in their regions for letters of assurance and Superintendent nominations (both discussed further below) after conducting a holistic review of the candidate's file.[2]

18.     The Director of Admissions considers recommendations for letters of assurance for all candidates and is authorized to sign such letters without committee action as outlined in Section 5(a)(2)(b) of the Academic Board Directive. The Director of Admissions also considers recommendations for Superintendent nominations for all candidates.

III.    **Steps to Apply to West Point**

19.     A West Point application contains six requirements: (1) the Candidate Questionnaire; (2) the Second Step Kit; (3) a Candidate Fitness Assessment; (4) a medical evaluation; (5) an interview; and (6) a nomination.

20.     Candidates can begin the application process no earlier than February 1st of the year before the candidate would enter West Point (their junior year for candidates applying

---

[2] Certain candidates are reviewed by specialized admissions officers rather than regional admissions officers.  For example, athlete candidates are reviewed by athlete admissions officers, soldier candidates by soldier admissions officers, international candidates by international admissions officers, and former cadet candidates by former cadet admissions officers.  For ease of reference, my use of "regional team" and "regional admissions officer" encompasses these specialized admissions officers.

directly from high school) by submitting the Candidate Questionnaire. Upon opening an application, and after around June 1st, candidates may complete the remaining steps, and must finish the process by January 31st of the year the candidate would enter West Point. However, if a candidate seeks a medical waiver, West Point provides until April 15th of the year the candidate would enter West Point to complete the medical qualification process. In addition, while West Point requests that Members of Congress submit their nominations no later than January 31st of the year the candidate would enter West Point, some Members might submit nominations thereafter.

21.    Using criteria explained below, West Point evaluates (or "qualifies or disqualifies") completed applications on a rolling basis and tenders most offers of admission between October and April of the year the candidate would enter West Point. A candidate must accept or decline an offer of appointment by May 1st of the year they would enter West Point. Each of the six requirements is discussed further below. West Point may tender offers of admission past May 1st depending on the acceptance rate at that time.

**1. Step One: Candidate Questionnaire**

22.    Unlike civilian universities, West Point admissions are governed by federal statutes and regulations that set forth specific eligibility criteria. For example, for appointment to West Point, a candidate must be at least 17 years old and not yet 23 years old by July 1st of the year they would enter West Point; be a U.S. citizen;[3] not be married, pregnant, or legally

---

[3] Up to 60 international cadets may study at West Point at any given time. Eligible countries are selected on an annual basis by the U.S. State Department and the U.S. Department of Defense. While international cadets are fully assimilated into the Corps of Cadets, they do not commission into the U.S. Army upon graduation, and their admissions process is different from the process for U.S. candidates. The class of 2026 admitted 16 international cadets, and the class of 2027 admitted 16 international cadets.

responsible for dependents; not have past felony convictions or drug abuse; not be a conscientious objector; and otherwise be of good moral character.

23.     The Candidate Questionnaire asks for candidates to self-report information, including their date of birth, citizenship, high school Grade Point Average (GPA), standardized test scores, extra-curricular activities, athletic participation, race and ethnicity, and gender, among other basic demographic information. The Candidate Questionnaire is used as an eligibility screening tool to determine if a candidate (1) meets the basic statutory eligibility requirements to receive an appointment to West Point, and (2) is likely to be competitive for admission. Candidate Questionnaires are reviewed by the candidate's assigned West Point admissions officer.

### 2.  Step Two: Second Step Kit

24.     If the West Point admissions officer concludes that a candidate meets the eligibility requirements to attend West Point after a preliminary screening of the Candidate Questionnaire, the West Point admissions officer directs his or her regional team to open the Second Step Kit for that candidate. Typically, 80% of candidates screened with the Candidate Questionnaire move on to this phase.

25.     The Second Step Kit requires candidates to submit official school transcripts; official Scholastic Assessment Test (SAT), American College Testing (ACT), or Preliminary SAT (PSAT) results; short answer essay question responses; and four teacher evaluations. The Second Step Kit also asks candidates for additional basic demographic information, including whether the candidate is the first member of their immediate family (to include grandparents) to attend college, the candidate's combined family income, and language fluency. The Second Step

Kit must be completed no later than January 31st of the year the candidate would enter West Point.

**3.   Steps Three to Five: Candidate Fitness Assessment, Medical Evaluation, and Interview**

26.     At the same time that the Second Step Kit is opened to eligible candidates, candidates are directed to take a Candidate Fitness Assessment. The Candidate Fitness Assessment is a test of strength, agility, speed, and endurance. It consists of six events: 1) basketball throw; 2) cadence pull-ups or flexed-arm hang; 3) 40-yard shuttle run; 4) modified sit-ups; 5) push-ups; and 6) one mile run.

27.     Candidates must also undergo a medical evaluation by the DoDMERB.

28.     Finally, candidates must interview with a Field Force or Military Liaison Officer, a coach (if a recruited athlete), or their commander (if a soldier).

29.     These steps must be completed no later than January 31st of the year the candidate would enter West Point.

**4.   Step Six: Nomination**

30.     As required by 10 U.S.C. § 7442, and unlike civilian universities, every candidate appointed to West Point must be nominated.

31.     There are two types of nominations. First, a candidate can receive a nomination from a member of the United States House of Representatives and Senate; the Vice President; Delegates to Congress from American Samoa, the District of Columbia, Guam, the Virgin Islands, and the Commonwealth of the Northern Marianas Islands; the Governor and the Resident Commissioner of Puerto Rico; and the Superintendent of West Point (a "statutory nominating authority"). *See* 10 U.S.C. § 7442(a)(2)-(10), (d). Second, a candidate can receive a "service-connected" nomination. *See* 10 U.S.C. § 7442(a)(1), (b)(1)-(4), (c).

