**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
**WHITE PLAINS DIVISION**

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS<br><br>*Plaintiff*,<br><br>v.<br><br>UNITED STATES MILITARY ACADEMY AT WEST POINT; THE UNITED STATES DEPARTMENT OF DEFENSE; LLOYD AUSTIN, in his official capacity as Secretary of Defense; CHRISTINE WORMUTH, in her official capacity as Secretary of the Army; LIEUTENANT GENERAL STEVEN GILLAND, in his official capacity as Superintendent of the United States Military Academy; and LIEUTENANT COLONEL RANCE LEE, in his official capacity as Director of Admissions for the United States Military Academy at West Point,<br><br>*Defendants.* | No. 7:23-cv-8262-PMH<br><br>**REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |

# TABLE OF CONTENTS

Table of Authorities ........................................................................................................ii

Introduction ....................................................................................................................1

Argument .........................................................................................................................2

    I.   SFFA will likely succeed on the merits. ...............................................................4

        A.  SFFA has standing. ......................................................................................4

        B.  West Point must satisfy strict scrutiny. ......................................................7

        C.  West Point fails strict scrutiny. ................................................................10

            1.   West Point has no compelling governmental interest. .....................11

            2.   West Point's use of race is not narrowly tailored. ..........................17

    II.  SFFA satisfies the remaining factors. .................................................................21

        A.  Irreparable harm .......................................................................................21

        B.  Balance of harms and public interest .......................................................25

Conclusion .....................................................................................................................25

Certificate of Service .....................................................................................................27

# TABLE OF AUTHORITIES

**Cases**

*A.H. ex rel. Hester v. French,*
  985 F.3d 165 (2d Cir. 2021).................................................................................3

*AAER v. Fearless Fund Mgmt.,*
  2023 WL 6295121 (N.D. Ga. Sept. 27).............................................................5, 6

*Abdul Wali v. Coughlin,*
  754 F.2d 1015 (2d Cir. 1985) .............................................................................3

*Able v. United States,*
  847 F. Supp. 1038 (E.D.N.Y. 1994)....................................................................22

*Adarand Constructors v. Peña,*
  515 U.S. 200 (1995) ..............................................................................7, 9, 16

*Advocs. for Highway & Auto Safety v. FMCSA,*
  41 F.4th 586 (D.C. Cir. 2022) .............................................................................5

*Agudath Israel of Am. v. Cuomo,*
  983 F.3d 620 (2d Cir. 2020)...............................................................................21

*Arias v. Decker,*
  459 F. Supp. 3d 561 (S.D.N.Y. 2020) .................................................................21

*B.R. v. F.C.S.B.,*
  17 F.4th 485 (4th Cir. 2021) ...............................................................................5

*Barrett v. Maciol,*
  2022 WL 130878 (N.D.N.Y. Jan. 14) .................................................................22

*Berkley v. United States,*
  287 F.3d 1076 (Fed. Cir. 2002) ...........................................................................8

*Biediger v. Quinnipiac Univ.,*
  691 F.3d 85 (2d Cir. 2012).................................................................................2

*Brewer v. W. Irondequoit Cent. Sch. Dist.,*
  212 F.3d 738 (2d Cir. 2000)..........................................................................22, 23

*Chamber of Com. v. CFPB,*
  2023 WL 5835951 (E.D. Tex. Sept. 8) ..............................................................5, 6

*Christian v. United States,*
  46 Fed. Cl. 793 (2000) ....................................................................................7, 8

*Citibank, N.A. v. Citytrust,*
  756 F.2d 273 (2d Cir. 1985)...............................................................................23

*Coal. to Defend Affirmative Action v. Granholm,*
  473 F.3d 237 (6th Cir. 2006) .............................................................................25

*Comer v. Cisneros,*
  37 F.3d 775 (2d Cir. 1994).................................................................................6

*D.M. ex rel. Bao Xiong v. Minn. State High Sch. League*,
  917 F.3d 994 (8th Cir. 2019) .................................................................................22

*Do No Harm v. Pfizer Inc.*,
  646 F. Supp. 3d 490 (S.D.N.Y. 2022) .......................................................................6

*Doe 2 v. Shanahan*,
  917 F.3d 694 (D.C. Cir. 2019) ................................................................................7

*Dzhabrailov v. Decker*,
  2020 WL 2731966 (S.D.N.Y. May 26) (Halpern, J.) ....................................................25

*FAIR v. Rumsfeld*,
  291 F. Supp. 2d 269 (D.N.J. 2003), *aff'g on standing*, 547 U.S. 47 (2006) .............................4

*Fisher v. Univ. of Tex. at Austin (Fisher I)*,
  570 U.S. 297 (2013) ....................................................................................... 7, 21

*Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp.*,
  25 F.3d 119 (2d Cir. 1994) ............................................................................. 23, 24

*Five Borough Bicycle Club v. N.Y.C.*,
  483 F. Supp. 2d 351 (S.D.N.Y. 2007) ......................................................................23

*Foulke ex rel. Foulke v. Foulke*,
  896 F. Supp. 158 (S.D.N.Y. 1995) ..........................................................................22

*Gratz v. Bollinger*,
  539 U.S. 244 (2003) ...................................................................................... 4, 6, 7

*Gresham v. Windrush Partners, Ltd.*,
  730 F.2d 1417 (11th Cir. 1984) ............................................................................22

*Grutter v. Bollinger*,
  288 F.3d 732 (6th Cir. 2002) (en banc) ....................................................................13

*Grutter v. Bollinger*,
  539 U.S. 306 (2003) .................................................................................. 18, 21, 23

*Hamdi v. Rumsfeld*,
  542 U.S. 507 (2004) .........................................................................................10

*Hartmann v. Stone*,
  68 F.3d 973 (6th Cir. 1995) .................................................................................10

*Hasbro, Inc. v. Lanard Toys, Ltd.*,
  858 F.2d 70 (2d Cir. 1988) .................................................................................24

*Hirabayashi v. United States*,
  828 F.2d 591 (9th Cir. 1987) .................................................................................9

*Hodnett v. Medalist Partners Opportunity Master Fund II-a, L.P.*,
  2021 WL 535485 (S.D.N.Y. Feb. 12) .......................................................................23

*Itar-Tass Russian News Agency v. Russian Kurier, Inc.*,
  886 F. Supp. 1120 (S.D.N.Y. 1995) ........................................................................23

*Johnson v. California,*
   543 U.S. 499 (2005) ........................................................................7, 8

*Juicy Couture, Inc. v. Bella Int'l Ltd.,*
   930 F. Supp. 2d 489 (S.D.N.Y. 2013) ...............................................24

*Kane v. de Blasio,*
   19 F.4th 152 (2d Cir. 2021) ...............................................................2

*King v. Innovation Books,*
   976 F.2d 824 (2d Cir. 1992) .............................................................24

*Korematsu v. United States,*
   323 U.S. 214 (1944) .........................................................................7, 9

*MacGinnitie v. Hobbs Grp.,*
   420 F.3d 1234 (11th Cir. 2005) ........................................................22

*Marks Org. v. Joles,*
   784 F. Supp. 2d 322 (S.D.N.Y. 2011) .........................................24, 25

*Mastrio v. Sebelius,*
   768 F.3d 116 (2d Cir. 2014) ...............................................................3

*Mastrovincenzo v. N.Y.C.,*
   435 F.3d 78 (2d Cir. 2006) .................................................................3

*Metro. Council, Inc. v. Safir,*
   99 F. Supp. 2d 438 (S.D.N.Y. 2000) ...............................................23

*Millennium Pipeline Co. v. Seggos,*
   288 F. Supp. 3d 530 (N.D.N.Y. 2017) ............................................22

*N.A. Soccer League v. USSF,*
   883 F.3d 32 (2d Cir. 2018) .................................................................4

*N.Y. Prog. & Prot. PAC v. Walsh,*
   733 F.3d 483 (2d Cir. 2013) .............................................................25

*NAACP v. Trump,*
   298 F. Supp. 3d 209 (D.D.C. 2018), *aff'g on merits*, 140 S.Ct. 1891 (2020)..........5

*Nat'l Ass'n for Gun Rts. v. Lamont,*
   2023 WL 4975979 (D. Conn. Aug. 3) ................................................3

