UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
WHITE PLAINS DIVISION

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, <br> *Plaintiff*, <br><br> v. <br><br> THE UNITED STATES MILITARY ACADEMY AT WEST POINT; THE UNITED STATES DEPARTMENT OF DEFENSE; LLOYD AUSTIN, in his official capacity as Secretary of Defense; CHRISTINE WORMUTH, in her official capacity as Secretary of the Army; LIEUTENANT GENERAL STEVEN GILLAND, in his official capacity as Superintendent of the United States Military Academy; and LIEUTENANT COLONEL RANCE LEE, in his official capacity as Director of Admissions for the United States Military Academy at West Point, <br> *Defendants*. | No. 7:23-cv-8262-PMH |

**REBUTTAL DECLARATION OF**
**LIEUTENANT GENERAL (RET.) THOMAS W. SPOEHR**

I, Thomas W. Spoehr, pursuant to 28 U.S.C. §1746, declare the following:

1.      I am a retired three-star general who served in the United States Army from 1980 to 2016.

2.      I am aware of the allegations made by the Plaintiff in this lawsuit and the papers submitted by the Defendants in opposition. I submit this rebuttal declaration at the request of counsel for Plaintiff Students for Fair Admissions, Inc., who retained my services on November 26, 2023. I have closely reviewed the Defendants' opposition brief and all the declarations and related exhibits submitted in support thereof, and I disagree with all their key conclusions supporting racial preferences in selecting candidates for West Point.

3.      The statements in this declaration are based on my personal knowledge, military judgment, experience, and the knowledge and information I obtained during my Army career and my

past seven years as a defense policy expert. In reaching these opinions I have reviewed and relied upon the documents referenced herein, as well as the papers both parties have submitted in this action.

4.    I am being paid $400 per hour for my work in this case. My compensation is not contingent upon reaching any opinion or achieving any outcome in this case; the opinions expressed herein are my own.

### I.    Army Background and Experience

5.    During my thirty-six years in the Army, I held command positions at nearly every level: from leading a military intelligence company during the invasion of Grenada to serving as a Deputy Commander of U.S. Forces, Iraq.

6.    I have extensive experience commanding in the Army's Training and Doctrine Command, leading units engaged in initial officer training, intermediate officer training, and basic training and advanced individual training courses for newly enlisted soldiers. While I was the Commander of 3rd Chemical Brigade at Fort Leonard Wood, we trained thousands of soldiers per year in these programs. During this time, I witnessed first-hand the magic of when a young volunteer is transformed into a confident young soldier by committed drill sergeants and trainers.

7.    I commissioned as an active-duty Army officer through the Reserve Officers Training Corps (ROTC) when I graduated from the College of William and Mary, in Williamsburg, Virginia, in May 1980. I commissioned as a Chemical Corps officer, which entails training and protecting Army and joint forces from the dangers of nuclear, chemical, biological, and radiological hazards and weapons. When I was promoted to Lieutenant General in 2013, I was the first Chemical Corps officer in the history of the Army to attain that rank.

8.    I spent my early Army career in a variety of units including military intelligence, armored units, logistics, and Chemical Corps units. My first assignment was to the 203rd Military Intelligence Battalion, Aberdeen Proving Ground, Maryland. Three years after arriving at the battalion,

I assumed command of a military intelligence company composed of dozens of different military occupational specialties, and men and women of different races and ethnicities. Shortly after I took command, my soldiers and I deployed to the island of Grenada as part of Operation Urgent Fury. We supported the 18th Airborne Corps by surveying and collecting captured enemy equipment. It was in this assignment that I began to learn how to form close-knit teams based on a common purpose, challenging training, and leading by example. Later I was assigned to the 1st Armored Division Support Command, Nuremburg, Germany, near the East German border where the constant threat was a cross-border Soviet invasion which required a high state of military readiness. My follow-on assignments included service on the staff of the Joint Chiefs of Staff at the Pentagon, and a posting at Fort Liberty (formerly Fort Bragg).

9.      While at Fort Liberty, I served in the 82nd Airborne Division as the Assistant Division Chemical Officer, G-3 (Training), and at the U.S. Army Special Operations Command as the command's Chemical Officer. While in the Special Operations Command and through my visits to subordinate Special Forces and Special Operations Aviation units, I was able to witness the extraordinary competence and cohesion that existed in those units.

10.     After my time with the 82nd Airborne and Special Operations Command, my assignments included a tour with the U.S. Space Command at Peterson Air Force Base, Colorado; commanding the 84th Chemical Battalion at Fort McClellan, Alabama; commanding the 3rd Chemical Brigade at Fort Leonard Wood, Missouri; and serving as the Commandant of the U.S. Army Chemical, Biological, Radiological, and Nuclear School at Fort Leonard Wood, Missouri.

