UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

STUDENTS FOR FAIR ADMISSIONS,

                                Plaintiff,

                -against-

THE UNITED STATES MILITARY ACADEMY
AT WEST POINT, et al.,

                                Defendants.

---

**OPINION AND ORDER**

23-CV-08262 (PMH)

PHILIP M. HALPERN, United States District Judge:

Students for Fair Admissions ("Plaintiff" or "SFFA") commenced this action on September 19, 2023 against the United States Military Academy at West Point ("West Point" or the "Academy"); the United States Department of Defense; Lloyd Austin, in his official capacity as Secretary of Defense; Christine Wormuth, in her official capacity as Secretary of the Army; Lieutenant General Steven Gilland, in his official capacity as Superintendent of the United States Military Academy; and Lieutenant Colonel Rance Lee, in his official capacity as Director of Admissions for the United States Military Academy at West Point (collectively, "Defendants").[1] (Doc. 1, "Compl."). Plaintiff presses a single claim for relief alleging that West Point's admissions policy violates the Fifth Amendment. Specifically, Plaintiff alleges that West Point's reliance on racial classifications in the admissions process fails to satisfy the strict scrutiny test as considered and applied in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181 (2023) ("*Harvard*").

---

[1] At oral argument on December 21, 2023, the Court directed the parties to meet and confer in an effort to eliminate any defendants that are unnecessary to the litigation so as to limit the field to necessary and proper parties only. At this early stage in the proceedings, the Court is unable to determine, based upon the Complaint and motion papers, which of the named Defendants is actually necessary to the proper adjudication of the issues herein.

Pending before the Court is Plaintiff's motion for a preliminary injunction under Fed. R. Civ. P. 65(a), which seeks an order "enjoining the defendants during the pendency of this action from considering race as a factor when making admissions decisions." (Doc. 32). Plaintiff first filed its motion for a preliminary injunction on September 19, 2023, contemporaneous with the filing of the Complaint. (Doc. 6—Doc. 10). After service of process was completed and on October 30, 2023, pursuant to the Court's directives at a telephone conference on October 24, 2023, Plaintiff filed a proposed Order to Show Cause, which the Court subsequently entered as modified, together with a revised memorandum of law in support of its preliminary injunction motion. (Doc. 30; Doc. 31, "Pl. Br."; Doc. 32). Defendants filed a memorandum of law in opposition, together with declarations and exhibits (Doc. 47, "Def. Br."; Doc. 48—Doc. 53), and the motion was fully submitted with the filing of Plaintiff's reply brief and affidavit (Doc. 60, "Reply"; Doc. 61). On December 18, 2023, three days before appearing for oral argument on the motion, Plaintiff supplemented its motion with two additional declarations. (Doc. 68; Doc. 69).[2, 3] The Court heard oral argument on December 21, 2023 ("Dec. 21, 2023 Tr.").

For the reasons set forth below, Plaintiff's motion for preliminary injunction is DENIED.

---

[2] Defendants, when asked at oral argument whether they would move to strike the supplemental declarations served long after the motion was fully briefed, "reserved," and noted that consideration of the supplemental records would not alter the Court's analysis on the motion. (Dec. 21, 2023 Tr. at 56:17-24).

[3] On November 29, 2023, the Court received two letter-motions, one from the National Association of Black Military Women, ACLU, NYCLU, and NAACP LDF (Doc. 56), and one from 107 West Point Graduates (Doc. 57). The parties do not oppose the requests to file amicus briefs in this matter. The letter-motions are hereby GRANTED and the Court accepts the briefs annexed to the letter-motions as amici curiae in opposition to the motion for a preliminary injunction.

## BACKGROUND

On June 29, 2023, the Supreme Court ruled that the race-based admissions policies of Harvard College ("Harvard") and the University of North Carolina ("UNC") violated the equal protection clause of the Fourteenth Amendment and Title VI of the Civil Rights Act of 1964. The Supreme Court noted (in a footnote) in the majority opinion that "[t]he United States as *amicus curiae* contends that race-based admissions programs further compelling interests at our Nation's military academies. No military academy is a party to these cases, however, and none of the courts below addressed the propriety of race-based admissions systems in that context. This opinion also does not address the issue, in light of the potentially distinct interests that military academies may present." *Harvard*, 600 U.S. at 213 n.4. Given that carveout in *Harvard* with respect to military academies, less than three months later, Plaintiff commenced the instant action against West Point, contending that West Point's race-based admissions process violates the Fifth Amendment's equal protection principles.[4]

Plaintiff calls upon this Court to enjoin, for the pendency of this action, West Point's consideration of race in its admissions process. The Court, in order to properly frame the issue before it, summarizes below the allegations in the Complaint, and information taken from the various declarations and exhibits proffered on this motion concerning West Point and its admissions process, including its consideration of race in admissions.

---

[4] SFFA filed a similar complaint and motion for preliminary injunction against the United States Naval Academy on October 5, 2023. That court ruled from the bench on December 14, 2023, denying SFFA's motion for a preliminary injunction, and later issued a written Memorandum Opinion explaining its reasoning. *See Students for Fair Admissions v. United States Naval Academy, et al.*, No. RDB-23-2699, 2023 WL 8806668 (D. Md. Dec. 20, 2023) ("*Naval Academy*").

I.      Becoming an Officer in the Army

West Point was established in 1802 and prepares students to become leaders and officers in the United States Army. (Doc. 53, "McDonald Decl." ¶ 7). To become an officer in the Army, an individual must (1) graduate from West Point; (2) attend a civilian college or university while participating in a Reserve Officers' Training Corps ("ROTC") program; (3) attend Officer Candidate School after graduating from college; (4) receive a direct commission after earning a professional degree; or (5) advance through the enlisted ranks and then complete one of these officer training programs. (Def. Br. at 11 (citing McDonald Decl. ¶ 103 n.9)). Defendants emphasize that "West Point is a vital pipeline to the officer corps, and especially senior leadership, in the Armed Forces." (*Id*. at 12 (citing Doc. 49, "Stitt Decl." ¶¶ 38-40)). West Point is a significant source of officer commissions for the Army, historically providing approximately 20% of those commissions. (McDonald Decl. ¶ 9; Stitt Decl. ¶ 37). "West Point graduates comprise 33% of general officers in the Army" and almost 50% of the Army's current four-star generals. (McDonald Decl. ¶ 9; Stitt Decl. ¶¶ 38-39).

