**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
**WHITE PLAINS DIVISION**

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS,<br><br>                                    Plaintiff,<br><br>v.<br><br>THE UNITED STATES MILITARY ACADEMY AT WEST POINT; CHRISTINE WORMUTH, in her official capacity as Secretary of the Army; LIEUTENANT GENERAL STEVEN GILLAND, in his official capacity as Superintendent of the United States Military Academy; and LIEUTENANT COLONEL RANCE LEE, in his official capacity as Director of Admissions for the United States Military Academy at West Point,<br><br>                                    Defendants. | No. 7:23-cv-08262<br><br><u>**AMENDED COMPLAINT**</u> |

Plaintiff, Students for Fair Admissions, brings this civil action for declaratory and injunctive relief against Defendants and alleges as follows:

## INTRODUCTION

1.      The United States Military Academy, or West Point, is one of the crown jewels of the American military. It is also one of the last remaining universities to expressly consider race as a factor in admissions.

2.      West Point has no justification for using race-based admissions. Its policy would be unconstitutional at all other public institutions of higher education. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 143 S. Ct. 2141 (2023). The Academy is not exempt from the Constitution. *Crawford v. Cushman*, 531 F.2d 1114, 1120 (2d Cir. 1976). And its calls for judicial deference to the military on questions of racial discrimination are "'gravely wrong,'" both legally and historically. *Harvard*, 143 S. Ct. at 2162 n.3 (discussing the overruling of *Korematsu v. United States*, 323 U.S. 214 (1944)).

3.      Because West Point discriminates based on race, its admission policy should be declared unlawful and enjoined.

## PARTIES

4.      Plaintiff, Students for Fair Admissions, is a voluntary membership organization formed for the purpose of defending human rights and civil liberties, including the right of individuals to equal protection under the law, through litigation and other lawful means. SFFA is a nonprofit membership group of tens of thousands of individuals across the country who believe that racial preferences in college admissions, including the academies, are unfair, unnecessary, and unconstitutional. SFFA has members who are ready and able to apply to the United States Military Academy.

5.      Defendant United States Military Academy at West Point is a military service academy created under federal law and operating under the command and supervision of the Department of the Army and Department of Defense. The Academy and its leadership are responsible for creating and executing its admissions policies for prospective cadets, including the policy at issue here.

6.      Defendant Christine Wormuth is the Secretary of the Army and oversees all Army operations and policies, including the policy at issue here. Secretary Wormuth is sued in her official capacity.

7.      Defendant Lieutenant General Steven Gilland is Superintendent of West Point and responsible for the creation, implementation, and oversight of all West Point policies, including the policy at issue here. General Gilland is sued in his official capacity.

8.      Defendant Lieutenant Colonel Rance Lee is Director of Admissions at West Point and responsible for the creation, implementation, and oversight of all West Point admissions policies, including the policy at issue here. Lieutenant Colonel Lee is sued in his official capacity.

## JURISDICTION & VENUE

9.      This Court has subject-matter jurisdiction over this case because it arises under the Constitution and laws of the United States. *See* 28 U.S.C. §1331.

10.     Venue is proper because a substantial part of the events or omissions giving rise to the claims occurred here. *See* 28 U.S.C. §1391(b).

11.     The Academy cannot invoke sovereign immunity. Federal courts routinely apply the APA's waiver of sovereign immunity to constitutional claims. *See, e.g., Standage v. Braithwaite*, 526 F. Supp. 3d 56, 86 (D. Md. 2021) (explaining, in a Fifth Amendment case against the Naval Academy, that "the §702 waiver encompasses qualifying claims arising under non-APA authority"); *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 775 (7th Cir. 2011) ("[T]he waiver in §702 is not limited to claims brought pursuant to the review provisions contained in the APA itself." (collecting cases)). The military and its service academies meet the APA's definition of "agency." *See, e.g., Doe v. Hagenbeck*, 870 F.3d 36, 45 (2d Cir. 2017).

## BACKGROUND

### I.     West Point's Admissions Process

12.     Appointment (*i.e.*, "admission") to West Point is highly selective: in the most recent class, fewer than ten percent of applicants were given the honor of joining the Long Gray Line.

13.     Federal law caps the Academy's enrollment at 4,400 cadets. To account for attrition, the Academy reaches that number by matriculating roughly 1,200 cadets in each incoming class.

### A.     Applications

14.     Applying to the Academy involves several steps. Candidates initiate the application process by submitting a candidate questionnaire, which asks candidates to self-report their race, sex, basic biographical information, high school GPA, standardized test scores, and athletic and extracurricular activities.

15.     An admissions officer screens the questionnaire to confirm that the candidate satisfies the statutory eligibility criteria—U.S. citizen, under 23 years old, and without dependents—and has the minimum academic credentials necessary to be competitive for admission. In an average year,

approximately eighty percent of applicants make it past this first step. For applicants in that eighty percent, West Point's admissions office opens a Second Step Kit.

16.     The Second Step Kit is similar to a standard college application. It includes official school transcripts, official standardized test score reports, multiple short answer essay questions, and four teacher evaluations.

17.     At least in prior years, West Point could consider an applicant's race when deciding whether to open the Second Step Kit for that candidate.

18.     When the Academy opens a Second Step Kit for applicants, it also directs them to take a physical-fitness test (the Candidate Fitness Assessment), undergo a medical evaluation by the Department of Defense, and conduct an interview with a Military Liaison Officer or a member of the Field Force in their area. If the applicant is a recruited athlete, her interview is conducted by a coach. If the applicant an enlisted servicemember, the interview is with her commanding officer.

19.     A candidate can complete the Second Step Kit, fitness test, medical evaluation, and interview in any order, as long as all are completed by January 31 of the year the candidate would enter West Point. While a candidate's medical evaluation must be complete by January 31, he does not need to receive final medical clearance until later in the Spring semester.

20.     The Admissions Office assigns each candidate a numerical score, known as a "Whole Candidate Score" or "WCS," based on the information in the application and the results of the physical-fitness test.

21.     Sixty percent of a candidate's WCS is based on his academic qualifications, which are calculated using a weighted combination of his grade point average and standardized test scores known as the "College Entrance Examination Rank" or "CEER." A candidate's CEER is designed to predict his academic performance at the Academy.

22.     Thirty percent of the WCS is based on a candidate's "community leader score," which is derived from a weighted combination of the candidate's athletic activities, extracurricular activities, and teacher appraisals. Community Leader Scores range from 147 to 740.

