```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------------x

3   STUDENTS FOR FAIR ADMISSIONS,

4                   Plaintiff,

5            v.                          23 CV 8262(PMH)

6                                        ORAL ARGUMENT
    THE UNITED STATES MILITARY
7   ACADEMY AT WEST POINT, et al.,

8
                    Defendants.
9
    ------------------------------------x
10
                                    United States Courthouse
11                                  White Plains, N.Y.
                                    December 21, 2023
12

13

14

15   Before:  THE HONORABLE PHILIP M. HALPERN, District Judge

16

17
                            APPEARANCES
18

19   CONSOVOY, McCARTHY, PLLC
            Attorneys for Plaintiff
20   PATRICK STRAWBRIDGE
     THOMAS McCARTHY
21   JAMES HASSON

22
     DAMIAN WILLIAMS
23          United States Attorney for the
            Southern District of New York
24   JENNIFER ELLEN BLAIN
     ALYSSA O'GALLAGHER
25          Assistant United States Attorneys
```

<pre>
 1              THE DEPUTY CLERK:  In the matter of Students for Fair
 2   Admissions v. The United States Military Academy at West Point,
 3   et al.
 4              Will counsel please note your appearance for the
 5   record, starting with the plaintiff.
 6              MR. STRAWBRIDGE:  Good morning, your Honor.
 7              For the plaintiffs, Patrick Strawbridge.  I am
 8   jointed by my colleagues Richard Gabriel Anderson, Thomas
 9   McCarthy and James Hasson.
10              THE COURT:  Good morning.
11              MS. BLAIN:  Good morning, your Honor.
12              Ellen Blain from the U.S. Attorney's Office as well
13   as my colleague.
14              MS. O'GALLAGHER:  Alyssa O'Gallagher from the U.S.
15   Attorney's Office.
16              Good morning, your Honor.
17              THE COURT:  All right.  Good morning, counsel.
18              Everybody please be seated.
19              I think we have a number of people on the line and so
20   I would ask that you all press your mute button so that you're
21   not interrupting the proceeding.  Okay.  Thank you for that.
22              Good morning, Christina.
23              Well, I'll hear from both of you.  I have a number of
24   questions that I would like to work through, but I certainly am
25   delighted to hear from you first.
</pre>

1          It's your motion.

2          MR. STRAWBRIDGE:  Thank you, your Honor.  And of

3    course I welcome any questions you have in whatever order you

4    would like to ask them.

5          THE COURT:  All right.  I'm happy to have you start.

6    I've got a variety of questions for you for sure.

7          MR. STRAWBRIDGE:  Well, I'll just begin by noting

8    where we are in this case.

9          West Point admits that it was using race to benefit

10   some of the applicants to its academy.  Other applicants of

11   different races are not receiving that benefit.  That is

12   run-of-the-mill unconstitutional racial discrimination.  No

13   civilian college in the country could legally do what West

14   Point is doing today and government programs that expressly

15   discriminate on the basis of race are almost invariably

16   enjoined under strict scrutiny.

17         The primary question for purposes of this hearing

18   today is whether the Military is somehow special in this arena.

19   The answer to that question is no.  Racial discrimination is

20   not made more palatable just because it wears a uniform and

21   applicants to West Point do not deserve lesser than equal

22   protection of the laws simply because they want to attend the

23   academy and serve their country.

24         To deny the requested injunction here, your Honor

25   would have to sustain the allegedly special interests asserted

1    by the Army in this case.  Those interests have never been

2    recognized as sufficient under strict scrutiny by the United

3    States Supreme Court to justify racial discrimination.  And in

4    fact, the Court has invalidated prior attempts to justify

5    racial classifications on the basis of balancing to a

6    particular population for retention or for recruiting purposes.

7              THE COURT:  So let me just stop for a second.

8              MR. STRAWBRIDGE:  Sure.

9              THE COURT:  So I'm a trial judge, so I have to start

10    at the beginning and try and understand all of the nuance that

11    you are presenting to me.  And so let me start with this

12    question.  And I want to come to the argument that seems to be

13    the main event here, but I've got to get there first.

14              MR. STRAWBRIDGE:  Sure.

15              THE COURT:  So, for example, why did you bring in

16    Lloyd Austin, the Secretary of Defense, and Christine Wormuth I

17    guess in her capacity as Secretary of the Army?  I can

18    understand the other two being affiliated with West Point, but

19    why do we need them?

20              MR. STRAWBRIDGE:  We want to make sure that we go up

21    through the sufficient chain of command so we're naming the

22    right people as defendants.  If the defendants don't think that

23    that's necessary, we're happy to consider dropping them.

24              THE COURT:  So how is it -- you know, I have your

25    complaint and, trust me, I've read everything you've both sent

me, both sides have sent me, several times now.  The complaint

just makes kind of the bare-bones allegation that each

Secretary is responsible for all aspects of the Military and

overseas operations and policies.  That doesn't get me to the

relationship between those individuals and the Academy.  And so

I'm just trying to understand.  And I have more questions in

this vein.

MR. STRAWBRIDGE:  Sure.

THE COURT:  So help me.  Is it just your belief that

they should be named?  Is that the sum and substance of it?

MR. STRAWBRIDGE:  Well, no, not quite.  I think our

understanding is that those officers are both responsible for

effectuating Military policy and Army policy, and I do believe

there are regulations that actually govern the United States

Military Academy that are promulgated at the Army level, so I

think that they're defendants named for that purpose.

THE COURT:  In that vein, when we're talking about

compelling governmental interests, is it the Army's compelling

governmental interest that I'm to be worried about or is it the

Academy's compelling governmental interest that I'm to be

worried about or is it both?

MR. STRAWBRIDGE:  I think it's both because I'm not

sure that they're distinct.  The Military Academy's asserted

interests in this case are interests in what happens I believe

when these cadets graduate and enter the Army.  So the Academy

1    is certainly executing upon this policy and it's obviously

2    where the discrimination is happening.  We can talk a lot about

3    what we know about that already.  But I do think that they're

4    asserting interests into what happens once they leave the

5    grounds.

6                  THE COURT:  Okay.  I interrupted you.

7                  MR. STRAWBRIDGE:  No, no.

8                  THE COURT:  It won't be the first time, I promise.

9                  MR. STRAWBRIDGE:  I would rather talk about what you

10   want to talk about, Judge.

11                 THE COURT:  I appreciate that.

12                 Well, let's talk about something else I want to talk

13   about.

14                 MR. STRAWBRIDGE:  Sure.

15                 THE COURT:  You take issue with, rather bluntly,

16   whether this is prohibitory or mandatory and I'm struggling to

17   recognize this as anything but mandatory in terms of the nature

18   of this injunction.  The case you gave me, this Christa

19   McAuliffe case, was a situation where a policy was about to be

20   implemented and the injunction was to prevent it.  Keep the

21   status quo, Judge.  Prohibitory.  Pretty easy to understand.

22   In this situation, though, I think, if I read this fairly, and

23   I'll hear from the defendant when it's their turn, this

24   injunction requires a remodeling of the admissions process from

25   top to bottom.  Or I say top to bottom, but I mean in the areas

1    in which race is clearly used.  And so, in my mind, that means

2    West Point must take affirmative steps, and if they must take

3    affirmative steps, that no longer is status quo, that's me

4    directing them to do things.  That's my understanding based on

5    what I read.  So let's clear that up for each other.

6            MR. STRAWBRIDGE:  So, yes.  So I don't think of it

7    that way.  All orders and all injunctions may well require the

8    government to change course or to take affirmative steps.  If

9    they're about to implement a policy, they may have to take

10   steps to make sure that policy doesn't get implemented and

11   enforced.  There may always be some --some form of --

12           THE COURT:  No, but they have to change the forms.

13   They have to change the -- the regional people have to rethink

14   or re-acclimate themselves to a lacking of race as a factor.

15   There's things to be done and that's what I'm focused on.

16           MR. STRAWBRIDGE:  So, again, I think that almost any

17   injunction may well require steps, but that's not sufficient to

18   turn it into a mandatory injunction where the order of the

19   Court requires some sort of affirmative action by the

20   government.

21           In this case, this is a classic prohibitory

22   injunction.  It's not unlike the County of Westchester case

23   that I think we cited in our letter to you yesterday.  All

24   we're asking is that they refrain from doing something; in this

25   case, they refrain from using race as a consideration.

1        THE COURT:  But they're doing it and so they have to

2   stop doing it, and in order to stop doing it, they have to take

3   steps.

4        MR. STRAWBRIDGE:  Yes.

5        THE COURT:  And I don't agree always with the broad

6   statement that every injunction requires people to do

7   affirmative things.  If I say you're enjoined from

8   implementing, the status quo ante remains.  If I say race is no

9   longer a factor in your process, fix it and fix it now, I'm

10  taking it from what I've read that they have to do things and

11  that's where I'm kind of at loggerheads with the issue.  I

12  don't think you think it matters because I think you think

13  that, as a matter of law, this all resolves itself.

14       MR. STRAWBRIDGE:  Well, I think -- so you're right in

15  that I don't think it's the most important point because I

16  think we can satisfy any standard given the fact that it's

17  strict scrutiny and it's an express racial classification.

18       Let me just provide two more points and if I persuade

19  you, I do.

20       THE COURT:  Yes, yes.

21       MR. STRAWBRIDGE:  I think that -- two points.

22       Even before the Harvard case, and we'll talk about

23  the Harvard case and its applicability, it was always very

24  clear to anybody who was using race in a college admissions

25  program that it had to be constantly re-evaluated and

1     constantly checked to see if it was still necessary and

2     adjusted as time goes on.  Grutter says that and Fisher says

3     that.  And so, in that respect --

4                THE COURT:  This 25-year period of time when all

5     discrimination will be terminated.

6                MR. STRAWBRIDGE:  That's what Grutter said, but even

7     Fisher and Fisher II made very clear that even on a

8     year-to-year basis, colleges had to re-evaluate whether it was

9     still necessary to use the odious racial classification

10    process.  So, in that respect, I don't think that there was as

11    much momentum or as much of a constant program as there would

12    normally be at West Point.

13               My only other point on this and then I'll leave it is

14    that if you look at Winter, which I think is a pretty good

15    example here from the Supreme Court, Winter involved a series

16    of sonar exercises off the coast of California that the Navy

17    had been conducting for four decades.  They went in and they

18    got an injunction.  And, of course, the Supreme Court

19    ultimately reversed the injunction on the grounds of merits,

20    but what they did not do was apply any kind of heightened test

21    or suggest that this was a mandatory injunction simply because

22    the Navy had been doing it for 40 years.  That's I think our

23    strongest argument.

24               THE COURT:  Shutting the light switch off in my mind

25    is different than remodeling an admissions program.  That's

1    where I struggle.

2            And then the other issue that I have with this is

3    when I look at your order to show cause and I look at your

4    wherefore clause, aren't you asking for pretty much the same

5    relief that you would get should we have a trial and you

6    prevail?  Isn't that really --

7            MR. STRAWBRIDGE:  No, I don't think that's the case

8    because, obviously, it would only be suspended for the period

9    of time and if they were to prevail at trial, they could go

10   back to using race.  So it's not --

11           THE COURT:  Well, no.  If you prevailed at trial,

12   what would I change?  I would just make the preliminary

13   injunction mandatory, wouldn't I?  I mean permanent.  Not

14   mandatory, permanent.