(i)    Statutory Nominating Authority

32.    Generally, nominations from Members of Congress, the Vice President, Delegates to Congress, and the Governor and Resident Commissioner of Puerto Rico make up 75% of West Point's cadet corps. The top fully qualified candidate appointed to West Point pursuant to nomination by a Member of Congress is "charged" to that member. When a Member of Congress has fewer than five charges at West Point at the end of an academic year, the Member is considered to have a vacancy for the following admissions cycle. For each vacancy, a Member of Congress can nominate up to ten individuals domiciled in his or her district or state. 10 U.S.C. § 7442(a). Typically, each year one vacancy per military service academy becomes available per Member of Congress. Members of Congress have virtually unlimited discretion to determine who they nominate and how their offices process and consider applications. West Point has no authority or control over which candidates Members of Congress nominate.

33.    Members of Congress are required to nominate their slate of candidates using one of three methods, as provided by 10 U.S.C. § 7442(a) and Department of Army Regulation 150-1, Chapter 3-4.

34.    First, Members can make nominations using the "competitive method," in which they submit nominees to the West Point Director of Admissions without any order of preference, leaving it to the Admissions Office to select one of the up to ten candidates within the nomination slate. *See* Army regulation 150-1, Chapter 3-4(a)(1). In this case, West Point ranks candidates within the slate (establishing "an order of merit") based on the candidates' Whole Candidate Score (explained below), a metric that does not incorporate or otherwise consider race or ethnicity. The fully qualified candidate with the highest Whole Candidate Score within a nomination slate will be offered an appointment.

35.     Second, Members can use the "principal-competing alternate method," in which the Member indicates a principal nominee, and in the event that the principal nominee is not deemed fully qualified by West Point or declines an offer of appointment, the member defers to the Admissions Office to select among the remaining candidates on the nomination slate based on the candidates' Whole Candidate Score. *Id.* Chapter 3-4(a)(2).

36.     Third, Members can use the "principal-numbered alternate method," in which the Member identifies a principal, or first choice nominee, and provides a ranked list of alternates. *Id.* Chapter 3-4(a)(3). In this case, West Point must offer an appointment to the fully qualified candidate who is ranked highest on the Member's list, even if that candidate has a lower Whole Candidate Score than other individuals on the Member's list.

37.     While it varies by year, approximately 85% of Members use the competitive method.

38.     Regardless of the nominating method used by a Member of Congress, West Point must appoint one nominee for each congressional vacancy so long as at least one of the candidates included on the slate for that vacancy is fully qualified.

39.     Section 7442(a)(2) also provides the Vice President, like Members of Congress, with five West Point vacancies; typically, one vacancy opens per year that he or she will nominate to fill. The Vice President provides nominations to candidates from the country at large.

40.     Section 7442(a)(5)-(10) provides the District of Columbia and the various U.S. territories with three to six West Point vacancies.  For each vacancy, they can nominate up to ten individuals using one of the three methods discussed above.

41.     Finally, Section 7442(d) authorizes the West Point Superintendent to nominate up to 50 candidates per year from the country at large, so long as the cap on authorized strength of the total Corps of Cadets of the Academy is not exceeded. Superintendent nominations can be provided at any point in the admissions cycle once a candidate has successfully completed all other applications steps, is found to be qualified, and is missing only a nomination. Superintendent nominations are used for qualified candidates who West Point highly desires but who lack nominations from other sources. There are no statutory restrictions on the Superintendent's discretion to nominate candidates. Superintendent nominations are most often used to provide nominations for athletes early in the admissions cycle in order to compete with other Division 1 athletic programs. Because non-military schools do not require applicants to secure nominations, those schools can typically offer admission to applicants earlier in the admissions process than West Point; accordingly, the Superintendent can use this statutory authority to compete for highly sought-after athletes.

42.     Since 2008, the Superintendent has never exhausted his nominations for any given year. For example, for the class of 2027, the Superintendent provided only 17 nominations; for the class of 2026, he provided only 21 nominations.

43.     As a result of the nomination requirement, the statutory nominating authorities play a large, and often determinative, role in the selection process. That is because candidates typically compete against the other candidates in their nomination pool, rather than against the entirety of candidates applying to West Point.

(ii)     Service-Connected Nominations

44.     Title 10 also authorizes military service-connected nominations.

45.     First, Section 7442(b)(1) provides for a presidential competitive category, in which the President may select 100 cadets per year who are children of certain members of the armed forces.

46.     Second, Section 7442(b)(2)-(4) provides that the Secretary of the Army may nominate 85 candidates per year from enlisted members of the Regular Army; 85 candidates per year from enlisted members of the reserve component of the Army; and 20 candidates per year from members of ROTC & Junior ROTC.

47.     Third, Section 7442(a)(1) provides that 65 West Point slots may be filled with "children of members of the armed forces who were killed in action or died of, or have a service-connected disability rated at not less than 100[%] resulting from, wounds or injuries received . . . [in] active service," as well as children of military or civilian personnel in a "missing status."

48.     Fourth, Section 7442(c) provides that the President is authorized to appoint children of persons who have been awarded the Medal of Honor.

## IV.     Quantification and Qualification of Candidate Files

### 1.     File Quantification and the Whole Candidate Score

49.     After a candidate completes the Candidate Questionnaire, the Admissions Office assigns a numerical score to the candidate's file as part of a process known as file "quantification."  *See* Academic Board Directive § 4(a). This numerical score—known as the Whole Candidate Score—is initially based on self-reported data provided by the candidate in the Candidate Questionnaire and is one of the most important indicators for initial screening of a candidate's file.

50.     The formula for calculating the Whole Candidate Score is set forth in Annex A to the Academic Board Directive.

51.    Sixty percent of the Whole Candidate Score derives from a candidate's academic qualifications, calculated from their standardized test scores and high school GPA.

52.    Thirty percent of the Whole Candidate Score derives from the candidate's Community Leader Score, which is based on extracurricular activities, sports participation, and evaluations from school officials.

53.    The final ten percent of the Whole Candidate Score comes from the Candidate Fitness Assessment.

54.    The Whole Candidate Score fluctuates during the application window and can increase or decrease until the candidate completes their application. For example, a Whole Candidate Score generated from the candidate's self-reported information contained in the Candidate Questionnaire may increase if the candidate submits higher verified standardized test scores or a higher official GPA. The Whole Candidate Score may decrease if the candidate does poorly on the Candidate Fitness Assessment or receives unfavorable school official evaluations.