*Ne. Fla. Ch. of AGC v. Jacksonville,*
   508 U.S. 656 (1993) .........................................................................4, 6

*New York v. Dep't of Com.,*
   351 F. Supp. 3d 502 (S.D.N.Y.), *aff'g on standing*, 139 S.Ct. 2551 (2019) ..........4

*Pankos Diner Corp. v. Nassau Cnty. Legislature,*
   321 F. Supp. 2d 520 (E.D.N.Y. 2003) ..............................................22

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1,*
   551 U.S. 701 (2007) ..........................................................................16

*PDE v. Olentangy,*
2023 WL 4848509 (S.D. Ohio July 28) ...............................6

*R.A.V. v. St. Paul,*
505 U.S. 377 (1992) ...............................5

*Register.com, Inc. v. Verio, Inc.,*
356 F.3d 393 (2d Cir. 2004).............................22

*Roe v. DOD,*
947 F.3d 207 (4th Cir. 2020) ...............................25

*S.C. Conf. of NAACP v. Alexander,*
2022 WL 453533 (D.S.C. Feb. 14) ...............................6

*Sample v. Diecks,*
885 F.2d 1099 (3d Cir. 1989) ...............................8

*Saunders v. White,*
191 F. Supp. 2d 95 (D.D.C. 2002) ...............................13

*SFFA v. Harvard,*
2023 WL 3126414 (D. Mass. Apr. 27).............................6

*SFFA v. Harvard,*
261 F. Supp. 3d 99 (D. Mass. 2017).............................6

*SFFA v. Harvard,*
600 U.S. 181 (2023) ................... 1, 3, 4, 6, 7, 8, 9, 12, 13, 14, 15, 17, 18, 19, 20, 21

*SFFA v. UNC,*
2018 WL 4688388 (M.D.N.C. Sept. 29) ...............................6

*SFFA v. Univ. of Tex. at Austin (UT),*
37 F.4th 1078 (5th Cir. 2022) ...............................4

*Singh v. Berger,*
56 F.4th 88 (D.C. Cir. 2022) ...............................25

*Speech First, Inc. v. Shrum,*
2023 WL 2905577 (W.D. Okla. Apr. 10) ...............................6

*Steffan v. Perry,*
41 F.3d 677 (D.C. Cir. 1994) (en banc) ...............................7

*Summers v. Earth Island Inst.,*
555 U.S. 488 (2009) ...............................5

*Tom Doherty Assocs., Inc. v. Saban Ent.,*
60 F.3d 27 (2d Cir. 1995).............................23

*Univ. of Tex. v. Camenisch,*
451 U.S. 390 (1981) ...............................2

*Vance v. United States,*
434 F. Supp. 826 (N.D. Tex.), *aff'd,* 565 F.2d 1214 (5th Cir. 1977) ...............................7

*Vitolo v. Guzman,*
    999 F.3d 353 (6th Cir. 2021) ...........................................................................21

*Wygant v. Jackson Bd. of Educ.,*
    476 U.S. 267 (1986) .......................................................................................13

*Y.S. ex rel. Y.F. v. N.Y.C. Dep't of Educ.,*
    2021 WL 1164571 (S.D.N.Y. Mar. 26) ...........................................................25

*Yang v. Kosinski,*
    960 F.3d 119 (2d Cir. 2020)............................................................................22

## Other Authorities

43 Fed. Reg. 19,260 (May 4, 1978)........................................................................19

Bernstein, *The Modern American Law of Race,*
    94 S. Cal. L. Rev. 171 (2021) .........................................................................18

*Confession of Error: The Solicitor General's Mistakes During the Japanese-American Internment Cases*
    (May 20, 2011), perma.cc/6RQM-Y9SN ..........................................................9

Gov't Accountability Off., *Military Service Academies: Actions Needed to Better Assess Organizational
Climate,* GAO-22-105130 (July 2022)..................................................................15

Graham, *The Origins of Official Minority Designation* (2002)..........................................19

MLDC, Issue Paper 36, *Compelling Interests and Diversity Policy* (May 2010)...............14

**INTRODUCTION**

*Harvard* didn't "carve out the military academies" from its rejection of race-based admissions. Opp. (Doc. 47) at 55 n.30. The Supreme Court knows how to clarify that certain policies remain lawful. *E.g.*, *SFFA v. Harvard*, 600 U.S. 181, 230 (2023) ("nothing in this opinion should be construed as prohibiting universities …"). *Harvard* simply "does not address" the academies "in light of" the "potentially distinct interests" that they "may present." *Id.* at 213 n.4. The Court said "distinct" because *Harvard* rejects the educational benefits that the academies previously relied on from *Grutter*. And the Court said "potentially" and "may" because the academies could lack those interests. Or the academies could fail narrow tailoring. *See id.* ("No military academy is a party to these cases"). Or perhaps the Court expected the academies, given the writing on the wall in *Harvard*, to abandon or overhaul their use of race. But nothing in *Harvard* suggests that the academies would get special deference or lower scrutiny. The Court even cited the military as an example of why courts cannot tolerate any deviation from the strictest scrutiny for racial classifications. *See id.* at 207 n.3.

This Court now has evidence about how West Point uses race, and the Supreme Court has tasked it with "address[ing] the propriety of race-based admissions systems in that context." *Id.* at 213 n.4. At this stage, the Court must predict whether West Point will likely carry its burden of proving that its race-based admissions can survive strict scrutiny under *Harvard*. If the answer is no, then the Court must enjoin West Point from illegally discriminating against citizens in every admissions cycle while this case is pending, including the one that will start in earnest on February 1. Such imminent constitutional violations, after all, are clear irreparable harm.

The record now confirms that West Point is violating *Harvard*, badly. West Point concedes that it gives racial boosts to only three races, meaning it treats race as a negative for all others. It concedes that it uses the same racial categories that the Supreme Court rejected as arbitrary. It has no firmer end date for when it will stop using race than Harvard or UNC. Its purported interests cannot

1

be measured by courts—a fundamental problem that cannot be solved through racial balancing, stereotyping, or judicial deference. And even if those interests could be measured, West Point would have to prove that they aren't met when academies abandon racial preferences, like Coast Guard did for years and Merchant Marine still does. But West Point doesn't even *mention* those academies. West Point carries the burden under strict scrutiny. Because it has no prospect of meeting that burden, the equities say it should comply with the constitutional command of racial neutrality until this case ends. This Court should grant a preliminary injunction at the December 21 hearing.

## ARGUMENT

West Point should be barred from considering race while this case is pending. West Point doesn't suggest that the record is inadequate or that this Court needs more information. And SFFA has been careful to focus this motion on its *legal* arguments. Preliminary injunctions are "customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). Courts resolve these motions by making, based on what they know now, a "'prediction about the merits.'" *Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 107 (2d Cir. 2012). That prediction is needed because, if left to its own devices, West Point will racially discriminate every cycle until this case ends, including the upcoming selections that start after January 31. *See Kane v. de Blasio*, 19 F.4th 152, 163 (2d Cir. 2021) ("The purpose of a preliminary injunction is … to preserve the status quo by preventing during the pendency of the suit the occurrence of that irreparable sort of harm." (cleaned up)).

That conclusion follows under any standard. West Point is *considerably* likely to lose under *Harvard*. It has no actual response to many of the restraints that the Supreme Court placed on race-based admissions. It instead relies heavily on the deference that *Harvard* rejects and that courts never give the military when it racially classifies citizens. And because West Point's discrimination violates constitutional rights, SFFA will suffer strong irreparable harm.

But if the standard matters, this Court should apply the normal one. SFFA explained why a preliminary injunction wouldn't give it ultimate relief. PI-Br. (Doc. 31) at 9-10. West Point never argues otherwise. SFFA also explained why a preliminary injunction would be wholly negative. PI-Br.9-10. West Point never argues otherwise. Though West Point says an injunction would "alter the status quo," Opp.12, that argument alone proves nothing. *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985). An injunction is not subject to the higher standard for "mandatory" injunctions unless the nonmoving party is also "being ordered to perform an act." *Id.* at 1025-26. West Point cannot argue that an injunction would require any positive act; its description of how it uses race proves the opposite. West Point "considers" the race of blacks, Hispanics, and Native Americans as a "factor" at three points in its process. Opp.8-10. The normal standard thus applies because SFFA merely asks for an injunction negatively "prohibi[ting]" that consideration. *Mastrovincenzo v. N.Y.C.*, 435 F.3d 78, 90 (2d Cir. 2006). Unlike the plaintiff in *A.H.*, SFFA does not ask for an order affirmatively "mandating [its members'] inclusion" in West Point. *A.H. ex rel. Hester v. French*, 985 F.3d 165, 177 (2d Cir. 2021).