11.     In 2011, I was deployed to Iraq as the Deputy Commander of U.S. Forces Iraq (Support), with responsibility for logistics, sustainment, and the withdrawal of U.S. forces during Operation New Dawn. While in Iraq, I oversaw 10,000 soldiers engaged in logistics and sustainment in combat operations. In that capacity, I worked directly for General Lloyd Austin, now Secretary of

Defense. My job was to support Gen. Austin's overall vision and mission, lead the men and women entrusted to me, ensure they had what they needed to succeed, and bring them home safely to their families. The command had a challenging mission, and it was only through the concerted effort of everyone on the U.S. Forces Iraq team—without regard to their race, gender or ethnicity—that we were able to succeed.

12.      After Iraq, I was the Director of Program Analysis and Evaluation for the Department of the Army Staff at the Pentagon. My final Army assignment was as the Director of the Office of Business Transformation, Secretary of the Army, Pentagon.

13.      In addition to my Bachelor of Science degree in Biology from the College of William and Mary, I hold a master's degree in strategic studies from the U.S. Army War College and a master's degree in public administration from Webster University.

14.      Among other decorations, I have been awarded the Distinguished Service Medal (with one oak leaf cluster), the Defense Superior Service Medal, the Legion of Merit (with two oak leaf clusters), the Iraq Campaign Medal, the Armed Forces Expeditionary Medal, and the Global War on Terrorism Medal. I have also been awarded the parachutist badge.

**II.      Post-Army Career**

15.      Following my retirement from the Army in 2016, I joined the Heritage Foundation as the Director of the Center for National Defense. In that capacity, I was responsible for managing the Foundation's national defense research portfolio. I led a team of eight researchers investigating and publishing on matters of military readiness, strategy, budgets, equipment, personnel policies, and other related areas.

16.      In that position, I published over 90 reports and articles. In general, my research focused specifically on the U.S. Army, military recruiting, defense budgets, defense strategy, and force posture. I have testified before Congress on military strategy, and my research has been featured in

multiple media outlets such as national television, newspapers and journals. My responsibilities required me to maintain close contact with the U.S. military and its leaders in order to produce accurate and timely research.

### III.    Preliminary Statement

17.    In no other field of endeavor are the penalties for failure so profound as in the profession of arms. Military leaders make daily decisions that can cost men and women their lives, and by extension, jeopardize the security of their country. For this reason, over the millennia that warfare has been conducted, armies and countries have cared more about military leaders' competence and skill than their immutable personal characteristics. Any emphasis on traits like race or ethnicity in the selection, promotion and advancement of military leaders will be accompanied by the risk of failure.

### IV.    The Army is most effective when it functions as a pure meritocracy, and since 1973 it has worked tirelessly to meet that standard.

18.    After the Vietnam War, the Army enacted widespread reforms with the goal of professionalizing the ranks and transforming the institution into a pure meritocracy. Though the war had been over for seven years when I joined the Army in 1980, its deleterious aftereffects were still evident in the ranks.

19.    Many of the commissioned and noncommissioned officers I encountered when I entered the Army in 1980 had been drafted. Many of them, as well as the volunteers, carried painful memories of the Army's tenure in Vietnam and the impacts of harmful personnel policies, nepotism, and careerism. Those who had served during that difficult period were determined to rebuild the Army into a more competent, professional force. There were deliberate campaigns to eradicate drug use and improve the Army's woefully poor education system. Army leaders painstakingly worked to build the Army into a meritocracy where competence and skill mattered above all.

20.    Previously, local promotion and selection boards were centralized and professionalized to reduce bias and nepotism. The Army also established the National Training Center

("NTC") at Fort Irwin California in 1979 to make unit combat training more difficult and realistic.[1] I witnessed after-action reviews for units that performed poorly during training at the NTC that were brutal in their candor, meted out impartially to anyone who earned it.

21.    The Army's pursuit of meritocracy continues to this day. In 2021, for example, the Army established the Battalion Command Selection Program to identify officers best suited to assume battalion command.[2] The program features a mix of physical fitness tests, blind interviews, and psychological exams. It was purposefully designed to blind selection boards to any factors other than an officer's objective performance and potential.

22.    In other words, the Battalion Command Selection Program—which selects the Army's best lieutenant colonels for critical command assignments—purposefully avoids even the appearance of engaging in the same behavior that West Point practices in selecting a portion of its incoming class.

23.    Racial preferences, even when applied as early as the West Point admissions process, release into the ranks a pernicious virus that chokes out meritocratic attitudes and undermines the basic tenets of professional armies. Left unchecked, they erode the military ethos and the unit cohesion it builds by conditioning soldiers to see themselves as individuals rather than as members of an organization with a single collective mission.