Admission to West Point is highly selective. In the most recent class, fewer than ten percent of applicants were given the honor of joining the Long Gray Line. (Compl. ¶ 18 (citing West Point Public Affairs, Class of 2027 to Enter West Point, (June 21, 2023), perma.cc/4QY3-5BK6)). Congress has set the size of the Corps of Cadets of the Academy at a limit of 4,400. 10 U.S.C. § 7442. As such, each incoming class currently consists of approximately 1,200 cadets before attrition. (Compl. ¶ 19 (citation omitted); Def. Br. at 11 (citing McDonald Decl. ¶ 10)). Cadets who graduate from West Point, under current law, are commissioned as active-duty officers with an obligation to serve a minimum of five years. (Def. Br. at 11 (citing McDonald Decl. ¶ 9)); 10 U.S.C. § 7448(a)(2).

II.   West Point's Admissions Process

West Point's admissions process is governed by, *inter alia*, federal statute (10 U.S.C. §§ 7442–46), Army regulations (Regulation 150-1, Chapter 3-4), and internal guidance. (Def. Br. at 12 (citing McDonald Decl. ¶ 11)). Plaintiff alleges that West Point's admissions process involves two stages: first, an applicant must pass medical examinations and a physical-fitness test and secure a "nomination" from a member of Congress, the Vice President, or the President; and at the second stage, applicants must be accepted by West Point's admissions office. (Compl. ¶ 17). Plaintiff alleges that at this second stage, once applicants have received a qualifying nomination, West Point unconstitutionally considers race. (*Id*. ¶¶ 17, 27-60).

Defendants, in opposition, explain in detail the West Point admissions process. To be admitted to West Point, a candidate must successfully complete (i) a candidate questionnaire, (ii) a second step kit, (iii) a candidate physical fitness assessment, (iv) a medical evaluation, and (v) an interview, and must receive (vi) a nomination. (Def. Br. at 12 (citing McDonald Decl. ¶ 19)).[5] These steps must be completed by January 31st of the year the candidate would enter West Point. (*Id*. at 12-13 (citing McDonald Decl. ¶ 29)).

As noted *supra*, candidates seeking admission to West Point must also secure a nomination. *See* 10 U.S.C. § 7442; (Compl. ¶ 17; Def. Br. at 13). There are two types of nominations: those

---

[5] A candidate must complete a "[c]andidate [q]uestionnaire," reporting their high school GPA, standardized test scores, extra-curricular activities, athletic participation, and "basic demographic information," which includes race and gender. (Def. Br. at 12 (citing McDonald Decl. ¶ 19)). Candidates may submit the candidate questionnaire as early as February 1st of the year before they would enter West Point (their junior year for candidates applying directly from high school). (*Id*. (citing McDonald Decl. ¶ 20)). The Admissions Office reviews this questionnaire to determine if a candidate meets West Point's basic statutory eligibility requirements and is likely to be competitive for admission, and if so, an admissions officer will permit the candidate to proceed to the next step in the process. (*Id*. (citing McDonald Decl. ¶¶ 23-24)). The next step of the admissions process, known as the "second step kit," requires submission of official high school transcripts, standardized test scores, essays, and teacher evaluations. (*Id*. (citing McDonald Decl. ¶ 25)). Candidates are also asked to provide background information, including whether they are the first member of their immediate family to attend college, their combined family income, and whether they speak any foreign languages. (*Id*.).

from a "statutory nominating authority" and "service-connected" nominations. 10 U.S.C. § 7442; (Def. Br. at 13 (citing McDonald Decl. ¶ 31)). Statutory nominating authorities include Members of the United States House of Representatives and Senate; the Vice President; Delegates to Congress from American Samoa, the District of Columbia, Guam, the Virgin Islands, and the Commonwealth of the Northern Marianas Islands; the Governor and the Resident Commissioner of Puerto Rico; and the Superintendent of West Point. (*Id.*).

Generally, individuals who received nominations from Members of Congress, the Vice President, Delegates to Congress, and the Governor and Resident Commissioner of Puerto Rico account for 75% of West Point's Corps of Cadets. (*Id.* (citing McDonald Decl. ¶ 32)). If a candidate is appointed to West Point pursuant to nomination by a Member of Congress, that candidate is "charged" to that Member. (*Id.*). Each Member of Congress may have five "charges" at West Point at any one time. (*Id.*). When a Member has fewer than five charges at the end of the academic year, the Member is considered to have a "vacancy" for the following admissions cycle. (*Id.*). For each vacancy, Members can nominate up to ten candidates, and in a typical year, each Member of Congress will have one vacancy at West Point. (*Id.*). Like Members of Congress, the Vice President is provided with five West Point vacancies. (McDonald Decl. ¶ 39). The District of Columbia and the various U.S. territories are provided with three to six West Point vacancies. (*Id.* ¶ 40). Finally, the Superintendent may nominate up to 50 candidates per year from the country at large, so long as the cap on authorized strength of the total Corps of Cadets of the Academy is not exceeded. (*Id.* ¶ 41).

Service-connected nominations include a selection of 100 cadets per year by the President. The Secretary of the Army may nominate 85 candidates per year from enlisted members of the regular Army, 85 candidates per year from enlisted members of the reserve component of the

Army, and 20 candidates per year from members of ROTC and Junior ROTC. 65 candidates may be nominated per year who are children of members of the armed forces who were, *inter alia*, killed in action; and finally the President is authorized to appoint children of persons who have been awarded the Medal of Honor. (McDonald Decl. ¶¶ 45-48).

Congressional nominating authorities, the District of Columbia, and the various U.S. territories, may nominate their slate of candidates using one of three methods: (1) "competitive"— where the Member submits nominees to West Point without any order of preference, allowing the Admissions Office to select the best qualified candidate within that slate; (2) "principal-competing alternate"—where the Member identifies a principal nominee and a list of unranked alternates; and (3) "principal-numbered alternate"—in which the Member identifies a principal nominee and a list of ranked alternates. (Def. Br. at 13-14 (citing Army Regulation 150-1, Chapter 3-4(a); McDonald Decl. ¶¶ 34–36); McDonald Decl. ¶ 40).