23.     The final ten percent of the WCS comes from the candidate's raw score on the Candidate Fitness Assessment.

24.     The Admissions Office uses a candidate's Whole Candidate Score—and the individual scores from its three subcomponents—to determine whether she is considered "qualified" for admission. To be fully qualified for admission, candidates must also pass their medical examinations.

25.     A candidate is considered qualified if he is in the top 81% of his class, has an SAT Math score of 570 or above, and has an SAT Evidence Based Reading and Writing Score of 550 or above. Taken together, the minimum qualifying CEER—the weighted academic performance predictor score that combines GPA and test scores—is 466 or greater. The minimum qualifying community leader score is 520 on a scale of 147-740, and the minimum qualifying physical fitness score is 450 out of 600.

26.     Altogether, an applicant is considered qualified if his component scores combine to produce a WCS of 5,200 or higher—slightly higher than the sum of the three minimum component scores. Qualification is a minimum threshold, however, and says little about the relative strength of a candidate's application compared to his or her peers.

27.     After the Admissions Office calculates a candidate's WCS, the Admissions Committee can adjust it up or down 10%, based on the more subjective components of his application.

**B.  Nominations**

28.     Candidates must secure a nomination to the Academy. Broadly speaking, there are two types of nominations: nominations from members of Congress or other "statutory nominating authorities," and "service-connected nominations" reserved for children of certain service members and

for soldiers who are currently serving on active duty or in the Army Reserve. Most nominations come from statutory nominating authorities.

29.     ***Nominations from Statutory Nominating Authorities.*** Under federal law, members of Congress, the Vice President of the United States, and West Point's Superintendent are entitled to nominate eligible U.S. Citizens for appointment to the Academy.

30.     Representatives and senators have statutory authority to nominate their constituents for admission to West Point ("congressional nominations").* Each senator and congressman can have no more than five nominees attending the Academy at any given time. *See* §7442(a)(3)-(4). Most legislators stagger their vacancies to ensure that they have at least one open seat in the incoming class at West Point each year.

31.     Members can nominate up to ten of their constituents for consideration for each vacancy. §7442(a). Eighty-five percent of members choose not to rank their nominees in order of priority; they simply nominate up to ten candidates and let the Academy select the nominee it finds most qualified. This practice is known as the "competitive method." Under the competitive method, the Academy ranks each candidate in a member of Congress's slate of nominees in an "order of merit" determined by their WCS, and the nominee with the highest WCS receives the appointment.

32.     Some members of Congress choose to identify a "principal" candidate and then name up to nine "alternates." When a member identifies a principal candidate, the Academy must select that candidate if she is qualified. If the principal candidate is unqualified, then the Academy either (a) chooses the alternate nominee with the highest WCS, just as it would under the competitive method (the "principal-competitive alternate" method); or (b) offers the appointment to the highest-

---

* "Congressional nominations," as used in this complaint, includes nominations from Congressional Delegates from American Samoa, the District of Columbia the Virgin Islands, Guam, and the Northern Marianas Islands, as well as nominations awarded by the Governor and Resident Commissioner of Puerto Rico. *See* 10 U.S.C. §7442(a).

ranked alternate nominee who is qualified, should the member choose to rank his alternate nominees in order of priority (the "principal-numbered alternate method").

33.     Congressional nominations, however awarded, account for approximately three-fourths of each incoming class.

34.     Unlike members of Congress, who can only nominate their constituents, the Vice President can nominate any U.S. citizen for admission to West Point. *See* 32 C.F.R. §575.3. The Vice President cannot have more than five nominees enrolled at West Point at any one time. *Id.* Accordingly, Vice Presidential nominees normally fill only one or two seats in each incoming class. Vice presidential nominees are also chosen in order of merit, based on their WCS ranking.

35.     ***Service-Connected Nominations.*** The following individuals are eligible for service-connected nominations: (1) the children of servicemembers who served at least eight consecutive years on active duty, served in the military reserves for the equivalent of eight active-duty years, are 100% disabled, or were killed in action; (2) enlisted soldiers serving in an active duty or reserve capacity; and (3) cadets who are enrolled in ROTC or JROTC detachments, or are formally retired from military service and meet the requirements for retirement pay benefits (*e.g.*, servicemembers who are 100% disabled, servicemembers who were killed in action, etc.). *See* 32 C.F.R. §575.3.

36.     The children of eligible servicemembers receive their nominations, known as "presidential nominations," automatically. One hundred seats are reserved for presidential nominees in each incoming class. *See* 32 C.F.R. §575.3. Separately, sixty-five seats are set aside in each class for the children of servicemembers who were killed in action.

37.     Active-duty soldiers and soldiers in the Army Reserve can obtain nominations from the Secretary of the Army. There are eighty-five seats in each incoming class for Secretary of the Army nominees who are serving on active duty, and another eighty-five for Secretary of the Army nominees who are in the reserves.

38.     ROTC and JROTC cadets can obtain nominations from the commanding officers of their respective detachments. ROTC and JROTC nominees can fill up to twenty seats in each incoming class.

39.     Candidates for each type of service-connected nomination are awarded appointments in order of merit based on their WCS.

40.     If a candidate has a service-connected or congressional nomination but does not receive one of the appointments for his slate of nominees, he or she can still be admitted as a "qualified alternate." 150 qualified alternates are chosen each year, in order of merit based on their WCS.

41.     Some applicants may secure nominations from multiple sources. For example, the child of an eligible service member who is automatically entitled to a presidential nomination can also earn a nomination from her congressman. Applicants in those circumstances can compete for appointments in both categories. The Academy does not publicly report the number of applicants who apply under these circumstances each year.

42.     ***"Additional Appointees" and "Superintendent Nominations."*** When the Academy has filled each nomination vacancy and appointed 150 qualified alternates and still has not filled its class, it offers appointments to the remaining nominees. These "Additional Appointees" can be chosen regardless of the comparative strength of their application, as long as they meet the bare minimum requirements for being considered "qualified."

43.     West Point has provided appointments to Additional Appointees every year for the past fifteen years. Almost thirty percent of the cadets in the Class of 2027 were Additional Appointees.

44.     Finally, the Superintendent can "nominate" up to fifty candidates each year, at his sole discretion. Superintendent nominations are only "nominations" in a technical sense—because the Superintendent also has authority over admissions decisions, they function as direct appointments to the Academy. Like Additional Appointees, Superintendent Nominations are available if the Academy has

filled each vacancy for statutory nominating authorities and appointed 150 Qualified Alternates. And, like Additional Appointees, Superintendent Nominees have been part of the incoming class for every year in recent memory. From the Class of 2021 to the Class of 2027, an average of 30 cadets per year received their appointments by way of Superintendent Nominations.