15           MR. STRAWBRIDGE:  I think that's correct, but without

16   the preliminary injunction, we're going to have injuries to our

17   clients in the form of racial discrimination, so I think

18   that's --

19           THE COURT:  Yes, no, I'm very clear, very, very clear

20   on where everybody is, but, again, like I go back to the

21   individuals.  It doesn't really answer my question, we think

22   it's appropriate.  What I would like is I would like you to

23   meet and confer, and if you don't need these people, I would

24   like you to eliminate them immediately from the action.  I

25   don't need the Secretary of Defense as a defendant in my case

1    unless I need him.  If I do, I do.  But work that out, okay,
2    and figure it out.
3              MR. STRAWBRIDGE:  We're happy to do that.
4              And I'll just say right now that, based on what we
5    know now, of course we have no intention of imposing
6    depositions and discovery requests at that level.
7              THE COURT:  Well, I don't know what you intend other
8    than to get an injunction from me today.
9              MR. STRAWBRIDGE:  Correct.
10             THE COURT:  So what I'm intending is that we limit
11   the field of play to the people that are absolutely necessary
12   and proper here.  And I would just appreciate it if you would
13   meet and confer and one of you write me a short letter.  All of
14   you think it's okay to just send things in and write letters
15   and things.  It's not.  We'll talk about that.  But in this
16   regard, I would like to resolve this.
17             I guess let me ask you another question before we
18   sort of get to the equal protection that you want to talk to me
19   about and I want to hear from you on.
20             The premise here is -- I worry that so you're the
21   plaintiff, you come in and, just at a thousand feet, you bring
22   an action under the Fifth Amendment, equal protection, through
23   the Fourteenth Amendment, I get it, and you, as the movant,
24   whether it's a clear showing or just a showing, have the
25   obligation to show a likelihood of success.  Humor me.

1          I think this is a mandatory injunction.  So I think I

2   would say today, without the benefit of actually what I'm going

3   to do in writing, I think it's mandatory, it would be a clear

4   showing, and you're now put in the untenable position of having

5   to cobble together the compelling governmental interests that

6   you believe the defendant is going to espouse.  And so

7   obviously you're all very capable and you're well read and

8   you've cobbled together what you think are the compelling

9   governmental interests.  And when I get to the defendant, we're

10  going to talk about that a little more in detail.  But what if

11  it turned out that the allegations that you've made are ajar,

12  different than, what the compelling governmental interests that

13  the defendant asserts are?  Doesn't that block me from issuing

14  an injunction?

15          MR. STRAWBRIDGE:  No, I don't think so, your Honor.

16  It's not unusual for a plaintiff to not have the benefit of

17  full information at the time they bring a complaint in a

18  request for emergency relief.  It is very often they can only

19  go on --

20          THE COURT:  No, no, no, it's not.  You're right.  I

21  mean, you're asking for a preliminary injunction and we don't

22  have to have every last detail, but certainly on the critical

23  issue of compelling governmental interests, don't you think you

24  need to give me exactly what it is that the governmental

25  compelling interests from West Point or the Army is?  And if

what you've given me is different than what they say it is,
don't you think you need to amend your complaint and don't you
think you need to do some things here to get this lined up
properly?  Or is it just that it's so important that, facts be
damned, I can just rule?

        MR. STRAWBRIDGE:  I certainly don't think it's so
important that facts should be forsaken.  What I would say is
that we did have the benefit of the United States filing a
written brief and standing up in the well of the Supreme Court
a year ago and elucidating what the interests of the Military
and the Military academies were in an officer selection and the
use of race.  So we had that information.

        THE COURT:  Absolutely.

        MR. STRAWBRIDGE:  We also now have the benefit of the
government's response on the record and we know what their
position is with respect to compelling interests.

        THE COURT:  Well, we're going to come to that, we're
going to come to that, but my point is, in the -- these are not
compellingly difficult questions, they're straightforward
questions.  Because, you know, I'm a burden-of-proof person.

        MR. STRAWBRIDGE:  Sure.

        THE COURT:  That's where I come from.  That's been my
life's work.  And I'm, in fairness, trying to look at this and
see what I can do now and I have a concern, you know, that
things are -- they're not cohesively presented.  There's a

1    little of this, a little of that.  The government hasn't filed

2    an answer yet.  The government's filed affidavits from various

3    people, which I'm going to talk to them about.  So have you as

4    an example.  They disagree with each other about whether these

5    are compelling or not.  And I'm saying, well, given all of

6    this, do we really need to go through this exercise today, now,

7    for a preliminary injunction?  Wouldn't this be better and

8    wouldn't everybody be better served rather than racing to an

9    answer yes or no?  Because that's what you want from me.  You

10   want a yes or a no.  And frankly, you know, I'll get you one as

11   soon as I can.  But wouldn't we be better served by getting

12   this all tidied up and lined up properly so that the record --

13   so that I can see and feel what's going on here and get some of

14   these factual issues cleaned up?

15            MR. STRAWBRIDGE:  We start from the premise when

16   we're dealing with an express racially discriminatory

17   government policy that it is presumptively unlawful, and in

18   that context, it is not unusual, once the government admits

19   that it has employed racial classification as part of a

20   program, to come in and put the government to its burden of

21   proof that it can satisfy strict scrutiny, which puts the

22   burden on the government ultimately to demonstrate what its

23   compelling interest is.

24            THE COURT:  But not on this motion.

25            MR. STRAWBRIDGE:  Well, yes and no in that we have --

1          THE COURT:  It's not yes or no.  It's your burden.

2     You have the burden.

3          MR. STRAWBRIDGE:  We have the burden of demonstrating

4     that it is clearly likely we're going to win.

5          THE COURT:  Yes.

6          MR. STRAWBRIDGE:  But how do we win?  We win by

7     showing that the government cannot meet strict scrutiny.  You

8     still have to take into the account the fact that it's strict

9     scrutiny and that it's a racial classification.  That still has

10    a role to play in that analysis of whether we are clearly

11    likely to win.  And the reality of -- and frankly, that's not

12    so heavy a lift.  The government rarely wins on strict scrutiny

13    because the burden is so high, and it especially rarely wins

14    when it admits that it is discriminating on the basis of race.

15    This isn't a case where we come in and we're arguing that there

16    is some sort of implicit racial discrimination or there's a

17    hidden racially discriminatory policy.  The government admits

18    that it is using race and it admits that it is using race at

19    West Point to decide a number of slots every year.

20         The reason why a preliminary injunction is so

21    important to us and to my client is because we have members who

22    have already applied to West Point, are going through the

23    admissions process, one has a nomination for this upcoming

24    cycle, and they want what Gratz, what Grutter, what Harvard,

25    what Adarand say they're entitled to, which is a fair process

1    that does not use their race against them or which race is not

2    influencing the outcome, and if they're going to get that for

3    this term, they need it in the next, you know, 30 days.

4              THE COURT:  So is it that they wouldn't apply if they

5    didn't get an injunction?  Is it that they think that they're

6    going to be discriminated against, Member A and Member C, such

7    that their qualifications won't be considered fairly by West

8    Point?

9              MR. STRAWBRIDGE:  I think, under Gratz, it's very

10   clear that their injury is the lack of an ability to compete in

11   a fair process that is not influenced by race.

12             THE COURT:  I see.

13             MR. STRAWBRIDGE:  And that's what's going to happen

14   to them absent a preliminary injunction.

15             THE COURT:  But they are gong to apply, right?

16             MR. STRAWBRIDGE:  Yes.

17             THE COURT:  You have one that is a member.

18             Now, let's talk about another loose end here for a

19   minute.  Whatever reasoning is associated with the supplemental

20   affidavits, you know, that's not okay just filing some

21   supplemental affidavits.  That isn't okay.  And I'll hear from

22   the government on whether they object to that or not.

23             MR. STRAWBRIDGE:  I'll just provide a brief

24   explanation.  I'm mindful of that and we did have a discussion

25   on our side about whether to do it.

1        There was an issue that was raised during the Navy

2    argument last week about an alleged weakness in the affidavits

3    regarding whether any of the members had received a nomination

4    or the members received a nomination in mid to late November,

5    which was after the initial papers were filed in this case, and

6    so we just wanted to clarify if there were any concerns or

7    issue about that.

8        THE COURT:  It doesn't change my comment.

9        MR. STRAWBRIDGE:  Understood.

10       THE COURT:  It may or may not be part of this record.

11   I'll hear from the government on it at the appropriate time.

12       And so I read the affidavit, so I see that one has

13   asked for a nomination, the other has gotten a nomination, and

14   I assume that when you say they're applying, they've filled out

15   the questionnaire.  Have they filled out the questionnaire?

16       MR. STRAWBRIDGE:  They are in the -- they have opened

17   up the application process and they are in the process of

18   gathering the information for their applications.

19       THE COURT:  Okay.  All right.  I interrupted you.

20       MR. STRAWBRIDGE:  The other point that I wanted to

21   make just about the necessity for the preliminary injunction,

22   and I just want to address this, apart from what we think is

23   the inherent harm associated with racial classifications, I

24   think that the government gives little short shrift to the

25   delayed opportunity to, you know, apply and/or attend the

1    Military Academy.

2              What some people don't realize about the U.S.

3    Academies is that you cannot transfer into them.  If you go --

4    even if you go and you take credit at another college for a

5    year, once you're admitted to the U.S. Military Academy, you

6    have to start over as a first-year student and you have to go

7    there for all four years.  So anybody who has had a 19 or

8    20-year-old I think can appreciate that it is not a small

9    matter to essentially put your life or your hopes and your

10   dreams on hold for a year while you wait for a fair process.

11   So I think that's another reason why a preliminary injunction

12   is particularly appropriate here.

13             THE COURT:  And then I guess -- before we get to

14   equal protection, I guess the other thing that is on my mind is

15   the competing $400-an-hour experts who disagree with each

16   other.  What do I make of that, frankly?

17             MR. STRAWBRIDGE:  Well, it's not unusual to have

18   expert testimony on these issues.  There was expert testimony

19   in the University of North Carolina and Harvard cases.  As with

20   any evidentiary submission before your Honor, especially at the

21   preliminary injunction stage, you can take it for whatever you

22   find it compelling for.  As you know, the evidentiary standards

23   are generally relaxed at the PI stage by necessity, but we did

24   want to provide the benefit of a responsive expert to their

25   experts.

```
1              I mean, ultimately we still think that what we're
2      relying on here and what we're asking you to rule on are
3      undisputed facts that the Army has conceded or provided to your
4      Honor themselves and then the legal analysis that accompanies
5      those undisputed facts when you have a case where the
6      government is employing racial classification.
7              Of course it's preliminary.  If your Honor gets the
8      full record and the decision -- if it decides that, you know,
9      the decision at the preliminary injunction stage was incorrect,
10     you can reverse that decision, but that doesn't mean that, you
11     know, you -- the question here is can you rule on a preliminary
12     injunction, do you have enough information to --
13             THE COURT:  No, I can rule.  There's no question I
14     have the authority to rule.
15             Let's talk about what you want to talk about, which
16     is the equal protection and the compelling governmental
17     interests here.
18             MR. STRAWBRIDGE:  Sure.
19             THE COURT:  Strict scrutiny and deference from your
20     point of view.  I disregard the deference given completely and
21     it's just a plain old strict scrutiny test because it's the
22     Military and race and it doesn't matter.
23             MR. STRAWBRIDGE:  I think that that's correct.  That
24     is our position.  And I think that that has to be our position.
25     I also -- that is our position if it's the law.  Harvard
```

1  includes a specific reference to Korematsu itself in the

2  decision that underscores the need to not be deferential even

3  when the Military is involved.  Obviously this is a different

4  policy than Korematsu.  I'm not trying to suggest they are

5  identical, but it does establish the point, which is that the

6  Military --

7          THE COURT:  I mean, it's the Footnote 3.  It's the

8  Footnote 3.  Everybody's looking at Footnote 4.  Footnote 3 is

9  also quite informative.

10          MR. STRAWBRIDGE:  Correct.

11          THE COURT:  But does it really say that, Judge, you

12  shouldn't give any deference to the Military?  Does it really

13  say that?

14          MR. STRAWBRIDGE:  I mean, I don't think it says that

15  in those words, but I think it highlights the harm in overly --

16  being overly deferential.

17          THE COURT:  No question.  It does highlight the harm,

18  but it doesn't preclude the consideration of deference is the

19  point.

20          MR. STRAWBRIDGE:  Well, what I would say is that, in

21  other examples that are analogous to this -- let's start with

22  the universities.  Before Harvard, even when the universities

23  were allowed in some circumstances to use race as part of

24  college admissions, they asked for deference and the Court in

25  Grutter and in Fisher was very clear --

1           THE COURT:  But this is the Military, so

2    universities, put them aside.  It's not a fair comparison.