55.    Race or ethnicity are not factors in the Whole Candidate Score.

56.    The Admissions Committee can adjust a Whole Candidate Score by plus or minus 10% of the candidate's Whole Candidate Score to allow for the special nature of school programs, significant work experience during the school year, special accomplishments, personal achievements of a significant nature, international studies, foreign language expertise, or information of a negative nature not strong enough to disqualify a candidate. For example, the Whole Candidate Score does not consider a candidate's performance in college if the candidate has taken university courses. If the candidate performed well in the candidate's college courses, a positive Whole Candidate Score adjustment may be warranted. Conversely, if a candidate

performed poorly in the candidate's college courses, a negative Whole Candidate Score adjustment may be warranted.

57.    When a candidate is considered for a Whole Candidate Score adjustment, the appropriate Regional Commander will present the case and the extenuating circumstances to the department responsible for consideration and approval of a Whole Candidate Score adjustment. These adjustments will be identified on the admission slate for each candidate so that the entire Admissions Committee can identify the candidates receiving a Whole Candidate Score adjustment.

58.    Race and ethnicity are not considered when making a Whole Candidate Score adjustment.

### 2.  **File Qualification**

59.    After the Admissions Office assigns a Whole Candidate Score to a candidate, West Point undertakes a three-step review process to determine whether a candidate is "qualified" or "not qualified." *See* Academic Board Directive § 4(b). First, the admissions officer assigned to the candidate conducts a first review.  If a candidate indicates that they are African American, Hispanic, or Native American in their Candidate Questionnaire, this first review is conducted by the Diversity Outreach Office. Other candidates' first reviews are conducted by a regional admissions officer. Regardless of who a candidate is first reviewed by, admissions officers apply the same qualification standards and review processes (described further below) to all candidates. After the first review, for all candidates, a member of the admissions committee (non-admissions staff or faculty) conducts a second review, and another admissions officer conducts a third review.

60.     The reviewing officials confirm that candidates meet the academic, leadership, and physical standards as reflected in the Whole Candidate Score. The reviewing officials also provide an individualized, holistic evaluation considering the subjective components of the application, including essay answers, interview results, writing samples, and comments from school officials. The admissions officers determine if the candidate is academically and physically qualified. If any of the three reviewers disagree, the candidate's status is reviewed by the Admissions Committee, whose decisions are determined by a simple majority.

61.     Standards for academic qualification are determined by the Director of Admissions, with approval by the Academic Board. By law, a candidate admitted to West Point "must show, by an examination held under regulations prescribed by the Secretary of the Army, that he is qualified in the subjects prescribed by the Secretary." 10 U.S.C. § 7446(b). Using the statute's guidance, West Point uses indicators of success typical in post-secondary education subjects such as math, engineering, and English and also incorporates indicators of candidate leadership potential. Physical qualification thresholds are established by the Director of Admissions in consultation with the Master of the Sword, and then approved by the Academic Board. DoDMERB determines minimum medical qualification.

62.     For the current admissions cycle, preliminary academic indicators for qualification include a GPA in the top 81% of the candidate's high school class, an SAT Math score at or above 570, and an SAT Evidence-Based Reading and Writing Score at or above 550. (The Academic Board Directive sets out similar indicators for ACT scores). *See* Academic Board Directive § 4(b).

63.     Candidates who pass the preliminary academic review process are considered to be academically qualified candidates. The academic assessment is only one attribute of the

17

qualification process. As noted, candidates must also be reviewed for medical qualification, and the physical and leadership components of the Whole Candidate Score. Any candidate who is deemed to be at risk in any of these areas will be presented to the Admissions Committee or the Executive Committee for qualification or disqualification. Being "at risk" in any of these components does not automatically disqualify a candidate.

64.    Race and ethnicity are not factors in determining the qualification of a candidate.

## V.    Selection of Candidates

65.    West Point evaluates completed applications for admission on a rolling basis each year between August of the year before the candidate would enter West Point and April or May of the year of entry (candidates' senior year of high school for those applying directly from high school). When a candidate is deemed qualified, the file returns to the Director of Admissions, who works to build a class of cadets. Selection is based on order of merit (or order specified by Member of Congress, where applicable) within the types of nominations obtained by candidates. *See* Academic Board Directive § 5(a). Out of order of merit selection will only be made for Additional Appointees (described further below) and Superintendent nominations. *Id.*

66.    Specifically, all candidates receiving a nomination using the competitive method (i.e., the statutory nominating authority gives West Point the discretion to choose among nominees) are selected for appointment based on order of merit by their Whole Candidate Score. For example, if a Member of Congress nominated ten candidates via the competitive method for one vacancy, West Point would offer admission to the fully qualified candidate with the highest Whole Candidate Score among the ten nominated within that district or state. Because candidates are ranked by Whole Candidate Score within each congressional district or state, the highest Whole Candidate Score among congressional vacancy winners can vary significantly under the

competitive method. Candidates in highly competitive congressional districts may not win the congressional vacancy despite having significantly higher Whole Candidate Scores than similarly situated candidates from less competitive districts.

67.    West Point uses the same process for candidates with service-connected nominations, such as a Presidential nomination—i.e., West Point ranks the candidates in order of merit based on the candidates' Whole Candidate Score. Race and ethnicity play no role in this process.

68.    For congressional slates where Members of Congress have chosen other nomination methods, designating nominees as a principal nominee or numbered alternate, the Admissions Office must consider selection in the sequence specified by the Member of Congress. In other words, a qualified candidate with a lower Whole Candidate Score relative to other candidates from that district may receive an offer of appointment simply because the Member of Congress designated that candidate as a principal nominee or numbered alternate. Again, West Point does not consider race or ethnicity in this selection process.

69.    When a qualified candidate will clearly win a vacancy, he or she will be placed on an admissions slate, which is voted on by a quorum of the Admissions Committee. Most appointment offers will be tendered from January through April of the year the candidate would enter West Point once West Point receives congressional nominations from the various Members of Congress and as candidates complete the medical evaluation. Appointment offers made before January are usually for candidates with a non-congressional nominating source, as those nominations are generally received before the congressional nominations.