In all events, West Point is wrong about the status quo. The status quo ante is not just a function of how long a policy has been in place. *See Nat'l Ass'n for Gun Rts. v. Lamont*, 2023 WL 4975979, at *6 (D. Conn. Aug. 3) (status quo ante was "the status quo pre-1993," when the challenged gun laws were passed, even though the case was filed 20 years later, after the Supreme Court decided *Bruen*). It's about what preceded the "'pending controversy.'" *Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014). This controversy is about whether West Point can use race after *Harvard*. Before *Harvard*, West Point "relied on *Grutter*." U.S.-*SFFA*-Br. 24, 5. After *Harvard* eviscerated *Grutter*, West Point had a decision to make: Either adopt race-blind admissions (like every civilian university did after *Harvard*), or continue using race based on new interests "distinct" from *Grutter*. *Harvard*, 600 U.S. at 213 n.4. West Point decided, for the upcoming admissions cycle, that it would use race. *Cf.* Opp.58 (noting that West Point constantly "adjust[s] its admissions policies that consider race"). West Point cannot

now "see[k] shelter under a current 'status quo' precipitated by [its] wrongdoing." *N.A. Soccer League v. USSF*, 883 F.3d 32, 37 n.5 (2d Cir. 2018).

## I.     SFFA will likely succeed on the merits.

West Point briefly contests SFFA's standing, even though no court has ever doubted SFFA's standing at any stage. West Point then concedes that its race-based admissions must satisfy strict scrutiny, but it backtracks by asking for the kind of deference that strict scrutiny abhors. And West Point tries to argue, based mostly on that same flawed plea for deference, that its use of race complies with *Harvard*. These arguments have no prospect of success.

### A.     SFFA has standing.

"Every court to have considered" whether SFFA has standing has held that it does. *Harvard*, 600 U.S. at 198-99 (citing *SFFA v. Univ. of Tex. at Austin* (*UT*), 37 F.4th 1078, 1084-86 & n.8 (5th Cir. 2022)). As an association, SFFA has standing if one of its members would, if this suit is germane to its purpose, and if its members needn't participate. *Id.* at 199. The latter two requirements are unchallenged and met. *See id.* The first is met too. By using race, West Point injures applicants by denying them the "'opportunity to compete for admission on an equal basis.'" *UT*, 37 F.4th at 1086. That injury is imminent, concrete, and particularized for SFFA's identified members, who are "'able and ready'" to apply once West Point stops using race. *Id.*; *see* Member A Decl. ¶6; Member C Decl. ¶5. Because a court can order that relief, causation and redressability are satisfied too. *Ne. Fla. Ch. of AGC v. Jacksonville,* 508 U.S. 656, 666 n.5 (1993). It doesn't matter whether the members apply to West Point, or whether they would get in. *Gratz v. Bollinger*, 539 U.S. 244, 262 (2003).

SFFA did not somehow lose standing by referring to its members with pseudonyms. Though the government really likes this argument, courts keep rejecting it—including in high-profile cases that reached the Supreme Court. *E.g.*, *New York v. Dep't of Com.*, 351 F. Supp. 3d 502, 606 n.48 (S.D.N.Y.), *aff'g on standing*, 139 S.Ct. 2551 (2019); *FAIR v. Rumsfeld*, 291 F. Supp. 2d 269, 286-89 (D.N.J. 2003), *aff'g on standing*, 547 U.S. 47, 52 n.2 (2006); *NAACP v. Trump*, 298 F. Supp. 3d 209, 225-26 & n.10

(D.D.C. 2018), *aff'g on merits*, 140 S.Ct. 1891, 1916 (2020). The government's argument "misunderstand[s] *Summers*," a case that didn't involve pseudonyms. *Chamber of Com. v. CFPB*, 2023 WL 5835951, at *6 (E.D. Tex. Sept. 8); *accord Advocs. for Highway & Auto Safety v. FMCSA*, 41 F.4th 586, 594 (D.C. Cir. 2022). The associations in *Summers* lacked standing because they failed to identify a *specific* member who had standing. *Summers v. Earth Island Inst.*, 555 U.S. 488, 497-99 (2009). They pointed to their membership generally and speculated that someone in there probably had standing. *Id.* at 497-98.

SFFA didn't violate the principle from *Summers*. It identified specific members; named them ("Member A," etc.); explained in detail why they currently have standing; and supported their standing with a verified complaint, a declaration from its president, and anonymous member declarations. *See AAER v. Fearless Fund Mgmt.*, 2023 WL 6295121, at *2-3 (N.D. Ga. Sept. 27) (finding standing on the same record); *Chamber*, 2023 WL 5835951, at *6 (similar). The members' "anonymity is no barrier to standing on this record." *Highway Safety*, 41 F.4th at 594. *Summers* didn't say that associations must provide members' "*real* names" or "*legal* names"; those associations didn't identify any individual (let alone use a pseudonym). It would be "contrary to all traditions of our jurisprudence to consider the law on this point conclusively resolved by broad language in cases where the issue was not presented or even envisioned." *R.A.V. v. St. Paul*, 505 U.S. 377, 386 n.5 (1992).

*Summers* could not have silently prohibited pseudonyms because "pseudonyms" are "immaterial to the case or controversy inquiry." *B.R. v. F.C.S.B.*, 17 F.4th 485, 495 (4th Cir. 2021). Providing members' legal names "'adds no essential information'" about standing. *Highway Safety*, 41 F.4th at 594. Here, for example, the government says it needs to unmask Members A and C to determine whether race would "play a role" when West Point considers their applications. Opp.16. But divulging their first and last names *now* would not reveal anything about what admissions track they turn out to be on *later*—after nominations come in, rankings are made, applications are finalized, vacancies are filled, alternates are picked, and the like. Even if it did, this information isn't relevant to standing. If

Members A and C were, say, Hispanic, they'd have a better chance of getting admitted because they could get racial preferences at the beginning, middle, and end of West Point's process. But because they are white, they have no chance at getting those preferences. This "inability to compete on an equal footing" is their "'injury in fact.'" *Jacksonville*, 508 U.S. at 666. Because West Point "makes it more difficult for members of one group to obtain a benefit," members in the outgroup need not allege that race was a "but for" cause of their non-admission. *Id.* They needn't even apply. *Id.* Their injury is "the denial of equal treatment resulting from the imposition of the barrier" itself. *Id.*; *accord Comer v. Cisneros*, 37 F.3d 775, 794 (2d Cir. 1994) ("The injury is … the missed opportunity to compete … on an equal footing"); *Gratz*, 539 U.S. at 261-62 (similar).

The government cites two district courts that have adopted its misreading of *Summers*, Opp.15 (citing *Do No Harm v. Pfizer Inc.*, 646 F. Supp. 3d 490 (S.D.N.Y. 2022); *Speech First, Inc. v. Shrum*, 2023 WL 2905577 (W.D. Okla. Apr. 10)), but this Court shouldn't follow those outliers. Both cases are on appeal. Both make the same mistakes and contradict the same authorities discussed above. And both have been rejected by every court to consider this issue since. *See AAER*, 2023 WL 6295121, at *2-3; *Chamber*, 2023 WL 5835951, at *6; *PDE v. Olentangy,* 2023 WL 4848509, at *6 n.2 (S.D. Ohio July 28).

Both cases also contradict *Harvard*. SFFA had standing against Harvard and UNC "when it filed suit." 600 U.S. at 200; *accord SFFA v. UNC*, 2018 WL 4688388 (M.D.N.C. Sept. 29) (denying 12(b)(1) motion); *SFFA v. Harvard*, 261 F. Supp. 3d 99 (D. Mass. 2017) (same). But when it filed suit, its complaints referred to its members with pseudonyms. *See* Doc. 1 ¶15, No. 1:14-cv-14176 (D. Mass. Nov. 17, 2014) ("Applicant"); Doc. 1 ¶13, No. 1:14-cv-954 (M.D.N.C. Nov. 17, 2014) ("Applicant"). Their real names were never disclosed to the public and weren't disclosed to the defendants until much later in discovery. *SFFA v. Harvard*, 2023 WL 3126414, at *6 n.4 (D. Mass. Apr. 27). No party or court thought their anonymity was relevant to standing. It wasn't. *See S.C. Conf. of NAACP v. Alexander*, 2022 WL 453533, at *3 (D.S.C. Feb. 14) (three-judge district court).