24.    As a former commander of units that oversaw basic training for new volunteers, I have come to believe that racial preferences in admissions, performance standards, or duty assignments— and any similar focus on the races and ethnicities of officers, noncommissioned officers, and junior enlisted soldiers alike—undermine the outcome the Army seeks to achieve during basic training. Part of the purpose of basic training is to break down pre-existing lines that may exist between new recruits

---

[1] Anne Chapman, *The Origins And Development Of The National Training Center 1976 – 1984* (2010), perma.cc/BUQ8-PNKV.

[2] Maj. Christopher Denton, *BCAP: The Battalion Command Assessment Program* (Feb. 16, 2021), perma.cc/2KNH-J2NM.

based on class, race, ethnicity, religion, or other cultural factors, and to bring those recruits together as soldiers with a common mission and shared team membership. Policies emphasizing soldiers' immutable traits and treating those traits as central to their identities will inevitably teach soldiers, either explicitly or implicitly, to categorize their peers as members of different "identity groups" rather than seeing them simply as valued teammates.

## V.    The Army in 2023 is nothing like the Army in 1968.

25.    Just as American society has moved past many of the racial tensions that plagued the nation in the 1960s, the Army, drawing primarily from young Americans of new generations, after 50 years, has also progressed. Defendants and their experts cite cases of racial unrest that plagued the Army in its long history, including in World War I, World War II, and Vietnam. *See, e.g.*, Opp. 22-26; Bailey Decl. ¶¶11-72; Lyall Decl. ¶53; Haynie Decl. ¶¶22-26. But notably, they provide very few, if any, similar examples from the post-1968 era.[3]

26.    An individual who served in the Army of 1968 would not recognize it in 2023. The difference in the levels of tolerance and mutual respect within the ranks is remarkable. In 1968 a noncommissioned officer would routinely take a misbehaving soldier behind the barracks and beat him for his infractions. When I was a captain at Fort Liberty (then Fort Bragg), a commander could throw a phone at a subordinate (and those phones were heavy) and it would go unremarked. Today, these actions would be rightly intolerable,[4] and the offender would be removed from command.

27.    West Point and its experts frequently reference cases of racial tension during the Vietnam War, of fights and outbursts. *See, e.g.*, Opp. 24-26; Bailey Decl. ¶¶36-44; Haynie Decl. ¶26. It is important, however, to put these incidents in their proper historical context. The Army is a subset

---

[3] The few examples they do provide miss the mark. For instance, the Academy mentions an instance of "[r]acial [u]nrest within the Army" that arose in 1971. Bailey Dec. ¶48 n.33. But the "[r]acial [u]nrest" the Academy highlights wasn't between officers—it was between soldiers and civilians. Bailey Dec. ¶48.

[4] Ralph Blumenthal, *Army Acts to Curb Abuses of Injured Recruits* N.Y. Times (May 12, 2006), perma.cc/D57J-TKRD.

of American society; while there were indeed some incidents of racial tension in the Army in the late 1960s, in April 1968 there were race riots in over 110 American cities.[5] Washington D.C. was engulfed in flames with 13 people killed and 1,180 fires set.[6]

28.    Contrast that with the tragic murder of George Floyd on May 25, 2020. Curfews had to be imposed in over 200 American cities, and in many cases the Army (in the form of the National Guard) was used to help restore order.[7] But the Army's experts can identify no reports of unrest within the Army, regardless of the relative ethnic makeup of the officers or enlisted of individual units.

29.    Same, too, for the civil unrest that followed the brutal beating of Rodney King in 1991. More than "51 deaths and over 2,000 injuries were attributed to the unrest," which included roughly 20,000 police, California Highway Patrol, and the Army (again, in the form of the National Guard).[8] Yet the Army's experts do not identify any reports of racial unrest within the Army.

30.    The acceptance of homosexual soldiers provides a similar situation. When President William Clinton first proposed the idea of open service by gays in the military in 1993, the resistance within the military was widespread, including even the Chairman of the Joint Chiefs of Staff, General Colin Powell.[9] Now, thirty years later, it is not even a discussion topic, because the Army and society have moved on.

31.    In 1963, civil rights leader Martin Luther King Jr. expressed his dream that one day people "will not be judged by the color of their skin, but by the content of their character." That was the message the Army sought to instill in me over my 36-year career. During my time in service, the

---

[5] United Press International, *Racial Violence Struck 110 Cities* N.Y. Times (Apr. 10, 1968), perma.cc/D3AD-VGBX.

[6] Jack Moore, *'Everything was on fire' — remembering the DC riots 50 years later* WTOP News (Apr. 2, 2018), perma.cc/V2TP-EN5C.

[7] *George Floyd is killed by a police officer, igniting historic protests* History (archived Dec. 3, 2023), perma.cc/8YW9-C8LS.