Once an applicant to West Point completes the candidate questionnaire, the Admissions Office assigns the candidate an initial numerical score, known as the "Whole Candidate Score" ("WCS"), which is calculated based on academic qualifications (60%), a "community leader score" (30%), and the candidate's fitness assessment (10%). (Def Br. at 14 (citing McDonald Decl. ¶¶ 49, 51-54)). Defendants assert that neither race nor ethnicity factors into the WCS. (*Id*. (citing McDonald Decl. ¶¶ 55, 58, Ex. A)).

Once the Admissions Office assigns a WCS, it then determines whether a candidate is "qualified" or "not qualified." (*Id*. (citing McDonald Decl. ¶ 59)). Three different reviewers in the Admissions Office evaluate the candidate's file and each separately determines whether the candidate meets the academic, leadership, and physical standards as reflected in the WCS, as well as the subjective components of the application. (*Id*. at 14-15 (citing McDonald Decl. ¶¶ 59-60)).

If any of the three reviewers disagree as to whether the candidate is qualified, the candidate is reviewed by the Admissions Committee, whose decisions are determined by a simple majority vote. (*Id*.). Defendants assert that the Admissions Office does not consider a candidate's race or ethnicity in determining whether a candidate is qualified. (*Id*. at 15 (citing McDonald Decl. ¶ 64)).

Defendants contend that the vast majority of West Point's incoming cadet class is based on an "order of merit," as determined by the WCS, within the category of nomination obtained by the candidate. (*Id*. (citing McDonald Decl. ¶ 65)). For candidates nominated by a Member of Congress under the "competitive" method, West Point will offer an appointment to the fully qualified nominee from that Member's slate with the highest WCS. (*Id*. (citing McDonald Decl. ¶ 66)). For candidates nominated by a Member of Congress under the "principal competing" or "principal-numbered" alternate methods, West Point must consider the order specified by the Member of Congress. (*Id*. (citing McDonald Decl. ¶¶ 35-38, 68)). Where the principal nominee is either deemed unqualified or declines admission under the "principal-competing" method, West Point must offer admission to the fully qualified candidate on the Member's list with the next highest WCS; and under the "principal-numbered" method, West Point must offer admission to the fully qualified candidate who ranks next highest on the Member's list, even if that candidate has a lower WCS than others on the Member's list. (*Id*. (citing McDonald Decl. ¶¶ 35-36)). Defendants assert that in these instances, race and ethnicity also play no role in West Point's selection process. (*Id*. (citing McDonald Decl. ¶¶ 55, 68)).

If a qualified candidate is not appointed to the vacancy for which they were nominated, the candidate may be offered an appointment under two other statutory provisions. (*Id*. at 16). First, West Point may appoint up to 150 "qualified alternates"—qualified candidates who received a statutory nomination but did not win the vacancy. 10 U.S.C. § 7442(b)(5). West Point appoints

qualified alternates solely based on WCS, which does not consider race or ethnicity. (*Id.* (citing McDonald Decl. ¶¶ 55, 70(a))).

Second, if West Point has filled each nomination vacancy, admitted 150 qualified alternates, and has still not filled its class, it may offer appointment to other remaining qualified nominees, known as "Additional Appointees." (*Id.* (citing McDonald Decl. ¶ 70(b))). For at least the last 15 years, West Point has provided offers of appointment to Additional Appointees to meet its class size of around 1,200 cadets. (*Id.* (citing McDonald Decl. ¶¶ 6, 70(b))). For Additional Appointees, the Admissions Office may consider race and ethnicity as one factor in a holistic assessment in extending offers. (*Id.*).

The Admissions Office also uses a recruiting tool referred to as a Letter of Assurance ("LOA"), in light of statutory, regulatory, and policy constraints preventing West Point from providing early admission decisions. (McDonald Decl. ¶ 71). Between July and September of the year before a candidate would enter West Point (a candidate's senior year if applying directly from high school), the Admissions Office will issue LOAs to approved candidates. (*Id.* ¶ 77). An LOA constitutes a firm commitment from West Point to the candidate that the candidate will be admitted—provided that the candidate meets the conditions in the letter. (*Id.* ¶ 73). After West Point provides an LOA to a candidate, the candidate has 60 days from the date of issuance to complete their application, except for securing a nomination and the medical qualification which must be completed by April 15. (*Id.* ¶¶ 73, 79). If the candidate does not complete their application within 60 days, the LOA is revoked. (*Id.* ¶ 79).

III.    <u>West Point's Consideration of Race in Admissions</u>

Plaintiff notes that West Point openly states that "[t]he United States Military Academy is fully committed to affirmative action." (Compl. ¶ 27 (citing *Cadet Consumer Information/Right to Know*, United States Military Academy at West Point, perma.cc/H38P-JY3J)). Plaintiff contends that said "'commitment' plays out across all areas of the Academy's admissions policy." (*Id.* ¶ 28). West Point counters that it "considers race and ethnicity flexibly as a plus factor in an individualized, holistic assessment of African American, Hispanic, and Native American candidates at three limited stages of the admissions process." (Def. Br. at 16). The stages when West Point considers race and ethnicity are: (1) when offering LOAs; (2) when extending Superintendent nominations; and (3) when extending offers to Additional Appointees. (*Id.* at 16-18). West Point asserts that it uses race and ethnicity in these three limited circumstances "only to further the military's distinct operational interest in developing a diverse officer corps to ultimately ensure that the military can meet its critical national security mission." (*Id.* at 18 (citing McDonald Decl. ¶¶ 80, 95; Doc. 48, "Vazirani Decl." ¶¶ 8-30)). In other words, Defendants contend, "the military has concluded that a diverse officer corps is critical to the military's ability to defend our nation," in that "it (1) fosters cohesion and lethality; (2) aids in recruitment of top talent; (3) increases retention; and (4) bolsters the Army's legitimacy in the eyes of the nation and the world." (*Id.* at 29, 30).