## II.     West Point's Use of Race

45.     West Point sets benchmarks for the percentage of each class that should be filled by "African Americans," "Hispanics," and "Asians," and it tracks its compliance with those figures down to a tenth of a percentage point.

46.     These "class composition goals" are set by West Point alone. The Academy does not receive guidance from the Army about what West Point's racial composition should be, so West Point sets these "diversity" goals by trying to make each class mirror the current racial composition of the Army's officer corps, while accounting for attrition. For example, Hispanics were 8% of officers in the regular army in recent years, so West Point aims to admit 11%. Likewise, African Americans were 11% of the officer population, so the Academy aims to admit 14%.

47.     West Point does not have a class composition goal for Native Americans.

48.     Overall, racial minorities comprised 29% of the Army officer corps in Fiscal Year 2019, the last year for which the data was available to the Academy, so it set its total minority enrollment percentage for the Classes of 2025 and 2026 at 37%. The Academy sets its admission percentages higher than its target outcome based on the assumption that up to a quarter won't graduate.

49.     West Point carefully tracks whether these racial benchmarks are met. Its current guidance for admissions officers starts by stressing that, last cycle, the team reached its goals for Asians, enlisted soldiers, and candidates with particularly high test scores, but it missed the mark for African Americans, women, and Hispanics. By that, West Point means it fell short of its "goal" of admitting 138 Hispanics by *one person* and its goal of admitting 244 women by *five people*. For each of the six years

for which pre-discovery data is available, West Point never missed its target for blacks or Hispanics by more than 3.6 percentage points:

| **Class** | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2027 |
|---|---|---|---|---|---|---|---|
| **Black** Admitted (Goal) | 10.7% (12-15%) | 8.6% (12-15%) | 9.5% (12-15%) | 13.9% (11-13%) | 15.1% (>14%) | 13.8% (>14%) | 10.4% (>14%) |
| **Hispanic** Admitted (Goal) | 9.6% (9-12%) | 8.6% (9-12%) | 11.7% (9-12%) | 10.1% (9-12%) | 9.7% (>11%) | 9.3% (>11%) | 10.8% (>11%) |

50.     For the classes of 2018-2021, the number of Hispanics enrolled in the first year (or "plebe") class were 116, 122, 121, and 119, respectively. West Point enrolled 99 Asian Americans in the Class of 2022. It then enrolled 99 Asian Americans again in West Point's Class of 2023.

51.     Colonel Deborah McDonald, the Academy's Director of Admissions until early 2023, once confessed that in a prior year the Academy had offered admission to every qualified African-American candidate, yet still failed to meet its target.

52.     For the Class of 2028, West Point instructs admissions officers to plan to admit specific numbers of candidates of each race for certain appointment categories. It also cautions admissions officers that they are "not to exceed" those numbers and to be mindful of the fact that some applicants might count towards more than one of the specified categories.

53.     The mere existence of the Academy's racial composition goals sends an unmistakable message that it views candidates first and foremost as members of their respective races, rather than as individuals. That message is only reinforced by the racial preferences the Academy uses to ensure that it meets those goals.

54.     At various part of its admissions process, West Point can and does consider race as a "plus factor" for African Americans, Hispanics, and Native Americans. It does not award these racial preferences for any other racial group.

55.     To have race be considered a plus factor by West Point, qualified and competitive applicants who are African American, Hispanic, and Native American need only identify themselves as a member of one of those races on their application. They do not need to discuss race in an essay or say that race has influenced their experiences or views.

56.     West Point does not verify, beyond self-reporting, whether applicants are the race they identify on their applications.

57.     When it considers or tracks race in admissions, West Point uses the following categories: (1) Asian; (2) Native Hawaiian or Pacific Islander; (3) Hispanic; (4) White; (5) African-American; and (6) Native American. These categories are the same categories that Harvard and UNC used at the time of the *Harvard* decision.

58.     If applicants check the box for "African American," "Hispanic," or "Native American" when filling out the candidate questionnaire, then their applications are routed to the "Diversity Outreach Office," which takes charge of nearly every aspect of their applications, including the initial determination whether they are qualified. If an applicant is not black, Hispanic, or Native American, his or her candidate questionnaire is reviewed by a regional admissions officer.

59.     Asian and Pacific Islander candidates are not sent to the diversity office.

60.     West Point stopped sending Hispanics to the diversity office after their population grew in 2014, but it recently started again after the Hispanic percentage at West Point became misaligned with the percentage of Hispanic officers in the Army.

61.     As described in part above, candidates can obtain an appointment through one of four main paths: (1) by obtaining a Letter of Assurance ("LOA"), which serves as a de facto form of early admission in which candidates receive conditional offers of acceptance—which the Academy describes as a "firm commitment"—if they complete their applications and take other minimum steps; (2) by having a high enough Whole Candidate Score to obtain an appointment from their

congressional slate service-connected nominee slate or by placing in the top 150 among the rest of the pool; (3) by receiving a Superintendent Nomination; or (4) by receiving an appointment as an Additional Appointee.

62.     The Academy is required by federal law to select candidates in order of merit when making appointments from congressional or service-connected slates and choosing Qualified Alternates, but no such obligations exist for Letters of Assurance, Additional Appointees, or Superintendent Nominations. When making appointment decisions for those categories, West Point can and does consider candidates' race.

63.     ***Letters of Assurance.*** West Point reserves most, if not all, LOA offers for five types of candidates: "recruited athletes," "scholars," "blacks," Hispanics," and "women." The Academy states that athletes and "scholars"—which the Academy defines as candidates with CEER scores of 650 and above and Whole Candidate Scores of 6,800 and above—are awarded LOAs because of their "talent." Candidates from the other three categories are prioritized for LOAs for being "diverse." Once again, the Academy omits Asian Americans from its definition of racially "diverse."

64.     West Point caps the number of LOAs that can be awarded to each category: This cycle, the caps are 160 for athletes, 120 for blacks, 75 for Hispanics, 75 for scholars, and 75 for women.

65.     To get an LOA, candidates need certain minimum scores that vary based on identity.

|  | Minimum CEER/ACEER | Minimum WCS |
|---|---|---|
| **Recruited Athletes** | 554 | none |
| **Blacks** | 554 | none |
| **Hispanics** | 554 | 5600 |
| **Women** | 554 | 6500 |
| **Scholars** | 650 | 6801 |

66.     To qualify for an LOA, black candidates need a minimum CEER score of 554—the same standard the Academy uses for recruited athletes. West Point does not set a minimum WCS for blacks or athletes.