3           MR. STRAWBRIDGE:  Okay.

4           THE COURT:  It's the Military.

5           MR. STRAWBRIDGE:  Let me go to the comparison that

6    the government relies heavily upon, which is Johnson, which was

7    prison officials.  Prison officials, as I'm sure your Honor is

8    aware, typically are given an awful lot of deference --

9           THE COURT:  Absolutely.

10          MR. STRAWBRIDGE:  -- in their goals and their

11   management of the safety of their prisons.  The policy that was

12   charged in Johnson was a 60-day racial quarantine, essentially,

13   as inmates came in that was expressly designed because of the

14   danger of loss of life or limb and ongoing extreme racial

15   confrontation inside the prison.  It's a very strong case for

16   deference under the Supreme Court's rules and I believe there

17   were some dissents, but the majority opinion was very clear

18   we're not going deferential, we're applying strict scrutiny,

19   strict scrutiny is the rule.

20          And then we've got some of the cases that we cited

21   from the Court of Federal Claims and from the D.C. Circuit in

22   which racial allegations were made against the Military and the

23   Court was quite clear they were applying strict scrutiny.

24          And when we apply strict scrutiny, we don't defer

25   because racial classifications are odious by their very nature,

1    they come with an awful lot of harms intrinsically, and nothing

2    but the highest burden of proof can serve to satisfy those rare

3    instances when racial classifications can be justified.

4          So, yes, our answer is no deference.  Your Honor

5    looks at this like you would any other case.  And in that

6    respect, I think the Court of Federal Claims, the 2000 case on

7    the reduction of force is I think our view as to how strict

8    scrutiny on racial classifications is properly applied in the

9    context of the Military.  I think that's the best example that

10   your Honor has to refer to a court properly applying strict

11   scrutiny to the Military's assertion of the need to classify on

12   the basis of race.

13         In this case -- and I want to distinguish a little

14   bit between Judge Bennett's order in this case and we

15   obviously -- you just hit on one of the issues that we have

16   with Judge Bennett's opinion, respectfully, and why we think

17   that he might have erred with respect to being overly

18   deferential to the Military's aims, but we also have more facts

19   in this case than were actually available to us in the --

20         THE COURT:  You said that.  We've got an admissions

21   policy, Exhibit A and B to the McDonald affidavit.  Is there

22   anything else that is more factual than what you had in the

23   other case?

24         MR. STRAWBRIDGE:  Those are the primary sources of

25   the facts, but there's more interesting information in there

1    and better information in there than the Navy made available at

2    the preliminary injunction stage.  And I'll just highlight a

3    few of them.

4              First of all, we have the admission -- this is on

5    paragraph 80 of the McDonald declaration as well as Exhibit B

6    to that declaration, Section 5 -- that African-Americans and

7    Hispanics are getting racial preferences and whites and Asians

8    are not.  That, of course, leads us to the problem that once --

9    in a case where the admissions are capped and there's only a

10   number of limited seats, all college admissions are a zero sum

11   game.  As the Court recently ignored in Harvard, to provide a

12   benefit to some racial groups is to provide a negative to other

13   racial groups.  There's no question that that's the case on the

14   Army's own admission.

15             We also have an admission from the Army that their

16   racial classifications have no discernible end point.  They are

17   not temporary and there is no standard by which we can measure

18   when they're going to end.  And the Army itself is conceding

19   that they have no end point.  And how do we know that?  If you

20   look at paragraph 85 as well as Exhibit A to Annex -- or Annex

21   B to Exhibit A of the McDonald declaration, they made very

22   clear that they are balancing to the existing racial

23   demographics within the officer corps, and as those

24   demographics change, they are changing the way in which they

25   employ the preferences.  We have an admission that, at one

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

point, they removed what I would call the segregated review for

Hispanic applicants because the number of Hispanics applicants

who are graduating from the U.S. Military Academy had reached a

level where they did not think that was necessary.  Recently,

they reinstituted that benefit.

And if you read the Harvard decision, it's very clear

on this point as well.  Anything that tries to tie a racial

benefit to racial demographics is inherently a request to

always use race.  Because the demographic makeup of the Army

has changed over time.  It's going to continue to change.  The

demographic makeup of the officer corps has changed over time.

It's going to continue to change in the future.  It's

completely antithetical to this notion that we're going to

allow a limited use of race for a set period of time to achieve

a particular end.  We have an admission that that's not what's

happening here.

And again, going back to Johnson, which they say is

the most analogous case for your Honor, that was a 60-day

policy involving maximum security prisoners who were a threat

to attack one another.  This has been going on for decades and

it will continue to go on for decades because the target that

they're going is to balance to demographic group.  That's also

problematic under a whole host of decisions, including Bylan,

including Adarand, including Grutter and including Fisher, that

says racial balancing, trying to manage your racial

1    demographics to a particular baseline, is inherently

2    unconstitutional.  That's never been an accepted interest and

3    it's always been rejected as a legitimate way to go about using

4    race.  And Army, or West Point, admits that's what they are

5    doing here.

6           We also know just how many seats are in play.

7    According to Army, at this stage of the case, which I will

8    accept as true for preliminary injunction, we know exactly how

9    many seats are being affected by the racial preferences

10   according to them.  That's in paragraph 93 of Colonel

11   McDonald's declaration.  She tells us how many nonwhites

12   received appointments in the 26 and 27 classes in the areas

13   where they claim that race is limited to being used.  Taking

14   them at their word, last year, it was 41 seats in a class of

15   1200 that went to nonwhites.  That means the maximum effect of

16   their racial preferences, if you assume all 41 seats would have

17   gone to whites absent the racial preferences, which we don't

18   know, but we will assume, I mean, that's less than five percent

19   of the entire class.

20          And then that brings us to the next weakness, I

21   think, in Army's overall presentation here, which is the claim

22   that they need to do this at West Point and at West Point only

23   when they are admitting people to class because they have this

24   interest in establishing diversity throughout the Army and

25   throughout the various units.  This is a very small number of

1    seats and it's hard to imagine that it's worth all the

2    negatives that are associated with racial classifications.  The

3    reason that is is because if you have 60 or 40 seats, I mean,

4    that's -- like I said, that's three to five percent of any

5    given class at West Point, but West Point only produces 20

6    percent of the officers that enter the Army every year.  So

7    we're talking about less than two percent effect on the --

8                    THE COURT:  Pretty good math.

9                    MR. STRAWBRIDGE:  -- Army officer class.

10                   Well, it took me a while.  I'll confess to that.

11                   THE COURT:  I don't trust lawyers' math.

12                   MR. STRAWBRIDGE:  Well, I had my colleagues double

13   check it and I encourage your Honor to do so.

14                   But I have two points on this.

15                   One is I don't think the harm for a preliminary

16   injunction is that significant when we're only talking about

17   those number of seats.  I don't think you can really have any

18   significant effect on the overall makeup of the Army

19   demographics, which is their claimed interest.  Parents

20   Involved is very clear that when we are employing racial

21   classifications for very small numbers, it's simply just not

22   worth it in that case.  It's not to suggest that more invasive

23   or larger programs are better, but it does suggest that we

24   should be really thinking hard as to whether we're going to use

25   a racial classification for such a small effect.

1          The other point that I would make is the compelling

2     interest in establishing diverse units and the assertion that

3     racial diversity across the Army makes a difference in its

4     actual war-fighting capabilities and its abilities to

5     accomplish its missions I think is belied a little bit by the

6     fact that this is the only area where Army is employing racial

7     classifications.  The Stitt declaration makes very clear that

8     they do not consider race in promotion and advancement in the

9     Army.  There is no evidence before the Court.  Indeed, there's

10    evidence in the form of our Spoehr declaration that we

11    submitted that they do not racially balance or racially assign

12    or use race as a factor in assigning individuals to units or to

13    commands or to any other aspect of the Army.

14          If they really believed in strict scrutiny land, if

15    they really believed that this was essential to their mission,

16    you would expect that they would be doing that, not just simply

17    opening up this one little racial classification at one end of

18    Army admissions and contending that that's what's going to

19    advance their allegedly compelling interest.  I think the

20    reason for that is twofold.  There's nothing particularly

21    compelling about the racial diversity of the unit.  What

22    matters in the unit is merit and accomplishment and cohesion

23    that is built through accomplishing tasks together.

24          THE COURT:  That's Lieutenant Spoehr is it?

25          MR. STRAWBRIDGE:  Yes.  General Spoehr, yes.

1          THE COURT:  General Spoehr.  Sorry.

2          Sorry, General.

3          That's what General Spoehr said.

4          MR. STRAWBRIDGE:  Yes, yes, that's what he said.  And

5   obviously that's information we submitted.

6          I'll just note that the government's other asserted

7   interest here is in recruiting and retention.  I think that

8   Wygant and Parents Involved both kind of reject this notion

9   that it can be sufficiently compelling to have a certain

10  demographic representation in the hiring and firing across an

11  institution for purposes of having representation in and of

12  itself.  That is not sufficiently compelling to justify the use

13  of racial classifications.

14         And I do not diminish the seriousness of the racial

15  conflict in the Vietnam era in the Army as well as in society

16  in general.  That was 50 years ago.  I think, if anything, the

17  Supreme Court precedent in this area makes it very clear that

18  we have to be looking at the circumstances as they exist now.

19  And I do think it's telling that the Army cannot point to any

20  significant racial conflicts of that level that have taken

21  place in the Army since I think 1972 or '73 was their last

22  example.  So to the extent that they're trying to suggest that

23  using admissions at West Point in a racially discriminatory way

24  which affects one to two percent of the overall officer class

25  entering the Army every single year is somehow linked to an

```
 1    interest in preventing racial armed conflict or brawling at the

 2    Army level, I simply don't think that they can satisfy their

 3    burden.  And I think it's unlikely that they will satisfy their

 4    burden when we get to the merits.

 5              THE COURT:  All right.  Let's talk about standing for

 6    a minute --

 7              MR. STRAWBRIDGE:  Sure.

 8              THE COURT:  -- because I don't think you have to tell

 9    me the name of the person to have standing.  I don't really buy

10    that.  I realize others have said you do.  The Supreme Court

11    has said you have standing, Member A, Member C.  I'm going to

12    hear from the substance of the standing.  I don't know whether

13    these are the right people that you've brought forward, and I'm

14    going to hear from defendant on that, but talk to me a little

15    bit about standing.  We don't need to talk about the name.  I'm

16    not interested in the name.

17              MR. STRAWBRIDGE:  Sure.

18              THE COURT:  But is this really enough?  Have you

19    really laid out enough?

20              MR. STRAWBRIDGE:  The answer to that is yes.  I think

21    this is exactly what was provided in the Harvard and UNC cases.

22    It's the exact same information that the Supreme Court said was

23    more than sufficient to establish --

24              THE COURT:  You were on those cases, right?

25              MR. STRAWBRIDGE:  And well beyond those cases as
```

well.  It's not uncommon.  And indeed, this is -- associational

standing like this was originally -- I think came about in the

civil rights era by the NAACP.  So I think this is standard

standing information.

As the case progresses in the future, into discovery,

there is additional information that can certainly be provided

with a protective order in place that allows them to verify as

we get closer to the end of the case, but I do think that we

have satisfied our requirement.

The two cases you said on names -- I know you're not

persuaded -- that did go the other way are both on appeal, for

the record, and several other cases as well.

THE COURT:  And of course I'll be guided by whatever

the Second Circuit instructs, but just sitting here, I don't

really think I need the names.

MR. STRAWBRIDGE:  I do want to be -- if your Honor is

concerned that we somehow don't have the right people for

standing, I would like an opportunity to address that.  I'm not

so sure what else we need.  We think both allege that they are

not members of the groups that get the benefit of the racial

preference that the Army provides.  I think, under Gratz and

Grutter and the SFFA cases, that's all they need to do.