70.     If a qualified candidate is not selected for appointment for the vacancy for which he or she was nominated, that candidate may still be offered an appointment under two other statutory provisions.

    a.  First, a candidate may receive an appointment as a qualified alternate. Specifically, Title 10 authorizes West Point to appoint 150 qualified alternates to the incoming class from among the pool of qualified candidates who received nominations from a Member of Congress, Delegate in Congress, the Resident Commissioner from Puerto Rico, or the Governor of Puerto Rico but did not win the vacancy. 10 U.S.C. § 7442(b)(5). These nominees compete against each other in a nationwide pool of qualified alternates, with the 150 highest-ranked candidates selected by "order of merit," defined as the 150 candidates with the highest Whole Candidate Score. *See* Academic Board Directive § 5(a). Race and ethnicity are not factors in determining the order of merit of qualified alternates.

    b.  Second, if vacancies in the incoming class of cadets remain following all the appointments otherwise authorized by law, 10 U.S.C. § 7443 provides that the Secretary of the Army may fill vacancies "[i]f it is determined that, upon the admission of a new class to the Academy, the number of cadets at the Academy will be below the authorized number." As such, Section 7443 provides for the appointment of additional cadets from among the remaining qualified nominees, with a nomination from any nominating source. These appointment offers are labeled "Additional

Appointees." Section 7443 does not require Additional Appointees to be selected by order of merit. During every year that I was Director of Admissions, it was necessary to make offers of appointment to Additional Appointees to meet the entering class size of around 1,200 cadets. For the class of 2026, 284 candidates were provided offers of appointment as Additional Appointees; for the class of 2027, 364 candidates were provided offers of appointment as Additional Appointees. As explained below, race and ethnicity are one of many factors that the Admissions Committee may consider as part of a holistic assessment in extending offers to Additional Appointees.

## VI.    Letters of Assurance

71.    Due to statutory, regulatory, and policy constraints not applicable to civilian universities, West Point cannot provide early admission decisions. In consideration of this limitation, the Admissions Office uses a recruiting tool referred to as a Letter of Assurance (LOA) to encourage competitive candidates to quickly complete their application process.

72.    To be considered for an LOA, a candidate must have completed the Candidate Questionnaire (Step One in the admissions process); submitted their 6th semester high school transcript and a verifiable PSAT, ACT, or SAT score; and completed an interview. A candidate need not have completed the Second Step Kit, Candidate Fitness Assessment, or medical evaluation, or have received a nomination to be considered for an LOA.

73.    An LOA constitutes a firm commitment from West Point to the candidate that the candidate will be admitted—provided that the candidate meets the conditions in the letter. *See* Academic Board Directive § 2(a). If a candidate receives an LOA, he or she must complete the

21

application and pass physical fitness standards within 60 days of the issuance of the LOA; become medically qualified by April 15; and receive a nomination. If a candidate fails to meet any one of these conditions, the candidate will not receive an appointment.

74.     The Director of Admissions provides guidance on how many LOAs are available in each admissions cycle, as West Point must be careful to balance incentives to candidates to complete the rigorous and time-consuming application with the countervailing statutory cap on the total number of cadets. There is no quota system or other numerical requirement in issuing LOAs. The guidance for the class of 2028 is attached as Exhibit B.

75.     To determine who should be offered an LOA, admissions officers and their supervisors review Candidate Questionnaires, 6th semester high school transcripts, verifiable standardized test scores, and interviews and identify promising candidates within several categories, including those with particular talents (Soldier, Athlete, Scholar) and/or those who are diverse (African American, Hispanic, Native American, Women).[4]

76.     A Soldier is an enlisted member of the Regular Army (i.e., active duty) or Reserve Component who has completed Advanced Individual Training and has an assessment from their commander in their file. An Athlete is a candidate who has been "chipped," a special designation by a West Point coach that a recruited athlete should receive an LOA. A Scholar is a candidate whose academic performance predictor, as known as the College Entrance Examination Rank (CEER) score, is greater than or equal to a specified value. A CEER score is calculated using a candidate's standardized test scores and high school GPA. These categories are reviewed yearly and may change depending on the admissions landscape.

---

[4] Soldiers and Native American candidates are included in these categories though they do not appear in Exhibit B.

77.    The Admissions Office conducts an individualized, holistic review of candidates before offering an LOA. Specifically, an admissions officer screens the application based on Candidate Questionnaire, high school transcript, verifiable standardized test scores, and interview. The admissions officer also identifies risk areas, such as substandard test scores in either math or reading, a low Community Leader Score, or issues concerning moral turpitude. Based on that review, the Director of Admissions issues LOAs to approved candidates in accordance with the Academic Board Directive. LOAs are typically issued between July and September of the year before a candidate would enter West Point (a candidate's senior year if applying directly from high school).

78.    If a candidate indicates that they are African American, Hispanic, or Native American in their Candidate Questionnaire, the LOA screening process described above is performed by the Diversity Outreach Office. Other candidates are screened by regional teams. Both the Diversity Outreach Office and the regional teams make their LOA recommendations to the Director of Admissions, who considers recommendations for LOAs for all candidates and is authorized to sign such letters without committee action as outlined in Section 5(a)(2)(b) of the Academic Board Directive

79.    After West Point provides an LOA to a candidate, the candidate has 60 days from the date of issuance to complete the application, except for the medical qualification and securing a nomination, which can occur after the 60-day deadline has ended. If the candidate does not complete their application within 60 days, the LOA is revoked. Likewise, if the candidate does not receive the required medical qualification and nomination, the LOA is revoked.