### B.    West Point must satisfy strict scrutiny.

West Point concedes that its race-based admissions "must satisfy 'strict scrutiny,'" Opp.12, but then repeatedly asks this Court for "deference," Opp.13, 21, 28. Those positions are "fundamentally at odds." *Johnson v. California*, 543 U.S. 499, 506 n.1 (2005). West Point can't classify Americans based on their skin color without satisfying the strictest scrutiny.

Because "all" racial classifications must satisfy strict scrutiny, *id.* at 505-06, "[a]ny" governmental exception to race neutrality must pass that "daunting" test, *Harvard*, 600 U.S. at 206. "'[A]ny person … has the right to demand that any governmental actor … justify any racial classification … under the strictest of judicial scrutiny.'" *Gratz*, 539 U.S. at 270. And "all racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed … under strict scrutiny." *Adarand Constructors v. Peña*, 515 U.S. 200, 227 (1995). These any's and all's could not be clearer; the caselaw leaves no room for a bespoke military-academy exception.

Courts do, in fact, require the military to satisfy strict scrutiny when it classifies citizens based on race. Strict scrutiny was "first articulated," after all, in *Korematsu*—a case involving an (infamous) racial classification by the military. *Fisher v. Univ. of Tex. at Austin* (*Fisher I*), 570 U.S. 297, 316 (2013) (Thomas, J., concurring); *see Korematsu v. United States*, 323 U.S. 214, 216 (1944) (stating that courts must subject "all legal restrictions" based on race "to the most rigid scrutiny"). Courts have applied strict scrutiny to the military's racial classifications ever since. *E.g.*, *Vance v. United States*, 434 F. Supp. 826, 833-34 (N.D. Tex.), *aff'd*, 565 F.2d 1214 (5th Cir. 1977); *Christian v. United States*, 46 Fed. Cl. 793, 803-06 (2000). Per the D.C. Circuit, strict scrutiny applies when "the military" makes decisions "based on race." *Steffan v. Perry*, 41 F.3d 677, 689 & n.9 (D.C. Cir. 1994) (en banc); *accord Doe 2 v. Shanahan*, 917 F.3d 694, 703 (D.C. Cir. 2019) (Wilkins, J., concurring) ("[E]ven in the military context, classifications based on race … trigger strict scrutiny." (cleaned up)). And per the Federal Circuit, "a strict

scrutiny analysis is required" whenever the military "treat[s] any person unequally because of his or her race." *Berkley v. United States*, 287 F.3d 1076, 1084, 1090-91 (Fed. Cir. 2002).

When courts apply strict scrutiny to the military's racial classifications, they apply real strict scrutiny—not some watered-down version that gives the government special deference. *Christian* is a good example. There, the court applied the established strict-scrutiny standard to a "race-based af-firmative action policy" issued by the Army. 46 Fed. Cl. at 804-13. In doing so, it cited the same strict-scrutiny cases that the Supreme Court applies outside the military context. *See id.* at 804-13 (relying on *Bakke, Adarand*, and others). And the court applied the traditional strict-scrutiny framework, recog-nizing that the "the burden" is on "the government," that racial classifications "may not have an infinite life span," and that military leadership—like civilians—can consider race only when "most exact connection between justification and classification" exists. *Id.* at 806-11. It then held that "the Army's affirmative action program … does not come close to the exact fit required" by strict scrutiny. *Id.* at 814-15. West Point cites several cases about courts giving deference to the military; tellingly, not a single one involves racial classifications.

This lack of deference comes from the Supreme Court's precedents. Prisons, for example, normally get the same level of deference as the military. *Sample v. Diecks*, 885 F.2d 1099, 1109 (3d Cir. 1989); *Pollock v. Marshall*, 656 F. Supp. 957, 962 (S.D. Ohio 1987), *aff'd*, 845 F.2d 656 (6th Cir. 1988). But when they classify citizens based on race, the Supreme Court applies normal strict scrutiny. *Johnson*, 543 U.S. at 505-06. Giving "deference" to "prison officials" when they use race, the Court explained, would create a "hands-off approach to racial classifications" that "is fundamentally at odds with our equal protection jurisprudence." *Id.* at 506 n.1. "[S]earching judicial review of racial classifications" is all the more "necessary" in contexts where "the government's power is at its apex." *Id.* at 511. Uni-versities, too, usually get "'a degree of deference'" in their "'academic decisions.'" *Harvard*, 600 U.S. at 217. But not when they "us[e] race to benefit some applicants but not others." *Id.* As the Court held

in *Harvard*, courts cannot "defer to universities and 'experts' in determining who should be discriminated against"; both "history" and "law" expose "the folly in that approach." *Id.* at 218 n.5. In *Harvard* itself, the Court outlawed the use of race at all universities, giving no deference to the government's assertion that it was "critically important" for universities to keep using race because far "more officers come from [civilian universities'] ROTC programs" than from the service academies. *Harvard* O.A. Tr. 150:8-17, perma.cc/3JEA-VMQK.

*Korematsu* offers an example and a warning. Though *Korematsu* was right to say that the military's racial classifications must pass strict scrutiny, all agree that the Court didn't faithfully apply that standard. It allowed the military to intern citizens because it deferred to the "judgment" of the "military authorities" that Japanese-Americans were a threat to national security. *Korematsu*, 323 U.S. at 218-19. As it turned out, the military's policy was "'carried out without adequate security reasons.'" *Adarand*, 515 U.S. at 236; *Hirabayashi v. United States*, 828 F.2d 591, 601 (9th Cir. 1987); *Confession of Error: The Solicitor General's Mistakes During the Japanese-American Internment Cases* (May 20, 2011), perma.cc/6RQM-Y9SN. *Korematsu* has since been "overruled," precisely because courts cannot tolerate "'any retreat from the most searching judicial inquiry'" in the race context. *Harvard*, 600 U.S. at 207 n.3 (cleaned up). Of course, rejecting applicants from West Point is not placing Americans in concentration camps. *Cf.* Opp.29 n.15. But it's notable that West Point asks this Court to defer—on matters of race—to the very institutions that authorized that internment and that (in West Point's words) have a long "history of racial tension, and resulting violence, disciplinary issues, and distrust." Opp.22. Such institutions should be "the very *last* ones to be allowed to make race-based decisions, let alone be accorded deference in doing so." *Harvard*, 600 U.S. at 227 n.8.

This Court should not repeat history's mistakes. *Korematsu* deferred to actual military tactics in an active world war, and yet *still* was "'gravely wrong the day it was decided.'" *Id.* at 207 n.3. Deference is even less warranted here, where the military is discriminating against high-schoolers when making

college-admissions decisions in the hopes that some of them will attend, graduate, and become officers many years later. *Cf. Hamdi v. Rumsfeld*, 542 U.S. 507, 535-36 (2004) (military policy violated "individual liberties" and didn't directly involve "the strategy or conduct of war"); *Hartmann v. Stone*, 68 F.3d 973, 985 (6th Cir. 1995) (military policy also injured "people not in the Armed Forces").

But even if this Court gives West Point deference, no amount of "'careful consideration'" of the military's views could change the outcome. Opp.40 n.21. The government *agrees* that the judiciary should have overruled the military's judgment that Japanese internment was vital to national security. Opp.29 n.15. And surely the government agrees that courts should have overruled the same national-security arguments it is making today if they were pressed in defense of segregation. *Cf.* Opp.22-23. Deference, in other words, can never overcome clear violations of equal protection. And West Point's violations of *Harvard* are clear. SFFA should win under any reasonable version of strict scrutiny.