[8] Kathleen J. Tierney & Lisa Reshaur, *Patterns Of Property Damage In The Los Angeles Unrest* University of Delaware (1994), perma.cc/WH6E-V3SY.

[9] Sarah Pruitt, *Once Banned, Then Silenced: How Clinton's 'Don't Ask, Don't Tell' Policy Affected LGBTQ Military* (July 3, 2019), perma.cc/EH4V-7V8Y.

Army strove to manifest King's dream of an environment that values people on the basis of their character, shared identity, and commitment to a common, noble purpose.

**VI.    Defendants' assertions in support of racial preferences.**

32.    West Point and its experts claim (1) that racial preferences enhance military readiness by fostering unit cohesion and providing various other intangibles that are unavailable to non-racially and ethnically-balanced units, *see* Opp. 29-34; Lyall Decl. ¶¶22-51; (2) that racial preferences enhance military readiness by helping West Point recruit "top talent" who will go on to serve as Army officers, *see* Opp.34-36; Haynie Decl. ¶¶29-30; (3) that racial preferences support military readiness by helping the Army retain talented officers who otherwise might leave the Army if it were not sufficiently diverse, *see* Opp. 36; Haynie Decl. ¶¶30-31; and (4) that racial preferences enhance the Army's legitimacy in the eyes of the public and the international community by facilitating a racially balanced and therefore "representative" force, *see* Opp. 37-38; Bailey Decl. ¶¶82-87. Based on my personal experience and four decades of institutional knowledge gained as a three-star Army general and a scholar of military readiness issues, I believe these assertions are incorrect.

**A.    Assertions that racial diversity is a "strategic imperative" or an inherent force multiplier are misguided and rely on racial stereotypes.**

33.    ***Strategic Imperative.*** Defendants and their experts repeatedly declare diversity in the Army officer corps to be a "strategic imperative." *See, e.g.*, Opp. 41 (citing Stitt Decl. ¶42; Vazirani Decl. ¶19; Haynie Decl. ¶¶17-28). They refer to it as an essential ingredient necessary for units to perform their missions in combat. Yet in my 36-year Army career, which included significant experience in Army unit readiness reporting, I have never seen an Army leader cite a lack of diversity as a reason why a unit performed poorly, nor to my knowledge does the Army endeavor to track diversity at any level below the total force level.

34.    Instead, what almost any soldier holding the rank of private and higher will tell you is that readiness is achieved through tough training and shared experiences built over time as units

practice together. This progression of building cohesion and readiness is accelerated as soldiers begin to learn they can count on their leaders, peers, and subordinates to competently perform their own responsibilities. Soldiers will routinely vow they will follow any leader—no matter their race, gender or other characteristics—to the gates of hell and beyond, as long as they are convinced of their competence.

35.    Accordingly, anything that might cause soldiers to question the competence and skill of their leaders subtracts cohesion from units. Any suggestion that a leader was selected for his or her role for reasons other than competence could directly undermine unit cohesion. And yet, by maintaining the double standard that West Point applies to candidates of different races, Defendants are seeding the ground with precisely those types of suggestions about minority officers and cadets.

36.    Given the backdrop of the multiple Executive Orders that President Joe Biden has issued on the subject of diversity, equity, and inclusion which carry the force of law for DOD personnel,[10] and based on my experience of serving as a general officer in the Pentagon for several years, I am aware that senior uniformed leaders are very constrained in their ability to make any public statements on this topic.

37.    West Point repeatedly endeavors to draw a correlation between unit cohesion, which is indeed critical to success, and diversity, stating: "The Army officer corps must continue to be diverse or the cohesiveness essential to the Army mission will be critically undermined." Opp. 29. Setting aside that the declarations do not support any particular level of minimum diversity that is allegedly "essential," this statement misunderstands how unit cohesion is formed and maintained.

38.    Military unit cohesion is an intangible quality painstakingly built through multiple factors: tough training and high standards which lead to confidence, the knowledge that unit leaders

---

[10] USAID, *Executive Orders on Diversity, Equity, Inclusion, and Accessibility* (archived Dec. 4, 2023), https://www.usaid.gov/equity/executive-orders-deia.

are competent and care about their soldiers, a clear sense of purpose, and the belief that the American people stand behind them. Matters of diversity in my experience are not part of that equation. If, in fact, diversity was important as the government suggests in developing unit cohesion, it strikes me that military leaders would be required to pay attention to managing the numbers and percentages of each race, ethnicity, and gender within their individual units. But I have never heard any such discussions in my 36-year military career.

39.     Moreover, the claim that units are less effective when they are not racially balanced is inconsistent with observable realities throughout the Army force structure. Take Army Special Forces units ("green berets"), for instance. Army Green beret units are widely considered among the most elite and professional organizations in the world. They are renowned for their proficiency and cohesion. Yet they are some of the least diverse organizations in the Army, with approximately 85 percent white officers and 86 percent white enlisted members.[11] It is impossible to reconcile statements that diversity is a "strategic imperative" with these facts.