Thus, West Point considers race in three limited circumstances as noted *supra*. First, the Admissions Office may extend an LOA to a candidate who has submitted a candidate questionnaire, official transcripts and standardized test scores, and has been interviewed, following an individualized review of the candidate's record. (*Id.* at 16 (citing McDonald Decl. ¶¶ 72, 73, 75, 77, 91)). As previously stated, LOAs are conditional offers of admission—the candidate must

still complete their application, pass physical fitness standards, become medically qualified, and receive a nomination. (*Id.* at 16-17 (citing McDonald Decl. ¶ 73)). If a candidate satisfies those conditions but is not selected to fill a congressional vacancy, non-congressional vacancy, or qualified alternate slot, they will receive an admissions offer as an Additional Appointee. (*Id.* at 17 n.1 (citing McDonald Decl. ¶ 93(a))). West Point's Diversity Outreach Office conducts this review for African American, Hispanic, and Native American candidates, while regional teams conduct this review for other candidates. (*Id.* (citing McDonald Decl. ¶ 78)).

Second, race or ethnicity could be one of many nondeterminative factors considered in extending Superintendent nominations. (*Id.* (citing McDonald Decl. ¶ 94)). Although the Superintendent may nominate up to 50 candidates per year, since 2008, the Superintendent has never exhausted his nominations in any given year. (*Id.* (citing McDonald Decl. ¶¶ 41-42)). Most Superintendent nominations are used for sought-after athletes, for candidates that are highly qualified and motivated to attend the Academy, and for candidates applying to other service academies. (*Id.* at 17-18 (citing McDonald Decl. ¶ 41)).

Third, at the end of the admissions cycle, if West Point has not reached its class size, in extending offers to Additional Appointees, the Admissions Office may consider race and ethnicity flexibly as a plus factor for African American, Hispanic, and Native American candidates in its holistic assessment of candidates to identify those who are expected to make valuable contributions to the cadet environment. (*Id.* at 18 (citing McDonald Decl. ¶ 93)).

**STANDARD OF REVIEW**

"A preliminary injunction 'is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007). A party seeking a preliminary injunction, in the Second Circuit, generally must establish: (1) irreparable harm absent injunctive relief; (2) a likelihood of success on the merits; and (3) that a preliminary injunction is in the public interest.[6] *Keil v. City of New York*, No. 21-3043, 2022 WL 619694, at *1 (2d Cir. Mar. 3, 2022); *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 279 (2d Cir. 2021).

"The typical preliminary injunction is prohibitory and generally seeks only to maintain the status quo pending a trial on the merits." *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 34 (2d Cir. 1995). "A mandatory injunction, in contrast, is said to alter the status quo by commanding some positive act." *Id.* "This distinction is important because [the Second Circuit has] held that a mandatory injunction should issue 'only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief.'" *Id.* In other words, the movant is held to a heightened standard and must show a "clear" or "substantial" likelihood of success on the merits, and must make a "strong showing" of irreparable harm, in addition to showing that the preliminary injunction is in the public interest. *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015); *see also JTH Tax, LLC v. Agnant*, 62 F.4th 658, 667 (2d Cir. 2023) ("A heightened standard is imposed, in part, because injunctions of those sorts tend to be particularly burdensome to the defendants subject to them."). "The 'clear' or 'substantial' showing requirement—the variation in

---

[6] Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes, and alterations.

language does not reflect a variation in meaning—thus alters the traditional formula by requiring that the movant demonstrate a greater likelihood of success." *Tom Doherty Assocs.*, 60 F.3d at 34.

The distinction between mandatory and prohibitory injunctions is, however, "not without ambiguities." *Id.* "Indeed, the typical method of differentiating the two—by examining whether the moving party is being ordered to act or refrain from action—is often 'more semantical than substantive.'" *Velez v. Prudential Health Care Plan of New York, Inc.*, 943 F. Supp. 332, 338 (S.D.N.Y. 1996) (quoting *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985)). Plaintiff attempts to frame the relief sought as prohibitory—an order to stop West Point from considering race as a factor in the admissions process (Pl. Br. at 9). The gravamen of the request, however, is not for an order "prohibiting" an act, but rather for an order directing the performance of an act, *i.e.*, for West Point to affirmatively change and remodel its admissions process. Defendants explained at oral argument that in order to cease consideration of race in the admissions process, West Point would have to convene the Academic Board; examine its current policy and decide how to untangle a complicated knot; change the policy and apply a new policy to the current applicant pool; possibly withdraw already offered appointments and LOAs; and a legion of written material would have to be changed. (Dec. 21, 2023 Tr. at 46:10-25). Simply put, granting Plaintiff's requested injunction would require myriad acts be undertaken, not prohibited.

Plaintiff also argues that it merely seeks to restore the status quo ante, and therefore commands a prohibitory injunction standard. When an injunction seeks "to require a party who has *recently disturbed* the status quo to reverse its actions," it seeks to "restore[ ], rather than disturb[ ], the status quo ante, and is thus not an exception to the rule" that is typically applied in evaluating motions for a preliminary injunction. *Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*, 364 F. Supp. 3d 253, 275 (S.D.N.Y.) (emphasis added), *aff'd*, 788 F. App'x 85 (2d Cir.

2019). The status quo was not, however, "recently disturbed"—West Point has been utilizing a race-based admissions process for over four decades. (McDonald Decl. ¶ 81). Indeed, "[b]ecause the proposed injunction's effect on the status quo drives the standard," the Court must ascertain "the last actual, peaceable uncontested status which preceded the pending controversy." *A.H. by & through Hester v. French*, 985 F.3d 165, 177 (2d Cir. 2021). It was four decades ago, and prior to *Harvard*, when West Point's admissions regime did not include consideration of race. Plaintiff's argument that the status quo has been "recently disturbed" is therefore unavailing.

Plaintiff also argues that the mandatory injunction standard does not apply because a preliminary injunction would not give it the ultimate relief sought in the action. Although the description of the relief sought in the Complaint differs slightly from that requested on this motion, it is in effect identical. (*Compare* Compl. at 27, *with* Doc. 32). Ultimate relief is being sought by this motion. Plaintiff's reliance on choice language in *Christa McAuliffe Intermediate Sch. PTO, Inc.*, does not alter this Court's conclusion. 364 F. Supp. at 253 (the "all-relief-sought" exception does not apply because the preliminary injunction affects "this year's admissions, while if Plaintiffs win at trial, Defendants would be enjoined from using the changed Discovery procedure in future admissions cycles"). The injunction sought in *Christa McAuliffe Intermediate Sch. PTO, Inc.* would have *prohibited* the use of a new admissions process not yet implemented. Here, because the injunction would command the installation and use of a new process—it is not at all clear how the requested injunction would, as Plaintiff suggests, affect but one year of admissions at West Point. Because the admissions cycle begins on February 1st of any given year and ends on April 15th of the following year, at least several years of admissions cycles would be impacted; and if appeals, discovery, and a trial took longer than a year, multiple admissions cycles could be impacted.