67.     Like black candidates, Hispanic candidates need a minimum CEER score of 554 to be eligible for an LOA. Unlike blacks and recruited athletes, however, Hispanic candidates must also have a minimum WCS of 5,600 or above. Put differently, if a black candidate and a Hispanic candidate both have CEER scores of 554, the black candidate will be eligible for a LOA if his physical fitness and Community Leader scores meet the Academy's minimum thresholds for admission, whereas the Hispanic candidate will need slightly higher fitness and leadership scores to be eligible. Under the Academy's WCS formula, a candidate with a CEER of 554 and the minimum qualifying Community Leader and physical fitness scores of 520 and 450 respectively will have a WCS of 5,334. Accordingly, the Academy's 5,600 WCS threshold for Hispanic candidates means that Hispanic candidates with a CEER of 554 must have a WCS that is 266 points higher than a similarly situated black candidate to be eligible for a LOA.

68.     "Scholars"—the only category that includes white and Asian men who aren't recruited athletes—must have the highest scores.

69.     The Academy not only holds minority students to lower eligibility standards for LOAs, but also uses separate teams to review their qualifications. While regional admissions officers typically review applications and recommend choice candidates for letters of assurance, the Diversity Outreach Office makes those recommendations for black, Hispanic, and Native American applicants.

70.     As a practical matter, an LOA is equivalent to an immediate and binding offer of admission if a candidate has no medical issues and scores the bare minimum on his physical-fitness test. The Academy stresses that a candidate who receives a LOA still must receive a nomination before he or she is fully accepted, but that is a mere formality because the Academy acknowledges it will admit

LOA recipients who lack congressional nominations by designating them as Additional Appointees or granting them Superintendent Nominations.

71.     ***Superintendent Nominations.*** Up to 50 applicants per year can be nominated—*i.e.*, admitted—directly by West Point's Superintendent. There are no restrictions on the Superintendent's discretion, so he can and does consider race for blacks, Hispanics, and Native Americans. Indeed, Superintendent Nominations are generally reserved for athletes and candidates who help the Academy meet its racial composition goals.

72.     As with the Second Step Kit, LOAs, and other aspects of West Point's admissions process, candidates from West Point's three favored racial demographics are recommended for Superintendent Nominations via the Diversity Outreach Office, while the regional admissions offices are responsible for recommending all other candidates.

73.     ***Additional Appointees.*** As described above, applicants who aren't admitted under any other path can still be admitted as additional appointees. Several hundred applicants get in this way each year. Unlike congressional appointments and service-connected appointments for enlisted soldiers or the children of certain veterans, the Academy does not need to admit Additional Appointees by order of merit.

74.     One of the reasons why the Academy deviates from its merit list when making these appointments is so that it can treat race as a "plus factor" for black, Hispanic, and Native American candidates.

75.     Like it does for LOAs, West Point tells admissions officers to plan to admit specific numbers of athletes and members of each race as additional appointees. For this admissions cycle, officers were told to plan to admit 180 athletes, 100 blacks, 75 women, and 75 Hispanics.

76.     At least for applicants who make it to this stage of the process, West Point's admissions process is zero sum. Potential additional appointees compete against each other, in a nationwide

pool, for the last large swath of seats in West Point's admitted class. No qualified applicant who is rejected by West Point goes through a race-neutral admissions process, since they necessarily did not get selected as an additional appointee—where West Point admits it considers race.

77.    Taken together, the Academy's comprehensive racial preferences point to one inescapable conclusion: race is determinative for hundreds of applicants each year. It is a factor in the admissions process for many more. And because race is a "positive" factor for some West Point applicants, it is necessarily a "negative" factor for others. *Harvard*, 143 S. Ct. at 2169.

78.    West Point has no written guidance to admissions officers about how to use race. Its written guidance nowhere tells admissions officers not to use race when, for example, adjusting the WCS or assessing a candidate's qualifications.

79.    West Point's race-based admissions policy does not have a sunset date—a predetermined date that, without further action, would end West Point's use of race in admissions.

80.    West Point does not have a specific day, month, or even year when it expects that it can end its use of race as a factor in admissions.

81.    West Point has no firmer logical or durational limit on its use of race in admissions than the ones articulated by Harvard and UNC in *Harvard*.

82.    West Point has never calculated, in the last decade, what the racial composition of its admitted or enrolled classes would be if it no longer used race as a factor in admissions.

83.    West Point has never conducted, in the last decade, a study of race-neutral alternatives, where it calculates the racial composition of its admitted or enrolled class under different scenarios where race is no longer a factor but other factors are changed.

84.    West Point has never studied, in the last decade, the admissions process at the Coast Guard Academy prior to 2010, when that academy did not use race as a factor in admissions.

### III.     West Point's Flawed Justifications for Its Race-Based Admissions Practices

85.     Before the Supreme Court's decision in *Harvard*, the Academy invoked the "educational benefits of diversity," like Harvard and UNC did in *Harvard*, as a justification for its race-based admissions. Specifically, the Academy submitted that the racial "diversity" achieved through race-based admissions "reduc[ed] a sense of isolation and alienation" among ethnic minorities in the Corps of Cadets and "encourage[d] greater participation by minority students in the classroom." *Students for Fair Admissions v. President and Fellows of Harvard College*, No. 21-707, Tr. 145:1-146:11, (Oct. 31, 2022). Now that the Supreme Court has refused to allow colleges to justify their actions by reference to those "educational benefits," West Point cannot and is not relying on that asserted interest to defend the constitutionality of its race-based admissions.

86.     West Point claims that its use of race in admissions is a national-security issue. It asserts that, to achieve the Army's national-security interests, the racial makeup of the officer corps must mirror that of the enlisted corps and the general population. So West Point must use race in admissions to maintain the current racial mix of the Army's officer corps.

87.     As to how balancing the racial makeup of the corps of cadets with the racial demographics of the officer corps is critical to fulfilling the Army's mission, West Point offers a scatter-shot of reasons devoid of evidentiary support and naked appeals to deference.

88.     The Academy claims that racial preferences further compelling national-security interests because a racially balanced force is necessary for (1) unit cohesion and battlefield lethality; (2) recruiting top-tier talent to serve in the Army; (3) retaining that talent; and (4) preserving the Army's public legitimacy both here and abroad.

89.     None of these purported interests are meaningfully furthered by West Point's race-based admissions policies. West Point's ongoing racial discrimination can have dream-shattering

consequences for the individual applicants who are unfairly denied admission, but it barely moves the needle in terms of the overall demographics of the officer corps.