Frankly, I don't even think -- if you read Gratz, I don't even

think it's necessary that they actually apply.  Gratz involved

someone who just said he was willing and able to apply once

1    they stopped discriminating, but, in this case, you have two

2    applicants who are going through the application process.

3              Unless your Honor has any other questions, I'm happy

4    to --

5              THE COURT:  No.  I want to hear from the defendants

6    now.  Thank you.  Thank you very much.  I very much

7    appreciate -- I very much appreciate your earnest desire to

8    convince me that you're right.  I really do.  And the dexterity

9    is obvious, so I appreciate that as well.

10             All right.  Let me hear from the defendant.

11             And why don't we start here.  Whoever's going to

12   argue, it's fine, but I want to talk about sort of a little bit

13   in reverse.  I want to talk about what are the compelling

14   governmental interests here.  Whose are they?  Whose am I

15   supposed to look at?  I've actually sort of gotten focused on

16   the varying and differing articulations of the governmental

17   interests here and, so could we start there and then go back to

18   whatever it is you want to tell me.

19             MS. BLAIN:  Of course, your Honor.

20             May I use the podium?

21             THE COURT:  Sure.  Of course.

22             MS. BLAIN:  Thank you.

23             THE COURT:  Thank God COVID's over and we're back to

24   podiums.

25             MS. BLAIN:  May it please the Court.

1          Plaintiff seeks the extraordinary remedy of a

2     preliminary injunction, which is one of the most drastic tools

3     in the District Court's arsenal.  And here's the context in

4     which they seek this preliminary injunction.  The context is

5     the Army's critical mission to protect national security.  As

6     the Supreme Court has said many times, it is "obvious and

7     unarguable that there is no government interest more compelling

8     than the security of this nation."

9          In this case, we're talking about the Army's

10    compelling interest in creating a diverse officer corps.

11    Unlike a civilian university, West Point is training cadets for

12    war.  Immediately upon graduation, these cadets are

13    commissioned as officers in the United States Army, commanding

14    soldiers in the most lethal and capable ground force in

15    history, capable of indefinitely seizing an adversary's land,

16    resources and population.  These officers command soldiers who

17    operate next-generation tanks, drones and artillery systems,

18    paratroopers and frontline troops.  West Point is a critical

19    pipeline for these Army officers.

20          Thirty-three percent of senior Army officers, meaning

21    those above the rank of colonel, are West Point graduates and

22    fifty percent of Army four-star graduates -- sorry -- Army

23    four-star generals are also West Point graduates.  And because

24    officers cannot be brought in from the outside, your Honor, the

25    Military must develop these officers internally, meaning that

today's West Point cadets are the Army leaders 30 and 40 years
in the future.

The Military has made a professional, considered
judgment that having a racially and ethically diverse officer
corps, which begins with the racially and ethically diverse
cadet corps, is necessary to build cohesive teams critical to
creating a combat-ready force, to aid in recruitment and
retention and to foster domestic and international legitimacy.
This is a national security imperative.  And that Military
judgment, your Honor, is based on history, real-world
experience and qualitative and quantitative research.

Plaintiff's preliminary injunction in this case
requests that this Court do three things that are unsupported
by the record and in contravention of Supreme Court and Second
Circuit precedent.

So, first, plaintiffs request that this Court ignore
the history and second-guess decades, from 1963 to 1971 to 1972
to 2009 to 2021 to 2022 and to today, of the Army's most-senior
Military leaders that racial diversity in the Army's officer
corps is a national security interest.  That is a judgment that
the Courts have already indicated and the Supreme Court and the
Second Circuit have long granted great deference to.

THE COURT:  So if we're not going to talk about my
first question, let me get to my second question.

MS. BLAIN:  I'm happy to talk about your first

1    question, too, your Honor.

2              THE COURT:  All right.  Let's go to the second one

3    first.

4              How does it work for me?  So how do I, as a practical

5    matter, engage the strict scrutiny/equal protection tests, the

6    two steps, and grant deference to the Military?  As a practical

7    matter, what analysis -- take me through the steps I need to

8    take in order to arrive at a conclusion.  Is it that I just

9    defer because it's the Military or is it that I water down the

10   very clear test, strict scrutiny test?  How does this work for

11   me?  Like when I go back, you're going home, I'm struggling

12   here to come up with what I think is the right answer, take me

13   through my analysis, please, deference and strict scrutiny.

14             MS. BLAIN:  I'll start with the fundamental premise,

15   your Honor, and then explain how we submit that operates in

16   practice when the Court goes back to its chambers and writes

17   the Court's decision.

18             So the fundamental premise, which guides the

19   practical reality here, the fundamental premise is that courts

20   traditionally, as the Court well knows, have been reluctant to

21   intrude upon the authority of the executive and Military and

22   national security affairs, particularly -- and that's the case

23   here -- particularly running the complex subtle and

24   professional decisions as to the composition, training,

25   equipping and control of Military forces.  The Supreme Court

said that in Gilligan from 1973 and the Supreme Court again

said that in 2002, neither of which case are cited by the

plaintiffs.  Justice Kavanaugh, in 2002, in the U.S. Navy Seals

case, again reiterated that, with all due deference to the

Court, it is difficult, he says, "to conceive of an area of

governmental activity in which the courts have less

competence."  And that's critical here because this competency

is uniquely within the Military's wheelhouse.

And so what does that mean in practice?  Well, in

practice, fundamentally that means, your Honor, that this is

not a battle of the experts.  And we know that from the Supreme

Court's decision in Goldman when it was evaluating a challenge

to the Air Force's regulation under the First Amendment, and,

there, it had Air Force declarations and an expert declaration

from the plaintiff and it said plaintiff's expert's view was

"quite beside the point."

And so that means when the Court is evaluating the

evidence that you have before it, six declarations from some of

the most senior leaders in the Military backed up by decades of

qualitative and quantitative research, the Court should give

great deference to that evidence, especially where -- and this

is what the Second Circuit has said in Able v. United States in

1998 -- especially where the challenged policy is the result of

exhaustive inquiry, because courts are ill-suited to second

guess the Military's judgments about Military capability and

1    readiness.

2            The D.C. Circuit in 2019, in the Doe 2 case, also

3    said the deference to the Military depends on the nature of the

4    Military interest at stake and whether the Military "used

5    considered, professional judgment."

6            So, here, your Honor --

7            THE COURT:  None of that involves race, though,

8    right?  I mean, none of those cases.

9            MS. BLAIN:  Those cases don't involve race, your

10   Honor.  In fact --

11           THE COURT:  Do we have any case that involves race in

12   the Military?

13           MS. BLAIN:  The only case that the Supreme Court has

14   had before it evaluating racial classification in the Military

15   context is Korematsu.  In Korematsu, of course, the Court has

16   repeatedly repudiated, but the Court has also repeatedly

17   emphasized deference in the Military context.  And while the

18   courts have consistently repudiated that holding, the courts

19   again have consistently looked past the Military's -- rather,

20   let me rephrase that -- given great deference to the Military's

21   judgment in this particular context because this is the context

22   in which the Military has the most competence rather than the

23   judiciary.

24           So, in practice, your Honor, what the Court has

25   before it is, on the one hand, six declarations based on

1    decades of history.  And not just history from the Vietnam era.

2           And try as we might, your Honor, just a quick point

3    on that.  We can't ignore history.  History informs where we

4    are today.  And unfortunately, racial discrimination is still

5    an issue in this country and also in the Military.  And I just

6    have a point on that and then I'll go back to evaluating the

7    data if that's okay with your Honor.

8           THE COURT:  Sure.  You're doing fine.

9           MS. BLAIN:  So in terms of why history is important,

10   because I think this is vital to the Court's consideration of

11   the evidence, so much of the evidence is based on the history

12   of racial tension in the United States Armed Forces, as

13   unfortunate as that is.  So it is still relevant today because,

14   unfortunately, as Lieutenant General Stitts says in his

15   declaration at paragraph 18, instances of white nationalism,

16   while rare, are growing in the Military.  So are instances of

17   racism and extremism.  The 2022 National Defense Strategy also

18   says, "Our efforts at creating a lethal fighting force will

19   fail if we allow problems in our own ranks to undermine our

20   cohesion, performance and ability to advance our mission, and

21   to advance that mission, the Military has repeatedly agreed and

22   tried to address sexual harassment and assault, diversity and

23   discrimination."

24          The Court need look no further than a letter

25   submitted to West Point by numerous West Point graduates in

1   2020 outlining their unfortunate legions of experiences,

2   experiencing and feeling racial discrimination.  And the Army

3   knows that that's because soldiers are still products of a

4   society from which they come.  The Army knows that.  Former

5   Secretary of Defense Mark Esper said as much in June of 2020.

6   He said, "We are not immune to the forces of bias and

7   prejudice, whether visible or invisible, conscious or

8   unconscious, and we know that this bias burdens many of our

9   service members."  And the Army knew that back in 1969, when

10  the Secretary of the Army also said that, while the Army is not

11  an institution committed to social change, it cannot ignore the

12  realities in which it exists.  Soldiers enter service with

13  pre-existing identities and how and whether the Military

14  acknowledges this and builds inclusive organizations helps

15  determine lethality and success.

16          So try as plaintiffs might, we cannot turn a blind

17  eye to history.

18          THE COURT:  So go back now.  Go back now.  Because

19  I've read all of this and I've digested it, but go back and

20  tell me.  We're sitting at my desk writing.  How do I deal with

21  deference and strict scrutiny, please?

22          MS. BLAIN:  Yes, your Honor.

23          THE COURT:  Is it just that I accept the conclusions

24  of the Military that race is necessary as a factor here?  Is

25  that where we're headed?

1           MS. BLAIN:  No, your Honor.  Deference does not mean

2    judicial advocation.  The Supreme Court has made that clear in

3    Rostker.  And so we do not -- we are not requesting that this

4    Court advocate from any judicial review.  What we are

5    requesting is that the Court grant deference to the evidence

6    and the judgment presented to it by the Military, particularly

7    when, as I was getting to, the Court has before it, on the one

8    hand, six declarations outlining the history, decades of

9    professional Military judgment, real-world combat experience

10   and substantiated by qualitative and quantitative research.

11   That's on the one hand.  And on the other hand, the Court has

12   one declaration from a retired lieutenant general who bases the

13   majority of his declaration on, A, his personal experiences

14   and, B, when he does cite sources, he cites either press

15   articles, irrelevant studies or, frankly, mischaracterizes at

16   least two of the studies before the Court.

17           And so when you compare those things and when you

18   contrast that with the considered professional judgment of the

19   Military repeated again for decades, plaintiff simply cannot

20   meet its burden on this record.  And that's where deference

21   comes into play and that is also why this is not a matter ripe

22   for a preliminary injunction ruling.  This matter should go to

23   discovery where both sides can create a full factual record,

24   as, again, the District Court in Maryland ruled, and only then

25   will your Honor have a full record before it.  And we

1   respectfully submit that the government will certainly be able

2   to meet its compelling national security interest, and on this

3   record today, they simply have not carried their burden to show

4   that we will not be able to.

5        THE COURT:  You agree, do you not, that strict

6   scrutiny here applies to the Military?

7        MS. BLAIN:  We agree.

8        THE COURT:  And you agree that Footnote 4, which I

9   read several times, contemplates that the Military may have

10  distinct interests from, at the very least, Harvard and

11  University of North Carolina, right?

12       MS. BLAIN:  Absolutely, your Honor.

13       THE COURT:  Okay.  And the interests, the compelling

14  governmental interests that the plaintiff has predicated their

15  claim on, are different than the ones you've stated to me this

16  morning.  Do you agree with that?

17       MS. BLAIN:  Well, your Honor, let me frame it this

18  way.  The inquiry before the Court on strict scrutiny is has

19  the government met its burden to show a compelling governmental

20  interest in the use here of limited -- of an admissions policy

21  that --

22       THE COURT:  You don't think you have the burden of

23  proof here.