**VII.    West Point's Limited Consideration of Race and Ethnicity in the Admissions Process**

80.    West Point considers race and ethnicity flexibly as a plus factor in its individualized, holistic assessment of African American, Hispanic, and Native American candidates at three limited stages of the admissions process. West Point adopted its current policies after decades of experience led the Armed Forces to recognize that building a cohesive fighting force that is highly qualified and broadly diverse is "integral to overall readiness and mission accomplishment."[5]

81.    Until the late 1960s, African American cadets did not enter West Point in substantial numbers. By 1968, West Point had graduated 27,969 cadets, of which very few were African American. In 1978, the Admissions Office first established class composition goals and created a Diversity Outreach Office to work on increasing cadet corps diversity. During the 1990s, the Admissions Office considered race and ethnicity in admissions and worked to advance diversity initiatives to bring in geographically, experientially, and racially and ethnically diverse classes.

82.    While the numbers of cadets from underrepresented demographics increased in the 1980s and 1990s, the gains were not significant. For example, in the entering class of 2000, the number of African American cadets was approximately 65 (6% of the men entering the class and 9% of the women entering the class). The number of women cadets entering that same year was 188, comprising 15.9% of the entering class. Given these relatively low numbers, the Admissions Office intensified its efforts to offer admission to candidates from underrepresented demographics.

---

[5] *See* Department of Defense, Department of Defense Board on Diversity and Inclusion Report: Recommendations to Improve Racial and Ethnic Diversity and Inclusion in the U.S. Military 3 (2020).

83. In 2013, based on the continued underrepresentation of previously excluded groups in the Army's officer corps, the Chief of Staff of the Army, General Raymond T. Odierno, directed West Point to increase diversity among its cadets, and specifically to increase the number of African American and women cadets.

84. As the Director of Admissions, I worked to implement this directive, in conjunction with broader Department of Defense (DoD) diversity goals. Specifically, my aspirational goal was to try to at least mirror the demographics of the Army officer corps in each graduating West Point class. At the time, the Army officer corps was far more diverse than the West Point cadet corps—for example, African Americans constituted 14% of the officer corps but only 8% of West Point cadets. Because of the military's closed personnel system, it was vital that West Point provide the Army with a pipeline of officers who would keep pace with the progress towards diversity that the Army had achieved elsewhere.

85. As a result, since General Odierno's direction, West Point has tied its talent and diversity goals to the demographics of the current officer corps in the active-duty component. For example, the current percentage of African Americans in the active-duty officer corps is 11%. The Admissions Office set an aspirational diversity goal of 14% African American cadets for the class of 2027. This goal was set higher than the current percentage of African Americans in the active-duty officer corps to account for attrition between entrance to West Point and graduation. For the class of 2027, the Admissions Office also had aspirational diversity goals of 11% for Hispanic cadets, 5% for Asian cadets, and 20% for women cadets, as well as talent goals of 23% Athletes, 30% Scholars, 15% Leaders, and 5% Soldiers. The Admissions Office did not include Native American and Pacific Islander cadets in its diversity goals because these

candidates make up a very small percentage of the applicant pool and cadet corps. These diversity and talent goals do not operate as ceilings or floors. Nor do the goals operate as quotas.

86.     West Point offers appointment by merit and will not offer appointment to unqualified candidates regardless of its diversity and talent goals. In other words, an otherwise unqualified candidate will not be offered an appointment based on his or her race or ethnicity. Indeed, during many application cycles, West Point does not meet its talent and diversity goals. For example, for the class of 2027, West Point did not meet its aspirational goals for Women, Athletes, African Americans, or Hispanic cadets. Despite not achieving its talent and diversity goals, West Point did not offer appointments to additional candidates based on their race or ethnicity to achieve a numerical goal.

87.     Similarly, these aspirational goals do not act as a ceiling. For example, for the class of 2027, West Point provided more offers of appointment to Asian cadets, Leaders, Scholars, and Soldiers than set out in its 2027 talent and diversity goals but did not stop offering admission to highly qualified candidates simply because the goal was met. West Point seeks to admit the highest quality candidates based solely on merit. (Annex B of the Academic Board Directive provides West Point's class composition goals.).

88.     Since 2013, West Point has seen a gradual increase in the percentage of cadets from underrepresented racial or ethnic demographics. For the class of 2013, West Point had 6.9% African American cadets, 6.3% Asian cadets, 0.8% Native American cadets, and 9.4% Hispanic cadets; for the class of 2027, West Point has 10% African American cadets, 13.5% Asian cadets, 0.9% Native American cadets, and 11.4% Hispanic cadets.

89.     Although West Point holistically considers race and ethnicity among many other factors at three limited points in the application process, it does not affect most West Point

appointments. As discussed above, a candidate's race or ethnicity plays no role in West Point's selection of candidates to fill congressional vacancies, non-congressional vacancies, or qualified alternate slots, all of which are filled in order of merit based on Whole Candidate Score (or as specified by Member of Congress, where applicable). Thus, for the class of 2027, consideration of race or ethnicity did not impact any of the 906 appointments (71% of total appointments) made under those nominating sources. Nor did it impact the 935 similar appointments made in 2026 (77% of total appointments).

90.    Race and ethnicity, among other criteria, may affect the admissions process at only the following three stages.

91.    First, early in the admissions cycle, the Admissions Office may consider race and ethnicity flexibly as a plus factor in deciding to offer an LOA to an African American, Hispanic, or Native American candidate after reviewing the Candidate Questionnaire, 6th semester high school transcript, verifiable standardized test scores, and interview. As noted, the Director of Admissions provides guidance each year on how many LOAs are available. *See* Exhibit B, 2028 Admissions Guidance § 6. That guidance also addresses when LOAs may be appropriate depending on a candidate's CEER score and Whole Candidate Score. *Id.* For example, the 2028 guidance notes that LOAs may be appropriate for African American candidates with a CEER score at or above 554. *Id.* Even if an African American candidate exceeds this CEER score, however, the Admissions Office may decide not to offer the candidate an LOA. As noted, the Office's review of each candidate is holistic, and the guidelines set forth in the Admissions Director's guidance are advisory only. The Director retains discretion not to offer an LOA to a candidate for any reason. And if a candidate receives an LOA, that is not a guarantee of

admission—a candidate must still satisfactorily complete the remaining steps of the admissions process; if the candidate does not do so, West Point will not offer admission.