## C. West Point fails strict scrutiny.

Until now, West Point has never detailed how it uses race. Its revelations are bleak. West Point first considers race when offering "letter[s] of assurance." Opp.8-9; McDonald Decl. ¶73. A letter of assurance "is a conditional offer of admission," Opp.8-9, and thus "constitutes a firm commitment from West Point … that the candidate will be admitted" if they apply and get minimally qualified. McDonald Decl. ¶73. When awarding these letters, West Point applies different rules to different races. McDonald Decl. Ex. B. 4. According to its "guidelines," "African-American[s]" can get a letter of assurance whenever their College Entrance Examination Rank is at or above 554. *Id.* (No Whole Candidate Score is required. *Id.*) "Hispanic-American[s]" can get a letter if they have the same rank as African Americans—but only if they also have a Whole Candidate Score of 5,600 or more. *Id.* And white and Asian applicants—who can only get a letter if they are "[s]cholars"—must have a College Entrance Examination Rank of 650 or more and a Whole Candidate Score of 6,801 or more. *Id.*

West Point's use of race continues "throughout" the rest of "admissions." McDonald Decl. ¶94; Opp.9. Each year, West Point's superintendent "nominate[s] up to 50 candidates." McDonald Decl. ¶94; Opp.9. And when he does, he considers race. During the "superintendent nomination" process, West Point relies on two "teams": regional offices, who "identify qualified candidates" based on traits like "leadership," "athleticism," and "scholastic aptitude"; and "the Diversity Outreach Office," which merely asks if a candidate is "an African American, Hispanic, or Native American," and is "otherwise qualified." McDonald Decl. ¶94; Opp.9. Once this two-track process is complete, the Superintendent can select roughly 5% of West Point's incoming class. McDonald Decl. ¶94; Opp.9.

After its traditional admissions process closes, West Point considers race again when selecting "Additional Appointees." McDonald Decl. ¶93; Opp.10. At this stage, West Point follows a two-step process. First, it asks whether a particular race "make[s] up a greater share of West Point cadets" than its proportional share in "the Army officer corps." Opp.10 n.3. If the answer is "yes"—and there are too many "cadets" from that race—then West Point "does not consider race as a plus factor" for that group (as was recently the case "for Asian and Pacific Islander candidates"). *Id.* If the answer is "no"— and there are too few "cadets" from that race—West Point considers race "as a plus" for that group. *Id.* Once it decides which races get "plus[es]" and which don't, *id.*, West Point relies on the same racial metrics it uses when awarding letters of assurance, offering a second bump for "African American, Hispanic, and Native American candidates" who were "qualified" to receive a letter of assurance but didn't get one. McDonald Decl. ¶93(b).

This regime cannot survive strict scrutiny, as articulated in *Harvard*. It pursues no valid, ascertainable interest. And it has all the narrow-tailoring shortcomings from *Harvard*, plus a few more.

### 1. West Point has no compelling governmental interest.

West Point cannot use race to pursue the so-called "educational benefits" of diversity. *Harvard* rejected these benefits as "inescapably imponderable" and "not sufficiently coherent for purposes of

strict scrutiny." 600 U.S. at 214-15. No amount of deference could make them ponderable or coherent. Hence why *Harvard* said the military academies would need to identify "potentially *distinct* interests." *Id.* at 213 n.4 (emphasis added). And West Point must recognize this, as it does not cite the educational benefits of diversity as an interest that could sustain its use of race.

After *Harvard*, the Supreme Court's precedents identify "only two compelling interests that permit resort to race-based government action." *Id.* at 207. The first is "remediating specific, identified instances of past discrimination." *Id.* The second is "avoiding imminent and serious risks to human safety in prisons." *Id.* West Point claims neither: It identifies no discrimination that it's remedying, and it's not a prison. So to rule for West Point, this Court will have to recognize a new interest and announce—for the first time—that it allows the government to explicitly use race. Tall order.

West Point claims that admitting cadets based on race furthers four interests: cohesion, Opp.29-30; recruitment, Opp.34; retention, Opp.36; and legitimacy, Opp.37-38. None can justify explicit racial classifications. They are impossibly vague and unmeasurable, and there's no evidence that racial balancing furthers them. They're also fatally inconsistent.

***Unmeasurable.*** None of West Point's interests are "sufficiently measurable to permit judicial review." *Harvard*, 600 U.S. at 214 (cleaned up). According to West Point, racial preferences "allo[w] service members to see themselves as part of an inclusive, representative force." Opp.30. And *that*, West Point says, "engenders a shared commitment, greater cohesion, trust, and confidence," which, in turn "enhances military effectiveness through increased job satisfaction and performance." Opp.30.

The problem is: "It is unclear how courts are supposed to measure any of these goals," or "know when they have been reached" so that racial preferences can end. *Harvard*, 600 U.S. at 214. West Point never offers any metric that courts could use to determine whether a sufficient percentage of soldiers "'see themselves as part of an inclusive, representative force,'" Opp.30; Vazirani Decl. ¶15,

or whether units have attained the necessary cohesion levels for "problem-solving" and team "innovation," Opp.30, 33; Stitt Decl. ¶19; *see also Harvard*, 600 U.S. at 214-15 ("There is no particular point at which there exists sufficient 'innovation and problem-solving…'"). West Point's interest in the cohesive benefits of diversity is as standardless as Harvard's interest in the educational benefits.

West Point's remaining interests—recruiting, retention, and public legitimacy—are even more elusory and amorphous. How can courts tell if West Point's racial preferences are causing it to recruit or retain "the top talent in the country"? Opp.34, 36. West Point doesn't say. It simply declares that "a diverse and inclusive organization that is representative of the society it serves will allow us to attract men and women, which inherently strengthens the force." Opp.35. Of course, West Point would be diverse without racial preferences; it just might not be the particular mix that West Point has now. In any event, the Supreme Court has already held that recruitment and retention are not compelling interests that could justify government classifications based on race. *See Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 273-75 (1986). The "question [of] whether a particular mix of minority [cadets] produces" public and international legitimacy is not reliably knowable either. *Harvard*, 600 U.S. at 215; *see also Saunders v. White*, 191 F. Supp. 2d 95, 129 (D.D.C. 2002) ("The Army's desire to create the perception of equal treatment is not an important enough governmental interest to justify [its] racial classifications" in promotion procedures.). Nor could a discriminator survive strict scrutiny by surveying the beneficiaries of its discrimination and asking them if they approve. *Grutter v. Bollinger*, 288 F.3d 732, 804-05 (6th Cir. 2002) (en banc) (Boggs, J., dissenting).

In response, West Point says its interests are "far more analogous" to those in *Johnson*, Opp.55, a case that didn't involve admissions, affirmative action, or the military. In *Johnson*, a prison sought to avoid a violent race riot—an event that posed "imminent and serious risks to human safety" and could be averted only through "racial segregation." *Harvard*, 600 U.S. at 208, 215. Recounting that case in *Harvard*, the Supreme Court observed that the prison's interests were compelling only because the

means for achieving them were "temporary" and "measurable": either the government "prevent[ed] harm to those in the prison," or it didn't. *Id.* at 214-15. Try as it might, West Point's metrics—"confidence," "cohesion," and "legitimacy," Opp.42-44—are intangible, abstract, and not reliably measured.

Even if these outcomes could be measured, a court would have to assess whether West Point's use of race was "'necessary'" to achieve them. *Harvard*, 600 U.S. at 207. It would need to assess whether racial preferences are *why* these outcomes are being achieved, and whether the outcomes would *no longer* be achieved if racial preferences ended and were replaced with race-neutral alternatives. *Id.* at 215. That task is impossible for courts. It's apparently impossible for West Point too, as it doesn't identify any method that even tries to answer these causal (or reverse causal) questions.

***Unsupported.*** West Point makes the puzzling claim that its goals are "concrete" and "measurable" because courts can "careful[ly] conside[r]" the views of senior military leadership (and presumably defer to them). Opp.40 n.21. That's not the law, *supra* I.B, and even the MLDC knows it. "This is not an area where traditional judicial deference to the military applies. Proof is needed." MLDC, Issue Paper 36, *Compelling Interests and Diversity Policy* 3 (May 2010). And "is far from evident" that cohesiveness and West Point's other asserted interests depend on a "racially diverse" (*translation*: racially balanced) military. *Harvard*, 600 U.S. at 215. To be sure, West Point purports to have such evidence. *E.g.*, Opp.25 n.2 ("a range of … studies"); *id.* at 32 ("numerous internal and external empirical studies"); *id.* at 34 ("numerous studies"); *id.* at 42 ("amply supported" by "qualitative and quantitative studies"). In reality, it simply repeats conclusory assertions it recently made elsewhere and gestures towards studies that have nothing to do with the U.S. military. *See* Spoehr Decl. ¶¶37-39, 42, 44-46, 48-50, 57, 59-60.