40.     The common Army practice of "detailing" company-level units to other battalions in a battlespace (*i.e.*, detaching them from their higher unit and placing them under the control of a separate unit operating elsewhere) is likewise instructive. Army leaders consider many factors when deciding whether to detail a unit to a different command team, but the demographics of the unit and the racial makeup of its new temporary command team are never among them. West Point's experts do not contend otherwise.

41.     If racial balancing were a prerequisite for battlefield success and inherently made units more formidable opponents, then the Army should be pursuing it across the service. If West Point is correct that racially balanced leadership has a significant impact Army wide, then it must have an equal

---

[11] Tom Vanden Brook, *Pentagon's Elite Forces Lack Diversity* USA Today (Aug. 6, 2015), https://perma.cc/XLC5-29JH.

or greater impact on smaller-scale formations like battalions, companies, and platoons. *See* Lyall Decl. ¶24 (expert's theory "can be applied equally to entire armies or individual formations within them"). Yet the Army makes no attempt to racially balance any of its 31 active-duty brigades or 27 National Guard brigades, nor does it try to balance any of the units that compose those brigades. If, in fact, our leaders truly believed that proportional diversity is a *strategic imperative* that is critical to success for units heading into life-or-death situations, then the Army's failure to mimic West Point's racial balancing process force-wide, in all units, would be considered a gross dereliction of duty. That West Point's racial preferences are the exception, rather than the norm, speaks volumes.

42.    Relatedly, West Point and its experts frequently cite statistics regarding the under-representation of minorities at the general officer level; yet the Army does not acknowledge using race as a factor in determining promotions within the ranks, school and command selections, and other elements of advancement.[12] But if a racially balanced officer corps is a military necessity and racial preferences further that goal, then employing racial preferences only when West Point selects high school seniors for enrollment makes no sense. Using racial preferences at West Point alone appears even more arbitrary when one considers that West Point produces less than one-fifth of new Army officers each year,[13] and that West Point graduates are significantly *less* likely to stay in the Army after their service obligation is complete compared to graduates of other Army officer commissioning programs.[14]

43.    West Point offers evidence for the inherent military advantages of racial diversity by way of a declaration from an expert witness, Professor Jason Lyall. Because West Point states that

---

[12] To the contrary, promotions are based "strictly" on merit. *See* Stitt Decl. ¶36 ("[P]romotions within the Army are strictly based on an individual's past performance and future potential once their career as an officer begins.").

[13] United States Military Academy at West Point, *Fact Sheets* (archived Dec. 3, 2023), www.westpoint.edu/about/public-affairs/news/fact-sheets.

[14] Institute for Defense Analyses, *Return on Investment in Graduates of the DOD Service Academies: Assessments and Improvements* 48-49 (July 2023), https://perma.cc/5ALB-TVEP.

Professor Lyall's conclusions "inform" its policies towards racial preferences, the accuracy and relevance of those conclusions are worth considering in detail.

44.     First, Professor Lyall concludes that "the evidence from quantitative data and historical case studies demonstrates that a diverse and inclusive military is critical for battlefield success. Diverse and inclusive militaries are typically more cohesive and lethal than their more exclusionary and discriminatory counterparts." Lyall Decl. ¶10. This conclusion is not supported by relevant facts.

45.     As a preliminary matter, Professor Lyall cites academic studies showing diverse teams have been able to obtain better results than homogeneous teams, but on examination, none of the examples cited are from the military. *See, e.g.*, Lyall Decl. ¶31 & n.29. The examples cited are either from academic settings or occupations not related to the military, such as stock trading and product innovation. Military units operate and make decisions in manners vastly different from stockbrokers and product developers.[15]

46.     Furthermore, when Professor Lyall employs the term "diversity," he inexplicably narrows its meaning to just race and ethnicity. Those elements—race and ethnicity—may indeed be the *least* important elements of "diversity" in a military setting. Diversity of thought, thinking, experience, and talents contribute far more to military efficiency than diversity of race or ethnicity. Two platoon leaders—one white, one black—who lived across the street from one another in the same part of South Boston, attended the same schools, learned from the same teachers and coaches, and attended West Point together are unlikely to have different perspectives on a military problem. Conversely, two officers coming from different parts of the United States, who grew up experiencing different types of terrain, were educated in different school systems, and attended different military

---

[15] *See* Joey Meneses, *"Shared Principles": A Comparison of Military and Civilian Approaches* Health System CIO (July 19, 2023), perma.cc/G5S5-4R7S.

schools will have vastly different approaches to a tactical problem, even if they are the same race. This latter type of diversity is much more useful than racial diversity in a military setting.