The issue of whether to apply a heightened standard is largely academic, however, because regardless of the standard applied, for the reasons discussed herein, Plaintiff has failed to establish a likelihood of success warranting the extraordinary and drastic remedy sought.

## ANALYSIS

### I.  Standing

Before considering the elements that Plaintiff must demonstrate for a preliminary injunction, the Court must first examine standing. A party invoking federal court jurisdiction must have standing to sue "for each claim and form of relief sought." *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011). "Standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021). "A court may only provide proposed injunctive relief, for instance, if a plaintiff can demonstrate his entitlement to that specific relief." *Doe v. Columbia Univ.*, No. 20-CV-06770, 2022 WL 4537851, at *16 (S.D.N.Y. Sept. 28, 2022). At the preliminary injunction stage, "a plaintiff's burden to demonstrate standing will normally be no less than that required on a motion for summary judgment." *Green Haven Prison Preparative Meeting of Religious Soc'y of Friends v. New York State Dep't of Corr. & Cmty. Supervision*, 16 F.4th 67, 78 (2d Cir. 2021). "To establish standing for a preliminary injunction, a plaintiff cannot rest on mere allegations but must set forth by affidavit or other evidence specific facts that establish the three familiar elements of standing: injury in fact, causation, and redressability." *Id*.

To invoke organizational standing, "an organization must demonstrate that (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested

requires the participation of individual members in the lawsuit." *Harvard*, 600 U.S. at 199 (quoting *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977)).

Defendants press only one argument attacking Plaintiff's standing: that Plaintiff's use of pseudonyms for its injured members is insufficient to establish the standing of those members. (Def. Br. at 23-24). Defendants contend that Plaintiff must identify Members A and C by name in order to demonstrate "how[ ] race and ethnicity would play a role in West Point's consideration of Plaintiff's members' applications." (*Id*. at 24). The requirement that Defendants would have this Court impose upon Plaintiff appears to be based on an overreading of the Supreme Court's decision in *Summers v. Earth Island Inst.*, which instructs that a plaintiff claiming an organizational standing must identify members who have suffered the requisite harm. 555 U.S. 488, 499 (2009). The associations in *Summers* lacked standing because they failed to identify a specific member who had standing, pointing instead to their membership generally and speculating that one of those members likely had standing. *Id*. at 497-99. Here, identification of specific members with standing, supported by a verified complaint, declaration from Plaintiff's president, and those members' declarations—albeit anonymous—suffices under *Summers* to "establish[ ] that at least one identified member ha[s] suffered or would suffer harm." 555 U.S. at 498.  Identification by name is not necessary where, as here, a name will not inform the pertinent inquiry of whether a person will be denied the opportunity to compete for admission at West Point on an equal basis.

Moreover, identification of these members by name as opposed to pseudonym does not comport with the Supreme Court's conclusion concerning standing in *Harvard*, which was that SFFA had standing at the commencement of those underlying litigations. 600 U.S. at 200. There, like here, the members were referred to by pseudonym. *See Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, No. 14-CV-14176, Doc. 1 (D. Mass. Nov. 17, 2014);

*Students for Fair Admissions, Inc. v. University of North Carolina, et al.*, No. 14-CV-00954, Doc. 1 (M.D.N.C. Nov. 17, 2014). Accordingly, this Court rejects this line of Defendants' attack on Plaintiff's standing at this stage of the action.[7]

II.   Likelihood of Success on the Merits

"Consideration of the merits is virtually indispensable" in the context of an alleged Constitutional violation, "where the likelihood of success on the merits is the dominant, if not the dispositive, factor." *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013). Plaintiff presses a single claim against Defendants for violation of the Fifth Amendment's equal protection principles.[8]

The Court's examination of an alleged equal protection violation concerning governmental classifications based on race involves "a daunting two-step examination known in our cases as 'strict scrutiny.'" *Harvard*, 600 U.S. at 206 (quoting *Adarand Constructors, Inc.* v. *Peña*, 515 U.S.

---

[7] Defendants rely on a decision currently on appeal in the Second Circuit in which the district court, *inter alia*, denied a motion for a preliminary injunction that was supported by anonymous declarants and dismissed the action for lack of Article III standing. *Do No Harm v. Pfizer Inc.*, 646 F. Supp. 3d 490, 501 (S.D.N.Y. 2022). The court in that case noted the rule that a plaintiff's burden to establish standing on a preliminary injunction motion is normally no less than that required on a motion for summary judgment. *Id.* at 500. Although this Court holds that the member-declarants identified by SFFA need not be named in order to sufficiently establish their standing, the principle that a more fulsome factual record—as would be required on a motion for summary judgment—is necessary for a motion of this ilk, rings true for the other reasons described herein forming the basis for this Court's decision.

[8] "As this case involves federal, not state, legislation, the applicable equality guarantee is not the Fourteenth Amendment's explicit Equal Protection Clause, it is the guarantee implicit in the Fifth Amendment's Due Process Clause." *Sessions v. Morales-Santana*, 582 U.S. 47, 52 (2017) (citing *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638, n.2 (1975) ("[W]hile the Fifth Amendment contains no equal protection clause, it does forbid discrimination that is so unjustifiable as to be violative of due process. This Court's approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment.")). The Supreme Court has held that the method of analyzing equal protection claims brought under the Fifth Amendment is no different than the analysis of such claims under the Fourteenth Amendment. *See Buckley v. Valeo*, 424 U.S. 1, 93 (1976) ("Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment."); *see also Fullilove v. Kreps*, 584 F.2d 600, 603 n.2 (2d Cir. 1978) (same), *aff'd sub nom. Fullilove v. Klutznick*, 448 U.S. 448 (1980). The parties in this case agree. (*See* Pl. Br. at 10 (describing applicable standard as the test applied in *Harvard*); Def. Br. at 12 (same)).