90. West Point produces less than a fifth of new Army officers each year. And the number of minority officers it produces because of racial preferences are a fraction of that number.

91. Each of West Point's justifications view soldiers as members of racial groups, rather than solely as individuals, and are grounded in assumptions about how minority service members think and feel.

### A.    Unit Cohesion and Lethality

92. West Point argues that statistical parity between the racial demographics of officers and enlisted soldiers is necessary to preserve unit cohesion and ward off racial strife within units. In support of that assertion, it highlights anecdotal incidents of racial tension among enlisted service-members during the Vietnam War, most of which occurred in a brief period from 1969 to 1972. That talking point, raised for the first time by a group of *amici* in *Grutter* and repeated in virtually every government defense of racial preferences since, cherry-picks a few unfortunate incidents and extrapolates them to the American military in general. At best, it is a textbook example of conflating correlation with causation.

93. In fact, racial animosity had been negligible within the U.S. armed forces stationed in Vietnam prior to 1967, and it has been virtually nonexistent post-Vietnam. During the Korean War—just a few years after President Truman ordered desegregation in the military—practical measures outweighed racial beliefs, and integration failed to produce the violence or poor morale the military brass expected. The military brass of that era were pro-segregation, and their predictions of violence and poor morale did not bear out.

94. The brief period of racial unrest that West Point retells was not produced by colorblind policies. It was a tragic byproduct of broader factors: a changing social environment, a controversial

war, and new conscription strategies that allowed wealthier Americans to escape the draft through college deferments while sending disproportionate numbers of low-income draftees to frontline combat units based on their educational backgrounds. In short, the incidents that West Point cites to justify open-ended racial preferences were the product of a perfect storm for racial conflict that has not existed for the past half century.

95.     Moreover, the underlying assumption of West Point's argument is that soldiers view their peers and superiors in terms of race, rather than in terms of their ability or character traits like loyalty, devotion, and selflessness. Put differently, it assumes that soldiers apply the same racial stereotypes to one another that West Point applies to them. There is no evidence to suggest that's the case.

96.     West Point makes a related argument that statistical parity between the racial demographics of the officer corps and those of the enlisted corps is necessary to foster trust between the enlisted corps and its leaders. The Academy has never provided evidence to support that assertion. This argument relies on crude and infantilizing stereotypes about the men and women who volunteer to serve in our armed forces, and it defies common sense. It assumes that black soldiers will be more likely to trust a black officer or a chain of command that includes black officers, that Hispanic soldiers are more likely to trust Hispanic officers, and so forth—because of their skin color, not their trustworthiness. And it completely ignores that trust between soldiers is formed through battlefield performance, and that servicemembers in war zones are more concerned with their leaders' competency than with their skin color.

97.     West Point broadly claims that the diversity produced by racial preferences facilitates military success and makes Army units more effective at accomplishing their missions. It claims, without any relevant evidence, that units are more adaptive, more efficient, and better at critical thinking and complex problem-solving when they are "racially diverse" (or, more accurately for purposes of West Point's admissions policy, "racially balanced"). Neither West Point nor the Army has

commissioned any studies purporting to show this to be the case in the military context. Nor can the Academy bridge its evidence gap through appeals to social-science papers measuring outcomes in inapplicable settings or inapposite fields like stock trading or computer programming.

98.     Furthermore, empirical evidence indicates the opposite. For example, the U.S. military's most elite special forces units—the green berets and Navy SEALS—are among its least racially balanced. Some races, like Native Americans, are vastly overrepresented, while others are underrepresented to nearly the same degree. Yet no one seriously contends that the green berets or Navy SEALS are insufficiently lethal.

### B.     Recruitment

99.     The Academy's assertion that racial balancing is imperative for recruiting talented servicemembers is even less persuasive. According to the Academy, most promising recruits will be hesitant to serve in an Army that is not "representative" of the population it protects. It further claims that this alleged inability to compete for "top talent" will have negative downstream effects on military readiness.

100.     Once again, West Point provides little to no evidence to back this claim. The Academy does not elaborate on what it means for the officer corps to be sufficiently "representative" or "diverse," nor does it explain how courts can measure whether its racial preferences are causing it to recruit the top talent in the country.

101.     West Point simply declares that the Army will lose "societal trust" if racial metrics between the officer and enlisted corps (and between the officer corps and society at large) are not equivalent. West Point further argues that this speculative loss of societal trust could, in turn, harm recruiting efforts.

102.     But today, despite West Point's racial preferences, the Army is facing a recruiting crisis that is unprecedented in the modern, all-volunteer era. The Army is spending hundreds of millions of

dollars to help would-be recruits satisfy basic eligibility requirements and is accepting enlistees who were previously rejected eight different times, but still cannot meet recruiting goals.

103.    Tellingly, not even West Point's leadership seems to buy what it's selling. During a July 19, 2023, hearing before a subcommittee of the House Armed Services Committee, Superintendent Gilland conceded that he had never heard of any instance where someone was interested in joining the Army but was turned off by its purported lack of diversity. Nor could he or any of the other service academy superintendents think of anyone who had.

### C.    Retention

104.    The Academy's arguments regarding retention are merely inverted versions of its unpersuasive arguments about recruiting. West Point claims that a dearth of racial diversity will lead to waves of attrition, but it never specifies why it believes that to be true. At most, this position is based on a smattering of organizational climate surveys about "diversity climates."

105.    The Government Accountability Office has declared these surveys unreliable due to defects in design and administration. *See* Gov't Accountability Off., *Military Service Academies: Actions Needed to Better Assess Organizational Climate*, GAO-22-105130, at 1 (July 2022).

106.    Neither those surveys, nor any others that West Point has conducted, ask cadets whether West Point should use race as a factor in admissions.

107.    If anything, West Point's assertions about retention are backwards. In-depth surveys and statistical studies of the Army's personnel crisis—*i.e.,* the rigorous analyses that West Point has failed to offer—show that the military's emphasis on non-merit factors in admission and promotion decisions is a leading cause of junior officer attrition. According to 9 out of 10 respondents, more officers would stay if the military were more of a meritocracy. And 71% of active-duty officers believe the military would retain more talent if opportunities were based solely on merit.

### D.     Public Legitimacy

108.    West Point's last resort is to claim that the military will suffer a crisis of legitimacy among the American people and foreign allies if it is insufficiently balanced by race. It maintains that an officer corps that does not reflect the racial makeup of the general population and the enlisted ranks will undermine the military's legitimacy by fueling perceptions of racial minorities serving as "cannon fodder" for white military leaders.