24       MS. BLAIN:  Well, not in the preliminary injunction.

25  Of course.  In the preliminary injunction --

1          THE COURT:  That's where I am.  I'm in the

2    preliminary injunction phase and what I'm urging is the

3    compelling governmental interest -- I'm not urging it, I'm

4    reading it -- that you have espoused on behalf of -- and we

5    have to get to who is it, is it West Point or the Army -- but

6    they're different than what the plaintiff has suggested they

7    are.  No?

8          MS. BLAIN:  Well, the government has explained to

9    your Honor in detail what its compelling governmental interest

10   is, and in the preliminary injunction context, the Court must

11   evaluate whether -- and this sort of can be confusing in the

12   context of strict scrutiny versus the preliminary injunction

13   standard, but, here, we would submit that the plaintiff has the

14   burden to show by a clear and likelihood of success on the

15   merits that the government will be unable to meet its

16   compelling interest that it has a national security objective.

17   And so when you're looking at the interest at apply, your

18   Honor, it's the interest of the United States Military on the

19   one hand, and the only time the plaintiff's interest themselves

20   come into play is in the irreparable injury inquiry.

21         THE COURT:  No, no, I get that part.  The

22   identification of the compelling governmental interests is the

23   only issue I have in my mind right now, which is, you said,

24   their, if I heard it right, compelling diverse officer corps,

25   cohesive teams, combat ready, recruitment and retention,

```
 1    boostering the Army's legitimacy around the world.
 2              MS. BLAIN:  And at home.
 3              THE COURT:  Those are your compelling -- and at home.
 4    Those are the compelling governmental interests that the
 5    government believes are subject to the strict scrutiny
 6    analysis.
 7              MS. BLAIN:  With the deference accorded in that
 8    analysis to the Military's judgment.
 9              THE COURT:  I got it.
10              MS. BLAIN:  Yes, your Honor.
11              THE COURT:  I still don't understand how I defer and
12    apply strict scrutiny other than to say I should consider the
13    evidence, which of course every judge will, and look at it,
14    compare it, contrast it and then accept it because it's the
15    Military.
16              MS. BLAIN:  Well, your Honor, there is precedent here
17    for the Court to go by, of course, and that is the Goldman case
18    where the Supreme Court again was evaluating a First Amendment
19    challenge to an Air Force policy.  And of course, a First
20    Amendment challenge is also subjected to heightened scrutiny.
21    And, there, the Supreme Court said, "Our review of
22    constitutional challenges to Military regulations is far more
23    deferential than constitutional review of similar laws or
24    regulations designed for civilian society."
25              We are not dealing with an admissions policy designed
```

1   for civilian society and that is one of the main reasons why

2   this case is very different from Harvard.  Try as plaintiffs

3   might like, this case presents an entirely unique context.  And

4   the Supreme Court has said in Grutter, in Adarand, in Parents

5   Involved that a Court must evaluate the context when reviewing

6   government policy under an equal protection analysis.  And the

7   context here is not just the benefits that flow from

8   educational diversity, as was, you know, at issue before the

9   Court in Harvard and UNC.  Instead, what's before this Court is

10  the government's compelling interests in using diversity to

11  create something else, and that something else --

12              THE COURT:  Whose interests?  Is it the Army?  Is it

13  West Point?  Whose interests are we focused in on?

14              MS. BLAIN:  It's both, your Honor.

15              THE COURT:  I see.

16              MS. BLAIN:  West Point has an interest in serving the

17  Army's national security interest in a diverse officer corps.

18  And that's particularly important because West Point

19  disproportionately represents senior Army officers.

20              And on that note, your Honor, if I could just take a

21  moment to address plaintiff's argument that the numbers don't

22  back up this compelling interest.

23              Here, we respectfully submit, your Honor, that,

24  number one, the plaintiff simply misunderstands the structure

25  of the Military.  Junior officers command 100 to 200 soldiers.

1    Colonels command 3,000 to 5,000 soldiers.  Two-star generals

2    command 10,000 to 15,000 soldiers.  Four-star generals, which,

3    again, are 50 percent of whom are West Point grads, command,

4    for example, the Pacific theater, which is hundreds of

5    thousands of soldiers.

6            So one officer can make a significant difference.

7    And we know that because General Stitt, Lieutenant General

8    Stitt, says that in paragraph 26 of his declaration.  He says

9    that it is vital that young recruits see themselves somewhere

10   in significant numbers, somewhere up the chain in the Army,

11   making the Army more representative of the nation, because when

12   they see themselves somewhere up the chain, whether that's the

13   head of the Pacific theater or their lieutenant colonel

14   commander, they are inspired and they're more likely to believe

15   in the mission and in their ability to be promoted and move up

16   the chain themselves.  That is why one officer makes a big

17   difference to thousands of soldiers.

18           The other thing, your Honor, is --

19           THE COURT:  I mean, isn't there another way to do

20   this?  Isn't there another -- you know, narrowly construing --

21   narrowly tailored, rather?  Can't you go out and try and

22   recruit the individuals you think are appropriate?  Why do we

23   need it in the admissions process?  Why can't we do it a

24   different way here?

25           MS. BLAIN:  Two things, your Honor.

1          One, Fisher II explicitly said that the fact that

2     there are sort of the results of the race-conscious policy is

3     relatively minimal is a feature of narrow tailoring.  So it is

4     actually -- West Point is trying to comply with the

5     Constitution and trying to narrowly tailor this as much as

6     possible.  And that's one reason why the numbers are small.

7     But, two, in terms of narrow tailoring specifically in terms of

8     the West Point admissions policy, I would turn that over to my

9     colleague,  AUSA O'Gallagher.

10          THE COURT:  We'll come to her in a minute.

11          MS. BLAIN:  Okay.

12          THE COURT:  Let's finish with you first.

13          Okay.  I mean, the other thing that's on my mind is

14     let's just say -- and don't read this the wrong way, but if I

15     were to issue an injunction here and say, okay, West Point is

16     no longer going to consider race, tell me about the steps that

17     West Point would have to take in order to implement that

18     direction for me.

19          MS. BLAIN:  Your Honor, that is exactly why this is a

20     mandatory injunction.  A mandatory injunction would alter the

21     status quo and the status quo is defined as the parties' prior

22     controversy positions vis-a-vis each other.

23          So West Point has employed this admissions policy for

24     decades and continues to apply the same policy now.  Applicants

25     have applied to West Point under that policy for decades and

1    continue to do so now.  And plaintiffs themselves, in terms of

2    Member C, applied to West Point a year ago under this policy

3    and is applying to West Point now.  Their positions have not

4    changed.  The only thing that has changed, your Honor, is the

5    decision in Harvard, and while that certainly affects civilian

6    universities' admissions policies, the Supreme Court, as your

7    Honor noted, explicitly carved out the Military academies from

8    that decision, so it could not possibly have changed West

9    Point's policies at that point.

10           More fundamentally to your Honor's question, this is

11   exactly what West Point would have to do.  Number one, you

12   would have to convene the Academic Board at West Point, which

13   is comprised of the heads of all of the academic units on

14   campus.  It would have to look at its current policy and decide

15   how to untangle a very complicated knot, as your Honor now

16   knows, to comply with any injunction.  It would then have to

17   change that policy and apply a new policy to the current cycle

18   of applicants currently awaiting evaluation.  It would also

19   potentially -- and this is the number three and four things,

20   your Honor.  Number three, it might have to withdraw already

21   provided offers of appointments and it might also have to

22   withdraw already offered letters of assurance.  And West Point

23   has already given out hundreds of letters of assurance and

24   offers of appointments to juniors and seniors in high school.

25   That is a change in the status quo.  That is four affirmative

1    acts that West Point would have to do.

2              THE COURT:  Are there forms that need to be changed?

3    Are there written policies that would need to be changed?

4    Having read this material, I have it in my head that there are

5    regional offices where people are being interviewed and looked

6    at.  Are there communications that would need to be changed

7    with respect to those regional offices?

8              MS. BLAIN:  Yes, your Honor.  There is a legion of

9    material that would have to be changed.  The policies that the

10   Court has before it in the McDonald declarations A and B, those

11   would have to be evaluated and potentially changed, and those

12   can only be changed, again, by a meeting and evaluation of the

13   full Academic Board.  And let's not lose sight of the fact that

14   it would then require a change in status for the applicants

15   depending on when they applied to West Point.  So the

16   applicants who have applied before an injunction would issue

17   would be evaluated under one standard and the applicants

18   applying thereafter would be evaluated under a different

19   standard.

20             THE COURT:  I mean, that gets solved, right, if there

21   is an injunction to be issued, by making it effective as of a

22   date in futuro, right?  It would give the West Point Academy a

23   chance to get its ducks in a row, so to speak, right?  That

24   could work.

25             MS. BLAIN:  Well, your Honor, West Point is currently

1    in the middle of an admissions cycle.

2              THE COURT:  No, I get it.

3         MS. BLAIN:  Right?

4              THE COURT:  I get it.

5         MS. BLAIN:  And as I understand it, the plaintiffs

6    are requesting that this Court today order that it change that

7    policy in the middle of an admissions cycle.

8              THE COURT:  That's what they've asked me to do.

9         MS. BLAIN:  And that would require a tremendous

10   amount of work that, frankly, would first require a tremendous

11   amount of meetings to even figure out what tremendous amount of

12   work would flow from such an injunction.  And we respectfully

13   submit that, particularly in light of the compelling national

14   interests at issue here and particularly in light of the lack

15   of irreparable harm and particularly in light, finally, of the

16   deference that courts traditionally give the Military in the

17   context of national security, that would do a great disservice

18   to the Military and it would cause potential harm to the men

19   and women in uniform.

20              THE COURT:  Let me ask you a question.  What do you

21   make of the argument about the ROTC candidates from

22   universities?  What, if anything, do you make of that?  Because

23   Harvard and University of North Carolina I presume have ROTC

24   programs.  But what do you make of that?

25              MS. BLAIN:  Well, your Honor, the Harvard decision

1    doesn't even mention ROTC, so it is unclear exactly what

2    repercussions -- what the Court thought about the government's

3    arguments regarding ROTC because they simply didn't, A, discuss

4    ROTC and then, B, explicitly carved out the Military academies.

5                THE COURT:  So it's a non sequitur.  It doesn't help

6    me or hurt me --

7                MS. BLAIN:  Well, exactly.

8                THE COURT:  -- in my understanding of what's here.

9                MS. BLAIN:  It's not relevant, your Honor.

10               THE COURT:  Okay.

11               All right.  What else do you want to tell me?

12               MS. BLAIN:  Just one quick thing, your Honor.  And

13   hopefully I'm not being a lawyer and I really mean three quick

14   things, but just one quick thing.

15               When the plaintiffs cited the Johnson case, Johnson

16   is actually critical, your Honor, and I just want to make clear

17   that, there, the Supreme Court was not not evaluating prison

18   regulations under strict scrutiny; instead, it was evaluating

19   what scrutiny applied to those regulations and then remanded

20   for an evaluation of strict scrutiny.  But, there, as the Court

21   noted again in Harvard and cited with favorability, that the

22   Johnson analysis that preventing harm could be a compelling

23   governmental interest would be sufficient in some cases to

24   justify the use of race in a limited way.  And that is exactly

25   what the Army is doing here.  It is trying to prevent harm to

1   its men and women in uniform and it is trying to create a

2   lethal fighting force.

3           So to the extent that the Court looks at Johnson and

4   is evaluating whether or not these goals are measurable, which

5   I will submit plaintiffs have not identified one case in which

6   a court has required the government to identify how well it's

7   protecting national security, certainly not one case in which

8   it has required the Military to evaluate with metrics or any

9   other measurability analyses how well it is protecting our

10  country's borders.  And so to the extent that measurability

11  does exist here, your Honor, that would require, again,

12  deference when evaluating the evidence and evaluating the

13  justifications.

14          And when you're looking at cohesion, there are four

15  things that we respectfully submit the Court could look at if

16  you were to evaluate cohesion in terms of measurability, and

17  the first thing, your Honor, is whether or not there have been

18  any race riots that have occurred since the initiation of the

19  diversity program and there have been none.  And that is

20  significant because that is the fundamental thing that the

21  government is trying to prevent.  And that is why that is

22  similar to Johnson.  It is the prevention of harm.