92.     For the class of 2027, West Point offered 675 LOAs. White candidates received 480 (71%) based on, among other things, their demonstrated talents as Soldiers, Athletes, or Scholars. For the class of 2026, West Point offered 484 LOAs. White candidates received 315 (65.1%), again based on, among other things, their demonstrated talents as Soldiers, Athletes, or Scholars.

93.     Second, at the end of the admissions cycle, if West Point has not reached its class size, West Point may make offers to "Additional Appointees." The class of 2026 had 284 Additional Appointees. The class of 2027 had 364 Additional Appointees. Race and ethnicity may affect offers of admission to Additional Appointees at this final stage of admissions in two ways.

       a.  First, a qualified candidate who is not selected to fill a congressional vacancy, non-congressional vacancy, or qualified alternate slot but has an LOA—which, as discussed above, may (or may not) be based in part on race and ethnicity as one factor in an individualized, holistic assessment—will receive an offer of appointment as an Additional Appointee. For the class of 2027, 170 Additional Appointees had LOAs. Of those, 142 were white. For the class of 2026, 168 Additional Appointees had LOAs. Of those, 113 were white.

       b.  The Admissions Committee may also make offers of appointment as Additional Appointees to candidates who competed for nomination and were found qualified but did not receive LOAs. In doing so, the

Admissions Committee may consider race and ethnicity flexibly as a plus factor for African American, Hispanic, and Native American candidates in its holistic assessment of candidates to identify those who are expected to make valuable contributions based on their demonstrated leadership, athleticism, scholastic aptitude, past experience as a solider, and diverse background. For the Class of 2027, West Point had 99[6] Additional Appointees admitted to the class who did not have an LOA. Of these 99 Additional Appointees, 86 were white. For the Class of 2026, West Point had 55 Additional Appointees who were admitted to the class who did not have an LOA. Of these 55 Additional Appointees, 45 were white.

c. Not including Additional Appointees appointed to West Point from USMAPS, 61% of Additional Appointees in the class of 2026 and 72% in the class of 2027 respectively were white.

d. For all Additional Appointees who are extended offers of appointment, race and ethnicity are only one factor among many other qualities and experiences that West Point considers valuable contributions to the cadet environment. For both 2026 and 2027, West Point made offers of appointment to white candidates whose Whole Candidate Scores were lower than qualified non-white candidates who were not offered appointment.

94.     Third, throughout the admissions cycle, admissions officers conduct a holistic review of all candidates to identify qualified candidates who are highly desired for the valuable

---

[6] Not including Additional Appointees appointed to West Point from USMAPS.

contributions they are expected to make (based on their demonstrated leadership, athleticism, scholastic aptitude, past experience as a soldier, and diverse background) but who lack a nomination and may warrant a Superintendent nomination. If the Diversity Outreach Office determines that an African American, Hispanic, or Native American candidate is otherwise qualified for admission but has not received a nomination, the Office may recommend that the Director of Admissions recommend the candidate for a Superintendent nomination. Both the Diversity Outreach Office and the regional teams make their Superintendent nomination recommendations to the Director of Admissions, who considers recommendations for all candidates and then makes recommendations to the Superintendent as to which candidates should receive Superintendent nominations. As noted, the Superintendent may nominate up to 50 candidates per year, and most of those nominations go to athletes. Since 2008, the Superintendent has never exhausted his nominations in any given year. For the class of 2027, he provided only 16 nominations, of which all 16 were provided because the candidates were athletes.  For the class of 2026, the Superintendent provided 19 nominations, of which 15 were provided because the candidates were athletes.  Of the four non-athlete Superintendent nominations provided for the class of 2027, all four were to white candidates.[7]

95.    To the extent West Point considers race and ethnicity in the admissions process, it does so to further the military's unique interests in developing a diverse officer corps. It does not consider race and ethnicity based on a belief that minority cadets always express a characteristic

---

[7] In prior years, a candidate's race or ethnicity could also potentially play a role in whether the Admissions Office opened the "second step kit" for a candidate. As explained above, however, most candidates (around 80%) make it to this phase of the application process. Thus, as a practical matter, it is highly unlikely that any consideration of race or ethnicity at this stage affected whether a candidate was ultimately selected for an appointment. In any event, West Point does not intend to continue considering race and ethnicity at this stage in future admissions cycles.

minority viewpoint on an issue. And because West Point has made substantial progress toward its goal of a fully integrated, highly qualified, and diverse Corps of Cadets, its use of race and ethnicity in the admissions process has become more limited in recent years.

96.    West Point also does not intend to use race and ethnicity as a factor in admissions indefinitely. The Admissions Office reviews its talent and diversity goals bi-annually in conjunction with its review of demographic information provided by DoD. During my tenure as Director of Admissions, I adapted our policies when appropriate. For example, around 2014, the Admissions Office stopped its practice of forwarding Hispanic candidates to the Diversity Outreach Office because our qualified candidate pool of Hispanic candidates had grown considerably, and so I concluded that we could manage their admissions files within the regional teams. I understand that the Admissions Office has recently started referring Hispanic candidates to the Diversity Outreach Office again due to a drop in the acceptance rate of such candidates, but this example underscores that West Point will adapt (and has adapted) its policies when continued consideration of race and ethnicity becomes unnecessary.

## VIII.    West Point's Limited Consideration of Race and Ethnicity Has Been Necessary to Achieve the Army's Compelling Interests

97.    DoD, the Army, and West Point have each concluded that it is critical to the Nation's military strength and readiness to maintain a pipeline of military officers who are highly qualified, diverse, and trained to succeed in an increasingly diverse environment. As West Point's Superintendent, Lieutenant General Steven W. Gilland, explained in a recent statement to Congress, West Point's mission is "[t]o educate, train, and inspire the Corps of Cadets so that each graduate is a commissioned leader of character committed to the values of Duty, Honor, Country and prepared for a career of professional excellence and service to the Nation as an officer in the United States Army." *Admissions, Curriculum, and Diversity of Thought at the*

*Military Service Academies: Hearing Before the H. Armed Servs. Comm., Subcomm. on Mil. Personnel*, 118th Cong. (2023) (statement of Lieutenant General Gilland, Superintendent of West Point).[8] As part of its mission, West Point seeks to commission leaders with foundational professional knowledge, skills, and the moral character required to support and defend the Constitution and serve as Army officers. The Nation places special trust and confidence in West Point graduates who accept commissions to serve as Army officers. The Nation expects its officers to wield lethal force in an ethical manner, to care for the Soldiers in their units, and to exercise stewardship over the Army Profession, while seizing the initiative to accomplish missions in a complex, decentralized operating environment.