The sources that West Point cites are flawed, irrelevant, or misinterpreted. For example, West Point relies on information from the DoD's climate surveys and invites this Court to do the same. *See*

Opp.42 (quoting Stitt Decl. ¶15). But the GAO has determined that "the DOD climate survey … does not provide complete and reliable information" due to "methodological issues concerning security, response rates, and post-survey weighting that limit its usability." Gov't Accountability Off., *Military Service Academies: Actions Needed to Better Assess Organizational Climate*, GAO-22-105130, at 1 (July 2022); *see also* Spoehr Decl. ¶67. And West Point's declarants offer up the same sort of general studies about the alleged benefits of diverse workforces that were before the Court in *Harvard* too, without avail. *E.g.*, 600 U.S. at 406 n.101 (Jackson, J., dissenting).

West Point's primary source, "which inform[s] DoD work on diversity and inclusion today," is even less reliable. Haynie Decl. ¶11 (discussing Lyall study); *see* Spoehr Decl. ¶¶43-55. From start to finish, West Point relies on Professor Lyall to suggest "how diversity and equality affect battlefield performance." Opp.33. But the key studies that Professor Lyall cites for the inherent benefits of diversity do not involve the military at all. *See* Lyall Decl. ¶31; Spoehr Decl. ¶¶43, 44, 45, 46, 50, 56, 59. And historical lessons from the Mongol armies and the ancient Greek phalanxes, or the mistreatment of conscripted soldiers in the Mahdist Army in Sudan in 1898, say nothing about whether West Point's racial preferences are necessary to make the U.S. military effective or efficient. *See* Lyall Decl. ¶¶17-18, 39; *cf.* Spoehr Decl. ¶¶38, 40, 41, 43, 47-50.

Most crucially, none of these sources even attempt to quantify the difference between the racial diversity that West Point gets with racial preferences and the racial diversity that West Point would get without racial preferences. *See Harvard*, 600 U.S. at 215 ("[T]he question in this context is not one of *no* diversity or of *some*: it is a question of degree."). West Point never even tells the Court what its racial numbers would *be* if it stopped using race (let alone if it also increased its use of race-neutral alternatives). For example, West Point's black enrollment was 10% last year, but it was as low as 6.9% as recently as 2013—yet West Point never suggests that anything noticeable or negative happened. McDonald Decl. ¶88. And though West Point says race relations are good now, Opp.29-32, it

consistently *fails* to meet its goal of having the race of officers mirror the race of soldiers, Opp.50, 58. Nor has it investigated whether its use of racial preferences undermines its own goals by increasing stigma and self-doubt. *See* Spoehr Decl. ¶¶34-35; *Adarand*, 515 U.S. at 229. And despite its repeated insistence that the officer corps must "represent the face of America" and "reflec[t] the public it serves," Opp.27, West Point makes no discernible effort to measure any form of diversity besides race.

*Inconsistent.* West Point says racial classifications are "vital to national security," "essential to the Army," and "critical for overall mission success." Opp.26-30. But it's hard to imagine how those classifications are "essential to the Army," Opp.29—a 1.4-million person fighting force—when they affect, at most, only a few hundred Army officers every year. West Point annually commissions "approximately 1,000 cadets," McDonald Decl. Ex. A 22, yet claims to consider race "only a small fraction" of the time, Opp.49. So even on West Point's telling, its use of race cannot possibly be "essential." Opp.29. If anything, it's a drop in the bucket: West Point commissions only 20% of "active-duty officers," McDonald Decl. ¶9, so unless West Point chose to admit only Blacks and Hispanics, the racial composition of the ranks will hardly change. And West Point uses race for Native Americans even though it doesn't even *have* a goal for how many should be admitted. Opp.10 n.4. Strict scrutiny does not allow West Point to use race—the most odious classification known to law—for benefits that are "minimal" at best. *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 733-35 (2007).

At bottom, West Point's purported interests in cohesiveness, recruiting, retention, and legitimacy boil down to racial balancing. West Point wants to admit cadets in proportion to their representation in the enlisted ranks, and it adjusts its preferences constantly based on that goal. *See* McDonald Decl. ¶96. "Racial balancing is not transformed from 'patently unconstitutional' to a compelling state interest simply by relabeling it 'racial diversity.'" *Parents Involved*, 551 U.S. at 732.

## 2.    West Point's use of race is not narrowly tailored.

West Point, as it now admits, violates many of *Harvard*'s rules about narrow tailoring. West Point thinks that's okay because *Harvard* "did not overrule *Grutter*, *Fisher*, or *Bakke*" on "the narrow-tailoring inquiry." Opp.45 n.26. That's true in one direction: If West Point is violating those decisions, then its use of race can't be lawful, as it would fail even the regime that came before *Harvard*. But it's not true in the other direction. *Harvard* clarified, strengthened, and added to what narrow tailoring means in this context. Consider the aftermath. "Many universities" kept using race after *Fisher II*, the last of the prior line of cases. *Harvard*, 600 U.S. at 231. After *Harvard*, no civilian university has said it will continue using race. West Point should have followed suit.

***Race as a Negative.*** West Point says it doesn't use race as a "negative," Opp.53-55, but it admits that "it considers race and ethnicity as a plus" for some races. Opp.55 n.30. In the "zero-sum" world of competitive admissions, "[a] benefit provided to some applicants but not to others necessarily advantages the former group at the expense of the latter." *Harvard*, 600 U.S. at 218-19. So by offering "a plus" to some races—as West Point admits it does, *e.g.*, Opp.8, 10, 46, 48, 55 n.30—West Point awards a minus to all others. That violates *Harvard*, which holds repeatedly that "race may never be used as a 'negative'" and that universities can't "employ race in a negative manner," "use race as a … negative," or turn "an individual's race … against him." 600 U.S. at 212, 218, 230. Nothing in *Harvard* limits this rule to negative uses of race that "*unduly* har[m] nonminority applicants." Opp.53 (emphasis added). And West Point, despite having the burden under strict scrutiny, doesn't disprove undue harm either, or even quantify for the Court the weight that race gets in its admissions process.

West Point seems to recognize that it can't overcome this rule from *Harvard*, which is why it suggests that the Court couldn't have meant for this rule to apply to military academies. Opp.55 n.30. But the Court surmised only that the military academies might have "potentially distinct interests." 600 U.S. at 213 n.4. It didn't suggest that, if those interests existed and were compelling, then the

academies would get a pass on narrow tailoring. The Court simply noted that "[n]o military academy is a party to these cases," and so it didn't know how the military academies used race before or after *Harvard. Id.* This Court now knows: West Point uses race the same way that *Harvard* called illegally "negative." Worse than Harvard and UNC, when West Point awards coveted LOAs, it has race-based quotas for blacks and Hispanics and requires other races to get higher scores. McDonald Decl. Ex. B(6)(b)-(d). Not even *Grutter* allows that "mechanical" use of race. *Grutter v. Bollinger*, 539 U.S. 306, 337 (2003).

**Incoherent Categories.** West Point admits that it relies on six racial categories: "Asian," "Native Hawaiian or Other Pacific Islander," "Hispanic," "White," "African American," and "American Indian or Alaska Native." McDonald Decl. ¶¶112-13; Opp.53. Harvard and UNC used the same categories. *Harvard*, 600 U.S. at 291 (Gorsuch, J., concurring). They come from the federal government. *Id.* But as *Harvard* explains, these racial categories are too "imprecise" to satisfy strict scrutiny. *Id.* at 215-16 (citing Justice Gorsuch's concurrence). "Asian," for example, sweeps in "60% of the world's population," lumping together Indians, Japanese, Pakistanis, and Koreans. *Id.* at 291-92 (Gorsuch, J., concurring). The "white" category covers Europe, West Asia, and North Africa, including peoples as diverse as Italians, Iranians, Norwegians, Moroccans, the Turkish, and the Welsh. *Id.* at 292. And "Pacific Islander" doesn't include all Pacific Islanders; "Filipino Americans remain classified as 'Asian.'" *Id.* The remaining categories are equally incoherent. *See generally* Bernstein, *The Modern American Law of Race*, 94 S. Cal. L. Rev. 171 (2021). Hence why *Harvard* found them "overbroad," "under-inclusive," "incoherent," and "irrational." 600 U.S. at 216-17. People within these categories don't even reliably "look like" each other, *see id.* at 292 (Gorsuch J., concurring); Bernstein 182 n.43, putting the lie to the government's repeated use of that phrase, *e.g.*, Opp.27, 35, 37.