47.    Professor Lyall closes in support of his first conclusion by arguing that "Officers play a central role in fostering inclusive environments that allow soldier diversity to be harnessed for enhanced problem-solving and innovation on the battlefield. Conversely, officers, if committed to exclusionary policies, can reinforce prewar discrimination or repression of targeted ethnic groups, throwing away the advantages of diversity and amplifying the negative effects of inequality within the military." Lyall Decl. ¶10. This assertion may be correct in certain settings, but it is only relevant if, in fact, there are officers who are "committed to exclusionary policies" and there is an ongoing "repression of targeted ethnic groups" for them to reinforce. Professor Lyall does not establish the existence of either premise: such officers may have existed in a past Army, but they largely no longer exist today and are quickly removed from leadership positions when identified. And, as explained below, the U.S. Army and American society bear no resemblance to the militaries and societies examined in Professor Lyall's research.

48.    Professor Lyall's second conclusion is that "inequality within the military itself ('military inequality') along ethnic and racial lines is detrimental to the core missions of the military, including lethality, force protection, and resilience under fire." Lyall Decl. ¶11. Importantly, "Military inequality is defined as *the degree to which a military draws on ethnic groups that are subject to state-based discrimination or repression*; the higher the percentage, and the worse the treatment of these groups, the higher the military inequality." Lyall Decl. ¶11 (emphasis added). Professor Lyall further states that "[i]n wars since 1800, armies with high levels of inequality ('divided armies') experience higher casualties, great greater frequency of mass desertion and defection from the ranks, exhibit a greater reliance on coercion to manufacture cohesion, and suffer higher rates of defeat on the battlefield." *Id.*

49.    Professor Lyall constructs a strawman Army that doesn't exist in 2023. Today, the U.S. Army in its values, policies, and Soldier's Creed is committed to military *equality*, not inequality. After 1973, the Army became an all-volunteer force, meaning every single person in the Army today is there because they volunteered to serve. Further, contrary to Professor Lyall's suggestion, there are no groups in the U.S. Army that are "subject to state-based discrimination or repression." Lyall Decl. ¶11; *see also* Lyall Decl. ¶32.

50.    The body of facts that Professor Lyall relies upon to demonstrate that armies possessing high degrees of "military inequality" are less effective is irrelevant to the question at hand. The U.S. Army of 2023 is not one characterized by inequality, but rather is the envy of most other nations for its equality. In the world today there are still conscript armies which have informal "caste systems" preventing certain ethnicities from advancing past the lowest levels. I know firsthand that these types of militaries—upon which Professor Lyall based his conclusions—cannot serve as a case study for the U.S. Army. Put differently, examples of officers in the Mahdist army in Sudan in 1898 or the Soviet Red Army in 1941 violently repressing their own conscripted soldiers are simply not germane to the question of whether racial preferences at West Point in 2023 enhance the United States Army's efficiency and lethality.

51.    Finally, Professor Lyall claims that "the US military, far from being 'colorblind,' has a long, tortured, history of racial and ethnic tension and contestation within its ranks." This is particularly relevant, he says, because "soldier identities are not rendered moot by combat conditions but indeed often shape the likelihood of survival on the battlefield." Lyall Decl. ¶12. The former assertion is correct but omits crucial context; while the latter, based on my experience, is simply wrong.

52.    The Army has existed as an institution since 1775, longer than the United States. It, like the American society from which it draws its members, has suffered from racial and ethnic discrimination. Yet the U.S. Army has often stood out as one of the few American institutions where

15

minorities consistently believed they stood a better chance of fair treatment in American society. The Civil War's 54th Massachusetts Regiment, the Buffalo Soldiers of the post-Civil War era, the esteemed 369th Infantry Regiment of the 93rd Division, "the Harlem Hellfighters" in World War I, the proud all-Black units of World War II such as the Tuskegee Airman, and the many other units and minority individuals who fought bravely in subsequent conflicts established themselves in the eyes of the nation and fellow military members as respected defenders of the country. Unfortunately, when their service was over, these individuals often returned to painful discrimination and prejudice at home.

53.     While the Army, like America, may have a "long, tortured history of racial and ethnic tension," it has also acted as a beacon of opportunity and hope for millions of ethnic and racial minorities to better their conditions and transcend their situations. Indeed, the Rand Corporation has found that a "majority of Black veterans experience improved economic stability compared with Black Americans who have never served, as measured by higher income, improved ability to cover costs of medical and dental care, higher rates of homeownership, and decreased reliance on food assistance programs."[16]

54.     Professor Lyall cites historical figures suggesting that African-American and other minority servicemembers have suffered greater casualties than their fellow white soldiers, implying their leaders choose to put them in the greatest danger. *See* Lyall Decl. ¶54. But data from 2005, when the wars in Afghanistan and Iraq were raging, contradicts this premise. As the L.A. Times reported in September 2005: "Whites, who constitute 67% of the active-duty and reserve forces, accounted for 71% of the fatalities. African Americans are 17% of the overall force and were 9% of the fatalities. Hispanics are 9% of the force and were 10% of the fatalities."[17]

---

[16] Tepring Piquado, Stephanie Brooks Holliday, Samantha McBirney, et al., *Among Black Americans, Is Military Service Associated with Better Quality of Life?* Rand Corporation (2022), perma.cc/BZP3-2RJU.