200, 227 (1995)). The "strict scrutiny" standard requires the Court to determine "first, whether the racial classification is used to 'further compelling governmental interests.'" *Id.* at 206-07 (quoting *Grutter v. Bollinger*, 539 U.S. 306, 326 (2003)). If the answer to the first question is yes, the second inquiry is "whether the government's use of race is 'narrowly tailored'—meaning 'necessary'—to achieve that interest." *Id.* at 207 (quoting *Fisher v. University of Tex. at Austin*, 570 U.S. 297, 311-312 (2013)).

A likelihood of success on the merits of its Fifth Amendment claim, therefore, requires that Plaintiff, in this procedural context, establish it is likely to prevail on its claim that Defendants *cannot* prove their consideration of race is used to further compelling governmental interests and is narrowly tailored to achieve those interests. Plaintiff, by electing to proceed with the instant motion at this early stage and without even the benefit of an answer to its Complaint,[9] has foisted an almost impossible burden on itself. That is, for Plaintiff to prove a negative now and without the benefit of a developed factual record—much less knowing and pleading the actual compelling governmental interests asserted by Defendants and how they are narrowly tailored.

The Supreme Court in *Harvard* considered whether the affirmative action admissions programs at Harvard and UNC violated the equal protection clause of the Fourteenth Amendment. "While the Court declined to overturn its 2003 decision in *Grutter v. Bollinger*, 539 U.S. 306 (2003), which held that consideration of an applicant's race as one factor in admissions did not violate the Constitution, the Court determined the schools' programs fell short of satisfying the burden that their programs be sufficiently measurable to permit judicial review under the rubric of strict scrutiny." *Naval Academy*, 2023 WL 8806668, at *2 (quoting *Harvard*, 600 U.S. at 214).

---

[9] Defendants requested, and Plaintiff did not oppose, a stay of the time for Defendants to file an answer to the Complaint "pending decision on [the] preliminary injunction motion, including any appeals." (Doc. 37). The Court granted that request on November 2, 2023. (Doc. 40).

The Court, in a footnote, expressly declined to address "the propriety of race-based admissions systems in [the military academy] context . . . in light of the potentially distinct interests that military academies may present." *Harvard*, 600 U.S. at 213 n.4.

Thus, guided by the Supreme Court's decision in *Harvard*, Plaintiff took a patchwork of information from the Government's submissions in *Harvard*,[10] newspaper articles, press releases, websites, agency reports, reports of the West Point Board of Visitors, and studies, coupled with the declarations of two of its members, to make an educated guess at what West Point would assert are its compelling governmental interests. (Compl. ¶ 97). Plaintiff alleged in its Complaint, and moved for a preliminary injunction on the basis, that "West Point asserts compelling interests in [1] facilitating organizational cohesion, [2] forming culturally aware leaders, [3] ensuring societal 'legitimacy' (circularly defined by the Academy), and [4] safeguarding the public trust." (Compl. ¶ 97). It contends that each of the foregoing has been, in sum and substance, rejected by the Supreme Court's decision in *Harvard*. While, of course, there is nothing wrong with compiling information needed to make good faith allegations in a complaint, each of the four purported interests, when compared to those asserted by Defendants, were imprecise and clearly not what West Point alleged.

At oral argument Plaintiff reiterated its position that it did not believe it was unusual for it bring this motion without full information and noted that Defendants, in opposition to this motion, indicated what they contend are their compelling interests. (Dec. 21, 2023 Tr. at 12:15-13:16). West Point's brief contends that "[t]he Army has concluded that diversity in the officer corps is vital to national security because it (1) fosters cohesion and lethality; (2) aids in recruitment of top

---

[10] The submissions included an amicus brief from 34 top former military leaders. *See* Brief of Adm. Charles S. Abbot et al. as Amici Curiae in Support of Respondents, *Students for Fair Admissions v. Pres. & Fellows of Harv. Coll.*, 600 U.S. 181 (2023) (Nos. 20-1199, 21-707).

talent; (3) increases retention; and (4) bolsters the Army's legitimacy in the eyes of the nation and the world." (Def. Br. at 30).

Defendants also submitted six declarations with their opposition to this motion. Acting Under Secretary of Defense for Personnel and Readiness for the Department of Defense, Ashish S. Vazirani, posits that a racially diverse officer corps (1) is critical to mission readiness and efficacy (Vazirani Decl. ¶ 12); (2) provides a broader range of thoughts and innovative solutions (*id*. ¶ 19); (3) helps military recruitment and retention which is vital to national security interests (*id*. ¶¶ 22, 25); (4) helps maintain the public trust and its belief that the military serves all of the nation and its population (*id*. ¶ 26); and (5) protects the U.S. militaries' legitimacy among international partners (*id*. ¶ 28). Colonel Deborah J. McDonald, the former Director of Admissions at West Point, states that diversity at West Point (1) helps cadets lead a multicultural force and fight alongside diverse partners and allies; (2) is essential for military cohesion; (3) is critical to maintaining diversity in the officer corps; and (4) is necessary to attract top talent. (McDonald Decl. ¶¶ 101-104).

While perhaps two possible interests raised by Defendants align generally with Plaintiff's allegations in its Complaint, it is clear to this Court that the allegations offered on each side are simply different. More specificity is needed to be alleged in the Complaint and a partial analysis of the compelling governmental interests would not be sufficient for preliminary injunction purposes. An additional issue arises with respect to compelling governmental interests as well: Does the Court consider West Point's articulation, the Army's articulation, or both?

Indeed, once Defendants posited their list of allegedly compelling governmental interests supported by those six declarations and exhibits, Plaintiff countered with a reply affidavit from Lieutenant General (Ret.) Thomas W. Spoehr, for the first time reacting specifically to the interests

claimed by Defendants, and "disagree[ing] with all [of Defendants'] key conclusions supporting racial preferences in selecting candidates for West Point." (Doc. 61, "Spoehr Decl." ¶ 2). Thus, on its face, the procedural posture demands the Court to resolve this significant issue based upon, in effect, reply papers.

The problems do not end there. Plaintiff demands that "real strict scrutiny" be applied, and "not some watered-down version that gives the government special deference." (Pl. Br. at 15). But, the reality is that this Court must analyze West Point's admissions program under the strict scrutiny rubric *together with* the Supreme Court's instruction to give "great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).[11] Simply put, West Point "is due more deference than were the private and public universities in *Harvard* given the explicit caveat in footnote 4 of *Harvard*." *Naval Academy*, 2023 WL 8806668, at *11.