109.    Again, this conclusory statement assumes that the American people assess the "legitimacy" and trustworthiness of an institution based on its racial makeup. That notion is both un-American and devoid of any evidentiary support.

110.    To the contrary, a significantly higher percentage of Americans expressed confidence in the U.S. military three decades ago than they do today. And half of Americans now think that military leaders' over-emphasis on social-justice issues and political correctness is undermining military effectiveness.

111.    70% of Americans agree that universities should be "not allowed" to "consider race in admissions." Anthony Salvanto, *CBS News Poll Finds Most Americans Say Colleges Shouldn't Factor Race Into Admissions*, CBSNews.Com, (June 21, 2023), perma.cc/PW5D-ZUAT.

112.    Thus, to the extent that West Point's mission is to solidify the public's trust, its race-based admissions policy shoots itself in the foot.

113.    Flawed as they are, none of West Point's justifications for racial preferences are new. In fact, nearly all its nebulous arguments for race-based admissions were made sixty-five years ago by opponents of desegregation. The military segregationists' arguments—like the arguments offered by West Point—were long on racial stereotypes but short on actual evidence. Like West Point, segregation proponents argued that a colorblind military would "create difficulties 'which would be reflected in morale and military efficiency.'" President's Committee on Equality of Treatment and Opportunity

in the Armed Services, *Freedom to Serve* 12, (May 22, 1950), perma.cc/C2F5-6SCD. Like West Point, they claimed that colorblind policies would degrade the military's ability to accomplish its national-defense mission. *Id.* at 49-50. And, like West Point, they warned that a colorblind approach would be inconsistent with "civilian sentiment" and pose external risks to the institution. *Id.*

114.     Truman's commission rejected all those arguments as unsupported and ideologically driven conjecture. In the process, the commission affirmed that servicemembers should be treated as individuals in all circumstances, and that drawing inferences from a person's membership in a particular racial or ethnic group was immoral and illogical. "To put racial restrictions on job opportunities seemed to the Committee to ignore completely the essential factor of individual differences." *Id.* at 13.

## IV.    *SFFA v. Harvard*

115.     The Supreme Court held in *Harvard* that racial preferences in college admissions violate the Equal Protection Clause of the Fourteenth Amendment.

116.     Harvard and UNC both admitted to using race in admissions, but both institutions strenuously insisted that they did so in a "holistic" manner that treated race only as an optional "tip." Both institutions defended their consideration of race as necessary to further a compelling interest in "the educational benefits of diversity."

117.     The Court held both policies unconstitutional for several reasons.

118.     The Court deemed the universities' reasons for using race impermissibly vague and unmeasurable. Harvard claimed that its consideration of race was crucial for "(1) training future leaders in the public and private sectors; (2) preparing graduates to 'adapt to an increasingly pluralistic society'; (3) 'better educating its students through diversity'; and (4) 'producing new knowledge stemming from diverse outlooks.'" *Harvard*, 143 S. Ct. at 2166. UNC made similar arguments but added a fifth

justification: "enhancing appreciation, respect, and empathy, cross-racial understanding, and breaking down stereotypes." *Id.*

119.    The Court held that those goals could not justify race-based admissions because they could not "be subject to meaningful review" and were "[in]sufficiently coherent for purposes of strict scrutiny." *Id.* Federal courts had no way of measuring the universities' self-assessed progress toward achieving those goals. *Id.* Moreover, "[e]ven if [those] goals could somehow be measured," there was no way for courts "to know when they have been reached, and when the perilous remedy of racial preferences may cease." *Id.*

120.    The universities also "measure[d] the racial composition of their classes using the following categories," which come from the federal government: "(1) Asian; (2) Native Hawaiian or Pacific Islander; (3) Hispanic; (4) White; (5) African-American; and (6) Native American." *Id.* at 2167. But those categories are "imprecise," "arbitrary," "undefined," "opaque," and both over- and "under-inclusive." *Id.*

121.    "The Universities' main response to these criticisms [was], essentially, 'trust us.'" *Id.* at 2168. Accepting that proposition, however, would have meant forgoing any meaningful judicial review. And although the Court recognized that some "degree of deference" applies to universities' educational decisions, "deference does not imply abandonment or abdication of judicial review." *Id.*

122.    Both universities strenuously protested that, although they used race as a "positive" for certain applicants, "an individual's race is never a negative factor in admissions." *Id.* The Court found that argument "hard to take seriously." *Id.* Because "[c]ollege admissions are zero-sum," a "benefit provided to some applicants but not to others necessarily advantages the former group at the expense of the latter." *Id.* Thus, by using race as a "positive" for some applicants, Harvard and UNC necessarily used it as a negative attribute for others.

123.     Both universities assumed that increasing the percentage of racial minorities on campus would necessarily increase other students' exposure to different ideas and perspectives. In blunter terms, their policies assumed that all racial minorities had certain views and life experiences solely because of the color of their skin. But "[o]ne of the principal reasons race is treated as a forbidden classification is that it demeans the dignity and worth of a person to be judged by ancestry instead of by his or her own merits and essential qualities." *Id.* at 2170.

124.     Neither Harvard's nor UNC's use of race had a logical end point. *See id.* at 2170-71. Neither institution could identify when it would stop using race or under what circumstances.

125.     For example, UNC defined its racial "diversity" goals in relation to the racial demographics of the general population. *See id.* at 2171-72 ("The University frames the challenge it faces as 'the admission and enrollment of underrepresented minorities,' a metric that turns solely on whether a group's 'percentage enrollment within the undergraduate student body is lower than their percentage within the general population in North Carolina.'" (cleaned up)). As the Academy does, UNC claimed that it "ha[d] not yet fully achieved its diversity-related educational goals" because it still needed to "obtain closer to proportional representation." *Id.* at 2172.

126.     The Court rejected that metric out of hand. It reiterated that "'outright racial balancing' is 'patently unconstitutional'" because "at the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat citizens as individuals, not as simply components of a racial, religious, sexual or national class." *Id.* (cleaned up). UNC's use of race to obtain "proportional representation" in incoming classes was further unconstitutional, the Court held, because it "'effectively assur[ed] that race will always be relevant and that the ultimate goal of eliminating' race as a criterion 'will never be achieved.'" *Id.* (cleaned up).

127.     In sum, the Court held that both universities failed strict scrutiny and their use of race was therefore unconstitutional because their "programs lack sufficiently focused and measurable

objectives warranting the use of race, unavoidably employ race in a negative manner, involve racial stereotyping, and lack meaningful end points." *Id.* at 2175.