23          The Court can also look at the views of the senior

24  Military generals in front of this Court.  Again, as in

25  Johnson, the Court noted, Harvard again cited favorably, that a

court can carefully consider the views of officials whose job

it is to make security judgments.  And, here, you have not just

the declarations in front of this Court, but the public

statements and the decades of congressionally formed committees

of the Department of Defense Board in 2021 comprised of 15

members across the Armed Services, of the 2009 Military

Leadership Diversity Council comprised of 30 Military officers.

The Court can look at that to determine whether or not the Army

is meeting its cohesion.

Third, and I'll do this quickly, your Honor, the

Court can also consider the same data that the Army does, which

is feedback from its current service members.  The OPA report

is a multiyear study that evaluated whether or not -- how its

service members are feeling about the diversity climate and the

health of his or her units.  And not just the OPA report.  The

Court can also consider the Defense Organizational Climate

Survey, which is a congressionally mandated yearly review of

more than one million service members about their views of

cohesion and lethality.

And then, finally, your Honor, in terms of cohesion,

the Court can, of course, also look at the numbers and look at

the number of, you know, officers with diverse backgrounds who

are currently serving in the Army and it can look at the number

of minority cadets who are currently at West Point.

So those are three ways that the Court can evaluate

1    cohesion.  We put them in our papers.  Otherwise, the Court can

2    evaluate recruitment and retention as well as legitimacy.  But

3    I just went down this rabbit hole because I wanted to make

4    clear that Johnson is about which type of scrutiny applies, but

5    did not actually apply strict scrutiny.

6              THE COURT:  All right.  Thank you.

7              MS. BLAIN:  Thank you.

8              THE COURT:  Co-counsel.

9              MS. O'GALLAGHER:  Yes.  Thank you, your Honor.  I'm

10    also going to move to the podium.

11              THE COURT:  Sure.

12              MS. O'GALLAGHER:  May it please the Court, your

13    Honor, and good afternoon.

14              The first thing that I would like to talk about today

15    is irreparable harm.  After I talk about irreparable harm, I'm

16    going to get into the narrow tailoring prong specifically of

17    the strict scrutiny analysis.

18              You very conveniently actually, for both of us,

19    divided our argument up along the lines that we had divided

20    ourselves, so thank you for that.

21              THE COURT:  I did that on purpose just so you know.

22              MS. O'GALLAGHER:  We appreciate it.

23              So I want to address irreparable harm first because,

24    as your Honor well knows, irreparable harm is the single most

25    important prerequisite for the issuance of a PI.  It should be

1    considered first in the preliminary injunction analysis, and if

2    there is no irreparable harm, then no PI should issue.

3         THE COURT:  I mean, the problem I have with

4    irreparable harm is -- I don't think I have a problem with

5    irreparable harm here because the Second Circuit says a

6    constitutional law violation de facto is irreparable harm.

7    It's presumed.  So why shouldn't I apply that rule?

8         MS. O'GALLAGHER:  Your Honor, respectfully, that's

9    not precisely what the Second Circuit says.

10        THE COURT:  I'm sure that's true.

11        MS. O'GALLAGHER:  In the Agudath case that plaintiff

12   cites, what the Agudath case recognizes is that there's a

13   presumption of irreparable harm that flows from a violation of

14   constitutional rights.  And that's a 2020 case from the Second

15   Circuit.

16        Plaintiff also cites a Southern District of New York

17   case, that's the Arias case, for the proposition that it's

18   settled in the Second Circuit that an alleged constitutional

19   violation on its own constitutes irreparable harm.  That

20   question actually, at the time, in 2020, when Arias wrote that,

21   was not settled.  And there was a significant split among

22   districts in this circuit about whether the alleged violation

23   of a constitutional injury on its own was sufficient to

24   constitute irreparable harm.

25        Luckily for us, the Second Circuit actually provided

additional authority in 2020 -- excuse me -- in 2021, so this post dates, the Agudath case.  And what the Second Circuit said in the A.H. case -- that's 985 F.3d 165 -- is that, in cases alleging constitutional injury, a strong showing of a constitutional deprivation that results in non-compensable damages ordinarily warrants a finding of irreparable harm.

So what I understood plaintiff to be arguing today and in their papers is that irreparable harm is this constitutional injury which they describe as the inability to compete on equal footing.

What the Second Circuit actually says is, okay, you need a strong showing of a constitutional deprivation that results in non-compensable damages.  And when we're looking at that standard, it's important to recognize that the most important factor that the Court should consider in deciding whether or not there is irreparable harm is whether the threatened harm would impair the Court's ability to grant an effective remedy.  If we were to go to trial and the Court were to issue a final judgment on the merits, would the Court be prevented at that point in time from granting an effective remedy to the plaintiffs were the plaintiffs to prevail.  And when we're looking at the constitutional injury that plaintiffs allege here, the inability to compete on equal footing, the Court would in no way be impaired in its ability to remedy that injury.

1              So Member A in this instance, in his declaration,

2     notes at that time, only a couple of months ago, that he was

3     not yet 18 and he was a senior in high school.  And Member C

4     noted in his declaration, which was filed after plaintiffs

5     filed their preliminary injunction, but still a month or two

6     ago, that, at that time, Member C was 18 and was in college,

7     presumably a freshman in college, first year in college.

8              West Point's regulations provide that a cadet can

9     enter West Point up to -- so long as, at July 1st of the year

10    that they're entering, they have not turned 23.  So the members

11    that plaintiff is relying on here in alleging that they will

12    suffer irreparable harm and are referring to this

13    constitutional injury of not being able to compete on equal

14    footing, were the Court not to issue a preliminary injunction

15    here and were the parties to proceed in the normal course and

16    give the Court the benefit of a full trial record to really

17    make a decision with a full trial record in front of it, there

18    would still be plenty of time to remedy that alleged

19    constitutional injury at the end of a final judgment on the

20    merits.  These members have years, potentially up to five

21    years, to continue to apply to West Point.

22              Plaintiff also, in their papers and here today,

23    describes I think what is essentially, if we're looking at the

24    A.H. case, that there are non-compensable damages as well.  And

25    they're referring to losing a year, as they describe it, losing

1    a year of their lives for these members and potentially being

2    set back in terms of Military seniority.

3            So with respect to that second part of the injury --

4    and again, according to A.H., you really need both for there to

5    be irreparable harm.  And as your Honor referenced, if your

6    Honor does find this to be a mandatory injunction, the standard

7    is even higher, needs to be a strong showing of irreparable

8    harm.  So with respect to that non-compensable damages remedy

9    that these members may lose out on a year of their lives and

10    lose out on seniority, that injury is entirely speculative and

11    irreparable harm must be actual and it must be imminent.  That

12    injury relies on a chain of events.

13            First, these members would have to actually apply to

14    West Point.  This is the first we're hearing today before your

15    Honor beyond these late-filed declarations of a couple of days

16    ago that reference that these members have already --

17            THE COURT:  Are you objecting to them, by the way, or

18    you're not going to object to their admission as part of this

19    record?

20            MS. O'GALLAGHER:  Your Honor, I think that the

21    government would respectfully like to reserve that question if

22    your Honor permits, but it's the government's belief that those

23    declarations do not affect the analysis.  So even if your Honor

24    were to consider them, it wouldn't move the needle whatsoever.

25            The only thing that those declarations add is that

1    Member A, who is the senior in high school, has interviewed

2    with his Congressperson for a nomination and is waiting to

3    learn it if he'll get one, and Member C, who is the college

4    student who applied to West Point last year --

5              THE COURT:  Just hold on a second.

6              Ma'am, you're going into jury room.  You're not

7    leaving the courtroom.

8              UNIDENTIFIED SPEAKER:  Thank you, sir, your Honor.

9              THE COURT:  Sorry.

10             MS. O'GALLAGHER:  That's quite all right, your Honor.

11             And Member C, who is the student who applied to West

12   Point last year and is now in college, received a nomination

13   from his Congressperson.  So those are the only two facts with

14   respect to these two members that these declarations add and

15   that doesn't change the irreparable harm analysis.  It doesn't

16   change all of the arguments I just made about the fact that the

17   Court wouldn't be impaired at issuing an effective remedy at

18   the end of a final judgment on the merits and it also doesn't

19   change the fact that irreparable harm in this instance with

20   respect to these members is entirely speculative.

21             So just to go back to the point there that I was

22   making, this is the first time that the government is hearing

23   today that these members have taken any steps with West Point

24   to apply.  So the nomination process.  Both members here,

25   though there are several different types of nominations that a

1    student could receive, both of these members here have pursued

2    congressional nominations.  So that process takes place in

3    Congress.  West Point does not control or have authority over

4    that process.  So with respect to the West Point process, this

5    is the first we're hearing today that plaintiffs have -- that

6    these members have taken any steps to apply.

7          As we laid out in our papers, there are several

8    things that need to take place, most of which need to take

9    place and need to be completed by the candidate applying by

10   January 31st, which is a little over a month from now, and that

11   requires a candidate who is applying to take step one, fill out

12   the candidate questionnaire.  Step two, fill out the

13   second-step kit.  There is a physical fitness requirement.

14   There is a medical evaluation requirement.

15         And these members, in order to have an actual and

16   imminent harm that requires this Court to issue an injunction,

17   would have to demonstrate that they were going to apply and

18   complete all of those steps by January 31st.  That they would

19   then be qualified.  Because West Point has a process where

20   candidates get qualified and only qualified candidates can be

21   considered for ultimate appointment to the Academy.  They would

22   have to then be qualified.  They would have to be considered

23   for vacancies; congressional vacancies, service-connected

24   vacations.  They would have to be considered for a qualified

25   alternate slot.  They would have to not be admitted at any of

those decision points, then be considered at the two discrete

points in the admissions process where race is considered and

can affect ultimate appointment, so that's at the additional

appointee phase and at the superintendent nomination phase, and

then not ultimately receive admission because it was due to

West Point's limited consideration of race.  All of those steps

would have to come to pass in order for these two candidates --

excuse me -- these two members to lose out on a year of their

lives and lose out on Military seniority and have that injury

be traced back to West Point.

So the harm that they allege with respect to these

non-compensable damages is completely speculative and, for

those reasons, there is no reason for your Honor to issue a

preliminary injunction because there is no strong showing of

irreparable harm here.

If your Honor doesn't have any further questions

about irreparable harm, then --

THE COURT:  No, I have none.  I understand your

point.

MS. O'GALLAGHER:  Okay.

So the next point that I would like to talk about

with your Honor is narrow tailoring and whether West Point's

admissions process here and its very limited consideration of

race is narrowly tailored.

So West Point's use of race and ethnicity in

1    admissions is narrowly tailored to further the Army's

2    compelling national security interest.  And I think that the

3    first and most fundamental mistake that plaintiff makes here is

4    taking the Harvard case of last term from the Supreme Court and

5    just applying it mechanistically to this entirely different

6    context.

7          The Supreme Court has instructed us several times now

8    in cases in the education context and cases in other contexts

9    that context matters in the strict scrutiny inquiry generally

10   and in the narrow tailoring inquiry specifically.

11         So, in Grutter, the Supreme Court there noted context

12   matters when reviewing race-based government action under the

13   Equal Protection Clause, not every decision influenced by race

14   is equally objectionable, and that the contours -- and

15   importantly for our purposes, for my purposes, that the

16   contours of the narrow tailoring inquiry with respect to

17   race-conscious university admissions must be calibrated to fit

18   the distinct issues raised by the use of race to achieve the

19   asserted interest.

20         So the Supreme Court's line of cases from Bakke all

21   the way through Harvard, the interest was the same in all of

22   those cases.  The compelling interest that was asserted was the

23   compelling interest of universities in the educational benefits

24   that flow from a diverse student body.