98.    As Lieutenant General Gilland has explained, to complete its mission, West Point focuses on three lines of effort. First, West Point builds diverse and effective winning teams through an inclusive cadet corps, staff, and faculty to develop more effective leaders who faithfully represent the Army and the Nation. Second, West Point develops leaders of character to generate leaders prepared to fight and win wars. Finally, West Point cultivates a culture of character growth that includes creating and sustaining a safe and secure environment built on trust, dignity, and respect.

99.    As part of the development of leaders, character development ranks as the most important. West Point's leadership model is designed to produce leaders capable of mastering the challenges of modern warfare. West Point begins the process by creating trust and serving as the foundation for building cohesive teams and sustaining readiness. As part of its curriculum, West Point promotes an academic environment where debate is encouraged, ideas are challenged, and

---

[8] Lieutenant General Gilland's full statement is available at https://perma.cc/6YXQ-A8WJ.

honest feedback is expected. West Point does not advocate for one perspective; instead, it teaches cadets how to think effectively and analytically.

100.    A common principle within the Army is to "train how you fight." West Point cannot effectively train future officers to lead a diverse force without training the cadets to operate in a diverse environment. West Point has concluded, based on its assessment of its candidate pool and educational needs, that limited consideration of race and ethnicity in admissions is necessary to West Point's mission of training future military leaders of character.

101.    West Point's purpose is to produce leaders of character who are prepared to provide selfless service to our Army and our nation. The West Point admissions process aims to create a diverse corps of cadets, which is essential to West Point's educational mission and to the larger mission of the Army, for several reasons. First, West Point has determined that diversity helps prepare cadets to lead a multicultural force and fight alongside the U.S.'s diverse partners and allies. Army officers must be comfortable leading individuals notwithstanding racial, cultural, linguistic, or other differences, and officers must be prepared to critically evaluate competing perspectives as they make life and death decisions under the stress of combat. As a result, West Point persists in drawing upon the widest possible set of backgrounds, talents, and skills to maximize the Army's warfighting capability.

102.    Second, a diverse cadet corps enhances appreciation, respect, and empathy, which are essential for military cohesion. Officers are expected to display integrity and honor, have empathy, and positively influence others. Cultural competency facilitates trust, which is key to achieving common goals in disciplined, cohesive teams. A diverse and inclusive environment pushes cadets beyond their comfort level so they can develop as agile and resilient critical

thinkers who can successfully lead Soldiers in complex and uncertain environments across the world.

103.    Third, diversity at West Point is critical to maintaining diversity in the officer corps—diversity that the Army has worked for years to achieve. Unlike other institutions in the United States, the military is a closed personnel system. Officers are developed internally; the military does not hire its officer corps laterally, as a corporation might. The military's future leadership will necessarily be drawn from those who join the military today. Current senior Army leadership accessed into the Army in the 1980s and 1990s. For example, General Randy George, the current Chief of Staff of the United States Army, graduated and accessed into the Army's officer corps from West Point in 1984. As a result of the nature of the closed loop system of the military career lifecycle, it is of critical importance to ensure diversity in initial officer accessions, especially accessions through West Point, since approximately 20% of new Army officers each year are West Point graduates, and a disproportionate percentage (33%) of Army general officers are West Point graduates.[9]

104.    Fourth, a diverse Corps of Cadets ensures an inclusive multifaceted environment for all cadets, thus ensuring that West Point can attract top talent in the nation from all backgrounds. Eliminating tailored consideration of race and ethnicity in admissions would lower acceptance and enrollment rates of diverse candidates, thus shrinking the pool of qualified officer candidates from diverse racial and ethnic backgrounds. Maintaining diversity in the corps of cadets is key to spurring a sense of belonging; it helps cadets feel like an integrated part of the

---

[9] To become an officer in the Army, an individual must either graduate from West Point, attend a civilian college or university while participating in an ROTC program, attend Officer Candidate School after graduating from college, receive a direct commission after earning a professional degree, or advance through the enlisted ranks and then complete one of these officer training programs.

academic community and encourages cadets to engage freely with each other. Prohibiting

consideration of race in admissions at West Point would reduce the number of officers of all

backgrounds exposed to a diverse educational experience.

## IX.    West Point's Consideration of Race-Neutral Alternatives

105.    West Point uses several alternative methods to increase racial diversity. However,

these alternative methods alone have failed to produce the level of diversity in the Corps of

Cadets that is necessary to achieve the Army's compelling interests. First, West Point has

marketed to specific underrepresented demographics through an enrollment management

company with the goal of increasing the pool of diverse candidates. However, when West Point

increased marketing to diverse populations, the number of completed applications declined and

the acceptance rates for Hispanic and African American candidates declined. This decline may

have been the result of the broader declining interest of young people to attend college and the

decreasing propensity overall for military service in today's youth.

106.    Second, West Point representatives frequently visit Army posts, camps, and

stations to market to Soldiers and increase West Point applications from servicemembers.

Because certain non-white racial demographics are overrepresented in the enlisted population,

increasing the number of candidates who are Soldiers could increase the number of diverse

candidates. However, the impact of increasing Soldier candidates would still have a minimal

impact on overall diversity at West Point because approximately 8-9% of candidates applying in

a given year are current Soldiers, and Soldiers make up only approximately 8% of a given class.

107.    West Point has also considered other race-neutral measures, in addition to

outreach efforts, to increase the level of diversity in the Corps of Cadets. For example, around

2016, West Point considered increasing diversity using socio-economic status criterion; however,

based on a review of several years' worth of qualified candidates, West Point discovered that lower socio-economic status would not be effective at increasing racial diversity at West Point from its candidate pool. Rather, West Point determined that consideration of lower socio-economic status as a factor would actually increase the number of white males in a given class.