West Point's racial categories weren't designed to achieve its interests. "[N]one of the career civil servants and appointed officials who shaped the [categories] had any awareness" that those categories would be used to "grant preference[s] in jobs, government contracts, and university admissions." Graham, *The Origins of Official Minority Designation* 289 (2002). And when the Government issued them, it stressed that "[t]hese classifications should not … be viewed as determinants for eligibility for participation in any Federal [affirmative-action] program." 43 Fed. Reg. 19,260, 19,269 (May 4, 1978). West Point comes nowhere close to proving that, say, a Puerto Rican soldier from Brooklyn is less likely to follow a black officer from Brooklyn than a white Hispanic who grew up in Spain. West Point's "use of these opaque racial categories undermines … [its] goals." *Harvard*, 600 U.S. at 217.

***Racial Stereotyping.*** West Point's purported interests in cohesion relies on "impermissible racial stereotypes." *Id.* at 220. West Point claims that its racial preferences will "foster trust and confidence 'between the enlisted corps and its members.'" Opp.27-28, 31. Minority servicemen, it says, are more likely to trust leaders with "demographic similarities." Opp.31. West Point thus assumes that minority servicemen will be less "inspire[d]," "confiden[t]," and "[t]rust[ing]" whenever a different race is at the helm. Opp.31. So minority servicemen are presumptively prejudiced: They trust certain races more than others simply because of their skin color. These unfounded assumptions are textbook stereotyping. *Harvard*, 600 U.S. at 219-20.

The same stereotypes underlie the remaining interests. West Point says that minority civilians will think the military is "illegitimate" if it doesn't look like them, Opp.37; that minority recruits "will be discouraged from serving" if their leaders don't look like them, Opp.34-35; and that minority soldiers will better "navigate diverse people … overseas" because they *do* look like them, Opp.38 (cleaned up). All are stereotypes. The first two assume that minorities are so race-obsessed that they'll refuse to support the troops or defend their country whenever West Point's campus isn't black enough, or is too Asian. And the last one assumes that minorities can better interact with "diverse" overseas

populations—not because of their unique traits or talents, but because their skin color more closely resembles that of the "diverse local populations." Opp.38. This type of race essentialism, arguing that a black lieutenant from San Diego can better relate to an Afghan shepherd than his white counterpart from Houston, isn't the stuff of strict scrutiny.

**No End Date.** "All race-conscious admissions programs must have a termination point," *Harvard*, 600 U.S. at 212 (cleaned up), but West Point's doesn't. Because West Point balances every class to "reflec[t] the diversity" of "the nation," Opp.43, it promises to use race in perpetuity. The nation's racial composition will always change, so West Point's racial balancing will always need to adjust. Harvard and UNC had the same problem. 600 U.S. at 221. Like West Point, those universities said that they would stop considering race when the composition of their classes mirrored "the general population." *Id.* at 221-23. But, as *Harvard* observed, that was no real stopping point. "By promising to terminate their use of race only when some rough percentage of various racial groups is admitted," these "admissions programs effectively assure that race will always be relevant." *Id.* at 223 (cleaned up). Promises of "periodic review" do not solve the problem. *Id.* at 225; *cf.* Opp.58-59.

West Point says *Harvard*'s end-date rule doesn't apply to it, Opp.59, but *Harvard* said that "*all* race-conscious admissions programs … must have a logical end point." 600 U.S. at 212 (emphasis added). And race-based admissions is what West Point is doing, not quelling prison race riots. *Cf.* Opp.59 (relying on *Johnson*). Even when the government is quelling prison riots, though, its use of race must be "temporary." *Harvard*, 600 U.S. at 215. The point is not that, over time, the *interest* will stop being compelling, but that the *explicit use of race to achieve* that interest will prove to be an unwarranted failure. *See id.* at 212-13. Racial preferences failed at civilian universities; they're failing West Point too.

**Race-Neutral Alternatives.** West Point, notably, does not say a word about the Coast Guard or Merchant Marine Academies. Merchant Marine "does not consider race" in its "general admissions process," U.S.-*SFFA*-Br.17 n.3, and before 2010, Coast Guard didn't either, PI-Br.18. Both academies

offer real-world, military-specific examples of race-neutral alternatives. Yet the government never even suggests, let alone proves with evidence, that these academies didn't achieve "diversity," or (more importantly) didn't achieve the military interests that diversity is supposed to unlock. The government has "the burden" on this question. *Fisher I*, 570 U.S. at 312.

Though West Point does say that it's "considered" layering "race-neutral alternatives" on top of its race-based admissions, Opp.56, narrow tailoring requires more. West Point had "the ultimate burden of demonstrating, *before* turning to racial classifications, that available, workable race-neutral alternatives do not suffice." *Fisher I*, 570 U.S. at 312 (emphasis added). In other words, West Point must at least study what the world would look like if it *abandoned* the use of race. No such "serious, good faith consideration" appears anywhere in the record. *Grutter*, 539 U.S. at 339. That failure is fatal, especially given the real-world examples that West Point had to draw on, like Merchant Marine and Coast Guard. *Cf. Harvard*, 600 U.S. at 229 n.9 ("Three out of every five American universities do not consider race in their admissions decisions," and "several States … have prohibited [it] outright.").

## II. SFFA satisfies the remaining factors.

"In constitutional cases, the first factor"—likely success on the merits—"is typically dispositive." *Vitolo v. Guzman*, 999 F.3d 353, 360 (6th Cir. 2021). It's dispositive here. West Point's racial discrimination "irreparabl[y] injure[s]" SFFA's members, and "maintaining [that] unconstitutional policy" is not in the "public interest." *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 637 (2d Cir. 2020).

### A. Irreparable harm

West Point spends only a footnote responding to SFFA's main source of irreparable harm: the imminent denial of its members' constitutional rights. West Point's violation of equal protection creates more than a "presumption" of irreparable harm. Opp.17 n.7. "In the Second Circuit, it is well settled that an alleged constitutional violation *constitutes* irreparable harm." *Arias v. Decker*, 459 F. Supp. 3d 561, 571 (S.D.N.Y. 2020) (emphasis added). There isn't "any justification" for carving out "an equal

protection violation" from this rule, *Brewer v. W. Irondequoit Cent. Sch. Dist.*, 212 F.3d 738, 744 (2d Cir. 2000), especially given "the subtle, pervasive, and essentially irremediable nature of racial discrimination," *Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417, 1424 (11th Cir. 1984). An "ongoing violation of … Equal Protection" is thus "a clear showing of irreparable harm." *Barrett v. Maciol*, 2022 WL 130878, at *5 (N.D.N.Y. Jan. 14); *accord Able v. United States*, 847 F. Supp. 1038, 1043 (E.D.N.Y. 1994) (same under the Fifth Amendment against the military).

West Point's objections to SFFA's other irreparable harm—its members' inability to compete for the upcoming admissions cycle—miss the mark. A lost opportunity to compete on a racially equal footing is an injury, West Point says, just not an *irreparable* injury. Opp.19. Courts disagree. Lost opportunity, including "the loss of an opportunity to attend a particular school," is "irreparable." *Foulke ex rel. Foulke v. Foulke*, 896 F. Supp. 158, 161 (S.D.N.Y. 1995). It remains irreparable even if the movant has the opportunity to compete again next time. *E.g.*, *D.M. ex rel. Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 1003 (8th Cir. 2019) (inability to try out for the high-school dance as a junior); *Yang v. Kosinski*, 960 F.3d 119, 128 (2d Cir. 2020) (inability to compete in the upcoming primary). "These sorts of injuries, *i.e.*, deprivations of temporally isolated opportunities, are exactly what preliminary injunctions are intended to relieve." *D.M.*, 917 F.3d at 1003. Irreparable, after all, just means money damages are either "unavailable," *Millennium Pipeline Co. v. Seggos*, 288 F. Supp. 3d 530, 542 (N.D.N.Y. 2017), or are "difficult to establish and measure," *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004). "[L]ost opportunities" are "difficult, if not impossible, to quantify." *MacGinnitie v. Hobbs Grp.*, 420 F.3d 1234, 1242 (11th Cir. 2005). And damages are entirely unavailable because these federal defendants "enjo[y] [sovereign] immunity that prevents any later monetary judgment." *Pankos Diner Corp. v. Nassau Cnty. Legislature*, 321 F. Supp. 2d 520, 524 (E.D.N.Y. 2003).