[17] Tony Perry, *Whites Account for Most of Military's Fatalities* L.A. Times (Sept. 24, 2005), perma.cc/AFC2-UY43.

55.     Lastly, Professor Lyall posits based on his scholarship that soldiers in combat are preoccupied with matters of race and ethnicity. Lyall Decl. ¶56-57. In my experience, what matters to soldiers is whether their leaders are competent, fair, and make decisions that don't waste their lives. The bonds of brotherhood formed in war are perhaps best summarized by Langley Chavis, a young African-American soldier serving in the recently integrated 3rd Battalion, 15th Regiment, 3d Infantry Division in Korea in 1951. In his memoirs, he recounted the aftermath of a particularly fierce firefight:

> After debriefing, I went to my hole, and I began to do some serious thinking. It was that night that I am sure I lost all the racial prejudice I had ever felt. I realized it didn't matter the race of the man that got in the pass with me, but more important was that he was there of his own free will. That he was putting his life on the line for me. We needed each other, because he depended on me just as much as I depended on him.[18]

56.     ***"Innovation," "problem solving," and cultural awareness.*** I am aware that West Point proposes additional ways that racial preferences enhance combat readiness, besides its unit-cohesion argument. In particular, the Academy and its experts assert that racially diverse units are more innovative and superior at "problem solving," *see* Opp.30 (quoting Haynie Decl. ¶¶10, 17); Opp.33 (quoting Lyall Decl. ¶31), and better equipped to deal with cultural complexities in foreign countries, *see* Opp.38 (quoting Haynie Decl. ¶19); Lyall Decl. ¶51. I address both assertions in order in the paragraphs below.

57.     West Point's assertion that diverse teams are inherently better at problem solving does not rely on any studies conducted in the context of military units. Moreover, while it has been my experience that a diversity of *viewpoints* can often lead to innovation and create more adaptive teams, it has never been my experience as a leader that a soldier's race is a suitable proxy for how he or she might think about a particular issue or approach a particular problem. I have never encountered any military leader who believed that to be the case.

---

[18] Langley Chavis, *The Day You Discover Race Doesn't Matter* The Bitter Southerner (archived Dec. 3, 2023), perma.cc/9B8N-9K9L.

58.     When I was assigned to the 82nd Airborne Division from 1992-1993, I often participated in operational plan development. These sessions focused on producing plans for the division's likely deployments and exercises. What made these sessions exceptionally productive was that they included officers and noncommissioned officers with an extraordinarily wide array of backgrounds and years of experience: weather officers from the Air Force, Army and Air Force pilots, artillerymen, aviators, infantrymen, intelligence, communications, engineers and others. When this group started brainstorming, the results were remarkable. The idea that the group also needed diversity of race, gender or ethnicity was never raised, and frankly would not have been countenanced. Individuals' views and recommendations were evaluated based on the strength of their thoughts versus their personal immutable characteristics.

59.     West Point's assertion that racial diversity automatically enhances cultural awareness and breaks down language barriers with local nationals is similarly flawed. The assertion appears to be founded on the premise that soldiers will have greater insight into particular regions if they happen to share the same skin color or ancestral ethnicity as the people who actually live there. Each special forces group in the Army is given responsibility over a different region of the world, and the special operators within those groups are expected to be knowledgeable about the region. If the Army assigned black special operators to 3rd Special Forces Group solely because 3rd Group's Area of Operations is Africa, that decision would rightly be criticized as trading in demeaning stereotypes. West Point's suggestion here is no different.

60.     Regardless, West Point's use of racial preferences has little application to language proficiencies and cultural awareness. Under West Point's admissions process, a native Arabic speaker whose parents are immigrants from the Middle East would be considered white.[19] Even though the

---

[19] *See 1997 Revisions to OMB Statistical Policy Directive No. 15, Race and Ethnic Standards for Federal Statistics and Administrative Reporting,* 19 (1997) (defining "white" as "a person having origins in any of the original peoples of the Middle East, Europe, or North Africa).

military has been at war in the Middle East for two decades, the system reduces his chances of acceptance into West Point rather than increasing them.