At best, Plaintiff has highlighted an issue of fact as to the nature of the asserted reasons for considering race, whether those reasons satisfy a strict scrutiny analysis, and whose interests are

---

[11] Deference in this context is not judicial abdication, but rather simple recognition that "in the area of military affairs . . . . the Constitution itself requires such deference." *Rostker v. Goldberg*, 453 U.S. 57, 67 (1981). When pressed at oral argument to explain, as a practical matter, how this Court should properly analyze strict scrutiny while granting deference, Defendants argued in sum and substance that the Court should view the deference inquiry as the weight afforded the evidence presented. Defendants argued that the Court has on the one hand six declarations proffered by Defendants, made by senior military leaders based upon their collective experience, among other things (Doc. 48—Doc. 53); and on the other hand, from Plaintiff in reply, a single declaration from a retired general who bases his opinion on his own robust experience, among other things (Doc. 61). (Dec. 21, 2023 Tr. at 36:13-37:1, 39:1-40:4). Defendants thus urge the Court to give great deference to their evidence, especially where it is the result of exhaustive inquiry. *Able v. United States*, 155 F.3d 628, 634 (2d Cir. 1998). The Court agrees that the weight of the evidence here does not suggest Defendants lack potentially compelling governmental interests; it suggests just the opposite. Plaintiff urges that the Court grant no deference at all to Defendants when considering strict scrutiny. The ultimate determination of how deference operates here remains uncertain.

actually at stake.[12] The reply does not solidify Plaintiff's conclusion—it creates questions of fact which falls far short of the clear showing required for the extraordinary and drastic remedy sought.

Plaintiff's argument at its core is that any alleged compelling interest asserted by Defendants is unconstitutional under *Harvard*.[13] The procedural posture created by Plaintiff on this application, proving a negative, makes it impossible for the Court to determine whether Plaintiff has made a clear showing entitling it to an injunction. It is possible that *Harvard*'s equal protection conclusions with respect to the civilian universities apply to West Point. Contrariwise, the reasons given by Defendants may all be compelling governmental interests which are narrowly tailored: what was not compelling to the Supreme Court as regards civilian universities may in fact be compelling when raised in the context of West Point and national security interests. Indeed, these possibilities are precisely what *Harvard* itself left open, by declining to address the issue altogether, "in light of the *potentially* distinct interests that military academies *may* present." *Harvard*, 600 U.S. at 213 n.4 (emphasis added). But to grant a motion of this importance with so much left open would be imprudent.

A full factual record is vital to answering this critical question whether the use of race in the admissions process at West Point furthers compelling governmental interests and whether the government's use of race is narrowly tailored to achieve that interest. The Court cannot enjoin West Point's use of race in admissions without a full understanding, informed by a complete

---

[12] The parties appear to agree that the Army and West Point are indistinct for purposes of this analysis. In other words, while the challenged admissions process occurs at West Point, the interests being served include what happens once those cadets leave the Academy grounds. The Court continues to question whether and to what extent the interests of the military inform the strict scrutiny analysis with respect to the military academy's use of racial classifications in its admissions process.

[13] The underlying litigations in *Harvard* were adjudicated after full trials, not at the pre-answer stage. The procedure employed here does not permit a proper consideration and development of the facts at issue; and is insufficient based on the evidence currently available.

factual predicate, as to what exactly are the compelling interests asserted, to whom those compelling interests belong, and how in this specific case they are or are not narrowly tailored to achieve those interests.[14] Accordingly, Plaintiff has not met its burden, on the present record, to show a clear, or otherwise preponderant, likelihood of success on the merits.

Although the other preliminary injunction factors need not be addressed in view of the above, the Court briefly addresses the remaining preliminary injunction requirements to complete its review.

### III. Irreparable Harm

"The burden of proof and persuasion rests squarely on the party moving for a preliminary injunction to show that irreparable harm is likely." *JBR, Inc. v. Keurig Green Mountain, Inc.*, 618 F. App'x 31, 34 (2d Cir. 2015). To satisfy its burden to show irreparable harm, a plaintiff "must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *JTH Tax*, 62 F.4th at 672.

Plaintiff argues, with respect to irreparable harm, that the alleged unconstitutional racial discrimination is itself strong irreparable harm, because it bars SFFA's members from fairly competing for a whole admissions cycle. (Pl. Br. at 9 (citing *Yang v. Kosinski*, 960 F.3d 119, 128 (2d Cir. 2020)), 19-20). While the Second Circuit has held that pleading an alleged constitutional

---

[14] Plaintiff points out that the present record lacks evidence of West Point's consideration of race-neutral alternatives, necessary to establish narrow tailoring. (Pl. Br. at 18 (citing *Grutter*, 539 U.S. at 339)). It suggests that West Point could follow the example of the Coast Guard Academy and its own Merchant Marine Academy. (*Id.*). The Coast Guard Academy, until 2010, was prohibited from using racial preferences in its admissions process and, in the two years before it began considering race, launched an aggressive advertising and recruiting campaign targeting minorities which increased minority enrollment by 60%, from 15% to 24%. (*Id.*). The Merchant Marine Academy does not use race for most of admissions. (*Id.*). While Defendants' opposition discusses some of the race-neutral alternatives it has considered and implemented, it is clear that both Plaintiff and Defendants need to further develop a factual record on this issue as well.