128.    In a footnote to the opinion, the Court declined to analyze the use of race by the military academies because "none of the courts below addressed the propriety of race-based admissions systems in that context." *Id.* at 2166 n.4. But *Harvard*'s reasoning makes it perfectly clear that West Point's use of race in the admissions process is unconstitutional. *Compare United States v. Windsor*, 570 U.S. 744, 778 (2013) (Roberts, C.J., dissenting) (noting that the majority opinion, which declared unconstitutional a federal definition of marriage, left open the constitutionality of "state marriage definitions")*, with Obergefell v. Hodges*, 576 U.S. 644, 662-63 (2015) (explaining that virtually every court of appeals concluded that the logic of *Windsor* also deemed the state definitions unconstitutional).

129.    The Academy has not ended its race-based admissions in light of *Harvard*. Officials at the academies told the press that "they would continue to use race as a factor while awaiting guidance from the Department of Defense"—guidance that has not been issued. Moreover, Superintendent Gilland informed the House Armed Service Committee in July that the Academy used racial "composition goals" when selecting the incoming Class of 2027.

## V.    Plaintiff and This Litigation

130.    At all times since this case was filed, SFFA has had members who are ready and able to apply to West Point, including Members A and B.

131.    Member A is a U.S. citizen who lives in the upper midwest.

132.    He has a grade point average near the very top of his class.

133.    Member A is active in sports and in excellent physical condition. He receives annual physicals and has no medical condition that would prevent him from being medically qualified to attend a military academy.

134.     Member A has long wanted to join the military and attend an academy. One of his grandfathers served in the military, and the other served in various law-enforcement capacities. Member A believes it would be an honor to serve his country, like they did.

135.     Member A was ready and able to apply to West Point for the Class of 2028, and got medically qualified and nominated by his Member of Congress. Member A is ready and able to apply to West Point for the Class of 2029, should a court order West Point to end its race-based admissions.

136.     But Member A is white. Unless West Point is ordered to stop using race as a factor in admissions, Member A's race will prevent him from competing for admission on an equal footing.

137.     Member A joined Students for Fair Admissions because he supports its mission and this lawsuit. He wishes to remain pseudonymous, however, because he is a high-school student, and he fears reprisal from West Point and others if his participation in this litigation becomes public.

138.     Member B is a U.S. citizen who currently attends high school in the southeast.

139.     Member B is an honors student, taking an accelerated course of study.

140.     Member B is active in youth sports and in excellent physical condition. He receives annual physicals and has no medical condition that would prevent him from being medically qualified to attend a military academy.

141.     Member B has long wanted to join the military and attend an academy. He is actively involved in a club for high schoolers who want to join the military. Both his grandfathers served; and three of his family members currently serve. One of his grandfathers fought in the Army on D-Day. Member B believes it would be an honor to serve his country, like they did.

142.     Member B is ready and able to apply to West Point in 2025. He will take all necessary steps to apply, qualify, and get nominated.

143.     But Member B is white. Unless West Point is ordered to stop using race as a factor in admissions, his race will prevent him from competing for admission on an equal footing.

144.     Member B joined Students for Fair Admissions because he supports its mission and this lawsuit. He wishes to remain pseudonymous, however, because he is a high-school student, and he fears reprisal from West Point and others if his participation in this litigation becomes public.

145.     If West Point is allowed to continue making admissions decisions based on applicants' race, SFFA's members—including Members A and B and other similarly-situated applicants—will suffer harm because they will be denied the opportunity to compete for a West Point appointment on equal grounds, because of their race.

### CLAIM FOR RELIEF

### COUNT
### Violation of the Fifth Amendment

146.     Plaintiff incorporates and restates all its prior allegations here.

147.     "It is undisputed that 'service academies are subject to the Fifth Amendment.'" *Lebrun v. England*, 212 F. Supp. 2d 5, 16 (D.D.C. 2002); *see also Crawford v. Cushman*, 531 F.2d 1114, 1120 (2d Cir. 1976) ("A succession of cases in this circuit and others ha[s] reiterated the proposition that the military is subject to the Bill of Rights and its constitutional implications."); *Frontiero v. Richardson*, 411 U.S. 677, 688 (1973) (similar).

148.     The Fifth Amendment contains an equal-protection principle that binds the federal government and is no less strict than the Equal Protection Clause that binds the States. *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 224 (1995). "[A]ny person, of whatever race, has the right to demand that any governmental actor subject to the Constitution justify any racial classification subjecting that person to unequal treatment under the strictest judicial scrutiny." *Id.* That principle stems not only from the Fifth Amendment, but also from the Fourteenth Amendment's guarantee of equal citizenship, the Constitution's limits on the scope of federal power, and bedrock principles of equality laid out in the Declaration of Independence.

149.    Because West Point's admissions policy relies on racial classifications, it must satisfy strict scrutiny. *Id.* In other words, it must employ measures that are "narrowly tailored" to "further compelling governmental interests." *Harvard*, 143 S. Ct. at 2162. West Point's overt racial preferences cannot clear this bar.

150.    The Supreme Court has recognized compelling interests in the use of race in only the narrowest of circumstances, where those preferences are explicitly designed to remedy recent acts of discrimination and to make the *individual subjects* of that discrimination whole. *See id.* West Point's admissions policy does not meet this standard, and the Academy makes no pretenses that it does.

151.    West Point asserts compelling interests in facilitating unit cohesion, achieving the increased lethality that supposedly flows from racially representative units on the battlefield, preventing declines in recruiting and retention, and ensuring public "legitimacy" (circularly defined by the Academy). It does not argue that the educational benefits of diversity are a compelling interest that could justify its use of race.

152.    *None* of West Point's purportedly compelling interests can "be subjected to meaningful judicial review." *Harvard*, 143 S. Ct. at 2166. There is no way for "courts … to measure these goals," and even if they could be measured, courts have no basis for assessing "when they have been reached." *Id.*

153.    West Point's appeal to the military benefits of diversity is no different from Harvard and UNC's appeal to the "educational benefits of diversity." In both instances, the purported benefits are vague and "elusive." *Id.* In fact, the only quantifiable aspects of West Point's race-based admissions program are the racial enrollment percentages set by the Academy each year.

154.    Moreover, "the question in this context is not one of *no* diversity or of *some*: it is a question of degree. How many fewer leaders [West Point] would create without racial preferences, or

how much poorer the education at [West Point] would be, are inquiries no court could resolve." *Id.* at 2167.