25         The interest -- as my colleague discussed with you,

1    the interest asserted here by the Army is an entirely different

2    interest.  It's an interest in national security and realizing

3    the cohesion and lethality, the recruiting and retention and

4    the legitimacy benefits that flow from having a diverse officer

5    corps.

6           So we know at the outset from the Supreme Court that

7    when you're looking at a different interest, the narrow

8    tailoring inquiry is different.  I think that may leave the

9    Court with the question of, okay, well, what do we do with this

10   line of cases from Bakke to Harvard, and I think the answer is

11   that line of cases provides a framework for the Court, it can

12   anchor the Court, but it can't apply mechanistically because

13   the interest here is it fundamentally different.

14          With that sort of general framework outlined, I do

15   want to go through the ways in which West Point's policy is

16   narrowly tailored.

17          So first and fundamentally, the Supreme Court said in

18   Grutter, and this dates back to Bakke, that the consideration

19   of applicants in an admissions process that considers race must

20   be individualized, it must be holistic, it must give serious

21   weight to all the ways that a candidate can contribute beyond

22   just race and ethnicity, race cannot be a defining feature and

23   you can't limit the range of qualities that can be considered

24   to race, but must consider all the qualities that -- all the

25   ways that a student might contribute alongside race and,

1    through that process, afford an individualized consideration.

2            At each of the three discrete processes -- excuse

3    me -- three discrete places in West Point's admissions process

4    where race is considered, that individualized process is

5    playing out.  So in the LOA process, there's a holistic review

6    of all candidates.  Race is not a defining feature.  Race is

7    considered alongside several other attributes.  And race at no

8    point in the LOA process, in the superintendent nomination

9    process, in the additional appointee process, it's not

10   determinative.  It's considered alongside other positive

11   contributions that these candidates might make as cadets and

12   ultimate Army officers.

13           THE COURT:  I thought race came into play in the

14   questionnaire.  I thought there was a question in the Part I,

15   Step I questionnaire about race.  Is that not true?

16           MS. O'GALLAGHER:  I think what your Honor is

17   referencing is that, in the candidate questionnaire, which is

18   the --

19           THE COURT:  Yes.

20           MS. O'GALLAGHER:  -- step zero, sort of opening up

21   the application, there is a demographic question that asks

22   about race and ethnicity.  But Grutter makes clear that West

23   Point need not close its eyes to the race and ethnicity of

24   these candidates.  What Grutter says is that race can be

25   considered flexibly as a plus factor in the context of a

1    holistic analysis where it's not determinative and where it's

2    not made the defining feature of the application or the review

3    process.

4            THE COURT:  I mean, isn't West Point obligated under

5    the OMB regulations to report race?

6            MS. O'GALLAGHER:  Yes.  West Point, as an institution

7    that's situated within the Department of Defense, is subject to

8    the Department of Defense mandate to --

9            THE COURT:  Is that why that question is there?

10            MS. O'GALLAGHER:  I think that that question is

11    informed by West Point's reporting requirements.  I do think

12    that that question is also there because it's a question that

13    is relevant to the university's consideration of applicants.

14            THE COURT:  Okay.

15            MS. O'GALLAGHER:  But when West Point does, as I

16    mentioned, consider race and ethnicity in its review of

17    applicants, it's doing so in a holistic, non-determinative way

18    and looking, at the same time, at the many other varied

19    contributions that candidates could make as cadets at West

20    Point; athletic contributions, intellectual contributions,

21    leadership contributions.  Because at the end of the day, West

22    Point is training cadets to be officers and to command

23    soldiers.

24            In addition to this holistic, individualized

25    consideration, West Point at no point in its process uses

1    anything that comes close to what the Supreme Court has

2    described as a quota.  What the Supreme Court says when it

3    describes quotas is that a quota is a program in which a

4    certain fixed number or proportion of opportunities are

5    reserved exclusively for minority groups.  Nothing in West

6    Point's process even approximates a quota and nothing in West

7    Point's process approximates the insulation or separate

8    tracking of students that the Court found problematic in Bakke.

9         Plaintiff referred to the idea that what West Point

10    might be doing is engaging in racial balancing, and the Supreme

11    Court has made clear multiple times that outright racial

12    balancing is patently unconstitutional, but the Supreme Court

13    has also said that what racial balancing means is desiring some

14    specified percentage of a particular group merely because of

15    its race or ethnic origin, meaning pursuing diversity for

16    diversity itself, diversity as an ends rather than diversity as

17    a means, and that's not at all what West Point is doing here.

18         The Army's interest that it's realizing through West

19    Point, as my colleague mentioned, is not in diversity for its

20    own sake.  It's not in this idea of racial balancing.  For

21    example, in the Harvard case, the Court looked at what UNC was

22    doing and found that UNC was looking at the population of the

23    state, looking at its student body, and just trying to make a

24    match there.  What the Army's doing here is trying to realize

25    the benefits that flow from having a diverse officer corps that

1    I mentioned earlier and it's made the considered judgment that

2    those benefits can only be realized if its officer corps

3    reflects the diversity of the nation and reflects the diversity

4    of the enlisted corps.

5           And so the fact that the Army is pursuing those

6    interests through West Point makes clear that the Army isn't

7    pursuing diversity for diversity's sake.  It's pursuing

8    diversity for the benefits that enure to it as a result.  So

9    it's not racial balancing.  And it has -- as my colleague

10   mentioned and as we go through in our papers and as our

11   declarations mentioned, the Army is relying on a lot of data, a

12   lot of research, a lot of experience that demonstrates and that

13   bears out and to which this Court should defer that, in order

14   to realize those benefits, it needs to have that reflecting in

15   its officer corps of the diversity of the country and the

16   diversity of the enlisted corps.

17          So what West Point is doing is just not racial

18   balancing in the way that the Court has described it, seeking a

19   specified percentage of a group merely because of its race.

20          Plaintiff also mentioned that what West Point is

21   doing here is treating race as a negative and that the Supreme

22   Court made clear in the Harvard case that race can't be treated

23   as a negative.  When the Supreme Court in the Harvard case

24   stated that race was being treated as a negative by the

25   respondents there, it had the benefit of a full trial record

1    before it in both cases.  And with respect to the Harvard case,

2    it also had the benefit of a First Circuit appeal.  And when

3    the Supreme Court said in those cases, in those instances at

4    Harvard and UNC, that race was being used as a negative, what

5    it meant was that race was being used in a determinative way

6    and it pointed to lots of evidence in the record that suggested

7    that; statistical evidence, evidence that respondents

8    themselves acknowledged that race was used in a determinative

9    way for "some, if not many," of the students that they admit,

10   pointed to Harvard's unique facet of Harvard's admissions

11   process that comes in at the end called the LOP, where the

12   candidates who are on the bubble are all placed together and

13   only four criteria are looked at -- legacy status, recruited

14   athlete status, financial aid and race -- and then, with those

15   four criterion in mind, they do the LOP.  They get rid of

16   everyone who's not going to get admitted.  And the Supreme

17   Court there pointed to evidence in the record that race is a

18   "determinative tip" for a significant percentage of black and

19   Hispanic applicants.

20          So what the Supreme Court was really saying in the

21   Harvard case when it said race was being treated as a negative

22   is that race was determinative for a not insignificant number

23   of applicants.  Now, contrast that with what the Court has said

24   in Grutter and what I ran through with your Honor just before,

25   that what West Point is doing here is completely different from

1   that.  It considers race holistically, alongside many other

2   factors, and at no point does it operate in this determinative

3   fashion.

4           And your Honor doesn't have the benefit that the

5   Supreme Court had in Harvard of a full record before it to even

6   make that determination, that race is being used as a negative,

7   but based on the record that the government has provided,

8   plaintiff has certainly not borne its burden to demonstrate

9   substantial likelihood that we won't be able to demonstrate

10  that race isn't being used as a negative.

11          Plaintiff also mentioned this idea that the Supreme

12  Court's cases in the realm of the use of race in college

13  admissions demonstrates that an end point is needed, and I

14  think that this is one of the key areas where you can't simply

15  take the Supreme Court's jurisprudence from the

16  higher-education civilian context and apply it sort of whole

17  cloth to the context of a Military service academy that

18  fundamentally is training cadets to be officers.

19          As my colleague alluded to, the more relevant

20  precedent, I think, for this Court to look to in the context of

21  whether an end point is needed is the Johnson case.  This is

22  Johnson v. California.  And in the Johnson case, what was at

23  issue was the safety of prisoners in the context of racial

24  violence within prisons.  The interest here, the national

25  security interest that's at issue here, is much more similar to

1    that interest of security of prisoners in the context of a

2    prison than it is to the interest that universities have in

3    realizing diversity for the benefits that flow.  And those

4    benefits are things like, you know, robust exchange in

5    classrooms and things like that.  What we're talking about here

6    is a fundamentally different interest.  As I mentioned at the

7    outset, the Court needs to take into account in its strict

8    scrutiny analysis and its narrow tailoring analysis how

9    different that interest is and that really factors into this

10   idea of what an end point is.

11        So I will mention that, in the McDonald declaration,

12   at paragraph 96, Colonel McDonald does make clear that West

13   Point does not intend to use race indefinitely, but the

14   requirement in Harvard that dates to Grutter that there needs

15   to be some sort of sunset, some clearly defined end point -- in

16   the Grutter case, it was 25 years -- that simply doesn't apply

17   is in this context.  So let's look at Johnson again.

18        The Supreme Court never suggested in Johnson, where

19   it's making clear that strict scrutiny applies to prisons

20   making race-based decisions, it never suggests that prison

21   officers, for example, need to cease considering race at some

22   defined end point.  You know, 25 years from now, 40 years from

23   now, at that point, prison officers, you need to cease all

24   consideration of race.  And with good reason.  Racial violence

25   in prisons doesn't evaporate in a set number of years in the

same way that the Military's need for a lethal and cohesive

Army is enduring.  A defined end point in this context, similar

to the defined end point that the Court described in a

completely different higher-education civilian context, it just

doesn't track here.

        And plaintiff mentioned that, with respect to

Johnson, it was this 60-day policy and that what West Point is

talking about here is a policy that's operated for decades.

Well, it was a 60-day policy with respect to an individual

prisoner and the amount of time that the individual prisoner

would be subject to segregation, but there was no temporal

limit on how long that 60-day policy could be in effect.

        So plaintiff's attempt to distinguish Johnson just

doesn't hold up, but, though it's the government's argument

that this sort of defined sunset, you know, 25 years, 50 years,

West Point needs an end point doesn't translate to this

completely different interest doesn't mean that what West Point

is saying is that it can do whatever it wants with respect to

consideration of race and it's actually quite the opposite.

        So my colleague on the other side even mentioned

that, in Fisher II, in Grutter, the Court has several times

stated that universities need to, for example, in Fisher II,

use data to assess whether changing demographics have

undermined the need for a race-conscious policy.  And that's

exactly what West Point is doing here.  Every two years,

biannually, West Point looks at data about the demographic

makeup that it gets from DOD of the officer corps and it

considers whether it needs to continue to use its policies that

consider race in the same way or whether it needs to modify

them.

        And the Court doesn't need to look any further than

McDonald's declaration to learn that West Point is in fact not

only reviewing, but is making changes, the change that my

friend on the other side referenced, you know, moving Hispanic

candidates from the diversity office, out of the diversity

office, based on an acknowledgment that an increase in

applications meant that was no longer necessary.

        So when the Court looks at this end-point question

through the lens of the interest, it's clear that what West

Point is doing here is permissible.

        I just want to make one more point before I move to

the balance of equities, which I'll address briefly, and that

is plaintiff referenced several times that there are only very

few seats that we're talking about here and he mentioned -- he

did some math.  And I noticed that your Honor said you don't

trust lawyers with math.  I also don't trust myself with math,

although I would question whether that math is accurate.  And I

think that that is another reason why we would all benefit from

a full record here to really dig into the numbers.  But that

aside, Justice Kennedy made clear in Fisher II that the fact

1  that race only comes into play in a narrow way is a hallmark of

2  narrow tailoring.  It doesn't mean a policy is less

3  constitutional.  It means a policy is more constitutional and

4  is actually, in fact, narrowly tailored.