108.    Additionally, West Point considered prioritizing first-generation college candidates. However, West Point reviewed its admissions data and determined that the number of first-generation college candidates applying to West Point was so small that this alternative would not significantly impact diversity of the Corps of Cadets.

109.    West Point has also considered changing its use of standardized tests, such as the SAT, which could increase racial diversity. However, West Point values a standardized measure of academic potential, especially considering the variance in academic rigor between high schools, to ensure that admitted cadets can succeed while at West Point. Further, the version of the Fiscal Year 2024 National Defense Authorization Act, as proposed by the United States Senate, would mandate that service academies require the submission and consideration of standardized test scores as part of the application process, thereby limiting the flexibility of West Point to restructure its admissions criteria.

110.    Finally, West Point has encouraged nominating sources, specifically Members of Congress, through training and outreach, to consider providing nominations that include a diverse slate of candidates that are representative of their districts or states. However, West Point has not observed a significant shift in diversity based on nominations. A recent study found that Members of Congress "have nominated disproportionately more white students than Black,

Hispanic, or Asian and Pacific Islander students."[10] The study showed that white students received approximately 74% of congressional nominations despite comprising 54% of the U.S. population aged 18 to 24.[11] The study concluded that this disproportionality in the nominating process "contributed to significant racial and ethnic disparities in the student bodies of the [military] academies."[12] This is another reason why West Point's limited consideration of race and ethnicity is necessary to ensuring a diverse class of cadets.

## X.     West Point is Required to Monitor Demographic Data

111.    Under federal law and DoD directives, West Point is required to collect and report military personnel data elements, including race and ethnicity, on its cadets.

112.    The Office of Management and Budget (OMB) oversees and coordinates the implementation of Federal regulations across the Executive Branch. In October 1997, OMB published a notice in the Federal Register, "Revisions to the Standards for the Classification of Federal Data on Race and Ethnicity," that replaced and superseded prior OMB guidance from 1977. In its 1997 revision, OMB modified and separated race and ethnicity categories. The following five categories of race are listed in the Federal Register Notice: "American Indian or Alaska Native," "Asian," "Black or African American," "Native Hawaiian or Other Pacific Islander," and "White." Similarly, OMB directed the use of ethnicity categories of "Hispanic or Latino" and "Not Hispanic or Latino." While the United States government has long collected statistics on race and ethnicity, until OMB issued its 1977 "Race and Ethnic Standards for Federal Statistics and Administrative Reporting," federal data collection lacked uniformity on

---

[10] Connecticut Veterans Legal Center, *Gatekeepers to Opportunity: Racial Disparities in Congressional Nominations to the Military Service Academies* at 3 (2021), https://perma.cc/85X7-TQ2F.

[11] *Id.* at 5.
[12] *Id.* at 3.

race and ethnicity reporting categories. OMB mandates the use of these race and ethnicity categories by federal agencies, including DoD.

113.    DoD issued mandatory guidance for all DoD entities, including West Point, on the reporting of military personnel data elements, first in DoD instruction 1336.05, and subsequently in DoD Manual 7730.69, Volume I, Uniformed Services Human Resources Information System: Main Reporting Requirements. DoD Manual 7730.69, Volume I, provides the master person file coding format, which requires DoD entities to identify the race code and ethnicity code of an individual "in accordance with the 1997 OMB standards on race and ethnicity . . . [in the] Federal Register" as described above. Collection and reporting of the required military personnel data elements enables the DoD to create mandatory information reports, statistical tabulations, and demographic information of the uniformed services.  Federal law and DoD directives thus mandate West Point's use of specific race and ethnicity categories.

## XI.    **A Preliminary Injunction Requiring West Point to Change Its Admissions Policies Would Impose Significant Harms**

114.    I understand that the Plaintiff has requested that the Court preliminarily enjoin West Point from considering race as a factor by December 1 of this admissions cycle. If the Court were to enter such an injunction, it would impose significant harms on West Point.

115.    As explained above, the current admissions cycle began in February 2023, when candidates who were then as young as juniors in high school could first submit the Candidate Questionnaire. The Admissions Office has been reviewing candidate applications since August 2023 under admissions policies that have been in place at West Point for years and that include the limited consideration of race and ethnicity for some candidates. Applying those longstanding policies, the Admissions Office has already extended LOAs and offers of appointment to hundreds of candidates for this admissions cycle.

116.    If the Court were to preliminarily enjoin West Point from applying its longstanding admissions policies, the Admissions Office would need to consider how to change those policies to comply with the Court's order. The Admissions Office would need to consider, among other things, how it uses LOAs and how it might advance the military's interest in diversity without considering a candidate's race or ethnicity. That process would take time and require consultation with the Academic Board and possibly other stakeholders.

117.    West Point might also have to consider whether and how to withdraw previously provided LOAs or offers of appointment, harming those candidates in the middle of their college application processes.

118.    Preliminarily enjoining West Point from applying its longstanding admissions policies mid-cycle would also mean that certain candidates could be evaluated under a different set of criteria depending on when in the cycle they submitted their application. For example, a candidate who has already submitted his application and received an LOA could be evaluated under a different set of criteria than a candidate who has not yet applied. This would be inherently unfair both to those who already have received an LOA and those whose applications are still under consideration. To my knowledge, West Point has never changed its admissions policies mid-cycle in this way or applied different criteria depending on when a candidate applied.

119.    Finally, preliminarily enjoining West Point from applying its longstanding admissions policies would harm the important national security interests that those polices are designed to further. I understand that the Army has made a military judgment that a diverse officer corps is necessary for mission and combat readiness. If West Point were prohibited from considering a candidate's race in the limited manner described above, I expect that West Point's

class of admitted cadets would become less diverse, as it was before West Point began applying its current policies. This would result in an officer corps that would also become less diverse over time.

Dated:  West Point, New York

November 21, 2023

_____

DEBORAH MCDONALD