West Point cannot sidestep these harms by claiming "delay." Though a "[s]ignificant delay in applying for injunctive relief" can disprove irreparable harm in intellectual-property cases, it can't here.

*Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985); *see Tom Doherty Assocs., Inc. v. Saban Ent.*, 60 F.3d 27, 39 (2d Cir. 1995) ("Most of the caselaw on this issue involves trademark and copyright disputes."). Significant delay "in a trademark case tends to neutralize any presumption that infringement alone will cause irreparable harm." *Citibank*, 756 F.2d at 276. But SFFA relies on no such presumption, and delay couldn't possibly undercut the irreparable nature of its injuries. Because SFFA "alleges future, though imminent, deprivation of its constitutional rights," any "delay in seeking the injunction does not undermine [its] contention that such a deprivation would be irreparable." *Metro. Council, Inc. v. Safir*, 99 F. Supp. 2d 438, 441 (S.D.N.Y. 2000). Delay would not make "an equal protection violation" any less "difficult to compensate monetarily." *Brewer*, 212 F.3d at 744. And it would not make West Point any less likely to violate the Constitution or to close the application window in early 2024, well before this case could be tried. As West Point's cases concede, courts are not concerned with "delays where 'the harm largely is prospective and will arise from a discrete future event.'" *Hodnett v. Medalist Partners Opportunity Master Fund II-a, L.P.*, 2021 WL 535485, at *6 (S.D.N.Y. Feb. 12). And courts don't "'addres[s]'" delay at all under "'the irreparable harm prong of the preliminary injunction standard'" in cases alleging "a prospective constitutional violation." *Five Borough Bicycle Club v. N.Y.C.*, 483 F. Supp. 2d 351, 361 (S.D.N.Y. 2007).

There was no "significant delay" here anyway. SFFA sought a preliminary injunction on the same day it sued, and it sued three months after the Supreme Court decided *Harvard*. It wasn't acting based on "strateg[y]." Opp.20 n.10. It *couldn't* sue before *Harvard* because its claim—that the Constitution forbids West Point from using race—was foreclosed by *Grutter*, which let the "'service academies'" use race to pursue educational benefits. 539 U.S. at 331. Once *Harvard* eliminated that justification, the clock started, *see Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 886 F. Supp. 1120, 1124 n.4 (S.D.N.Y. 1995), and the law doesn't fault SFFA for taking a "reasonable" time to "investigate" its claims, *Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp.*, 25 F.3d 119, 124 (2d Cir. 1994).

SFFA's investigation was more than reasonable. *E.g.*, *id.* at 125 (six months); *Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 79 (2d Cir. 1988) (seven months); *King v. Innovation Books*, 976 F.2d 824, 831 (2d Cir. 1992) (eight months). It wasn't even clear what West Point would do after *Harvard*, including whether and how it would use race, until it told the press in August that it will "use race as a factor" (and noted that the government was still reviewing *Harvard* and drafting guidance). Verif. Compl. (Doc. 1) ¶75. SFFA then had to piece together "the facts" about how West Point uses race, research the "law" on the military and race, and determine whether it had members who were harmed by that policy and vet those members. *Marks Org. v. Joles*, 784 F. Supp. 2d 322, 333 (S.D.N.Y. 2011); *accord Juicy Couture, Inc. v. Bella Int'l Ltd.*, 930 F. Supp. 2d 489, 504 (S.D.N.Y. 2013). True, a questionnaire opened to applicants in early 2023. McDonald Decl. ¶20. But SFFA sued several months before February 2024—when congressional nominations must be made, applications must be finished, and West Point admits the vast majority of the class. McDonald Decl. ¶¶20, 25, 29, 69 & Ex. B(4).

West Point's "delay" argument also cuts both ways. SFFA was responsible, at most, for the three months between *Harvard* and this lawsuit. But West Point is the one who took lengthy extensions—getting over two months to respond to this motion—that pushed this Court's decision far closer to the close of applications on January 31. *Cf. King*, 976 F.2d at 831 (stressing that "a great deal of [the] alleged delay was attributable to" the nonmovant). If delay undercuts claims of harm, then it should undercut West Point's claim that a preliminary injunction would meaningfully disrupt its upcoming cycle. According to West Point, moreover, SFFA should have sought a preliminary injunction for the 2024 cycle "in January 2023." Opp.20 n.10. But West Point doesn't mean it. If SFFA had done that, then West Point would have argued that SFFA's claims weren't "ripe." Opp.18 n.8. And January 2024 is almost here. So if this Court agrees with West Point about delay, then it should at least enter a preliminary injunction that bars West Point from using race in every cycle after this next one. Better yet, it should reject West Point's position for what it is: a cynical argument that means that, at any

time, a preliminary-injunction motion would always be too early or too late. This Court should "declin[e] to take the position that delay alone" could "requir[e] denial of a preliminary injunction motion" here, especially since the other factors so heavily favor SFFA. *Marks*, 784 F. Supp. 2d at 333.

## B. Balance of harms and public interest

The equities are "*always* 'best served' by ensuring [that] constitutional and civil rights are upheld." *Y.S. ex rel. Y.F. v. N.Y.C. Dep't of Educ.*, 2021 WL 1164571, at *5 (S.D.N.Y. Mar. 26) (emphasis added). The Government never "ha[s] an interest in the enforcement of an unconstitutional [policy]." *N.Y. Prog. & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013). And "[t]here is a strong public interest in preventing continued constitutional violations." *Dzhabrailov v. Decker*, 2020 WL 2731966, at *9 (S.D.N.Y. May 26) (Halpern, J.).

Contra West Point, those principles equally apply to the military. "Enforcement of an unconstitutional law is always contrary to the public interest," even "in the military" context. *Singh v. Berger*, 56 F.4th 88, 108 (D.C. Cir. 2022) (cleaned up). And the public "undoubtedly has an interest in seeing its governmental institutions follow the law," even when a case "involves complex, subtle, and professional decisions as to the composition [of the] military." *Roe v. DOD*, 947 F.3d 207, 219, 230-31 (4th Cir. 2020) (cleaned up). West Point's "national security" arguments beg the question of the merits, Opp.59-60, a question that the government is highly likely to lose. And any harm from having to change policies was invited by West Point when it decided to use race after *Harvard* and outweighed by applicants' interest in not suffering unconstitutional discrimination. *Coal. to Defend Affirmative Action v. Granholm*, 473 F.3d 237, 252 (6th Cir. 2006). This Court could also make clear that West Point need not revoke whatever small number of "LOAs or offers of appointment" it sent out before the preliminary injunction, Opp.60, so long as West Point doesn't consider race when making general admissions decisions starting February 1, *see* McDonald Decl. ¶69.

## CONCLUSION

This Court should grant SFFA's motion at the December 21 hearing.

Dated: December 5, 2023

Respectfully submitted,

/s/ *Thomas R. McCarthy*

Adam K. Mortara**
(TN Bar No. 40089)
LAWFAIR LLC
40 Burton Hills Blvd., Ste. 200
Nashville, TN 37215
(773) 750-7154
mortara@lawfairllc.com

Thomas R. McCarthy*
Patrick Strawbridge*
J. Michael Connolly*
Bryan K. Weir*
Cameron T. Norris*
James F. Hasson**
R. Gabriel Anderson**
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
patrick@consovoymccarthy.com
mike@consovoymccarthy.com
bryan@consovoymccarthy.com
cam@consovoymccarthy.com
james@consovoymccarthy.com
gabe@consovoymccarthy.com

*pro hac vice
**pro hac vice forthcoming

*Counsel for Students for Fair Admissions*

**CERTIFICATE OF SERVICE**

I certify that on December 5, 2023, I e-filed the foregoing via ECF, which will automatically email all counsel of record.

*/s/ Thomas R. McCarthy*