> **B.    Racial preferences likely hurt—and certainly do not help—recruiting and retention.**

61.    Defendants and their experts also claim that the diversity produced by West Point's racial preferences are necessary for recruitment and retention Army-wide. Individuals making declarations defending the government's support for racial preferences argue that these measures help military recruiting. *See, e.g.*, Haynie Decl. ¶¶28-30; Vazirani Decl. ¶22.

62.    Considering the Army is in the middle of its worst period of recruiting it has ever experienced since 1973, this argument appears particularly odd. The Army missed its active-duty recruiting goal by 15,000 soldiers in fiscal year 2022 and by 10,000 in fiscal year 2023.[20]

63.    Indeed, evidence suggests the exact opposite: that Americans view measures such as racial preferences as a part of a growing body of evidence of the politicization of the military.

64.    In 2022, the annual Ronald Reagan National Defense Survey found 48 percent Americans—less than half—had a great deal of trust in the U.S. military. This level of trust is markedly down from 2017, when 70 percent of Americans expressed the same. No other institution has dropped so far and fast in the esteem of American citizens.[21] The leading reason why Americans say they have less trust in the military is that they perceive military leaders have become overly politicized. Of the Americans surveyed, 62 percent expressed either a great deal or some concern over this perception of politization.

---

[20] Thomas Novelly, Steve Beynon, Drew F. Lawrence, Konstantin Toropin, *Big Bonuses, Relaxed Policies, New Slogan: None of It Saved the Military from a Recruiting Crisis in 2023* Military (Oct. 13, 2023), perma.cc/XL76-WRGQ.
[21] Ronald Reagan Institute, *Reagan National Defense Survey* (Nov. 2022), perma.cc/A6JY-GYLQ.

65.    Moreover, numerous polls report that most Americans of all ethnicities oppose the use of racial preferences in college admissions.[22] Even though West Point reports that it has been using racial preferences at least as far back as 2013, this fact was not widely known, even among Army senior officers. I was not aware of the use of West Point's racial preferences until 2022, six years after I left the Army. Thus, the knowledge that West Point and the other military academies employ racial preferences in their admissions process could be a factor in the recent drop in the public's confidence and trust in the military. Given that most Americans do not favor racial preferences in college admissions, West Point's use of such unpopular means seems likely to only increase concerns about politicization of the military and harm, rather than help, military recruiting efforts.

66.    Regarding West Point's claim that a lack of diversity produced by racial balancing will prevent the Army from retaining the best and brightest officers, *see* Opp. 34-35, I see no evidence to support that claim, and my experience indicates otherwise.

67.    West Point grounds this assertion in data largely collected from the DoD command climate surveys. Whatever the results of those surveys, they are unlikely to reliably explain the causes of attrition or factors necessary for greater officer retention. That is because, as a 2022 Government Accountability Office report concluded, "the DOD climate survey—the academies' primary tool for collecting information—does not provide complete and reliable information. Specifically, the survey has methodological issues concerning security, response rates, and post-survey weighting that limit its usability."[23] Further, my personal experience suggests that drawing conclusions regarding why soldiers leave the military from impersonally administered surveys has very limited utility. Most soldiers view surveys as a task to be completed as quickly as possible.

---

[22] Pew Research Center, *More Americans Disapprove Than Approve of Colleges Considering Race, Ethnicity in Admissions Decisions* (June 8, 2023), perma.cc/WWR5-DVRU.
[23] Gov't Accountability Off., *Military Service Academies: Actions Needed to Better Assess Organizational Climate*, GAO-22-105130, at 1 (July 2022).

### C. Racial preferences will harm, rather than enhance, the Army's public legitimacy.

68.     West Point's brief and the declarations in support of it also assert that a racially "representative" military produced through racial preferences will enhance the Army in the eyes of the American public. *See, e.g.*, Haynie Decl. ¶13. Neither Haynie nor West Point offers any documentary support for this assertion. As a general in the U.S. Army, however, I frequently encountered questions about civil-military relations and the public's perception of Army. In my experience, the American public's respect for the military flows from its perception that the military is a disciplined, results-oriented institution that prides itself on providing equal opportunity for Americans. Given that disposition, it is doubtful to me that racial preferences in Academy admissions—a policy most of the public disproves of even for civilian institutions—would lend additional legitimacy to the armed forces.

69.     West Point and Haynie also suggest that racial preferences will enhance the Army's legitimacy in foreign countries. They provide little documentary support for this assertion either. For the assertion to have any relevance to West Point's admissions system though, it would first be necessary to identify the desirable language and cultural skills that prospective West Point candidates possess, match them against Army needs, and select them on that criterion. But that is not what the Academy is currently doing. Rather, the Academy's position appears to be that a certain level of diversity in race or ethnicity automatically conveys legitimacy to overseas Army operations, which they have provided no factual basis to establish.

Per 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 5, 2023

_____
LTG (Ret) Thomas W. Spoehr