violation itself constitutes irreparable harm, *Connecticut Dep't of Envtl. Prot. v. O.S.H.A.*, 356 F.3d 226, 231 (2d Cir. 2004); *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) ("it is the alleged violation of a constitutional right that triggers a finding of irreparable harm"), the presumption of irreparable harm afforded constitutional claims appears to be impacted by the outcome of the Court's analysis of the likelihood of success on the merits element. *See, e.g., We The Patriots USA, Inc.*, 17 F.4th at 294 ("Although Plaintiffs are subject to meaningful burdens on their religious practice if they choose to obtain the COVID-19 vaccine, because they have failed to demonstrate a likelihood of success on their First Amendment or other constitutional claims, their asserted harm is not of a constitutional dimension. Thus, Plaintiffs fail to meet the irreparable harm element simply by alleging an impairment of their Free Exercise right."); *see also Brock v. City of New York*, No. 21-CV-11094, 2022 WL 479256, at *4 (S.D.N.Y. Jan. 28, 2022) ("[T]he favorable presumption of irreparable harm arises only after a plaintiff has shown a likelihood of success on the merits of the constitutional claim. . . . Thus, when a plaintiff seeks injunctive relief based on an alleged constitutional deprivation, 'the two prongs of the preliminary injunction threshold merge into one . . . in order to show irreparable injury, plaintiff must show a likelihood of success on the merits.'" (quoting *Turley v. Giuliani*, 86 F. Supp. 2d 291, 295 (S.D.N.Y. 2000))); *Andre-Rodney v. Hochul*, 569 F. Supp. 3d 128, 141-42 (N.D.N.Y. 2021) ("While an allegation of a constitutional violation is insufficient to automatically trigger a finding of irreparable harm, if the constitutional deprivation is convincingly shown and that violation carries noncompensable damages, a finding of irreparable harm is warranted. . . . To determine whether the constitutional deprivation is convincingly shown the Court must assess the likelihood of success on the merits."). In other words, once the Court considers and concludes that the likelihood of success element has

not been met, as it does here, the mere allegation of a constitutional violation is insufficient to establish irreparable harm.

Plaintiff also argues that "the loss of an opportunity to attend a particular school is irreparable injury in the sense that monetary damages cannot readily be fixed or, for that matter, compensate for the lost opportunity." (Reply at 22 (citing *Foulke by Foulke v. Foulke*, 896 F. Supp. 158, 161 (S.D.N.Y. 1995)). Defendants argue, persuasively, that there is no actual imminent harm as this Court is not precluded from issuing an effective remedy at the end of a final trial on the merits with the benefit of a full trial record before it.[15] Here, Member A is not yet 18 years old, and is a high-school senior who is applying to colleges now. (Doc. 8, "Member A Decl." ¶¶ 1, 2, 6). Member C is 18 years old and presently enrolled in college. (Doc. 25, "Member C Decl." ¶¶ 1, 4). To be eligible for admission to West Point, "a candidate must be at least 17 years of age and must not have passed his twenty-third birthday on July 1 of the year in which he enters the Academy." 10 U.S.C. § 7446. Because Member A and Member C are far away from their twenty-third birthdays, there is significant time to remedy the alleged constitutional injury. Because Plaintiff has not sufficiently established that Member A and member C will "lose a year" of their lives and never catch up to their peers "in terms of military seniority" (Pl. Br. at 20), and because

---

[15] Defendants also argue, effectively, that Plaintiff's "theory of irreparable harm is premised on nothing more than 'an accumulation of inferences' . . . [which] 'is simply too speculative and conjectural to supply a predicate for prospective injunctive relief." (Def. Br. at 16 (quoting *Nachshen v. E. 14 Realty, LLC*, No. 18-CV-08304, 2019 WL 5460787, at *2 (S.D.N.Y. Oct. 9, 2019)). The steps required for Member A and Member C to suffer irreparable injury, all of which must come to pass, would be: (1) to "complete their West Point applications before January 31, 2024"; (2) "be qualified"; (3) "not be selected to fill a vacancy or qualified alternate slot"; (4) "be considered for selection as Additional Appointees or Superintendent nominations"; and (5) "ultimately not be selected for appointment because of West Point's limited consideration of race." (*Id.*; *see also* Dec. 21, 2023 Tr. at 57:21-59:15). This "highly attenuated chain of possibilities," *Superb Motors Inc. v. Deo*, No. 23-CV-06188, 2023 WL 5952145, at *4 (E.D.N.Y. Aug. 25, 2023), is insufficient to establish irreparable harm under the circumstances.

it is unclear whether Plaintiff is likely to succeed on the merits, Plaintiff has not established it will be irreparably harmed absent the requested injunction.[16]

IV. Public Interest and Balancing the Equities

"Under the last injunction factor, [the Court] must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief, as well as the public consequences in employing the extraordinary remedy of injunction." *Yang*, 960 F.3d at 135-36; *We The Patriots USA, Inc.*, 17 F.4th at 295 ("When the government is a party to the suit, our inquiries into the public interest and the balance of the equities merge"). A balancing of the equities has been described as "the hardship imposed on one party outweigh[ing] the benefit to the other." *Ligon v. City of New York*, 925 F. Supp. 2d 478, 540 (S.D.N.Y. 2013).

West Point is mid-admissions cycle. As of February 1, 2024, a new admissions cycle begins at West Point. But the prior year's admissions cycle, which began on February 1, 2023, continues into April of 2024 (*see* McDonald Decl., Ex. B).  The requested injunction, to take effect on February 1, 2024, would require the entire admissions policy to be changed, and a new policy be applied to the current applicant pool midstream, as well as to applicants to the new admissions cycle beginning on February 1, 2024. This result would not only affect the students who previously applied and are currently applying, but could require West Point to withdraw already offered appointments and LOAs. (McDonald Decl. ¶ 117; Dec. 21, 2023 Tr. 46:20-24). The requested preliminary injunction does more than disrupt a single admissions cycle; it impacts the carryover admissions process from the prior admissions year which began on February 1, 2023. Because Plaintiff has not clearly demonstrated a likelihood of success on the merits or that its members will

---

[16] The Court is not persuaded by Defendants' argument that Plaintiff's alleged delay in filing this action and seeking emergency relief for the 2023-24 admissions cycle undercuts its claim of irreparable harm. Plaintiff sued and moved for a preliminary injunction only three months after the Supreme Court decided *Harvard*.

suffer irreparable harm absent injunctive relief, the balance of the equities does not tip in Plaintiff's favor.  As Plaintiff has not shown a likelihood of success on the merits of its constitutional violation claim, it has also failed to show that a preliminary injunction serves the public interest. *We The Patriots USA, Inc.*, 17 F.4th at 296.

 Accordingly, Plaintiff has not met its burden of proof with respect to likelihood of success on the merits of its claim, irreparable harm, or that the public interest weighs in favor of granting injunctive relief.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for a preliminary injunction is DENIED.

The Clerk of Court is respectfully directed to terminate the motion sequences pending at Docs. 6, 56, and 57.

**SO ORDERED.**

Dated:    White Plains, New York
              January 3, 2024

_____
PHILIP M. HALPERN
United States District Judge