155.    The Academy's admissions program also fails narrow tailoring because it "fail[s] to articulate a meaningful connection between the means [it] employ[s] and the goals [it] pursue[s]." *Id.* West Point claims that racial preferences are necessary to ensure "an officer corps that reflects the demographics of the nation it serves." To that end, it carefully tracks the class composition of "African Americans," "Hispanics," and "Asians." That interest is not compelling; it is pure racial balancing.

156.    Besides, these categories are "imprecise in many ways." *Id.* "Some of them are plainly overbroad: by grouping together all Asian students, for instance, [West Point is] apparently uninterested in whether *South* Asian or *East* Asian students are adequately represented, so long as there is enough of one to compensate for a lack of the other." *Id.* (emphasis original). "Meanwhile, other racial categories, such as 'Hispanic,' are arbitrary or undefined." *Id.*

157.    Furthermore, West Point produces only seventeen percent of newly commissioned Army officers each year. Even if it had a compelling interest in ensuring perfectly proportional racial representation between the corps of cadets and the officer corps, the Academy's use of the "invidious" practice of racial preferences barely moves the needle in terms of the demographics of the Army-wide officer corps. *Id.* at 2166.

158.    Nor has the government offered facts or evidence-based reasoning to support its excuses for using race at the academies. The government flatly asserts that the "service academies have carefully considered potential race-neutral alternatives" and "have concluded that, at present, those alternatives would not achieve the military's compelling interest in fostering a diverse officer corps." But it has never identified any studies, reports, or experiments "carefully considering" race-neutral alternatives.

159.     Contra West Point, military academies can achieve racially diverse student bodies through race-neutral means. The Coast Guard Academy provides a real-world example. Until 2010, that academy was prohibited by federal statute from using racial preferences in its admissions process. In the two years before the Academy began considering race, it launched an aggressive advertising and recruiting campaign targeting minorities. At the end of those two years, the academy had increased minority enrollment by 60%—from 15% to 24%. Those numbers were within a few percentage points of the other academies, which had been using explicit racial preferences for years.

160.     West Point's race-based admissions violate the Fifth Amendment because "race may never be used as a 'negative'" or "operate as a stereotype." *Id.* at 2168 (cleaned up). As discussed above, West Point openly acknowledges that race is determinative for some applicants. Because West Point provides a racial "benefit" to "some applicants but not to others," it "necessarily advantages the former group at the expense of the latter." *Id.* Because race is a "positive" for minority applicants who receive preferences, it is necessarily a "negative" for all others. *Id.*

161.     The Academy's admissions program also relies on impermissible stereotypes. The Supreme Court has "long held that universities may not operate their admissions programs on the 'belief that minority students always (or even consistently) express some characteristic minority viewpoint on any issue,'" and that they may not "assum[e] that 'members of the same racial group—regardless of their age, education, economic status, or the community in which they live—think alike.'" *Id.* at 2169 (cleaned up). West Point does exactly that when it uses racial preferences to "foster trust between the enlisted corps and its leaders," create "sociocultural competencies essential to multicultural leadership in the 21st century," and "ensur[e] that the military contains the cultural and racial identities necessary to better understand our partner forces."

162.     West Point is violating equal protection by engaging in the "patently unconstitutional" practice of "[o]utright racial balancing." *Id.* 2172. The Academy sets specific racial goals for each

incoming class and adjusts them year over year to balance the racial demographics of each class with the racial demographics of the general population and enlisted corps. It is not "'treat[ing] citizens as individuals,'" but as "'simpl[e] components of a racial … class.'" *Id.* (cleaned up).

163.     West Point's use of race in admissions is also unconstitutional because it "lack[s] a 'logical end point.'" *Id.* at 2170 (cleaned up). Indeed, under its theory of "racial diversity," it would be impossible for the Academy to stop considering race. By tying its racial enrollment needs to the ever-shifting demographics of the country and the enlisted ranks, West Point is essentially promising to use race in perpetuity. *Cf. id.* at 2172-74.

164.     West Point's status as a military academy does not mean that courts must defer to its conclusory assertions that it needs to employ racial preferences, let alone diminish any of the constitutional violations described above. *See Owens v. Brown*, 455 F. Supp. 291, 300 (D.D.C. 1978) (courts are not compelled "to abdicate their responsibility to decide cases and controversies merely because they arise in the military context"). Although courts have been mindful of the military's unique role in society and the unique considerations that come with it, no level of deference justifies systematic racial discrimination. *See Harvard*, 143 S. Ct. at 2168 ("any deference must exist 'within constitutionally prescribed limits'").

165.     In fact, as the Court recognized in *Harvard*, blind deference to assertions of national security or military necessity can lead to "gravely wrong" outcomes and gross violations of civil rights. *Id.* at 2162 n.3. "[I]n the infamous case *Korematsu*," the "Court upheld the internment of 'all persons of Japanese ancestry in prescribed West Coast ... areas' during World War II because 'the military urgency of the situation demanded' it." *Id.* (cleaned up). The Supreme Court has "since overruled *Korematsu*, recognizing that it was 'gravely wrong the day it was decided.'" *Id.* (cleaned up).

166.     "The Court's decision in *Korematsu* nevertheless 'demonstrates vividly that even the most rigid scrutiny can sometimes fail to detect an illegitimate racial classification' and that '[a]ny

retreat from the most searching judicial inquiry can only increase the risk of another such error occurring in the future.'" *Id.* (cleaned up).

167. Because West Point's use of racial classifications in admissions violates the Fifth Amendment, it should be declared unlawful and enjoined.

**WHEREFORE**, Plaintiff asks this Court to enter judgment in its favor and to provide the following relief:

a. A declaratory judgment that the Academy's use of race in admissions is unconstitutional under the Fifth Amendment;

b. A preliminary injunction prohibiting the Academy from considering or knowing applicants' race when making admissions decisions;

c. A permanent injunction prohibiting the Academy from considering or knowing applicants' race when making admissions decisions; and

d. All other relief that Plaintiff is entitled to, including but not limited to attorneys' fees and costs.

Respectfully submitted,

*s/Thomas R. McCarthy*

Thomas R. McCarthy (*pro hac vice*)
Patrick Strawbridge (*pro hac vice*)
J. Michael Connolly (*pro hac vice*)
Cameron T. Norris (*pro hac vice*)
James F. Hasson (*pro hac vice*)
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com

*Counsel for Students for Fair Admissions*

Adam K. Mortara (*pro hac vice* forthcoming)
LAWFAIR LLC
40 Burton Hills Blvd., Ste. 200
Nashville, TN 37215
(773) 750-7154
mortara@lawfairllc.com

Dated: September 19, 2023
Amended: February 19, 2024