5        And then the last thing I want to address, unless

6  your Honor has any further questions, is the balance of

7  equities here and the public interest.  So my colleague

8  actually hit on several of the points that I was going to make,

9  so I'll try to make them as succinctly as possible.

10        The public interest here is in national security.

11  And the public interest -- courts have found that where

12  national security is at play, that the public interest in

13  national security can outweigh individual plaintiffs'

14  constitutional interests.  In the Fifth Circuit case Defense

15  Distributed, for example, the Court made that determination,

16  and the defendants would submit that the public interest here

17  clearly weighs in favor of the government given that.

18        And then the balance of the equities I'll only touch

19  on very briefly because I think my colleague pretty much

20  covered everything.  The balance of the equities clearly here

21  weighs in favor of the government.  The need to change an

22  entire policy midstream and the affects that that would have

23  not only on West Point that we've really reiterated here, but

24  also on students who are applying and the fact that they could

25  be subject to a different policy depending on when they

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

1  applied.

2          Your Honor mentioned, well, what if I said that the

3  injunction wasn't going into effect until the future, and I

4  think that an injunction at the preliminary injunction stage

5  that doesn't go into affect until the future only underscores

6  the fact that what's needed here is not emergency relief.  If

7  it were emergency relief, they would need the injunction to go

8  into affect immediately.

9          But when we're talking about an injunction that's

10 going to disrupt an admissions cycle, the balance of the

11 equities clearly weighs in favor of the government.

12         And that was all I had for your Honor today.

13         THE COURT:  All right.  Thank you.

14         I take it you have a comment or two for me,

15 Mr. Strawbridge.

16         MR. STRAWBRIDGE:  Thank you, your Honor.  I'm aware

17 of the lunch hour rapidly dwindling.

18         THE COURT:  Don't worry about the lunch hour.  That's

19 not a problem for me.

20         MR. STRAWBRIDGE:  I will try to keep this brief.

21         A couple points to begin with on the record.

22         My friend on the other side indicated that there was

23 nothing in the record until today that indicated our members

24 were actively taking steps to apply to the Academy.  I'm afraid

25 that's just simply not true.  Member A, in paragraph 6, makes

1    very clear that they are undertaking affirmative steps to

2    apply.  Member C, in paragraph 5, does the same.

3              THE COURT:  I read that.  I understood that.

4              MR. STRAWBRIDGE:  Okay.

5              With respect to your Honor's concerns about the state

6    of the complaint and the nature of the injunction here, on the

7    complaint, I just want to note that, at paragraphs 40 to 42, we

8    anticipated and described the racial balancing interest, the

9    desire to conform the officer corps to a particular percentage

10   of ethnicities.  On paragraphs 45 to 55, we talked about their

11   internal functioning interest, which is the cohesion in the

12   recruitment and retention.  And on paragraphs 55 to 60, we

13   talked about their sort of external legitimacy issues, which is

14   you're better able to relate to foreign armies and the United

15   States Army is more legitimate if you use racial preferences at

16   West Point.  So I actually do think the complaint anticipated

17   the very interests that they've articulated here.

18             Two cases for your Honor that involve race and I

19   think underscore that even if steps need to be taken to comply

20   with them, whether it's mandatory injunction or not, it's still

21   worth doing when we're talking about racial classifications.

22             Vitolo v. Guzman is a roughly recent Sixth Circuit

23   case, 999 F.3d 353.  That involved a government grant program,

24   I believe.  It involved changing -- a number of changes need to

25   be made when an injunction issues to stop a government grant

1    program.  You might have to relaunch the grant program.  You

2    have to change the published criteria.  You have to instruct

3    people.  You have to have a bunch of meetings to make sure that

4    no one's applying the wrong criteria.  But that didn't stop the

5    court in those cases from applying -- from offering injunction.

6         In Akina v. Hawaii there is a racially classified

7    election.  People of only certain ethnicity could vote in an

8    election.  The United States Supreme Court, 577 U.S. 1024,

9    actually imposed an injunction stopping them from counting the

10    ballots in the election because it racially classified

11    citizens.

12         So sometimes significant steps need to be made.  I

13    would submit the steps here are really not as significant.  It

14    sounds like some meetings and some guidelines need to be

15    changed.  Of course, we think an injunction should be

16    prospective.  We're not asking for an order that pulls back an

17    offer that somebody has an admission.  The vast bulk of

18    admissions offers are going to be made in the months of

19    January, February and March.  That comes straight from their

20    own declarations.

21         We do have a case that involves strict scrutiny and

22    national security interests by the Military.  We have cited a

23    case.  That case is Korematsu.  Everyone agrees what happened

24    in that case and everyone agrees that, if anything, that case

25    puts an exclamation point on the need for real strict scrutiny

1    even when Military interests are asserted.  National security

2    interests -- that was a wartime tactic in the middle of the

3    largest conflict civilization had ever had -- still were wrong

4    and overly deferential to the Military.  Everybody agrees.  The

5    Supreme Court has said so.  The Supreme Court said so in

6    Footnote 3 of Harvard.  And if we needed a reminder, Johnson

7    itself says that when government powers at its apex and were

8    applying strict scrutiny, that's when it's most important to

9    double check what they're doing.

10            Of course there is racial tension in our society.  Of

11    course there is racial tension in the Military.  Racial tension

12    will probably, in some factor, unfortunately always be with us.

13    That is not a justification for racial classifications.  I

14    would submit that there is racial tension at UNC and that there

15    is racial tension on the Harvard campus if the newspapers that

16    I read are accurate.

17            THE COURT:  According to the newspapers.

18            MR. STRAWBRIDGE:  That didn't stop the Court from

19    saying that the strong remedy of racial classifications -- the

20    strong government action of racial classifications could

21    somehow be justified.

22            On the racial balancing point, I just want to note

23    that I think this is racial balancing.  I would refer you to

24    Exhibit B to Colonel McDonald's declaration and the chart at

25    Section 5.  If that doesn't meet the classic definition of

racial balancing, I'm not sure what does.  What's being measured in that chart is not a particular outcome or a particular benefit that's being received, it's just simply comparing the admissions process and targeting admissions offers for particular populations based solely on ethnicity.

The Harvard case did involve national security interests with respect to the ROTC interests that were asserted.  And it was addressed in the opinions.  Justice Sotomayor, in her dissenting opinion, noted that all of the national security interests that applied to Military academies had been asserted by the Solicitor General in writing and in argument with respect to the ROTC programs and, unfortunately, from Justice Sotomayor's perspective, that was not sufficient to persuade the Supreme Court to take a different tact with respect to all universities that include those ROTC programs.  So there is at least a clue there.

And I want to just finish with I guess two points, one of which has to do with Footnote 4 in this Harvard carve-out.  We don't quarrel with Footnote 4.  Footnote 4 says the United States service academies may have different interests.  It doesn't say they do have different interests.  It doesn't even say that those interests would survive strict scrutiny.  But it didn't have the record or any information about what the service academies were doing before them and so it didn't opine specifically on that question.  But there is a

1    difference between a carve-out as in like this ruling doesn't

2    apply to there may be other arguments those academies could

3    make.  It falls on the former.

4            And I do think it is somewhat telling that my friends

5    on the other side certainly seem to think that Grutter and

6    Bakke and Fisher inform what they do and how this Court should

7    adjudge the programs.  I mean, Harvard is just an application

8    of all those cases.  It's the same principles in those cases

9    that Harvard is opining on.  So I don't know why the principles

10    would be any less informative as to how we judge whether they

11    can meet strict scrutiny even if, by the letter of the law, the

12    opinion leaves some wiggle room possibly for the Military.

13            The other thing that I want to say is the importance

14    of strict scrutiny I think is emphasized when my friends,

15    frankly, have to struggle a little bit to explain why an end

16    date isn't really an end date and the requirement that racial

17    classifications be temporary and capable of being measured

18    isn't really a requirement that they be temporary and capable

19    of being measured when they have to recharacterize what was

20    said, when they have to say that race was determinative because

21    of the LOP list.  If you read the Harvard decision, the mere

22    fact that race was making any difference in anyone's admission

23    was sufficient to implicate the Fourteenth Amendment in that

24    case, the Fifth Amendment principles in this case.

25            And as your Honor is probably no doubt aware, in

1   Windsor, which had to do with the Defense of Marriage Act, the

2   Supreme Court specifically said it wasn't deciding in that case

3   the future of gay marriage and the constitutionality of gay

4   marriage.  Nevertheless, when Obergefell came along several

5   years later, it relied directly on the principles from Windsor

6   and extended them to gay marriage.  And in the meantime, a

7   number of district courts and a number of lower appellate

8   courts still took the principles of Windsor and had to apply

9   them to the situation even though it was not addressed or, in

10  effect, specifically not addressed in Windsor to rule on that

11  question and that's what we are asking you to do here.

12          I understand that your Honor may not be prepared to

13  rule today, if I'm reading you correctly.

14          THE COURT:  You're reading me pretty well.

15          MR. STRAWBRIDGE:  We do have an approaching deadline.

16  We understand that filing PIs is an imposition on the Court,

17  but we do want to protect the rights of our members and we do

18  want to protect their rights in the upcoming admissions cycle.

19          And so, unless your Honor has any other questions for

20  me --

21          THE COURT:  No.  I have no other questions.

22          Let me say a couple of things to both sides here.

23          First of all, the obvious.  I greatly appreciate the

24  effort and the energy and the desire to educate me in, frankly,

25  a fascinating reality situation that I find myself in.  And so

1    I'm very appreciative, honestly, of the hard work here.

2    Because this is hard work.  And having spent 40 years on that

3    side of the bench before I was so lucky and privileged as to

4    get to this side of the bench, I know what it takes.  And so

5    thank you for spending the time needed.

6        You're right.  I'm not issuing a ruling today because

7    I'm not prepared to issue a ruling today.  It's not a burden.

8    It's a privilege for me to be here to do this work, so I'm not

9    burdened at all by the work.  I have to digest, frankly, some

10   of what I've heard today and I have to consider whether you

11   have met your burden of proof here in such a way as to issue

12   the kind of injunction that you want me to issue.

13       I'm fully aware of your deadlines.  I'm fully aware

14   of what it is you need to accomplish.  And I don't intend to be

15   a cog in the wheel one way or the other, frankly; however, I do

16   need to take the time I need to resolve the issues I need to

17   resolve.  They are plentiful here.  I have a better

18   understanding now, frankly, than I did walking in the room of

19   some of these finer points and I've got to digest it.  So I

20   will get you a decision as quickly as I can.  I know what your

21   deadline of January 31st is.  I got it.  I understand it.  I

22   want to be done with this and my thinking on it as quickly as

23   the issues permit me to resolve them.  So I'm not going to rule

24   today.  I know you got a ruling in the other case from the

25   bench.  That judge is a much more experienced district court

1  judge than I and probably more capable.  So I need to work

2  through these issues and I'm in the middle of doing that,

3  frankly.  So I will be in touch with you.

4         Now, let me just say a word about writing to me and

5  helping me any further.  I don't do well with unsolicited

6  letter writings.  You have something you need to get to my

7  attention, fine, that's okay with me, but just kind of dropping

8  me notes and this and that and here's a supplemental affidavit,

9  Judge, please don't do that.  I have no interest in that kind

10 of stuff.  You've given me enough to digest.  I see where I am.

11 And of course, if something else comes up and you need me, get

12 me.  Okay?  But don't feel, Judge, I just wanted to, you know,

13 summarize some of the points I made to you in oral argument

14 today.  No, thank you.  I have a transcript.  I'll get the

15 transcript.  I'll get what I need out of it.  All right?

16        Again, thank you very much.  I hope you get a chance

17 to enjoy some of the holiday spirit and season.  You certainly

18 deserve a little time off for at least this presentation, so

19 tell whomever you need to that the Judge said give us a couple

20 of days off now, will you?

21        All right.  Take good care, counsel.

                         ----

22

23

24

25